## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| | Chapter 11 |
| In re: | Case No. 24-11432 (CTG) |
| BASIC FUN, INC., *et al.*,[1] | (Jointly Administered) |
| Debtors. | **Re: D.I. 202, 203** |
| | **Hearing Date: Sept. 30, 2024 at 10:00 a.m.  (ET)** |
| | **Obj. Deadline: Sept. 24, 2024 at 4:00 p.m. (ET)** |
| | **(extended for U.S. Trustee)** |

## UNITED STATES TRUSTEE'S OMNIBUS OBJECTION TO
## (I) COMBINED DISCLOSURE STATEMENT AND CHAPTER 11 PLAN OF
## REORGANIZATION OF BASIC FUN, INC. ET AL. AND
## (II) MOTION OF DEBTORS FOR ENTRY OF AN ORDER, *INTER ALIA*,
## APPROVING SOLICITATION AND TABULATION PROCEDURES

Andrew R. Vara, the United States Trustee for Region Three (the "U.S. Trustee"), through his undersigned counsel, hereby objects (this "Objection") to: (i) interim approval of the disclosure statement (the "Disclosure Statement") incorporated in the *Combined Disclosure Statement and Chapter 11 Plan of Reorganization of Basic Fun, Inc.* et al. [D.I. 202] (the "Combined Disclosure Statement and Plan"); and (ii) the *Motion of Debtors for Entry of an Order (I) Approving the Adequacy of the Disclosures in the Combined Plan and Disclosure Statement on an Interim Basis, (II) Scheduling the Confirmation Hearing and Deadline for Filing Objections, (III) Establishing Procedures for the Solicitation and Tabulation of Votes to Accept or Reject the Combined Plan and Disclosure Statement, (IV) Approving the Form of Ballot and Solicitation Package, and (V)*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number or United Kingdom registration number, as applicable, are: Basic Fun, Inc. (9742), Basic Fun Holdco, LLC (0066), TGS Acquisition, LLC (3011), TBDUM, LLC (9615), and K'NEX UK Limited (1398). The location of the Debtors' principal place of business and the Debtors' mailing address is 301 Yamato Road, Suite 4200, Boca Raton, Florida 33431.

*Approving the Notice Provisions* [D.I. 203] (the "<u>Procedures Motion</u>"),[2] and in support of this Objection respectfully states:

## PRELIMINARY STATEMENT

1.       The Court should deny interim approval of the Disclosure Statement for the following separate and independent reasons:

(a)       **The Disclosure Statement fails to provide adequate disclosures regarding the third-party release provisions of the Debtors' proposed plan.** The Disclosure Statement fails to provide adequate information as to who will be deemed to give third-party releases, who will receive such releases, what claims are being released, the value of such claims, and the consideration received in exchange for the releases. The Debtors fall far short of meeting their burden under section 1125 of the Bankruptcy Code.

(b)       **The Debtors' proposed plan is patently unconfirmable and should not be solicited using procedures that facilitate the plan's defects.** The court must deny interim approval of a disclosure statement if the related proposed plan is not confirmable on its face. Here, the proposed plan is unconfirmable for at least three reasons:

(i)       the plan's third-party release provision seeks relief inconsistent with Supreme Court precedent, the Bankruptcy Code, and applicable law because it extracts non-consensual third-party releases from holders of claims or interests that fail to check an opt-out box on a ballot or opt-out form—including those who are not entitled to vote on the Plan and parties who will receive no notice under the Plan;

(ii)       the plan's injunction enforcing the exculpation and third-party release is neither statutorily authorized nor warranted; and

(iii)       the Debtors propose to treat the entire Plan as a settlement and to have the settlement bind parties beyond those that are actively settling their claims with the Debtors.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Disclosure Statement and the Procedures Motion, as applicable.

2.      In addition, the Court should deny the Procedures Motion because the Debtors cannot and will not provide adequate notice of the proposed plan's third-party release provisions to myriad entities who will be "deemed to consent" to such releases without notice.

3.      Accordingly, and for the reasons set forth in more detail herein, the U.S. Trustee respectfully requests that the Court enter an order or orders: (a) denying interim approval of the Disclosure Statement; and (b) denying the Procedures Motion.

## JURISDICTION AND STANDING

4.      This Court has jurisdiction to hear and determine the Procedures Motion, interim approval of the Disclosure Statement and this Objection pursuant to: (i) 28 U.S.C. § 1334; (ii) applicable order(s) of the United States District Court of the District of Delaware issued pursuant to 28 U.S.C. § 157(a); and (iii) 28 U.S.C. § 157(b)(2).

5.      Pursuant to 28 U.S.C. § 586, the U.S. Trustee is charged with overseeing the administration of chapter 11 cases filed in this judicial district. The duty is part of the U.S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the Courts. *See Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").

6.      The U.S. Trustee has standing to be heard on the Procedures Motion and the Disclosure Statement pursuant to 11 U.S.C. § 307. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under 11 U.S.C. § 307, which goes beyond mere pecuniary interest).

**BACKGROUND**

**A.      The Chapter 11 Cases**

7.      On June 28, 2024, the above-captioned debtors and debtors in possession (collectively, the "Debtors") each filed a voluntary petition for relief pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, (the "Bankruptcy Code," or "Code"), in the United States Bankruptcy Court for the District of Delaware (this "Court"), thereby commencing the above-captioned chapter 11 cases (the "Chapter 11 Cases"). The Debtors' business and the alleged circumstances leading to these chapter 11 cases are described in the *Declaration of Frank McMahon, Chief Financial Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Pleadings.* [D.I. 15] (the "First Day Declaration").

8.      The Debtors continue to manage and operate their business as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

9.      No official committee of unsecured creditors in the Chapter 11 Cases has been appointed. [D.I. 73].

10.      As of the date hereof, no trustee or examiner has been requested in the Chapter 11 Cases.

**B.      The Restructuring Support Agreement**

11.      On August 7, 2024, the Debtors filed *Motion of Debtors for Entry of an Order (A) Authorizing the Debtors to Enter Into, and Perform Under, the Restructuring Support Agreement And (B) Granting Related Relief* (D.I. 154) (the "RSA Motion"), seeking approval of the RSA. [D.I. 153]. The RSA is by and among the Debtors, Basic Fun, L.P. (or "Basic Fun TopCo") the non-debtor parent of Debtor Basic Fun Holdco, LLC, Jay Foreman and John McDonald, Falcon Structured Equity Partners, LP ("Falcon"), and Royal Bank of Canada ("RBC"). [D.I. 153-2].

12.     On August 22, 2024, the Court entered an order authorizing the Debtors to enter and perform under the RSA. [D.I. 194] (the "RSA Order"). The RSA Order, among other things, included certain milestones for confirming a chapter 11 plan. *Id.* Those milestones were subsequently extended by stipulation and memorialized in the Court's order of September 4, 2024. [D.I. 200]. The Combined Disclosure Statement and Plan and Procedures Motion were filed in accordance with the stipulated milestones, and through those items the Debtors seek further relief as contemplated by the RSA and the stipulated milestones. [D.I. 203] (seeking conditional approval of the Disclosure Statement at a hearing on September 30, 2024, and proposing a combined hearing on October 21, 2024).

13.     The RSA specified certain terms the parties thereto would include in a plan of reorganization, but all parties' rights with respect to approval of the disclosure statement and plan are preserved.

**C.      Specific Provisions of the Debtors' Proposed Plan**

14.     On September 9, 2024, the Debtors filed the Combined Disclosure Statement and Plan, which incorporates their proposed chapter 11 plan of reorganization (the "Plan"). D.I. 202. The Plan includes the following provisions relevant to this Objection.

**i.      Third-Party Release Provisions**

15.     Article XIV.D of the Plan, Releases by the Releasing Parties, provides as follows (the "Third-Party Release[s]"):

> Effective as of the Effective Date, to the fullest extent permissible under applicable Law, each Releasing Party, in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim, Cause of Action, directly or derivatively, by, through, for, or because of a Releasing Party, is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Debtor and each other Released Party from any and all Claims (other than any Reinstated Claims or Interests), interests, obligations, rights, suits, damages, Causes of Action,

remedies, and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, known or unknown, foreseen or unforeseen, existing or hereafter arising, in Law, equity, contract, tort, or otherwise, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, the Estates or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert (whether individually or collectively), ***based on or relating to*** (including the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable), ***or in any manner arising from, in whole or in part***, the Debtors (including the management, ownership or operation thereof) or their Estates or the Non-Debtor Subsidiaries, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or Non-Debtor Subsidiaries, the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Combined Plan and Disclosure Statement, the business or contractual arrangements between any Debtor or Non-Debtor Subsidiaries and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the decision to file the Chapter 11 Cases, any intercompany transactions, the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Restructuring Support Agreement, the Combined Plan and Disclosure Statement (including the Combined Plan and Disclosure Statement Supplement), the solicitation of votes on the Combined Plan and Disclosure Statement, the pursuit of Confirmation and Consummation of the Combined Plan and Disclosure Statement, the DIP Facilities, the DIP Credit Agreement, the Exit Facility Documents, the administration and implementation of the Combined Plan and Disclosure Statement, including the issuance or distribution of Securities pursuant to the Combined Plan and Disclosure Statement, or the distribution of property under the Combined Plan and Disclosure Statement or any other related agreement, ***or upon any other act, omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date***. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date obligations of any party or Entity under the Combined Plan and Disclosure Statement or the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Combined Plan and Disclosure Statement Supplement) executed to implement the Combined Plan and Disclosure Statement, including the assumption of the indemnification provisions as set forth in the Combined Plan and Disclosure Statement; (b) the rights of any Holder of an Allowed Claim to receive distributions under the Combined Plan and Disclosure Statement; or (c) the liability of any Released Party that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a Final Order to have constituted fraud, gross negligence or willful misconduct.

D.I. 202, Art. XIV.D (emphasis added).

16.     The Plan provides the following definition for the term "Released Parties":

"**Released Parties**" means, collectively, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) Basic Fun TopCo; (d) Foreman; (e) MacDonald; (f) Falcon; (g) Great Rock; (h) RBC; (i) each current and former Affiliate of each Entity in the foregoing clauses (a) through (h); and (j) *each Related Party of each Entity in clauses (a) through (h)*.

*Id.* at Art. III.A, Released Parties (emphasis added).

17.     The Plan provides the following definition for the term "Releasing Parties":

"**Releasing Parties**" means, collectively, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) Basic Fun TopCo; (d) Foreman; (e) MacDonald; (f) Falcon; (g) Great Rock; (h) RBC; (i) each current and former Affiliate of each Entity in the foregoing clauses (a) through (h); and (j) each Related Party of each Entity in clauses (a) through (h); (k) *all Holders of Claims or Interests* that (1) *vote to accept* the Combined Plan and Disclosure Statement *or are deemed to accept* the Combined Plan and Disclosure Statement and (2) *do not affirmatively opt out of the releases* provided by the Combined Plan and Disclosure Statement; (l) *all Holders of Claims who abstain from voting* on the Combined Plan and Disclosure Statement *and who do not affirmatively opt out* of the releases provided by the Combined Plan and Disclosure Statement; (m) *all Holders of Claims who vote to reject the Combined Plan and Disclosure Statement and who do not affirmatively opt out of the releases* provided by the Combined Plan and Disclosure Statement; and (n) *each Related Party of each Entity in clause* (a) through (h) of this definition to the fullest extent permitted by law, provided, however, that with respect to (j) hereof, a Related Party is only a Releasing Party with respect to claims that, under applicable non-bankruptcy law, it was authorized to assert on behalf of the Persons identified in (a) through (h) hereof.

*Id.* at Art. III.A, Releasing Parties (emphasis added).

18.     The Plan provides the following definition for the term "Related Party":

"**Related Party**" means, each of, and in each case in its capacity as such, current and former directors, managers, officers, committee members, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors.

*Id.* at Art. III.A, Related Party.

19.     The Plan includes an injunction in support of the Third-Party Release that provides

(the "Plan Injunction");

> Except as otherwise expressly provided in the Combined Plan and Disclosure Statement, or for obligations issued or required to be paid pursuant to the Combined Plan and Disclosure Statement or the Confirmation Order, ***all Entities that have held, hold, or may hold Claims (other than Reinstated Claims), Interests, or Causes of Action that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from*** taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, ***or the Released Parties***: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Cause of Action; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable Law or otherwise; and (5) ***commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released or settled pursuant to the Combined Plan and Disclosure Statement.***

*Id.* at Art. XIV.E (emphasis added).

20.     The Debtors provide the following detail regarding the Third-Party Release

mechanics as to the unimpaired parties in their Procedures Motion:

> The Debtors also propose to send to such holders of Claims not entitled to vote and deemed to accept the Combined Plan and Disclosure Statement an opt out form (the "Opt Out Form") annexed to the Notice of Non-Voting Status (Deemed to Accept), which provides such holders with the option to opt out of the releases, exculpations, and injunctions contained in Article XIV of the Plan.

D.I. 203, ¶ 58.  The Disclosure Statement identifies only one impaired class, Class 3 – Prepetition Mezzanine Claims. [D.I. 202] at p. 2-3. The Prepetition Mezzanine Claims are derived from various transactions and are asserted by "RBC as collateral agent ("Prepetition Mezzanine Agent", together with the Prepetition Senior Agent, the "Prepetition Agents") for the several lenders from time to time party thereto ("Prepetition Mezzanine Lenders", together with the Prepetition Senior Lenders, the "Prepetition Secured Lenders")." [D.I. 15] at ¶ 39. The Disclosure Statement also demonstrates that Class 3 consists of only $9,188,914.00 in estimated aggregate allowed claims, while the amount of allowed claims for the other classes totals more than $74 million. [D.I. 202] at p. 2-3 & 47.

21.     Thus, the Plan will require the majority of creditors to affirmatively opt out of the Third-Party Release as part of a mailing that does not affect how they would otherwise be treated under the Plan. Many of these prospective Releasing Parties may not even be known to the Debtors or the Released Parties and may not have any notice or knowledge of these Chapter 11 Cases and the Plan that purports to extinguish their rights. Moreover, the Debtors will not be serving the Related Parties with Opt-Out Forms, the Combined Hearing Notice or the Combined Disclosure Statement and Plan. Therefore, it appears that the only way for such Related Parties to avoid being "deemed to have consented" to the Third-Party Release is to discover these Chapter 11 Cases, the Combined Disclosure Statement and Plan and its related deadlines, and then file an objection to the Third-Party Release. *See id.* Finally, the Release is exceedingly broad, extending to not just claims "based on or related to . . . or in any manner arising from, in whole or in part," an extended list of entities and conduct but also "any other act, omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date."

ii.    **Plan Settlement**

22.    The Plan contains the following at Art. VIII.E. entitled General Settlement of

Claims and Interests:

> In consideration for the classification, distributions, releases, and other benefits
> provided under this Combined Plan and Disclosure Statement, on the Effective
> Date, ***the provisions of this Combined Plan and Disclosure Statement shall
> constitute a set of integrated, good-faith compromises and settlements of all
> Claims, Interests, Causes of Action, and controversies resolved pursuant to this
> Combined Plan and Disclosure Statement***. This Combined Plan and Disclosure
> Statement shall be deemed a motion by the Debtors to approve such compromises
> and settlements pursuant to Bankruptcy Rule 9019 and section 1123 of the
> Bankruptcy Code, a***nd the entry of the Confirmation Order shall constitute the
> Bankruptcy Court's approval of such compromises and settlements under
> Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, as well as a
> finding by the Bankruptcy Court that such integrated compromises or settlements
> are in the best interests of the Debtors, the Estates, and Holders of Claims and
> Interests, and are fair, equitable, and within the range of reasonableness***. Subject
> to Article X, distributions made to Holders of Allowed Claims and Allowed
> Interests in any Class are intended to be and shall be final and indefeasible and shall
> not be subject to avoidance, turnover, or recovery by any other Person

*Id.* at Art. VIII.E. (emphasis added).

23.    While the Debtors describe the elements of the "Out-of-Court Restructuring" in the

Disclosure Statement, the Debtors do not specifically identify any settlements in that document.

*See id.* at Art. VIII.F. & Art. VIII.G.4.

**D.    The Procedures Motion**

24.    On September 9, 2024, the Debtors filed their Procedures Motion.

25.    In the Procedures Motion, the Debtors seek approval of their Ballot for Class 3 and

for the Opt Out Form to be served on the other parties that are classified as "unimpaired" under

the Plan. *See* [D.I. 203-2] at ¶¶ 14-18.

**OMNIBUS OBJECTION**

I.    **THE DISCLOSURE STATEMENT LACKS ADEQUATE INFORMATION REGARDING THE THIRD-PARTY RELEASE PROVISIONS.**

26.    The disclosure statement requirement of Bankruptcy Code section 1125 is "crucial to the effective functioning of the federal bankruptcy system" and, consequently, "the importance of full and honest disclosure cannot be overstated." *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) (citing *Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.)*, 848 F.2d 414, 417-18 (3d Cir. 1988)). "Adequate information" under section 1125 is "determined by the facts and circumstances of each case." *See Oneida*, 848 F.2d at 417 (citing H.R. Rep. No. 595, 97th Cong., 2d Sess. 266 (1977)). The "adequate information" requirement is designed to help creditors in their negotiations with debtors over the plan. *See Century Glove, Inc. v. First Am. Bank*, 860 F.2d 94, 100 (3d Cir. 1988). Further, section 1129(a)(2) of the Bankruptcy Code conditions confirmation upon compliance with applicable Code provisions. The adequate disclosure requirement of section 1125 is one of those provisions. *See* 11 U.S.C. § 1129(a)(2); *In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000).

27.    The Bankruptcy Code defines "adequate information" as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, *that would enable such a hypothetical reasonable investor of the relevant class to make an informed judgment about the plan*[.]

*See* 11 U.S.C. § 1125(a)(1) (emphasis added); *see also Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994); *Kunica v. St. Jean Fin., Inc.*, 233 B.R. 46, 54 (S.D.N.Y. 1999).

28.     To be approved, a disclosure statement must include sufficient information to apprise creditors of the risks and financial consequences of the proposed plan. *See In re McLean Indus.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987) ("substantial financial information with respect to the ramifications of any proposed plan will have to be provided to, and digested by, the creditors and other parties in interest in order to arrive at an informed decision concerning the acceptance or rejection of a proposed plan"). Although the adequacy of the disclosure is determined on a case-by-case basis, the disclosure must "contain simple and clear language delineating the consequences of the proposed plan on [creditors'] claims and the possible [Bankruptcy Code] alternatives so that they can intelligently accept or reject the plan." *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988).

29.     Section 1125 of the Bankruptcy Code is geared towards more disclosure rather than less.  *See In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990). The "adequate information" requirement merely establishes a floor, and not a ceiling for disclosure to voting creditors. *In re Adelphia Commc'ns Corp.*, 352 B.R. 592, 596 (Bankr. S.D.N.Y. 2006) (citing *Century Glove*, 860 F.2d at 100).

30.     Once the "adequate disclosure" floor is satisfied, additional information can go into a disclosure statement if the information is accurate, and its inclusion is not misleading. *See id.* The purpose of the disclosure statement is to give creditors enough information so that they can make an informed choice of whether to approve or reject the debtor's plan. *In re Duratech Indus.*, 241 B.R. 291, 298 (Bankr. E.D.N.Y.), *aff'd*, 241 B.R. 283 (E.D.N.Y. 1999). The disclosure statement must inform the average creditor what it is going to get and when, and what contingencies there are that might intervene.  *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

31.     Applied here, the Disclosure Statement does not provide sufficient disclosures appropriate to the circumstances of these Chapter 11 Cases.  The Disclosure Statement does not identify all parties who will be the recipients of Third-Party Releases.  That is because the definition of "Released Parties" *also* includes the broad categories of Related Parties, such as all "agents," "advisors," "consultants" and "other professionals and advisors."

32.     The Disclosure Statement is also unclear as to whether holders of administrative claims, which are identified as "unclassified"; are included among the Releasing Parties who are being forced to release non-debtors. The definition of "Releasing Part[y]" includes "all Holders of Claims and Interests" that either (1) vote to accept or are deemed to accept; (2) abstain from voting; or (3) vote to reject, and "do not affirmatively opt out of the releases." *See* Art. III.A. Releasing Parties. The Procedures Motion is silent as to whether unclassified claims will receive the Non-Voting Combined Notice. [D.I. 203-2] at ¶ 12.

33.     In addition, the Debtors fail to disclose that they are giving two sets of releases benefitting the same Released Parties. The Debtors are both a Released Party and a Releasing Party. Therefore, the Plan provides that the Debtors will release the Released Parties pursuant to both Article XIV.C (Releases by the Debtors) and Article XIV.D (Releases by the Releasing Parties). The Debtors also fail to explain which of the two releases will control if there is a conflict.

34.     Moreover, the Disclosure Statement does not adequately disclose: (a) why the Debtors will be releasing the Released Parties (whether under the Debtor release or the Third-Party Release); (b) the nature and value of the claims the Debtors are releasing; or (c) what (if anything) the Debtors are receiving as consideration for such releases.

35.     In summary, the Disclosure Statement fails to provide adequate information as to who will receive third-party releases and debtor releases, what claims are being released, the value

of such claims, and the consideration received in exchange for the releases. Because the Disclosure Statement fails to provide adequate information as to numerous, significant issues, the Court should not approve the Disclosure Statement on an interim basis.

## II.   THE COURT MUST DENY APPROVAL OF THE DISCLOSURE STATEMENT BECAUSE THE PLAN IS PATENTLY UNCONFIRMABLE.

36.     If the proposed plan is patently unconfirmable on its face, the bankruptcy court must deny the application to approve the disclosure statement. *See generally In re Quigley Co.,* 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007) *(citing In re Beyond.com Corp.*, 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003) (collecting cases); *In re 266 Washington Assocs.*, 141 B.R. 275, 288 (Bankr. E.D.N.Y.) *aff'd*, 147 B.R. 827 (E.D.N.Y. 1992); *In re Filex, Inc.*, 116 B.R. 37, 41 (Bankr. S.D.N.Y. 1990)).

37.     Moreover, the Court should not approve solicitation procedures that facilitate the Plan's defects, and it would be a waste of estate resources for the Debtors to solicit votes on a Plan that is patently unconfirmable.

38.     Here, the Court must deny approval of the Disclosure Statement because the Plan is patently unconfirmable on at least three separate and independent bases. *First*, the Plan is unconfirmable because it proposes non-consensual Third-Party Releases and an injunction against bringing the released claims that are not authorized under the Bankruptcy Code. *Second*, the Plan's injunction enforcing the exculpation and third-party release is neither statutorily authorized nor warranted. *Third*, the Plan seeks to treat itself as a comprehensive settlement of all claims and interests without such parties having actively settled their claims.

A.    **The Plan is Not Confirmable Because It Proposes Non-Consensual Third-Party Releases That are Not Authorized Under the Bankruptcy Code.**

39.    In *Harrington v. Purdue Pharma L.P.*, 603 U.S. __, 144 S. Ct. 2071, 2082-88 (2024), the Supreme Court held that non-consensual third-party releases are not authorized under the Bankruptcy Code.

40.    Contract principles govern whether a release is consensual. *In re SunEdison, Inc.*, 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017). That is because a third-party release is essentially a settlement between a non-debtor claimant and another non-debtor.

41.    Whether parties have reached an agreement—including an agreement not to sue—is governed by state law. The only exception is if there is federal law that preempts applicable state contract law. *See, e.g., Shady Gove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 416 (2010) (plurality) ("For where neither the Constitution, a treaty, nor a statute provides the rule of decision or authorizes a federal court to supply one, 'state law must govern because there can be no other law.'") (quoting *Hanna v. Plumer*, 380 U.S. 460, 471-72 (1965)).

42.    No federal law applies to the question of whether the non-debtor Releasing Parties have agreed to release the non-debtor Released Parties. The Bankruptcy Code does not apply to agreements between non-debtors. And no Code provision authorizes courts, as part of an order confirming a chapter 11 plan, to "deem" a non-debtor to have consented to an agreement to release claims against other non-debtors where consent would not exist under state law. Nor does 11 U.S.C. § 105(a) confer any power to override state law. Rather, section 105(a) "serves only to carry out authorities expressly conferred elsewhere in the code." *Purdue Pharma, L.P.*, 144 S. Ct. at 2082 n.2 (quotation marks omitted). Bankruptcy courts cannot "create substantive rights that are otherwise unavailable under applicable law," nor do they possess a "roving commission to do

equity." *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003) (quotation omitted). Thus, the state-law definition of consent is not diluted or transformed by the Code.

43.    Indeed, even as to a debtor, it is well settled that whether parties have entered a valid settlement agreement is governed by state law. *See Houston v. Holder (In re Omni Video, Inc.)*, 60 F.3d 230, 232 (5th Cir. 1995) ("Federal bankruptcy law fails to address the validity of settlements and this gap should be filled by state law."); *De La Fuente v. Wells Fargo Bank, N.A. (In re De La Fuente)*, 409 B.R. 842, 845 (Bankr. S.D. Tex. 2009) ("Where the United States is not a party, it is well established that settlement agreements in pending bankruptcy cases are considered contract matters governed by state law."); *see also Travelers Cas. and Sur. Co. of America v. Pacific Gas and Elec. Co.*, 549 U.S. 443, 450-451 (2007) ("[T]he basic federal rule in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law.") (quotation marks omitted); *Butner v. United States*, 440 U.S. 48 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law.").

44.    Here, the Debtors do not meet the state-law burden of establishing that the Releasing Parties will expressly consent to release their property rights nor to having that release memorialized in the Plan.

45.    Just like it is legal error to define consent in a manner inconsistent with state law, it is error to presume it exists. Consent arises when two sets of parties affirmatively assent to something. *See* 1 VOSS ON DELAWARE CONTRACT LAW § 2.05 (citing *Loveman v. The NuSmile, Inc.*, C.A. No. 08C-08-223 MJB, memo. op. at *7 (Del. Super. Ct. Mar. 31, 2009) (Brady, J.)).

46.    The "general rule of contracts is that silence cannot manifest consent." *Patterson v. Mahwah Bergen Ret. Grp., Inc.,* 636 B.R. 641, 686 (E.D. Va. 2022). As explained in the

Restatement (Second) of Contracts:  "Acceptance by silence is exceptional.  Ordinarily an offeror does not have power to cause the silence of the offeree to operate as acceptance." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).

47.     "[T]he exceptional cases where silence is acceptance fall into two main classes: those where the offeree silently takes offered benefits, and those where one party relies on the other party's manifestation of *intention* that silence may operate as acceptance.  Even in those cases the contract may be unenforceable under the Statute of Frauds."  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981). Thus, "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him any duty to speak."  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981); *see Patterson*, 636 B.R. at 686 (discussing how contract law does not support consent by failure to opt out). Further, "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting." RESTATEMENT (SECOND) OF CONTRACTS § 69, cmt. c (1981); *see Reichert v. Rapid Invs., Inc.*, 56 F.4th 1220, 1227-28 (9th Cir. 2022) ("[E]ven though the offer states that silence will be taken as consent, silence on the part of the offeree cannot turn the offer into an agreement, as the offerer cannot prescribe conditions so as to turn silence into acceptance." (quotation marks omitted).

48.     Delaware common law, as a point of reference, is in accord. *See, e.g., Hornberger Mgmt. Co. v. Haws & Tingle Gen. Contractors, Inc.*, 768 A.2d 983, 991 (Del. Super. Ct. 2000) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 69 (1981)). Silence and inaction will generally not be deemed assent to an offer because Delaware follows the "mirror image" rule, requiring the acceptance to be identical to the offer. *See Urban Green Techs., LLC v. Sustainable Strategies 2050 LLC*, No. N136-12-115, 2017 WL 527565, at *3 (Del. Super. Ct. Feb. 8, 2017).

49.    The Debtors propose that the Third-Party Releases in the Plan, which benefit numerous non-debtors that are Released Parties, bind: (a) all parties who vote to accept the Plan, unless they check an opt-out box on the returned ballot; (b) those who vote to reject the Plan, unless they check an opt-out box on the returned ballot; (c) all creditors in voting classes who abstain from voting and do not check an opt-out box on a returned ballot; (d) claimants or holders of interests in non-voting classes who are deemed to accept the plan, unless they complete and return an opt-out election form; and (e) and unclassified claims.[3] Because the Plan forces third-party releases on these parties without their affirmative consent, the releases are non-consensual and cannot be approved under *Purdue*.

50.    *First*, merely voting for a plan without checking an opt-out box does not constitute the affirmative consent necessary to reflect acceptance of an offer to enter a contract to release claims against non-debtors. *See* RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981). Voting on a chapter 11 plan is governed by the Bankruptcy Code, and a favorable vote reflects only approval of the plan's treatment of the voters' claims *against the debtor*. Those voting on the chapter 11 plan have not "manifest[ed] [an] intention that silence may operate as acceptance" of an offer to release claims against non-debtors. *Id*. Nor are they "silently tak[ing] offered benefits" from the released non-debtors, *id.*, such that consent may be inferred. The only benefits received are through distributions from the debtor's chapter 11 plan—there are no benefits provided from

---

[3] The Plan defines "Releasing Part[y]" to include "all Holders of Claims or Equity Interests that (1) vote to accept the Combined Plan and Disclosure Statement or are deemed to accept the Combined Plan and Disclosure Statement and (2) do not affirmatively opt out of the releases provided by the Combined Plan and Disclosure Statement; (l) all Holders of Claims who abstain from voting on the Combined Plan and Disclosure Statement and who do not affirmatively opt out of the releases provided by the Combined Plan and Disclosure Statement; (m) all Holders of Claims who vote to reject the Combined Plan and Disclosure Statement and who do not affirmatively opt out of the releases provided by the Combined Plan and Disclosure Statement;" [D.I. 202] Art. III.A. Releasing Parties. The Procedures Motion is silent as to whether creditors holding unclassified claims will be receiving Non-Voting Opt-Out Forms.

the released non-debtor to the releasing claimant. Further, because the plan's distributions are not contingent on agreeing to the non-debtor release, one cannot infer consent from the acceptance of those distributions.

51.     The *Patterson* court, in applying black-letter contract principles to opt-out releases in a chapter 11 plan, found that the failure to opt out of a third-party release does not constitute the requisite affirmative consent to bind the releasing party under contract law. *Patterson*, 636 B.R. at 686. "Whether the Court labels these 'nonconsensual' or based on 'implied consent' matters not, because in either case there is a lack of sufficient affirmation of consent." *Id*. at 688.

52.     *Second*, the plan imposes non-debtor releases on those who vote to reject the Plan, unless they check an opt-out box on the returned ballot.  But it is even more obvious that those who vote to reject a plan are not consenting merely through silence by failing to opt out of the non-debtor release. *See In re Chassix Holdings, Inc.*, 533 B.R. 64, 79 (Bankr. S.D.N.Y. 2015).

53.     Whether or not a creditor votes to accept or reject the plan, such creditors may not have understood the solicitation package, and may not have possessed the time or financial resources to engage counsel, never imagining that their rights against non-debtors could be extinguished through the bankruptcy of these Debtors.

54.     As this Court noted in *Emerge*, "[a] party's receipt of a notice imposing an artificial opt-out requirement, the recipient's possible understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not qualify" as consent through a party's silence or inaction. *In re Emerge Energy Servs., LP*, No. 19-11563, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (Owens, J.).

55.     The Debtors may try to distinguish these cases from *Emerge* based on the argument that *Emerge* dealt with creditors and shareholders who were receiving no distribution under the

plan. However, the Court's decision in *Emerge* was not expressly limited to such a factual situation. To the contrary, the Court's recognition that failure to return a ballot or opt-out election form can be due to "carelessness, inattentiveness, or mistake," rather than constituting the manifestation of an intent to agree to a third-party release, would be applicable regardless of whether a creditor or interest holder was to receive a distribution under a plan.

56.     *Third*, the Plan provides that creditors in voting classes who do not vote and do not opt out of the third-party releases shall also be stripped of their direct claims against non-debtors. For the reasons discussed above, no consent can be inferred from this silence. Further, such creditors: (a) may never have received the solicitation package, or received it late, due to mail errors or delays; or (b) received the solicitation package timely, completed same and returned it to the balloting agent but, through no fault of their own, the ballot never reached the balloting agent, or the ballot was received late.

57.     "Charging all inactive creditors with full knowledge of the scope and implications of the proposed third-party releases, and implying a 'consent' to the third-party releases based on the creditors' inaction, is simply not realistic or fair and would stretch the meaning of 'consent' beyond the breaking point." *Chassix*, 533 B.R. at 88. Moreover, the court in *SunEdison* observed that solicited parties may have failed to vote for reasons other than an intention to assent to the releases. *See SunEdison*, 576 B.R. at 461.[4]

58.     *Fourth*, the non-consensual Third-Party Releases will also be imposed on unimpaired claimants or holders of interests who are not permitted to vote on the plan, but who

---

[4] Not all decisions from this District have required affirmative consent for third party releases.  In *In re Indianapolis Downs, LLC*, 486 B.R. 286 (Bankr. D. Del. 2013), this Court reached a different conclusion than that of *Emerge* and the other cases cited above concerning the need for affirmative consent to third party releases.

receive a notice informing them that, unless they check an opt-out box on the Non-Voting Opt-Out Form to opt out of giving third-party releases, they will be deemed to have consented to same. For the same reasons discussed in *Chassix* and *Emerge*, and under black-letter contract law discussed above, such "deemed consent" from silence does not constitute the affirmative consent required to support a consensual release.

59.     *Fifth*, the non-consensual Third-Party Releases will apparently be imposed on holders of administrative claims and priority claims.[5] [D.I. 202] Art. III.A. Releasing Parties.  The claims to be released include direct claims that unimpaired parties hold against numerous non-debtors.  The scope of the release of their direct claims against non-debtors is far broader than the claims upon which they will be paid. The release covers:

> any and all Claims (other than any Reinstated Claims or Interests), interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, known or unknown, foreseen or unforeseen, existing or hereafter arising, in Law, equity, contract, tort, or otherwise, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, the Estates or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert (whether individually or collectively), based on or relating to (including the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable), or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof) or their Estates or the Non-Debtor Subsidiaries, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or Non-Debtor Subsidiaries, the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Combined Plan and Disclosure Statement, the business or contractual arrangements between any Debtor or Non-Debtor Subsidiaries and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the decision to file the Chapter 11 Cases, any intercompany transactions, the Chapter 11 Cases, the negotiation,

---

[5] The Debtors' leave administrative claims unclassified, while priority claims are classified in Class 1. [D.I. 202] at p. 2-3.

formulation, preparation, or consummation of the Restructuring Support Agreement, the Combined Plan and Disclosure Statement (including the Combined Plan and Disclosure Statement Supplement), the solicitation of votes on the Combined Plan and Disclosure Statement, the pursuit of Confirmation and Consummation of the Combined Plan and Disclosure Statement, the DIP Facilities, the DIP Credit Agreement, the Exit Facility Documents, the administration and implementation of the Combined Plan and Disclosure Statement, including the issuance or distribution of Securities pursuant to the Combined Plan and Disclosure Statement, or the distribution of property under the Combined Plan and Disclosure Statement or any other related agreement, or upon any other act, omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

[D.I. 202] Art. XIV.D (emphasis removed).

60.     So, for example, a taxing authority whose priority claim against the Debtors is proposed to be paid in full under the Plan (as required by the Code) could later be subject to an argument by a Released Party that it has no obligation to pay taxes in connection with revenue received from transactions with the Debtors because, under the Plan, the taxing authority has been deemed to release the Released Party for all claims related in any manner to the Debtors.

61.     For all of these classes of creditors, conspicuous warnings in the Disclosure Statement, on the plan ballots, or on an opt-out form that silence or inaction will constitute consent to a release are not sufficient to convert their silence into consent to the non-debtor release. *See SunEdison*, 576 B.R. at 458-61.  In *SunEdison*, the debtors argued that the warning in the disclosure statement and on the ballots regarding the potential effect of silence gave rise to a duty to speak, and the non-voting creditors' failure to object to the plan or to reject the plan should be deemed their consent to the release. *See id.* at 460. The court rejected this argument because the debtors failed to show that the nonvoting creditors' silence was misleading or that the nonvoting creditors' silence signified their intention to consent to the release (finding that silence could easily be attributable to other causes). *See id.* The debtors did not contend that an ongoing course of conduct between themselves and the nonvoting creditors gave rise to a duty to speak. *See id.*

62.     The Ninth Circuit's decision in *Norcia*, cited with approval by the Third Circuit in *Noble v. Samsung Elec. Am., Inc.*, 682 F. App'x 113, 117-118 (3d Cir. 2017), provides a good example of why there is no consent based on the mere provision of an opt-out form with chapter 11 plan solicitations. In *Norcia*, a consumer bought a Samsung phone from a Verizon Wireless store and signed the Verizon Wireless Customer Agreement. *Norcia*, 845 F.3d at 1282. The customer did not take the phone's box or its contents with him when he left the store. *Id*. Among the box's contents was a Samsung "Product Safety & Warranty Information" brochure that contained an arbitration provision, which "stated that purchasers could opt out of the arbitration agreement by providing notice to Samsung within 30 calendar days of purchase, either through email or by calling a toll-free telephone number." *Id*. It also stated that opting out would not affect the warranty coverage. *Id*. The customer did not take any steps to opt out. *Id*. When the customer later sued Samsung, Samsung argued that the arbitration provision applied. *Id*. at 1282-83.

63.     As an initial matter, the *Norcia* court rejected the argument that the customer agreed to the arbitration provisions by signing his contract with Verizon: "The Customer Agreement is an agreement between Verizon Wireless and its customer. Samsung is not a signatory." 845 F.3d at 1290. That is even more true in the context of a chapter 11 plan. Not only are the non-debtor Released Parties not signatories to it, a chapter 11 plan is a creature of the Bankruptcy Code specifically for determining how the debtor will pay its creditors, not for resolving claims between non-debtors.

64.     The Ninth Circuit further held that the customer's failure to opt out did not constitute consent to arbitrate. The court applied the "general rule," applicable under California law, that "silence or inaction does not constitute acceptance of an offer." 845 F.3d at 1284 (quotation marks omitted); *accord Hornberger, Inc.*, 768 A.2d at 991 (citing limited circumstances

23

under RESTATEMENT (SECOND) OF CONTRACTS § 69 where silence and inaction constitute acceptance). The customer did not agree to arbitrate because he did not "sign the brochure or otherwise act in a manner that would show his intent to use his silence, or failure to opt out, as a means of accepting the arbitration agreement." *Norcia*, 845 F.3d at 1285 (quotation marks omitted). "Samsung's offer to arbitrate all disputes with [the customer] cannot be turned into an agreement because the person to whom it is made or sent makes no reply, even though the offer states that silence will be taken as consent, unless an exception to this general rule applies." *Id*. at 1286 (quotation marks and citation omitted).

65.     The Ninth Circuit explained that exceptions to this rule exist when the offeree has a duty to respond or when the offeree retains the offered benefits but held neither exception applied. *Norcia*, 845 F.3d at 1284-85. There was no state law imposing a duty on the customer to act in response to the offer, the parties did not have a prior course of dealing that might impose such a duty, and the customer did not retain any benefits by failing to act given that the warranty applied whether or not he opted out of the arbitration provision. 845 F.3d at 1286.

66.     Here, too, the debtor's creditors have not signed an agreement to release the non-debtor releasees nor acted in any other manner to suggest that their silence manifests acceptance of an offer to release them.

67.     First, as in *Norcia*, the debtor's creditors have no duty to respond to the offer to grant a non-debtor release such that their silence can be understood as consent. They have no state law duty to respond, nor have they any prior course of dealing with the released non-debtors that would impose such a duty. There is no such duty under federal law, either. Creditors have no affirmative obligation to act on a plan (either to vote or to opt out). *See, e.g.,* 11 U.S.C. § 1126(a) (providing that creditors "may" vote on a plan); *In re SunEdison, Inc.*, 576 B.R. at 460–61 (holding

creditors have no duty to speak regarding a plan that would allow a court to infer consent from silence). Correspondingly, creditors have no obligation to read a plan. And creditors who have no intention of voting in the first place are unlikely to do so.

68.     Further, because impaired creditors have a federal right under the Bankruptcy Code to vote on a chapter 11 plan, 11 U.S.C. § 1126(a), merely exercising that right does not manifest consent to release claims against non-debtors. While impaired creditors have a right to vote on a chapter 11 plan, because they have no duty to do so, no inference of consent can arise from non-voters' silence. Likewise, an unimpaired creditor, who has no right to vote on a plan, does not manifest consent to a non-debtor release by failing to return an opt out form.

69.     Second, as in *Norcia*, creditors are not retaining any benefits by failing to act that manifests consent to the non-debtor release because they are entitled to whatever distributions the Plan allocates them regardless of whether they opt out of the non-debtor releases. *See Norcia*, 845 F.3d at 1286 (holding customer did not retain any benefits when warranty applied regardless of failure to opt out). Further, acceptance of a "benefit" that the offeror had no right to refuse the offeree does not manifest acceptance of the offer. *See Railroad Mgmt. Co., L.L.C. v. CFS La. Midstream Co.*, 428 F.3d 214, 223 (5th Cir. 2005) ("In the absence of any evidence that Strong had the right to exclude CFS from the property in question or that CFS accepted any service or thing of value from Strong, no reasonable jury could conclude that CFS's failure to remove its pipeline upon Strong's demand constituted consent to a contract.").

70.     There is an additional reason why the failure to return an opt-out form, or merely voting for a plan, cannot validly release the non-debtors: recipients of plan solicitations have no reason to expect that an offer to contract with non-debtors will be included in the plan solicitation. As the Third Circuit has explained, there can be no presumption that someone has agreed to

contractual provisions of which they are "on notice," unless "there is a reasonable basis to conclude that consumers will have understood the document contained a bilateral agreement." *See Noble v. Samsung Elec. Am., Inc.*, 682 F. App'x 113, 117-118 (3d Cir. 2017); *see also Norcia*, 845 F.3d at 1289 ("[N]o contract is formed when the writing does not appear to be a contract and the terms are not called to the attention of the recipient.") (quotation marks omitted).

71.     In sum, there will be no affirmative consent to Third-Party Releases given by the numerous persons and entities on whom such releases will be imposed.  Such releases are therefore non-consensual.

**B.      The Injunction Enforcing the Exculpation and Third-Party Release Is Neither Statutorily Authorized Nor Warranted.**

72.     This Court also may not approve the injunction (Plan Art. XIV(E)) enforcing the Third-Party Release by non-debtor parties in interest against other non-debtors. Even if releases between non-debtors are consensual, there is no Code provision that authorizes chapter 11 plans or confirmation orders to include injunctions to enforce them. Further, such an injunction is not warranted by the traditional factors that support injunctive relief because, if the release is truly consensual, there is no threatened litigation and no need for an injunction to prevent "immediate and irreparable harm" to either the estates or the released parties. A consensual release may serve as an affirmative defense in any ensuing, post-effective date litigation between the third-party releasees and releasors, but there is no reason for this Court to be involved with the post-effective date enforcement of those releases. Moreover, this injunction essentially precludes any party deemed to consent to this release from raising any issue with respect to the effectiveness or enforceability of the release (such as mistake or lack of capacity) under applicable non-bankruptcy law.

73.     Similarly, to the extent that applicable law authorizes exculpation beyond 11 U.S.C. § 1125(e), there is no statutory authority in the Code that justifies an injunction to enforce an exculpation, and the Debtors have shown no need for an injunction to prevent "immediate and irreparable harm" to either the estates or the released parties.

**C.      The Plan is Impermissibly Deemed to Be a Settlement.**

74.     Section 1123(b)(3)(A) of the Bankruptcy Code allows a plan proponent to "provide for [] the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C. § 1123(b)(3)(A) (emphasis added).

75.     Section 1123(b)(3) only allows a debtor to settle claims it has against others; it does not allow a debtor to settle claims that creditors and interest holders may have against it, which is what Plan § 6.9 seeks to do. *See Varela v. Dynamic Brokers, Inc. (In re Dynamic Brokers, Inc.)*, 293 B.R. 489, 496 (B.A.P. 9th Cir. 2003) ("The only reference in [section 1123(b)] to adjustments of claims is the authorization for a plan to provide for 'the settlement or adjustment of any claim or interest belonging to the debtor or to the estate.' . . .  It is significant that there is no parallel authorization regarding claims against the estate.") (quoting section 1123(b)(3)(A)) (internal citation omitted).

76.     The resolution of claims against the Debtors is governed by sections 1129 and 1141.

77.     A plan may incorporate one or more negotiated settlements, but a plan is not itself a settlement.  Sending a plan to impaired creditors for a vote is not equivalent to parties negotiating a settlement among themselves. A "settlement" is "an agreement ending a dispute or lawsuit." BLACK'S LAW DICTIONARY (10th ed. 2014). An "agreement" is "a mutual understanding between two or more persons about their relative rights and duties regarding past or future performances; a manifestation of mutual assent by two or more persons." *Id.*

78.     Approval of settlements is governed by Federal Rule of Bankruptcy Procedure 9019, which provides that, "[o]n motion by the trustee [or chapter 11 debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement." But, because a "settlement" requires an agreement between the settling parties, Rule 9019 governs only parties that have entered into an express settlement agreement; it is not a blanket provision allowing general "settlements" to be unilaterally imposed upon broad swaths of claimants that have no formal agreement with any party to "settle" their claims.

79.     The decision whether to approve a settlement under Rule 9019 is left to the sound discretion of the bankruptcy court, which "must determine whether 'the compromise is fair, reasonable, and in the best interest of the estate.'" *Washington Mut.*, 442 B.R. at 338 (quoting *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997)). In contrast, chapter 11 plans are subject to the requirements of Bankruptcy Code sections 1123 and 1129. What may be permissible under a negotiated settlement agreement that is considered "fair, reasonable, and in the best interest of the estate" outside of the plan context is different from what may be permissible under a plan.

80.     In Plan Art. VIII.E., the Debtors attempt to impermissibly designate the entire Plan as a Rule 9019 "settlement." Further, it appears Art. VIII.E.is not limited to settling claims belonging to the Debtors or the estate. Thus, Art. VIII.E. exceeds the scope of what can be settled under section 1123(b)(3)(A). Unless Art. VIII.E. is narrowed so that (i) it pertains only to claims the Debtors are settling against others and (ii) the Plan itself is not a settlement, the Plan does not comply with section 1123(b)(3)(A) and does not satisfy section 1129(a)(1). Consequently, the settlement and compromise language contained in Art. VIII.E. should be removed from the Plan

### III.    The Solicitation Procedures Will Not Provide Notice to Numerous Entities That Their Claims Against Non-Debtors Will Be Released Under the Plan.

81.    The Procedures Motion fails to provide that the Debtors will serve any part of the Solicitation Package, the Combined Hearing Notices, or any other document on the numerous Related Parties that would notify them that the Plan will strip them of their right to pursue their direct claims against a large number of non-debtor entities for no consideration. Moreover, it likely would be impossible for the Debtors to arrange to provide such notice to the tens (and potentially hundreds) of thousands of Related Parties, because the identity of many of such Related Parties— such as all "agents" of all Releasing Parties—are not, and cannot be, known by the Debtors.

82.    In *Folger Adam Security, Inc. v. DeMatteis/MacGregor*, 209 F.3d 252 (3d Cir. 2000), the Third Circuit ruled that "[d]ue process requires 'notice reasonably calculated, under all the circumstances, to apprize interested parties of the pendency of the action and afford them an opportunity to present their objections.'" 209 F.3d at 265 (citations omitted).

83.    The Debtors' proposed solicitation procedures will not provide notice to the Related Parties that is "reasonably calculated, under all the circumstances, to apprize [them] of the pendency of the action and afford them an opportunity to present their objections" to having Third-Party Releases extracted from them. *Id.*  In fact, most (if not all) of the Related Parties will receive no notice at all, because they are not themselves creditors or interest holders of the Debtors. Therefore, the Court must deny the Procedures Motion. *See Purdue Pharma*, 144 S. Ct. at 2086 ("nothing in the bankruptcy code contemplates (much less authorizes)" a non-consensual release of direct claims held by creditors against non-debtor third parties); *In re Boy Scouts of America and Delaware BSA, LLC*, 642 B.R. 504, 678 (Bankr. D. Del. 2022) (stating that the Court was unable to find that the twenty-two categories of "Related Releasing Parties" received notice, and because Court had concluded that "a request for opt-out consent must be grounded in adequate

notice, it was inconsistent to permit releases from persons who do not receive notice by virtue of creditor (or shareholder) status."); *see also Patterson*, 636 B.R. at 660 (noting that "[t]he Bankruptcy Court did not order that any notice or opt-out forms be sent to all of the Releasing Parties, including the current and former employees, consultants, accountants or attorneys of Debtors, their affiliates, lenders, creditors or interest holders.").

## <u>RESERVATION OF RIGHTS</u>

84.     The U.S. Trustee leaves the Debtors to their burden of proof and reserves any and all rights, remedies and obligations to, among other things, complement, supplement, augment, alter or modify this Objection and reservation of rights, assert any objection, file any appropriate motion, or conduct any and all discovery as may be deemed necessary or as may be required and to assert such other grounds as may become apparent upon further factual discovery.

**WHEREFORE**, the U.S. Trustee respectfully requests that the Court enter an order or orders: (i) denying interim approval of the Disclosure Statement; (ii) denying the Procedures Motion; and (iii) granting such other and further relief as the Court deems just and equitable.

Dated: September 24, 2024                              Respectfully submitted,

**ANDREW R. VARA**
**UNITED STATES TRUSTEE**
**REGIONS 3 AND 9**

By:  */s/ Timothy J. Fox*
Timothy J. Fox, Jr. (DE Bar No. 6737)
Trial Attorney
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 N. King Street, Room 2207, Lockbox 35
Wilmington, DE 19801
Telephone: (302) 573-6491
Email:  Timothy.Fox@usdoj.gov

## CERTIFICATE OF SERVICE

I, Timothy J. Fox, Jr., hereby certify that on September 24, 2024, I caused to be served a copy of this Objection by electronic service on the registered parties via the Court's CM/ECF system and courtesy copies were sent via email to parties in interest.

Dated: September 24, 2024

*/s/ Timothy J. Fox*
Timothy J. Fox, Jr.