## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BASIC FUN, INC., *et al.*,[1] | Case No. 24-11432 (CTG) |
| Debtors. | (Jointly Administered) |

---

### FIRST AMENDED COMBINED DISCLOSURE STATEMENT AND CHAPTER 11 PLAN OF REORGANIZATION OF BASIC FUN, INC., ET AL.

Dated: September 27, 2024
  Wilmington, Delaware

**POLSINELLI PC**

Shanti M. Katona (Del. Bar No. 5352)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921
skatona@polsinelli.com

-and-

Mark B. Joachim (admitted Pro Hac Vice)
1401 Eye Street, N.W., Suite 800
Washington, D.C. 20005
Telephone: (202) 783-3300
Facsimile: (202) 783-3535
mjoachim@polsinelli.com

*Counsel to the Debtors and Debtors in Possession*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number or United Kingdom registration number, as applicable, are: Basic Fun, Inc. (9742), Basic Fun Holdco, LLC (0066), TGS Acquisition, LLC (3011), TBDUM, LLC (9615), and K'NEX UK Limited (1398). The location of the Debtors' principal place of business and the Debtors' mailing address is 301 Yamato Road, Suite 4200, Boca Raton, Florida 33431.

## NOTICE

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THE COMBINED PLAN AND DISCLOSURE STATEMENT EXCEPT AS EXPRESSLY INDICATED HEREIN. THE COMBINED PLAN AND DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION, AND BELIEF. NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED, OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED PLAN AND DISCLOSURE STATEMENT ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS. CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OF THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THE COMBINED PLAN AND DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE COMBINED PLAN AND DISCLOSURE STATEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY.

**TABLE OF CONTENTS**

I.      Introduction ................................................................................................................... 1

II.     Important Dates ............................................................................................................. 4

III.    Definitions and Construction of Terms ........................................................................ 4

        A.      Definitions ......................................................................................................... 4

        B.      Interpretation; Application of Definitions and Rules of Construction ............. 16

IV.     Disclosures ................................................................................................................... 17

        A.      General Background ......................................................................................... 17

                1.      Overview of the Debtors' Business ...................................................... 17

                2.      Corporate History and Business ........................................................... 17

                3.      Prepetition Corporate and Capital Structure ........................................ 18

                4.      Events Precipitating the Chapter 11 Filing .......................................... 24

        B.      The Chapter 11 Cases ...................................................................................... 28

                1.      First Day Orders ................................................................................... 28

                2.      Retention of Professionals .................................................................... 28

                3.      No Committee has been Appointed in the Chapter 11 Cases ............... 29

                4.      Rejection of Executory Contracts ......................................................... 29

                5.      Restructuring Support Agreement ........................................................ 29

        C.      Summary of Treatment of Claims and Interests Under the Combined Plan and
                Disclosure Statement ....................................................................................... 29

        D.      Certain U.S. Federal Income Tax Consequences to this Combined Plan and
                Disclosure Statement ....................................................................................... 31

                1.      Consequences to Debtors ...................................................................... 32

                2.      Consequences to Holders of Prepetition Mezzanine Claims ............... 32

                3.      Consequences to other Holders ............................................................ 33

        E.      Certain Risk Factors to Be Considered ........................................................... 33

                1.      Bankruptcy Law Considerations ........................................................... 33

2. Risks Related to Recoveries Under the Combined Plan and Disclosure Statement and the Debtors' and the Reorganized Debtors' Businesses................ 39

3. The Support of the Non-Debtor Parties is Subject to the Terms of the Restructuring Support Agreement, which is Subject to Termination in Certain Circumstances. .......................................................................... 40

4. The Debtors May Not Be Able to Accurately Report Their Financial Results. .............................................................................................. 40

5. The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness. ........................................................ 40

6. Certain Tax Implications of the Combined Plan and Disclosure Statement. ....... 40

7. The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases. ..................................................................... 41

8. Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses. ................................................................................. 41

9. Financial Results May Be Volatile and May Not Reflect Historical Trends. ....... 42

10. The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases. ............... 42

11. Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations. ....................................................................................... 43

F. Feasibility. ........................................................................................... 43

G. Best Interests Test and Alternatives to the Combined Plan and Disclosure Statement ............................................................................... 43

V. Unclassified Claims .......................................................................................... 44

A. Administrative Expense Claims. ............................................................... 44

B. Professional Fee Claims. ......................................................................... 45

C. Priority Tax Claims. ............................................................................... 45

D. Statutory Fees ....................................................................................... 45

E. Great Rock DIP Claims ........................................................................... 46

F. RBC DIP Claims. ................................................................................... 46

VI. Classification and Treatment of Claims and Interests ............................................. 46

A. Classification of Claims and Interests. ....................................................... 46

B.      Treatment of Claims and Interests ........................................................ 46

      1.      Class 1 – Other Priority Claims ............................................... 46

      2.      Class 2 - Other Secured Claims ............................................... 47

      3.      Class 3 – Prepetition Mezzanine Claims ................................. 47

      4.      Class 4 – TopCo Note Claims .................................................. 48

      5.      Class 5 – General Unsecured Claims ....................................... 48

      6.      Class 6 – Intercompany Claims ............................................... 48

      7.      Class  7 – Interests .................................................................. 48

C.      Impaired Claims and Interests .............................................................. 48

D.      Cramdown and No Unfair Discrimination............................................. 49

VII.    Confirmation Procedures ................................................................................. 49

A.      Confirmation Procedures ...................................................................... 49

      1.      Combined Hearing .................................................................. 49

      2.      Procedure for Objections ......................................................... 49

      3.      Requirements for Confirmation ............................................... 50

B.      Solicitation and Voting Procedures ...................................................... 50

      1.      Substantive Consolidation ...................................................... 50

      2.      Eligibility to Vote on the Combined Plan and Disclosure Statement ................. 51

      3.      Solicitation Package ................................................................ 51

      4.      Voting Procedures and Voting Deadline ................................. 52

      5.      Deemed Acceptance or Rejection ............................................ 53

      6.      Acceptance by Impaired Classes ............................................. 53

VIII.   Implementation and Execution of the Combined Plan and Disclosure Statement........................ 53

A.      Effective Date ....................................................................................... 53

B.      Implementation of the Combined Plan and Disclosure Statement ....................................... 53

C.      Senior Exit Facility .............................................................................. 53

D. Mezzanine Exit Facility ................................................................................................ 54

E. General Settlement of Claims and Interests. ............................................................... 55

F. Restructuring Transactions. ......................................................................................... 56

G. Out-of-Court Restructuring. ........................................................................................ 56

  1. The Fourth Amended LPA .............................................................................. 57

  2. Mezzanine Facility Paydown .......................................................................... 57

  3. Loan and Note Conversion ............................................................................. 58

  4. Equity Restructuring ....................................................................................... 58

  5. Management Incentive Plan. ............................................................................ 58

  6. Governance ...................................................................................................... 58

  7. Acquisition Preferred Basket .......................................................................... 59

  8. Falcon Preferred Consent Rights .................................................................... 59

  9. Reimbursement of Fees and Expenses ............................................................ 59

H. Corporate Existence. .................................................................................................... 60

I. Vesting of Assets in the Reorganized Debtors Free and Clear of Liens and Claims. ........ 60

J. Preservation of Causes of Action. ............................................................................... 60

K. Director and Officer Liability Insurance. ..................................................................... 61

L. Indemnification Obligations. ....................................................................................... 62

IX. Executory Contracts and Unexpired Leases ......................................................................... 62

A. Assumption and Rejection of Executory Contracts and Unexpired Leases. .................... 62

B. Claims Based on Rejection of Executory Contracts or Unexpired Leases. ...................... 63

C. Cure Defaults for Assumed Executory Contracts and Unexpired Leases. ........................ 63

D. Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases. ........................................................................................................................... 64

E. Insurance Policies. ....................................................................................................... 64

F. Reservation of Rights. .................................................................................................. 65

G. Nonoccurrence of Effective Date. ............................................................................... 65

H. Contracts and Leases Entered into After the Petition Date...................................... 65

X. Provisions Governing Distributions........................................................................ 66

    A. Distributions on Account of Claims Allowed as of the Effective Date. ........... 66

    B. Manner of Payment........................................................................................ 66

    C. Compliance with Tax Requirements............................................................... 66

    D. Allocations..................................................................................................... 67

    E. No Postpetition Interest on Claims. ............................................................... 67

    F. Foreign Currency Exchange Rate. ................................................................. 67

    G. Setoffs and Recoupment. ............................................................................... 67

    H. Claims Paid or Payable by Third Parties. ...................................................... 68

        1. Claims Paid by Third Parties/Insurers. ............................................... 68

        2. Claims Payable by Third Parties........................................................ 68

        3. Applicability of Insurance Policies..................................................... 68

XI. Effect of Rejection by One or More Classes............................................................. 69

    A. Impaired Classes Entitled to Vote.................................................................. 69

    B. Acceptance by Class. ..................................................................................... 69

    C. Reservation of Cramdown Rights................................................................... 69

XII. Procedures For Resolving Contingent, Unliquidated, And Disputed Claims............... 69

    A. Disputed Claims Process. .............................................................................. 69

    B. Allowance of Claims. .................................................................................... 70

    C. Claims Administration Responsibilities. ........................................................ 70

    D. Adjustment to Claims or Interests without Objection..................................... 70

    E. Disallowance of Claims or Interests. ............................................................. 70

    F. No Distributions Pending Allowance. ............................................................ 71

    G. Distributions After Allowance........................................................................ 71

XIII. Conditions Precedent to Confirmation and the Effective Date ................................... 71

| | | | |
|---|---|---|---|
| | A. | Conditions Precedent to Confirmation | 71 |
| | B. | Conditions Precedent to the Effective Date | 72 |
| | C. | Waiver of Conditions | 73 |
| | D. | Effect of Nonoccurrence of Conditions | 73 |
| XIV. | | Settlement, Release, Exculpation, Injunction, and Related Provisions | 73 |
| | A. | Discharge of Claims and Termination of Interests. | 73 |
| | B. | Release of Liens. | 74 |
| | C. | Releases by the Debtors. | 74 |
| | D. | Releases by the Releasing Parties. | 75 |
| | E. | Injunction | 76 |
| | F. | Exculpation | 77 |
| XV. | | Retention of Jurisdiction | 78 |
| XVI. | | Miscellaneous Provisions | 79 |
| | A. | Amendment or Modification of the Combined Plan and Disclosure Statement | 79 |
| | B. | Exhibits/Schedules | 80 |
| | C. | Combined Plan and Disclosure Statement Supplement | 80 |
| | D. | Filing of Additional Documents | 80 |
| | E. | Binding Effect of Combined Plan and Disclosure Statement | 80 |
| | F. | Governing Law | 80 |
| | G. | Time | 80 |
| | H. | Severability | 81 |
| | I. | Revocation | 81 |
| | J. | Claims Agent | 81 |
| | K. | Inconsistency | 81 |
| | L. | No Admissions | 81 |
| | M. | Successors and Assigns | 81 |

N.    Votes Solicited in Good Faith.................................................................................. 82

O.    Closing of Chapter 11 Cases.................................................................................. 82

P.    Waiver or Estoppel. ................................................................................................ 82

Q.    Reservation of Rights............................................................................................. 82

XVII.    Recommendation .................................................................................................... 82

I.    **Introduction**[1]

The Debtors propose the Combined Plan and Disclosure Statement pursuant to Bankruptcy Code sections 1125 and 1129, and Local Rule 3017-2. The Debtors are the "proponents" of the Combined Plan and Disclosure Statement within the meaning of Bankruptcy Code section 1129.

The Combined Plan and Disclosure Statement reflects substantial negotiations among the Debtors, the Debtors' lenders, and certain of the Debtors' indirect interest holders, all of whom encourage Creditors to vote to accept this Combined Plan and Disclosure Statement.

Copies of the Combined Plan and Disclosure Statement and all other documents filed with the Court in the Chapter 11 Cases are available for review without charge on the bankruptcy case website at: https://cases.stretto.com/basicfun/court-docket/.

The Combined Plan and Disclosure Statement is a chapter 11 plan of reorganization. The Combined Plan and Disclosure Statement has the support, pursuant to the terms of the Restructuring Support Agreement entered into by the Debtors on August 23, 2024, of the Debtors' prepetition Creditors and Interest holders Jay Foreman, John MacDonald, Basic Fun TopCo, RBC, and Falcon. Specifically, as set forth below and in the Restructuring Support Agreement, with the committed support of these parties, the Debtors are seeking to move forward with a Plan that significantly deleverages the Debtors' balance sheet and permits the Debtors to maintain and continue to develop their valuable ongoing business, and to maximize their enterprise value on a going-forward basis for the benefit of all stakeholders (the "**Reorganization Transaction**"). Through the Reorganization Transaction:

- Holders of Great Rock DIP Claims shall receive, in full satisfaction of its Great Rock DIP Claim, payment in full in Cash of the Allowed amount of the Great Rock DIP Claim on the Effective Date from the proceeds of the Senior Exit Facility.

- Holders of RBC DIP Claims shall receive, in full satisfaction of its RBC DIP Claim, New First Out Term Notes in an amount equal to the Allowed amount of the RBC DIP Claim on the Effective Date.

- Holders of Claims in Class 1, which consist of Holders of Other Priority Claims, are Unimpaired and will be paid in full in Cash on the Effective Date.

- Holders of Claims in Class 2, which consist of Holders of Other Secured Claims, are Unimpaired and will receive either (a) Cash equal to the amount of such Claim; (b) the collateral securing its Allowed Other Secured Claim; (c) Reinstatement of its Allowed Other Secured Claim; or (d) such other treatment that renders its Allowed Other Secured Claim Unimpaired in accordance with Bankruptcy Code section 1124.

- Holders of Claims in Class 3, which consist of Holders of Prepetition Mezzanine Claims, are Impaired and shall receive (i) solely with respect to Holders of

---

[1] All capitalized terms used but not defined in the introduction shall have the meanings ascribed to them in Article III of the Combined Plan and Disclosure Statement.

Prepetition Mezzanine Claims arising from the Original Mezzanine Loans (other than the Prepetition Last Out Loans), New First Out Term Notes in an amount equal to $2,500,000 on the Effective Date, and New Last Out Term Notes in an amount equal to $3,952,501.05, which, for the avoidance of doubt, shall be purchased by Falcon and the Founders on the Effective Date in the form of participations pursuant to the terms of the Out-Of-Court Restructuring (as defined below) and subject to the terms of the Mezzanine Exit Facility, and (ii) solely with respect to Holders of Claims arising from the Prepetition Last Out Loans, the Founder Preferred Equity in Basic Fun TopCo pursuant to the Last Out Conversion.

- Holders of Claims in Class 4, which consist of Holders of TopCo Note Claims, are Unimpaired and shall receive such Holder's Pro Rata share of the New TopCo Notes and such Holder's Pro Rata share of the New TopCo Note Cash Payment.

- Holders of Claims in Class 5, which consist of Holders of General Unsecured Claims, are Unimpaired and on and after the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall continue to pay or dispute each General Unsecured Claim in the ordinary course of business as if the Chapter 11 Cases had never been commenced.

- Holders of Claims in Class 6, which consist of Holders of Intercompany Claims, are Unimpaired and shall receive Reinstatement of such Holder's Intercompany Claims.

- Holders of Interests in Class 7, which consist of Holders of Interests, are Unimpaired and shall receive such Holder's Pro Rata share of Interests in the applicable Reorganized Debtor.

**For the avoidance of doubt, the Combined Plan and Disclosure Statement provides that all Allowed General Unsecured Claims, including trade claims, will be paid in full in the ordinary course of business and otherwise unimpaired by the chapter 11 process.** In light of the foregoing, the Debtors expect to continue operating normally throughout the Chapter 11 Cases and remain focused on serving their customers and working with suppliers on normal terms.

Each Holder of a Claim against the Debtors who is entitled to vote to accept or reject the Combined Plan and Disclosure Statement is encouraged to read the Combined Plan and Disclosure Statement in its entirety before voting.

98876382.5

| Class | Estimated Allowed Claims[2] | Treatment | Entitled to Vote | Estimated Recovery to Holders of Allowed Claims[3] |
|---|---|---|---|---|
| Class 1 – Other Priority Claims | $0 | Unimpaired | No (Deemed to Accept) | 100% |
| Class 2 – Other Secured Claims | $0 | Unimpaired | No (Deemed to Accept) | 100% |
| Class 3 – Prepetition Mezzanine Claims | $9,188,914.00 | Impaired | Yes | 85+%[4] |
| Class 4 – TopCo Note Claims | $49,189,511.36 | Unimpaired | No (Deemed to Accept) | 100% |
| Class 5 – General Unsecured Claims | $25,656,893.65 | Unimpaired | No (Deemed to Accept) | 100% |
| Class 6 – Intercompany Claims | N/A | Unimpaired | No (Deemed to Accept) | 100% |
| Class 7 – Interests | N/A | Unimpaired | No (Deemed to Accept) | 100% |

Subject to the restrictions on modifications as set forth in Bankruptcy Code section 1127, Bankruptcy Rule 3019, and in the Combined Plan and Disclosure Statement, the Debtors expressly reserve the right to alter, amend or modify the Combined Plan and Disclosure Statement one or more times before its substantial consummation.

---

[2] These amounts represent estimated Allowed Claims, and do not represent amounts actually asserted by creditors in Proofs of Claim or otherwise. The Debtors have not completed their analysis of Claims in the Chapter 11 Cases, and objections to such Claims have not been Filed and/or fully litigated and may continue following the Effective Date. Therefore, there can be no assurances of the exact amount of the Allowed Claims at this time. Rather, the actual amount of the Allowed Claims may be greater or lower than estimated.

[3] The estimated percentage recovery is based upon, among other things, an estimate of the Allowed Claims in the Chapter 11 Cases. As set forth above, the actual amount of the Allowed Claims may be greater or lower than estimated. Thus, the actual recoveries may be higher or lower than projected depending upon, among other things, the amounts and priorities of Claims that are actually allowed by the Bankruptcy Court.

[4] Holders of Prepetition Mezzanine Claims will receive New First Out Term Notes issued under the Mezzanine Exit Facility. The Mezzanine Exit Facility amends and restates the Prepetition Mezzanine Facility by, among other things, extending the maturity date to three (3) years and 90 days after the Effective Date. Accordingly, the Prepetition Mezzanine Claims are impaired.

98876382.5

## II.    Important Dates

| | |
|---|---|
| Voting Record Date | The earlier of September 30, 2024 or the entry of the Interim Approval and Procedures Order |
| Deadline to Mail Solicitation Packages and all Notices | Within five (5) business days after entry of the Interim Approval and Procedures Order. |
| Deadline to File Combined Plan and Disclosure Statement Supplement | October 4, 2024 at 4:00 p.m. (ET) |
| Voting Deadline for the Combined Plan and Disclosure Statement | October 11, 2024 at 4:00 p.m. (ET) |
| Combined Plan and Disclosure Statement Objection Deadline | October 11, 2024 at 4:00 p.m. (ET) |
| Opt In Deadline | October 15, 2024 at 4:00 p.m. (ET) |
| Deadline to File Confirmation Brief and Other Evidence Supporting the Combined Plan and Disclosure Statement, and form of Confirmation Order | October 15, 2024 at 4:00 p.m. (ET) |
| Deadline to File Voting Tabulation Affidavit | October 15, 2024 at 4:00 p.m. (ET) |
| Combined Hearing | October 21, 2024 at 11:30 a.m. (ET) |

## III.    Definitions and Construction of Terms

### A.    Definitions

"**Administrative Agent**" means Stretto in its capacity as administrative agent to the Debtors.

"**Administrative Expense Bar Date**" means the date that is 30 calendar days after service of the Notice of Effective Date with such date to be provided in the Notice of Effective Date.

"**Administrative Expense Claim**" means any right to payment constituting actual and necessary costs and expenses of preserving the Estates under Bankruptcy Code sections 503(b) and 507(a)(2) including, without limitation: (a) Professional Fee Claims, and (b) any fees or charges assessed against the Estates under section 1930 of title 28 of the United States Code.

"**Advisory Committee**" means the members of the Basic Fun TopCo's Advisory Committee from and after the Effective Date.

"**Affiliate**" means an "affiliate" as defined in Bankruptcy Code section 101(2).

"**Allowed**" means, with reference to any Claim, proof of which was properly Filed or, if no Proof of Claim was Filed, that has been or hereafter is listed by a Debtor on its Schedules as liquidated in amount and not disputed or contingent and, in each case, as to which: (a) no objection to allowance has been interposed within the applicable period fixed by the Combined Plan and Disclosure Statement, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or the Bankruptcy Court; or (b) an objection has been interposed and such Claim has been allowed by the Bankruptcy Court, in whole or in part, by a Final Order.

4

"**Amended And Restated Mezzanine Credit Agreement**" means that certain Amended and Restated Subordinate Credit Agreement entered into on October 30, 2020, by and between Basic Fun as borrower, Holdco, K'NEX, TBDUM, and TGS as other loan parties, and RBC as collateral agent and lender.

"**Avoidance Actions**" means any and all Causes of Action and rights to recover or avoid transfers or to avoid any lien under chapter 5 of the Bankruptcy Code or applicable state law or otherwise.

"**Ballot**" means the voting form distributed to each Holder of an Impaired Claim entitled to vote on the Combined Plan and Disclosure Statement, on which the Holder is to indicate acceptance or rejection of the Combined Plan and Disclosure Statement in accordance with the voting instructions and make any other elections or representations required pursuant to the Combined Plan and Disclosure Statement.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware, having jurisdiction over the Chapter 11 Cases or, if such Court ceases to exercise jurisdiction over the Chapter 11 Cases, such court or adjunct thereof that exercises jurisdiction over the Chapter 11 Cases in lieu of the United States Bankruptcy Court for the District of Delaware.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time.

"**Basic Fun**" means Debtor Basic Fun, Inc., a Delaware Corporation.

"**Basic Fun TopCo**" means Non-Debtor Basic Fun, L.P., a Delaware Limited Partnership.

"**Board**" means the members of the Debtors' Boards of Directors from and after the Petition Date.

"**Business Day**" means any day other than a Saturday, Sunday, or any other day on which commercial banks in New York, New York are required or authorized to close by Law or executive order.

"**Case Website**" means the website maintained by Stretto where parties are able to view the Combined Plan and Disclosure Statement and other documents related to the Chapter 11 Cases at https://cases.stretto.com/BasicFun/.

"**Cash**" means legal tender of the United States of America or equivalents thereof, including, without limitation, payment in such tender by check, wire transfer, or any other customary payment method.

"**Causes of Action**" means any Claim, cause of action (including Avoidance Actions and D&O Claims), controversy, right of setoff, cross claim, counterclaim, or recoupment and any claim

on contracts or for breaches of duties imposed by law or in equity, demand, right, action, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, power, privilege, license, or franchise of any kind or character whatsoever, known, unknown, fixed or contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.

"**Chapter 11 Cases**" means the chapter 11 cases initiated by the Debtors' filing on the Petition Date of voluntary petitions for relief in the Bankruptcy Court under chapter 11 of the Bankruptcy Code. The Chapter 11 Cases are jointly administered by the Bankruptcy Court under Case No. 24-11432-CTG.

"**Claim**" shall have the meaning set forth in Bankruptcy Code section 101(5).

"**Claims and Noticing Agent**" means Stretto in its capacity as claims and noticing agent to the Debtors.

"**Claims Register**" means the official register of Claims maintained by Stretto.

"**Class**" means any group of substantially similar Claims or Interests classified by the Combined Plan and Disclosure Statement pursuant to Bankruptcy Code sections 1122 and 1123(a)(1).

"**Clerk**" means the Clerk of the Bankruptcy Court.

"**Combined Plan and Disclosure Statement**" means this combined disclosure statement and chapter 11 plan of liquidation including, without limitation, all exhibits, supplements, appendices, and schedules hereto, either in their present form or as the same may be altered, amended, or modified from time to time.

"**Combined Plan and Disclosure Statement Supplement**" means the appendix of schedules and exhibits to be Filed with the Bankruptcy Court at least seven (7) days before the Confirmation Hearing.

"**Company**" means the Debtors.

"**Confirmation Date**" means the date on which the Confirmation Order is entered on the Docket.

"**Confirmation Hearing**" means the hearing to be held by the Bankruptcy Court to consider (a) approval of the Combined Plan and Disclosure Statement as providing adequate information pursuant to Bankruptcy Code section 1125, and (b) confirmation of the Combined Plan and Disclosure Statement pursuant to Bankruptcy Code section 1129, as such hearing may be adjourned or continued from time to time.

"**Confirmation Hearing Notice**" means the notice of the Confirmation Hearing to be provided to all known Creditors or their representatives.

"**Confirmation Order**" means the Order of the Bankruptcy Court confirming the Combined Plan and Disclosure Statement pursuant to Bankruptcy Code section 1129.

"**Confirmation**" means confirmation of the Combined Plan and Disclosure Statement pursuant to Bankruptcy Code section 1129.

"**Consummation**" means the occurrence of the Effective Date.

"**Creditor**" means any Person that is the Holder of a Claim against the Debtors as defined in Bankruptcy Code section 101(10).

"**Critical Vendors**" means certain vendors, suppliers, service providers, and other similar parties that are essential to maintaining the going concern value of the Debtors' business.

"**Cure**" means all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

"**D&O Claims**" means any claims or Causes of Action held by the Debtors or their Estates against current and former directors and officers of the Debtors arising prior to the Petition Date.

"**D&O Policies**" means all insurance policies of any of the Debtors for directors', managers', and officers' liability existing as of the Petition Date (including any "tail policy") and all agreements, documents, or instruments relating thereto.

"**Debtors**" means the debtors in the Chapter 11 Cases: Basic Fun, Holdco, TBDUM, TGS, and K'NEX.

"**Debtor Release**" means the release set forth in Section XIV(C) of the Combined Plan and Disclosure Statement.

"**DIP Agent**" means Great Rock in its capacity as administrative agent of the DIP Lenders in the Chapter 11 Cases.

"**DIP Credit Agreement**" means the Senior Secured Super-Priority Debtor-in-Possession Loan and Security Agreement dated as of July 3, 2024 among the Debtors and the DIP Lenders [Docket No. 167, Exhibit A], as amended or modified from time to time.

"**DIP Facilities**" means, collectively, the superpriority senior secured revolving loan facility in the principal amount up to $50,000,000 available on a final basis as approved by the Final DIP Order, senior secured term loans in the principal amount of $10,000,000 deemed funded on a final basis as approved by the Final DIP Order, and senior secured delayed draw term loans in a principal amount of $5,000,000 pursuant to the Final DIP Order.

"**DIP Facility Claims**" means all Claims asserted against the Debtors by the DIP Lenders, including, without limitation, principal, accrued and unpaid interest, any reimbursement

obligations (contingent or otherwise), all fees, expenses, and disbursements (including, without limitations, attorneys' fees, financial advisors' fees, and related expenses and disbursements incurred by, or on behalf of, the DIP Lenders), indemnification obligations, all other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable in respect thereof.

"**DIP Guarantors**" means (i) Holdco, (ii) K'NEX, (iii) TBDUM, and (iv) TGS.

"**DIP Lenders**" means, collectively, Great Rock and RBC.

"**DIP Motion**" means the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 34].

"**Disputed**" means, as to a Claim or an Interest, any Claim or Interest: (a) that is not Allowed; (b) that is not disallowed by the Plan, the Bankruptcy Code, or a Final Order, as applicable; (c) as to which a dispute is being adjudicated by a court of competent jurisdiction in accordance with non-bankruptcy Law; (d) that is Filed in the Bankruptcy Court and not withdrawn, as to which a timely objection or request for estimation has been Filed; and (e) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

"**Distribution**" means any distribution to the Holders of Allowed Claims.

"**Docket**" means the docket in the Chapter 11 Cases maintained by the Clerk.

"**Effective Date**" means the date on which the conditions specified in Article XIII.B of the Combined Plan and Disclosure Statement have been met or satisfied.

"**Effective Date Transactions**" means the transactions listed in Article VIII.

"**Entity**" means an "entity" as defined in Bankruptcy Code section 101(15).

"**Estates**" means the estates of the Debtors created upon the commencement of the Chapter 11 Cases pursuant to Bankruptcy Code section 541.

"**Exculpated Parties**" means, individually and collectively, in each case solely in their capacity as such, each and all of: (a) the Debtors; (b) the directors, managers, and officers of the Debtors who served in such capacity between the Petition Date and the Effective Date; and (c) the Professionals retained by the Debtors in the Chapter 11 Cases.

"**Executory Contract**" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code, specifically excluding contracts and agreements entered into pursuant to the Combined Plan and Disclosure Statement.

98876382.5

"**Exit Facilities**" means, collectively, the Senior Exit Facility and the Mezzanine Exit Facility.

"**Exit Facility Documents**" means, collectively, the documentation for the Senior Exit Facility and Mezzanine Exit Facility.

"**Falcon**" means Falcon Structured Equity Partners, LP.

"**Falcon and Founders Term Sheet**" means the Term Sheet for Restructuring Support Agreement attached to the Restructuring Support Agreement as Exhibit 1.

"**Falcon Fees and Expenses**" means the professional fees incurred in connection with negotiation and pursuit of the Combined Plan and Disclosure Statement.

"**Federal Judgment Rate**" means the federal judgment rate in effect as of the Petition Date.

"**File, Filed, or Filing**" means file, filed, or filing with the Bankruptcy Court in the Chapter 11 Cases.

"**Final Decree**" means the order entered pursuant to Bankruptcy Code section 350, Bankruptcy Rule 3022, and Local Rule 5009-1 closing the Chapter 11 Cases.

"**Final DIP Order**" means the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 167].

"**Final Fee Hearing**" means the hearing to be held by the Bankruptcy Court to consider applications for final allowance of compensation and reimbursement of expenses of Professional Fee Claims and related matters.

"**Final Order**" means an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction that has been entered on the Docket in the Chapter 11 Cases (or the Docket of such other court) that is not subject to a stay and has not been modified, amended, reversed or vacated and as to which (a) the time to appeal, petition for certiorari or move for a new trial, reargument or rehearing pursuant to Bankruptcy Rule 9023 has expired and as to which no appeal, petition for certiorari or other proceedings for a new trial, reargument or rehearing shall then be pending, or (b) if an appeal, writ of certiorari, new trial, reargument or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was timely and properly appealed, or certiorari shall have been denied or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired.

"**First Day Declaration**" means the *Declaration of Frank McMahon, Chief Financial Officer of Debtors, in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 15].

98876382.5

"**First Day Order**" means the Final Orders entered by the Bankruptcy Court approving the First Day Motions and granting the relief set forth in each First Day Motion.

"**First Interim DIP Order**" means the *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 65].

"**Fourth Amended LPA**" means the Fourth Amended and Restated Agreement of Limited Partnership of Basic Fun TopCo.

"**Foreman**" means Jay Foreman.

"**Founders**" means, collectively, Foreman and MacDonald.

"**General Partner**" means non-Debtor BF GP, Inc., a Delaware corporation.

"**General Unsecured Claims**" means any unsecured Claim against the Debtors which is not a Great Rock DIP Claim, RBC DIP Claim, Other Priority Claim, Other Secured Claim, Prepetition Mezzanine Claim, TopCo Note Claim, Intercompany Claim, or Interest and is not entitled to a priority under the Bankruptcy Code or any order of the Bankruptcy Court.

"**Governmental Unit**" means a "governmental unit" as defined in Bankruptcy Code section 101(27).

"**Great Rock**" means Great Rock Capital Partners Management, LLC.

"**Great Rock DIP Claims**" means all DIP Facility Claims held by Great Rock.

"**Great Rock Term Sheet**" means the $50 Million First Priority Senior Secured DIP-to-Exit Revolving Credit Facility Term Sheet attached to the Restructuring Support Agreement as Exhibit 2.

"**Holdco**" means Basic Fun Holdco, LLC, a Delaware Limited Liability Company.

"**Holder**" means the beneficial holder of any Claim or Interest.

"**Impaired**" or "**Impaired Classes**" means, with respect to any Class, a Class that is impaired within the meaning of Bankruptcy Code sections 1123(a)(4) and 1124.

"**Intercompany Claims**" means any Claim held by one Debtor against another Debtor.

"**Interest**" means any "equity security" in a Debtor as defined in Bankruptcy Code section 101(16), including, without limitation, all issued, unissued, authorized or outstanding ownership interests (including common and preferred) or other equity interests, together with any warrants, options, convertible securities, liquidating preferred securities or contractual rights to purchase or acquire any such equity interests at any time and all rights arising with respect thereto.

98876382.5

"**Interim Approval and Procedures Order**" means the order of the Bankruptcy Court conditionally approving the Combined Plan and Disclosure Statement for solicitation purposes only and authorizing the Debtors to solicit the Combined Plan and Disclosure Statement.

"**K'NEX**" means Debtor K'NEX UK Limited, a UK private limited company.

"**Law**" means any federal, state, local or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Lien**" has the meaning set forth in section 101(37) of the Bankruptcy Code.

"**Local Rules**" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

"**MacDonald**" means John MacDonald.

"**MIP**" means the management incentive plan to be established by the Reorganized Debtors on or after the Effective Date on terms consistent with the Restructuring Support Agreement and the consent rights contained therein.

"**Mezzanine Exit Facility**" means the $16,452,501.93 term loan facility consisting of New First Out Term Loans and New Last Out Term Loans issued under the Mezzanine Exit Facility Agreement substantially in the form attached to the Combined Plan and Disclosure Statement Supplement and executed on the Effective Date among Debtors and RBC, among others.

"**Mezzanine Exit Facility Agreement**" means that agreement documenting the term loan facility consisting of New First Out Term Loans and New Last Out Term Loans and executed on the Effective Date among Basic Fun, Inc., as Borrower, Basic Fun Holdco, LLC, as Holdings, K'NEX, TBDUM, and TGS, as other loan parties, and RBC, as collateral agent, to be attached to the Combined Plan and Disclosure Statement Supplement.

"**Mezzanine Exit Facility Documents**" means collectively, the documentation for the Mezzanine Exit Facility, including, but not limited to, the Mezzanine Exit Facility Agreement, the Collateral Documents (as defined in the Mezzanine Exit Facility Agreement), and the other Loan Documents (as defined in the Mezzanine Exit Facility Agreement).

"**New First Out Term Loans**" means certain term loans in aggregate amount of $[12,500,000] to be provided by RBC, via a cashless exchange of RBC DIP Claims and Prepetition Mezzanine Claims, to the Company under the Mezzanine Exit Facility Documents.

"**New First Out Term Notes**" means certain term notes executed by the Debtors, as borrowers, in favor of RBC, as lender, in the aggregate amount of $[12,500,000] to be provided under the Mezzanine Exit Facility Agreement as New First Out Term Loans.

98876382.5

"**New Last Out Term Loans**" means certain term loans in aggregate amount of $3,952,501.05 deemed provided by RBC, via a cashless exchange of Prepetition Mezzanine Claims, to the Company under the Mezzanine Exit Facility Documents.

"**New Last Out Term Notes**" means certain term notes made by the Debtors, as borrowers, in favor of RBC, as lender, in the aggregate amount of $3,952,501.05 be provided under the Mezzanine Exit Facility Documents as New Last Out Term Loans.

"**New TopCo Notes**" means certain term notes made by Basic Fun, as borrower, in favor of Basic Fun TopCo, as lender, in the aggregate amount of $49,189,511.36, less the New TopCo Note Cash Payment to be issued on the Effective Date, which amend and restate the TopCo Notes.

"**New TopCo Note Cash Payment**" means Cash payment in the amount of $[1,200,000] to be received by each Holder of Claims in Class 4.

"**Non-Debtor Parties**" means, collectively, RBC, Falcon, and the Founders.

"**Non-Debtor Subsidiaries**" means, together, (i) Tech 4 Kids HK, (ii) The Bridge Direct Holdings HK, and (iii) The Bridge Direct HK.

"**Notice of Effective Date**" means the notice filed on the Docket in accordance with Section VIII.A. hereof notifying parties in interest of the occurrence of the Effective Date.

"**Other Priority Claims**" means any Claim entitled to priority pursuant to Bankruptcy Code section 507(a) other than Administrative Expense Claims and Priority Tax Claims.

"**Other Secured Claims**" means any Secured Claim other than the Great Rock DIP Claims, the RBC DIP Claims, and the Prepetition Mezzanine Claims.

"**Oppenheimer**" means Oppenheimer & Co.

"**Owner Notes**" means those certain Term Notes issued between August 1, 2018 and September 30, 2019 made by Basic Fun TopCo in favor of the Founders.

"**Person**" means a "person" as defined in Bankruptcy Code section 101(41).

"**Petition Date**" means June 28, 2024, the date on which the Debtors Filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

"**Polsinelli**" means Polsinelli PC.

"**Prepetition Last Out Loans**" has the meaning set forth in Section IV(A)(3)(c)(iii).

"**Prepetition Mezzanine Claims**" means any Claim arising from, or related to, the Prepetition Mezzanine Facility and Prepetition Mezzanine Secured Obligations related thereto, including any and all outstanding principal, which is owed as of the Petition Date in the aggregate amount of approximately $9,188,914, plus any and all accrued interest, fees (including, without limitation, fees of its Professionals, including its attorneys and financial advisors, accrued or

12

accruing through the Effective Date), expenses, costs and other charges payable with respect to the Prepetition Mezzanine Facility, which Claims are Allowed pursuant to the terms of this Combined Plan and Disclosure Statement.

"**Prepetition Mezzanine Facility**" has the meaning set forth in Section IV(A)(3)(c)(iii).

"**Prepetition Mezzanine Secured Obligations**" has the meaning set forth in Section IV(A)(3)(c)(iii).

"**Prepetition Senior Credit Facility**" has the meaning set forth in Section IV(A)(3)(c)(ii).

"**Priority Tax Claims**" means Claims of a Governmental Unit against any Debtor entitled to priority pursuant to Bankruptcy Code section 507(a)(8) or specified section of Bankruptcy Code section 502(i).

"**Pro Rata**" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in the same Class.

"**Professional**" means any professional Person employed in the Chapter 11 Cases pursuant to Bankruptcy Code sections 327, 328, 363, or 1103 pursuant to an order of the Bankruptcy Court and who is to be compensated for services rendered pursuant to Bankruptcy Code sections 327, 328, 329, 330, 331, or 363.

"**Professional Fee Claims**" means all Claims for compensation and reimbursement of expenses by Professionals to the extent Allowed by the Bankruptcy Court.

"**Professional Fee Claims Bar Date**" means the date that is forty-five (45) days after the Effective Date.

"**Proof of Claim**" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

"**RBC**" means Royal Bank of Canada.

"**RBC DIP Claims**" means all DIP Facility Claims held by RBC.

"**RBC Term Sheet**" means the Term Sheet for Amended and Extended Subordinate Credit Agreement, attached to the Restructuring Support Agreement as Exhibit 3.

"**Reinstate**," "**Reinstated**," or "**Reinstatement**" means with respect to Claims and Interests, that the Claim or Interest shall not be discharged hereunder and the holder's legal, equitable, and contractual rights on account of such Claim or Interest shall remain unaltered by Consummation in accordance with section 1124(1) of the Bankruptcy Code.

"**Related Party**" means, each of, and in each case in its capacity as such, current and former directors, managers, officers, committee members, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors,

assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors.

"**Released Parties**" means, collectively, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) Basic Fun TopCo; (d) Foreman; (e) MacDonald; (f) Falcon; (g) Great Rock; (h) RBC; (i) each current and former Affiliate of each Entity in the foregoing clauses (a) through (h); and (j) each Related Party of each Entity in clauses (a) through (h).

"**Releasing Parties**" means, collectively, and in each case in its capacity as such: (a) Basic Fun TopCo; (b) Foreman; (c) MacDonald; (d) Falcon; (e) Great Rock; (f) RBC; (g) each current and former Affiliate of each Entity in the foregoing clauses (a) through (f); and (h) each Related Party of each Entity in clauses (a) through (f); (i) all Holders of Claims or Interests that (1) vote to accept the Combined Plan and Disclosure Statement or are deemed to accept the Combined Plan and Disclosure Statement and (2) affirmatively opt in to the releases provided by the Combined Plan and Disclosure Statement; (l) all Holders of Claims who abstain from voting on the Combined Plan and Disclosure Statement and who affirmatively opt in to the releases provided by the Combined Plan and Disclosure Statement; (j) all Holders of Claims who vote to reject the Combined Plan and Disclosure Statement and who affirmatively opt in to the releases provided by the Combined Plan and Disclosure Statement; and (k) each Related Party of each Entity in clause (a) through (f) of this definition to the fullest extent permitted by law, provided, however, that with respect to (h) hereof, a Related Party is only a Releasing Party with respect to claims that, under applicable non-bankruptcy law, it was authorized to assert on behalf of the Persons identified in (a) through (f) hereof. For the avoidance of doubt, except for those creditors listed in the foregoing clauses (a) through (f), creditors treated under Article V of the Combined Plan and Disclosure Statement are not Releasing Parties.

"**Reorganized Company**" means the Reorganized Debtors together with Basic Fun TopCo after the Effective Date.

"**Reorganized Debtors**" means the Debtors, as reorganized pursuant to and under this Combined Plan and Disclosure Statement on or after the Effective Date, and their successors.

"**Restructuring Support Agreement**" means the Restructuring Support Agreement, entered into by the Debtors on August 23, 2024 [Docket No. 153, Exhibit B], between the Debtors and Non-Debtor Parties, as may be amended or modified in accordance with its terms.

"**Schedules**" means the schedules of assets and liabilities, the list of Holders of Interests, and the statements of financial affairs Filed by the Debtors under Bankruptcy Code section 521 and Bankruptcy Rule 1007, and all amendments and modifications thereto.

"**Second Interim DIP Order**" means the *Second Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral,*

*(III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, And (VII) Granting Related Relief* [Docket No. 129].

"**Secured Claims**" means Claims which are: (a) secured by a valid and perfected lien in collateral which is enforceable pursuant to applicable law, the amount of which is equal to or less than the value of such collateral (i) as set forth in the Combined Plan and Disclosure Statement, (ii) as agreed to by the Holder of such Claim and the Debtors, or (iii) as determined by a Final Order in accordance with Bankruptcy Code section 506(a); or (b) subject to a valid right of setoff under Bankruptcy Code section 553.

"**Security**" means any security, as defined in section 2(a)(1) of the Securities Act or section 101(49) of the Bankruptcy Code.

"**Senior Exit Facility**" means the $50 million revolving credit facility issued under the Senior Exit Facility Agreement and executed on the Effective Date among the Reorganized Debtors, as borrowers, and Great Rock, as agent, among others.

"**Senior Exit Facility Agreement**" means that agreement documenting the $50 million revolving credit facility executed on the Effective Date among the Reorganized Debtors, as borrowers, and Great Rock, as agent, substantially in the form to be attached to the Combined Plan and Disclosure Statement Supplement.

"**SLR**" means Crystal Financial LLC d/b/a SLR Credit Solutions.

"**Solicitation Package**" means the packages to be distributed to Creditors for solicitation of votes on the Combined Plan and Disclosure Statement.

"**Statutory Fees**" means all fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930, and any interest thereupon.

"**Stretto**" means Stretto, Inc.

"**Tax Code**" means the Internal Revenue Code, as amended.

"**TBDUM**" means Debtor TBDUM, LLC, a Delaware Limited Liability Company.

"**Tech 4 Kids HK**" means non-Debtor Tech 4 Kids (Far East) Limited, a Hong Kong corporation.

"**Term Sheets**" means, together, the Falcon and Founders Term Sheet, the Great Rock Term Sheet, and the RBC Term Sheet.

"**TGS**" means Debtor TGS Acquisition, LLC, a Delaware Limited Liability Company.

"**The Bridge Direct HK**" means non-Debtor The Bridge Direct (HK) Limited, a Hong Kong Corporation.

98876382.5

"**The Bridge Direct Holdings HK**" means non-Debtor The Bridge Direct (HK) Holdings Limited, a Hong Kong corporation.

"**Third Party Release**" means the release set forth in Section XIV(D) of the Combined Plan and Disclosure Statement.

"**TopCo Note Claims**" means any Claim arising from, or related to, the TopCo Notes.

"**TopCo Notes**" means those certain Term Notes issued between August 1, 2018 and September 30, 2019 made by Basic Fun in favor of Basic Fun TopCo.

"**Treasury Regulations**" means the regulations, including temporary regulations or any successor regulations, promulgated under the United States Internal Revenue Code, as amended from time to time.

"**U.S. Trustee**" means the Office of the United States Trustee for the District of Delaware.

"**Unexpired Lease**" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

"**Unimpaired**" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

"**Voting Class**" means Class 3.

"**Voting Deadline**" means October 11, 2024 at 4:00 p.m.

"**Voting Record Date**" means the date established by the Bankruptcy Court pursuant to the Interim Approval and Procedures Order.

B.       **Interpretation; Application of Definitions and Rules of Construction**

The following rules of construction, interpretation, and application shall apply:

(1)      Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter genders.

(2)      Unless otherwise specified, each section, article, schedule, or exhibit reference in the Combined Plan and Disclosure Statement is to the respective section in, article of, schedule to, or exhibit to the Combined Plan and Disclosure Statement.

(3)      The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Combined Plan and Disclosure Statement as a whole and not to any particular section, subsection, or clause contained in the Combined Plan and Disclosure Statement.

98876382.5

(4)     The rules of construction contained in Bankruptcy Code section 102 shall apply to the construction of the Combined Plan and Disclosure Statement.

(5)     A term used herein that is not defined herein but that is used in the Bankruptcy Code shall have the meaning ascribed to that term in the Bankruptcy Code.

(6)     The headings in the Combined Plan and Disclosure Statement are for convenience of reference only and shall not limit or otherwise affect the provisions of the Combined Plan and Disclosure Statement.

(7)     Unless otherwise provided, any reference in the Combined Plan and Disclosure Statement to an existing document, exhibit, or schedule means such document, exhibit, or schedule as may be amended, restated, revised, supplemented, or otherwise modified.

(8)     In computing any period of time prescribed or allowed by the Combined Plan and Disclosure Statement, the provisions of Bankruptcy Rule 9006(a) shall apply.

## IV.    Disclosures

### A.    General Background

#### 1.    Overview of the Debtors' Business

The Company is a global children's entertainment company that creates, designs, markets and distributes a diversified portfolio of innovative toys, games, products, and entertainment properties throughout the world. The Company's principal place of business is located in Florida. The Company maintains a website at the following address: www.BasicFun.com.

The Company's product lines consist of various products from both owned and licensed brands. Owned brands include, but are not limited to, K'nex, Mash'ems, Misfittens, Cutetitos, Playhut, and Uncle Milton. Licensed brands include, but are not limited to, Care Bears, Lite Brite, Tonka, Nintendo Amusement, Lincoln Logs, and My Little Pony Retro.

The Debtors' inventory is sold to various retail customers such as Target, Walmart, Amazon, Macy's, Costco, and other similar toy and game purchasers, as well as amusement parks and fun centers. Approximately 70% of the Company's revenue is generated from the Company's licensed products. The Company's relationships with its licensors are a key component of the Company, and they are overseen by the Company's management, including Jay Foreman, Hugh Kennedy, and Stephen Chernin.

#### 2.    Corporate History and Business

The Company was started by Jay Foreman in 2009 as a licensing and logistics business under the business entity name: The Bridge Direct, Inc. The Company then transitioned into the business of acquiring toy companies and products. The Company focused on acquiring companies that have well-known, steady toys in order to build a consistent profit base. To that end, beginning in 2013, the Company engaged in a number of mergers and acquisitions.

17

In 2013, the Company acquired the assets of The Good Stuff Company, which was in the business of designing, manufacturing, marketing and selling plush toys, inflatable balls, soft-play sports sets, baseball caps, towels, and other novelty items to the amusement park, private label, and sporting goods markets, and also included a novelty toy business branded under the "Basic Fun" tradename.

In 2015, the Company acquired the Shopkins license for construction toys, which was a breakout toy line for the Company in 2015 and 2016, and in 2017, the Company acquired assets of Uncle Milton Industries, Inc. through an assignment for the benefit of creditors. Uncle Milton Industries, Inc. was a leader in the science and educational toy category, with a portfolio that includes many top entertainment and educational licenses as well as proprietary brands. The Uncle Milton brands include products that span across many product categories including science toys, activity and outdoor toys, room décor, games and puzzles, seasonal toys, gifts, and more.

Also in 2017, the Company entered into a business combination with Tech 4 Kids, Inc., a Canadian toy company, which included The Bridge Direct, Tech 4 Kids, K'nex, Good Stuff and Uncle Milton. The Company was renamed Basic Fun, Inc., and the Company and its subsidiaries generally ceased to use the Bridge Direct and Tech 4 Kids tradenames.

In 2018, the Debtors acquired in a foreclosure sale of the assets of Smart Brands International Co, LLC d/b/a K'NEX Brands, which sells the K'nex toy product line, which are building toys made up of rod and connector building systems specially designed for every age group and skill level. The Company also acquired the licenses to manufacture and sell the following toy brands: Lincoln Logs, Tinker Toys and My Little Pony.

In 2018, the Company acquired in a sale pursuant to Section 363 of the Bankruptcy Code certain assets of Playhut, Inc., which produced a line of indoor and outdoor play structures, including lightweight popup playhouses, tents, tunnels and games. Also in 2018, the Company launched a successful proprietary brand, Cutetitos, a line of plush, stuffed animals. In 2020, the Company acquired the master license for Care Bears and Tonka, two iconic, well-known toy brands.

Despite the Company's successful acquisition of many major toy companies and products over 10 years, in fiscal year 2023, the Company recognized total net sales of approximately $144.1 million, representing a decrease of $15.3 million, or 9.6%, compared to fiscal year 2022. The decrease in the net sales from 2022 to 2023 was in large part attributable to decreased consumer spending on toys and games, coupled with a surplus in inventory, as discussed in more detail below.

### 3.    Prepetition Corporate and Capital Structure

### a.  Corporate Structure

Basic Fun is a Delaware corporation and wholly owns Debtors (i) TBDUM; (ii) TGS, and (iii) K'NEX. Basic Fun is wholly owned by Debtor Holdco. Holdco is wholly owned by Non-Debtor Basic Fun TopCo.

General Partner is the general partner of the Basic Fun TopCo. Jay Foreman owns 100% of the equity interests in the General Partner. The following persons and entities own limited partnership interests in Basic Fun TopCo: (i) Jay Foreman (6,471,498.12 Units of Class A-1 Limited Partnership Interests and 519,000 Units of Class A-2 Limited Partnership Interests), (ii) MacDonald Family Limited Partners (3,008,501.91 Class A-1 Limited Partnership Units), (iii) CCNAS Investment Holdings, LLC (468,000 Class A-1 Limited Partnership Units and 52,000 Class A-3 Limited Partnership Units), (iv) Falcon Structured Equity Partners, LP (1,712,558.31 Class A-1 Limited Partnership Units 190,284.26 Class A-4 Limited Partnership Units (subject to adjustment) and 400,000 Class C Limited Partnership Units), and (v) various employees of the Company (55,559.50 Class B Limited Partnership Units in aggregate).

Basic Fun also wholly owns the following Non-Debtor Subsidiaries: (i) Tech 4 Kids HK, and (ii) The Bridge Direct Holdings HK. The Bridge Direct Holdings HK wholly owns The Bridge Direct HK. The Non-Debtor Subsidiaries provide manufacturing support for the Company's business.

The Non-Debtor Subsidiaries operations in Hong Kong are funded weekly by transfers from the Debtors to the Non-Debtor Subsidiaries' Hong Kong bank accounts based on management's determination of funding needs. The Non-Debtor Subsidiaries provide a cash flow forecast of what their projected disbursements will be for each week. Based on the cash flow forecast, the director of accounting sends a list of payments to be approved, which includes payments for, inter alia, rent, utilities, payroll, quality control. Then Debtor Basic Fun funds those payments through a wire to the Hong Kong bank accounts.

Each of the Debtors is an obligor under one or more of the Company's Prepetition Secured Obligations (defined below), by way of being a borrower or a guarantor.

Debtor Basic Fun is governed by the Board, which is composed of five (5) members: Jay Foreman, John MacDonald, Lisa Buchanan, Mike Swartz, and Berj Garabedian. Prior to the Petition Date, the Company appointed Lisa Buchanan as an independent director for the Debtors, replacing Steve Littman.

The Board of Managers for Holdco is identical to the Board for Basic Fun. Each of TGS, TBDUM and K'Nex is managed by Basic Fun, its sole member. The Board of Directors of K'NEX is composed of the following three directors: Messrs. Foreman, MacDonald and Littman.

The Debtors employ approximately 112 employees in the United States, three (3) employees in Canada, five (5) employees in the United Kingdom, and sixty (60) employees in Hong Kong. None of the Debtors' employees are subject to a collective bargaining agreement or represented by a trade or labor union.

### b.  Equity Ownership

Basic Fun is a Delaware corporation. Basic Fun is authorized to issue 100 shares of Common Stock, all of which is issued and outstanding, and owned by Holdco.

98876382.5

### c. Prepetition Secured Debt

#### i. 2017 RBC Credit Agreements – The Initial Loans

In 2017, as part of the business combination of Tech 4 Kids and the Bridge Direct, the Company began the process of raising third party capital through two tranches of loans provided by RBC and certain other senior lenders. In the initial round, the Company borrowed approximately $40 million in senior loans and $15 million in mezzanine loans from RBC, along with access to a $20 million accordion line for acquisitions (the "**Initial Debt Raise**").

On August 3, 2017, Basic Fun Canada Holdings, Inc., Basic Fun, Ltd., Holdco, the subsidiaries of Holdco from time to time party thereto, as borrowers, the lenders from time to time party thereto (the "**2017 Senior Lenders**"), and RBC, as administrative agent, entered into that certain Credit Agreement (the "**2017 RBC Senior Credit Agreement**"), pursuant to which the 2017 Senior Lenders made available to the Company $40 million in senior term loans and a $20 million accordion line for acquisitions (the "**2017 RBC Senior Obligations**").

On the same date, Basic Fun, as borrower, Holdco, the subsidiaries of Holdco party thereto, and RBC, as collateral agent for the lenders (in its capacity as collateral agent, the "**2017 Mezzanine Agent**")) for the several financial institutions from time to time party thereto ("**2017 Mezzanine Lenders**") and for itself as lender entered into that certain Subordinate Credit Agreement (as amended by amending agreements dated November 30, 2017, February 6, 2018, June 11, 2018, August 1, 2018, February 5, 2019, March 29, 2019, May 3, 2019, June 28, 2019, November 8, 2019 and July 15, 2020 and by consents dated May 14, 2020 and June 9, 2020, the "**2017 Mezzanine Credit Agreement**"), pursuant to which the Mezzanine Lenders made available to the Company up to $15,000,000.00 in subordinate loans (the "**Original Mezzanine Loans**").

In December of 2017, the Company commenced due diligence toward acquiring the assets of K'Nex.  The transaction closed in February 2018 and the 2017 Senior Lenders advanced $5,000,000 through the accordion facility, matched by a former investor in K'Nex, CCNAS Investment Holdings, Jay Foreman and John MacDonald.

On July 15, 2020, the 2017 Mezzanine Credit Agreement was amended pursuant to that certain Amendment No. 10 to Subordinate Credit Agreement, pursuant to which the Mezzanine Lenders agreed to make an additional loan to Basic Fun in the principal amount of $2,500,000 (the "**Prepetition First Out Loan I**") by way of a single advance in the full amount thereof.

Also on July 15, 2020, Jay Foreman and John MacDonald entered into those certain Participation Agreements, pursuant to which (i) Jay Foreman purchased a 100% participation interest in RBC's right, title and interest in, to the Prepetition First Out Loan I in the amount of $1,750,000, which represented a 70% share of the Prepetition First Out Loan I; and (ii) John MacDonald purchased an undivided 100% participation interest in RBC's right, title and interest in, to the Prepetition First Out Loan I in the amount of $750,000 outstanding, which represented a 30% share of the Prepetition First Out Loan I.

98876382.5

ii.    SLR Credit Agreement – The 2020 Refinancing Transaction

In late 2019, uncertainty in the market as a result of the Toys R Us Bankruptcy (defined below) and the Covid-19 Pandemic led RBC to advise the Company that RBC would not extend the 2017 RBC Senior Obligations beyond its stated maturity date of September 30, 2020. RBC moved the account to their Special Loan's Group and hired A&M to monitor cashflow and report on the company's performance. A term sheet negotiated with PNC was ultimately withdrawn as a result of Covid-19 impact uncertainty. As a result, the Company needed to refinance its 2017 RBC Senior Obligations (the "**2020 Refinancing Transaction**").

On October 30, 2020, Debtor Basic Fun, Inc., as borrower and borrower representative, and Debtors Holdco, K'NEX, TBDUM, and TGS as guarantors, entered into that certain Credit Agreement (as amended by that certain Waiver and First Amendment to Credit Agreement, dated as of April 26, 2021, that certain Second Amendment to Credit Agreement, dated as of October 27, 2021, that certain Waiver and Third Amendment to Credit Agreement Dated December 30, 2021, and as further amended, restated, amended and restated, supplemented or otherwise modified, the "**2020 SLR Credit Agreement**") with SLR and each other lender from time to time party thereto (the "**Prepetition Senior Lenders**"), and SLR as administrative agent (the "**Prepetition Senior Agent**").

Pursuant to the 2020 SLR Credit Agreement, the Prepetition Senior Lenders made available to the Debtors (i) a revolving credit facility in the maximum aggregate principal amount of $20 million (the "**Prepetition Senior Credit Facility**"), subject to a traditional ABL borrowing base; and (ii) a term loan in the maximum principal amount of $20 million (the "**Prepetition Senior Term Loan**"). The Prepetition Senior Credit Facility and the Prepetition Senior Term Loan shall be collectively referred to herein as the "**Prepetition Senior Facility**", and the debts owed thereunder shall be collectively referred to herein as the "**Prepetition Senior Secured Obligations**". The Prepetition Senior Secured Obligations are secured by a first-priority security interest in favor of the Prepetition Senior Agent, for the benefit of the holders of the Prepetition Senior Secured Obligations, in substantially all of the Debtors' assets.

As of the Petition Date, the outstanding principal amount owed by the Debtors with respect to the Prepetition Senior Term Loan was not less than $20 million and $326,164.74 with respect to the Prepetition Senior Credit Facility.

iii.    RBC Amended and Restated Mezzanine Debt

On October 30, 2020, Basic Fun as borrower, Holdco, K'NEX, TBDUM, and TGS as other loan parties, RBC as collateral agent ("**Prepetition Mezzanine Agent**") for the several lenders from time to time party thereto ("**Prepetition Mezzanine Lenders**", together with the Prepetition Senior Lenders, the "**Prepetition Secured Lenders**") and for itself as lender entered into that certain Amended And Restated Mezzanine Credit Agreement, pursuant to which the parties agreed to amend and restate the terms of the 2017 Mezzanine Credit Agreement. Pursuant to the terms of the Amended and Restated Mezzanine Credit Agreement, the Mezzanine Lenders agreed to advance an additional $2,500,000 to the Company (the "**Prepetition First Out Loan II**", together with Prepetition First Out Loan I, the "**Prepetition First Out Loans**"), which has been fully repaid. On June 28, 2024, the Amended and Restated Mezzanine Credit Agreement was

further amended, pursuant to which amendment the Prepetition First Out Loans were subordinated and became last out loans (the "**Prepetition Last Out Loans**"). The Original Mezzanine Loans and the Prepetition Last Out Loans shall be collectively referred to herein as the "**Prepetition Mezzanine Facility**", and the debts owed thereunder shall be collectively referred to herein as the "**Prepetition Mezzanine Secured Obligations**". The Prepetition Mezzanine Secured Obligations are secured by a second-priority security interest in favor of the Prepetition Mezzanine Agent, for the benefit of the holders of the Prepetition Mezzanine Secured Obligations, in substantially all of the Debtors' assets.

As of the Petition Date, the outstanding principal amount owed by the Debtors with respect to the Prepetition Mezzanine Secured Obligations was not less than $19,188,914.

The Prepetition Mezzanine Secured Obligations together with the Prepetition Senior Secured Obligations shall be collectively referred to herein as the "**Prepetition Secured Obligations**."

     iv.   The Falcon Investment

In January 2018, the Company and Basic Fun TopCo also sought out a private equity partner to invest in the business, hiring BMO Capital Markets. Though there were initially several interested parties, due to factors including the Toys R Us Bankruptcy (discussed in more detail below), only one party, Falcon, committed to an investment that Basic Fun TopCo and its existing equity holders deemed to be acceptable. Due diligence was commenced in March 2018 and concluded in July 2018.

On August 1, 2018, Falcon and Basic Fun TopCo entered into that certain Partnership Interest Purchase Agreement, pursuant to which Falcon invested $40 million in consideration for 400,000 units of Series C Preferred Partnership Interests, which accrue a preferred return of 10% per annum, and 178,533.48 Class A-4 Limited Partnership Interests (subject to certain adjustments) which represented approximately 14% of the "common equity" of Basic Fun TopCo (the "**Falcon Investment**").

Ten Million ($10,000,000) of the proceeds of the Falcon Investment were loaned by Basic Fun TopCo to the Company pursuant to a Term Note (the "**Falcon Contribution Note**"). The Falcon Contribution Note is subordinated in payment to all of the current and past secured debt obligations of the Company.

In addition, at the time of the Falcon Investment there was an outstanding $5,000,000 of notes documenting $5,000,000 loaned by Basic Fun TopCo to the Company in connection with the K'Nex acquisition (the "**K'Nex Note**"). Basic Fun TopCo had borrowed the $5,000,000 from Messrs. Foreman and MacDonald pursuant to notes issued by Basic Fun TopCo, which notes to Messrs. Foreman and MacDonald were repaid by Basic Fun TopCo from the proceeds of the Falcon Investment. The K'Nex Note is subordinated in payment to all of the current and past secured debt obligations of the Company. The remainder of the $40,000,000 equity investment repaid Foreman and MacDonald and a former unit holder $17,000,000 for his 26% interest in the company, senior employee distributions and transaction fees.

### d. Additional Owner Loans and Capital Investments.

During 2019 and in connection with negotiations with RBC and to obtain forbearance from certain defaults pursuant to the 2017 RBC Senior Credit Agreement and the 2017 Mezzanine Credit Agreement, the Company, and ultimately amendments to those loan agreements, the Company was required to obtain additional liquidity.

On March 29, 2019, Messrs. Foreman and MacDonald loaned Basic Fun TopCo an aggregate of $5,000,000 pursuant to Term Notes (the "**March Owner Notes**"). All of the proceeds of the March Owner Notes were used by Basic Fun TopCo to make a loan to the Company pursuant to a term note (the "**March LP Note**").

On June 28, 2019, Messrs. Foreman and MacDonald loaned Basic Fun TopCo an aggregate of $8,000,000 pursuant to Term Notes (the "**June Owner Notes**"). All of the proceeds of the June Owner Notes were used by Basic Fun TopCo to make a loan to the Company pursuant to a term note (the "**June LP Note**").

On September 30, 2019, Messrs. Foreman and MacDonald loaned Basic Fun TopCo an aggregate of $5,000,000 pursuant to Term Notes (the "**September Owner Notes**", and collectively with the March Owner Notes and the June Owner Notes, the "**Owner Notes**"). All of the proceeds of the September Owner Notes were used by Basic Fun TopCo to make a loan to the Company pursuant to a term note (the "**September LP Note**", and together with the K'Nex Note, the Falcon Contribution Note, the March LP Note and the June LP Note, the "**LP Notes**").

The LP Notes were all amended and restated as of October 30, 2020 and have a maturity date of April 29, 2024, and are fully subordinated to the debt pursuant to the Prepetition Senior Facility and the Prepetition Mezzanine Facility.

The $18 million in principal amount of Owner Notes were amended and restated on October 30, 2020 and provide that on April 1, 2021 they were converted into Junior Preferred Securities (as defined below). "Junior Preferred Securities" is a newly created class of Partnership Interests of Basic Fun TopCo which (w) is entitled to aggregate liquidation preference distributions equal to the amount of any principal and interest of the converted Owner Note plus a preferred return, (x) is not convertible to any other equity security of Basic Fun TopCo, (y) has no voting rights or other rights under the Agreement of Limited Partnership of Basic Fun TopCo, as amended or restated, other than rights to approve amendments to the terms of the Junior Preferred Securities and (z) has rights to distributions (including upon liquidation and redemption) junior to the Class C Units and only after payment in full of the Class C Liquidation Preference (but senior to the rights of the Class A Units and Class B Units of Basic Fun TopCo).

On October 30, 2020, in connection with, and as condition to, the 2020 Refinancing Transaction, Basic Fun TopCo sold $1,000,000 of Class A-1 Units in Basic Fun TopCo to the existing Class A Unitholders. In that transaction, Mr. Foreman acquired 6,292,348.31 Class A-1 Units for $562,793.75, Mr. MacDonald acquired 2,707,651.72 Class A-1 Units for $242,175.00, Falcon acquired 1,712,558.31 Class A-1 Units for $153,172.88 and CCNAS Investment Holdings, LLC acquired 468,000 Class A-1 Units for 41,858.37.

4.     **Events Precipitating the Chapter 11 Filing**

a.  **Despite its Growth, the Debtors' Business has Experienced Significant Economic Challenges**

i.   Initial Debt Raise and the Toys R Us Bankruptcy

Within weeks of the Initial Debt Raise, Toys "R" Us, Inc. and its affiliated debtors ("**Toys R Us**") each filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Virginia (Richmond Division) (jointly administered under Case No. 17-34665) on September 18, 2017 (the "**Toys R Us Bankruptcy**").

Prior to the Toys R Us Bankruptcy, Toys R Us was the Company's largest customer, with annual sales of approximately $35 million. The Toys R Us Bankruptcy left the Company with approximately $6 million in uncollectable receivables, of which the Company eventually collected approximately $1 million through insurance, and a significant hole in its sales projections. In March 2018, the Toys R Us bankruptcy converted to a chapter 7 liquidation, and Toys R Us closed all of its stores.

Despite the volatility in the toy market, the Company acquired additional toy and game entities between Q4 2017 and Q1 2018. Throughout 2019, the Company struggled to transition its volume of inventory from the now-defunct Toys R Us to Amazon. And, having acquired multiple operating entities, the Company further began to scale up its operations and its management team in order to more effectively handle all lines of business and run more efficiently.

ii.   Effects of the COVID-19 Pandemic

In 2020, the spread of the COVID-19 pandemic and the ensuing mandatory stay-at-home orders left widespread uncertainty across consumer markets. As a result of this uncertainty and a variety of other factors, RBC advised the Company that RBC would not extend the Company's senior term loan beyond September 30, 2020.

As a result, the Company found itself in the position of having to refinance its senior debt in an historically difficult market.  Doing so via the 2020 Refinancing Transaction with SLR was costly and resulted in a constraint on the Company's liquidity due to suppressed borrowing base availability and other restrictions. Also, from 2019 to 2020, John MacDonald and Jay Foreman invested, through the Owners Notes and the 2020 sale of Class A-1 Units, an additional $20.7 million, of what is now equity of Basic Fun TopCo, as capital into the Company.

By July 2020, the Company began to recover from the effects of COVID-19 under which the "stay-at-home" economy ultimately drove demand for toys and games higher than usual as consumers were purchasing toys and games for kids and families at home. Despite these sales, the Company still suffered its worst year in its amusement division, as all amusement parks and fun centers were closed, costing the Company over $10 million in sales in 2020.

In 2021, though demand for core toys remained strong, the amusement division continued to suffer as amusement parks remained closed. Moreover, COVID-19's impact on the supply chain

24

caused additional issues for the Company. The Company experienced supply chain difficulties related to goods being manufactured in China, as there were not enough ships or container boxes to pick up all the goods being produced to fill demand. As a result of a shortage in container boxes and ships, the goods being produced were not being shipped on time to meet demand. Moreover, any ships that were available faced delays getting in and out of ports due to COVID-19 testing protocols. Finally, the cost of shipping and receiving these containers in 2021 and 2022 increased as much as 7-10 times, a cost increase that could not be passed along to customers that had already negotiated terms at the previous shipping rates. Cost pressures hit the Company's bottom line and were difficult for the Company's teams in the US and Hong Kong. Cash flow was drained by the extra costs of dealing with Covid and the supply chain. The Company continued to face increased costs associated with its 2020 Refinancing Transaction from RBC to SLR and the RBC mezzanine debt. Accordingly, the extra trade costs associated with COVID-19, supply chain issues, and the refinance from RBC to SLR significantly impacted the Company's profits and cash flow in 2021.

### iii.  Continued Demand and Inventory Concerns

By 2022, with consumers spending less time at home post-COVID, consumers were flush with stimulus money but stopped buying home goods, including toys and games, and instead spent more heavily on experiences, like travel and entertainment. This demand shift helped the Company's smaller amusement business segment, which experienced a record year, but it was incredibly challenging for the retail business segment as demand for retail toys and games dropped, especially in the last half of the year. Moreover, at the same time, the supply chain finally regulated and shipments caught up to speed, leaving a surplus of inventory at the same time that demand for retail dipped. The Company continued to be strained by the high cost of shipping and the markdowns needed to support the overstocks of inventory.

From 2018 through 2022, over a dozen accretive acquisitions were assessed by the Company and in many cases letters of intent were submitted.  The Company developed a playbook for acquisitions and retained a VP of Business Development focused on leveraging the platform established by Jay Foreman to grow through acquisitions. The anticipated benefits of a business partner with $3 billion of assets to deploy to grow the Company have not materialized as letters of intent requiring equity were not available and additional equity contributions from Foreman and MacDonald could not be invested with priority to the Falcon Investment.

In 2023, despite increased demand for amusement products, consumer demand remained weak, and the Company turned its lowest overall volume since 2020. Given the scale of the Company's platform and the difference in the actual sales and forecast, the Company's margins shrank dramatically in 2023. These troubles have carried in to 2024, as the experiential economy, and therefore the amusement business, is suffering from a spending slump and the average consumer spends less money on toys and games.

### iv.  Negotiations with the Company's Prepetition Secured Lenders and Falcon

In October 2023, the Company's trailing twelve months of financial data ("**TTM**") declined to below the requirements set forth in the 2020 SLR Credit Agreement. In December 2023, the Company's forecast declined for the upcoming fiscal year.

In June 2024, certain defaults under the 2020 SLR Credit Agreement remained outstanding. Additionally, the SLR facilities were scheduled to mature on July 2, 2024, in accordance with the existing springing maturity clause set 90 days prior to the RBC maturity. Although the outstanding defaults triggered SLR's right to implement cash dominion over the Company's accounts, SLR chose not to exercise this right at that time but reserved the right to do so in the future.

In light of the continuing events of default, SLR implemented discretionary funding and declined a large revolver advance, considering the Company's cash position at that time. The Company voluntarily complied with SLR's request to transfer daily receipts to SLR's collection account, with funds being re-advanced to the Company upon request. The Company needed greater liquidity and more certain access to their line of credit during the summer months, their busiest production period, to meet customer demands later in the year.

The Company was also in a covenant-based default under the Amended and Restated Mezzanine Credit Agreement. Both RBC and SLR sent the Company notices of default. As a condition to renewing the mezzanine loans, RBC signaled its desire to see (i) the Company's access to capital to support operations, including through an acquisition strategy as a means to grow EBITDA, and (ii) re-alignment of management and equity interests in order to ensure that management was properly incentivized, and their interests were aligned with those of the Company.

By December 2023, the Company's default under the 2020 SLR Credit Agreement caused, among other things: (i) the Company to accrue contractual fees and default interest to SLR, (ii) the amortization under Prepetition First Out Loans to end after only one month, and (iii) interest payments to RBC to end, resulting in a Paid-in-Kind ("**PIK**") 18% rate.

In December 2023, the Company was showing a significant decline in its Q4 earnings. The Company received initial terms from a new potential takeout lender to replace SLR. RBC had further discussions with the Company's management and Falcon and responded to the prospective takeout lender terms with the view that RBC would not renew with SLR or the potential takeout lender unless the conditions discussed above were satisfied. RBC held individual calls with Falcon, Foreman, and MacDonald to communicate the position of RBC regarding the September 2024 maturity and the bases on which an additional term might be available.

The Company's management confirmed that replacement mezzanine financing would be prohibitively expensive if even possible given the declining TTM, EBITDA, and resulting depressed valuation of the Company.

In January 2024, the Company hired an advisor to further explore a relationship with a potential takeout lender as a replacement for SLR on the basis that the RBC requests would be met. The parties made good progress and resulted in a financing proposal by such takeout lender with improved economics to SLR.

In February 2024, the Company's management had further conversations with Falcon related to RBC's conditions. The Company held an in-person Board meeting in March, which included discussion of this increasingly critical gap as SLR notified the Company that their

springing maturity under the 2020 SLR Credit Agreement would be July 2, 2024 due to RBC not extending the maturity date under the Amended and Restated Mezzanine Credit Agreement. The parties were unable to make progress in March 2024. The RBC maturity inside the 2020 SLR Credit Agreement maturity was not resolved as part of the last credit amendment negotiated among the parties, complicating the negotiations.

In April 2024, the Company's CFO and John MacDonald, the Chair of the Debtors' Boards, held rounds of discussion with SLR, RBC, and Falcon. Following multiple calls with RBC and Falcon, the Company received a response from Falcon that did not adequately provide for access to capital or management alignment. RBC recommended that the Company retain an investment banker to provide valuation and strategic assistance in moving past the impasse with SLR, RBC, and Falcon.

After considering various investment banker options, the Company chose two well-known firms that went through three rounds of interviewing and discussions. The Company ultimately chose Oppenheimer as its investment banker.

Oppenheimer stepped into role of weekly communication with the goal of advancing all parties to a comprehensive longer-term solution that would document a new equity path and re-align equity interests to extend the Amended and Restated Mezzanine Credit Agreement and substitute a new lender for SLR.

In June 2024, Oppenheimer presented two options to refinance SLR with more availability and a lower interest rate and proceeded with negotiations and discussions. Great Rock provided the best terms, met with the Company at its headquarters in Florida, and commenced its borrowing base audit. At the same time, Oppenheimer had further conversations with RBC, SLR, and Falcon.

Also in June 2024, SLR tightened oversight over the Company. Disbursements were strictly limited to deposits which was constraining during June, a busy month in the cycle of a toy company.

### b.  Prepetition Restructuring Efforts

As discussed in detail above, prior to the Petition Date, the Company and Basic Fun TopCo engaged in extensive negotiations with the Prepetition Secured Lenders and Falcon to pursue a consensual restructuring of the Company's Prepetition Secured Obligations and Falcon's preferred equity position in Basic Fun TopCo. The parties could not agree on a restructuring that would allow the Company the necessary liquidity to begin making acquisitions as a path to growing EBITDA. Without a fully consensual path forward or further extension on its Prepetition Secured Obligations, the Debtors were unable to make further acquisitions in support of the continued growth of the Company.

The Company's management was faced with (i) a growing liquidity shortfall, (ii) maturity of its Prepetition Secured Obligations on July 2, 2024, (iii) an impasse among the key stakeholders, (iv) below-target TTM for Q1 of 2024, and (v) inability to access the Prepetition Senior Credit Facility. As a result, the Company's management, in consultation with its advisors, determined that it was in the best interests of the Company to recommend to the Company's Boards that the Company pursue a restructuring through Chapter 11 of the Bankruptcy Code.

98876382.5

To that end, the Company began exploring post-petition financing options with Great Rock, RBC, and certain other lenders under the Amended and Restated Mezzanine Credit Agreement. The terms Debtors negotiated with the lenders under the DIP Facilities were more favorable to the Debtors than the current debt structure and provide the Company with more liquidity to be able to (i) pursue a restructuring through confirmation of a plan of reorganization in these Chapter 11 Cases, and (ii) ultimately continue its strategic goals of acquiring more toy brands and growing its business.

The DIP Lenders committed to providing DIP financing, as described in the DIP Motion.

**B.      The Chapter 11 Cases**

**1.      First Day Orders**

On the Petition Date, the Debtors filed certain motions to transition into operations during the Chapter 11 Cases, stabilize operations, and preserve relationships with vendors, clients, and employees (the "**First Day Motions**").

The First Day Motions requested relief from the Bankruptcy Court to, among other things: (a) jointly administer the Chapter 11 Cases; (b) appoint Stretto as Claims and Noticing Agent; (c) pay employee wages; (d) maintain the Debtors' cash management system; (e) maintain utilities; (f) pay shippers/warehousemen; (g) obtain postpetition financing; (h) redact certain personally identifiable information; and (i) pay Critical Vendors. In support of the First Day Motions, the Debtors relied upon the First Day Declaration.

The Bankruptcy Court held hearings and granted the relief sought at a hearing on July 2, 2024 on an interim basis, and on July 29, 2024 on a final basis. The Bankruptcy Court entered the Second Interim DIP Order on July 31, 2024, and entered the Final DIP Order on August 12, 2024.

The First Interim DIP Order authorized the Debtors to use the proceeds of the DIP Facilities to payoff and discharge the Prepetition Senior Secured Obligations. Accordingly, Debtors paid off the Prepetition Senior Secured Obligations in full following entry of the First Interim DIP Order.

**2.      Retention of Professionals**

The Debtors, through various applications which were subsequently approved by the Bankruptcy Court, sought to employ certain professionals including: Polsinelli as counsel [Docket No. 152]; Oppenheimer as financial advisor and investment banker [Docket No. 151]; and Stretto as Claims and Noticing Agent and Administrative Agent [Docket Nos. 7, 150].

The Debtors further sought, and the Bankruptcy Court approved, authority to retain certain Professionals used by the Debtors in the ordinary course of business. Pursuant to the *Order Authorizing the Retention and Payment of Certain Professionals Utilized by the Debtors in the Ordinary Course of Business* [Docket No. 114], the Debtors filed the *Affidavit of Jayne Backett* of Fieldfisher LLP [Docket No. 175], the *Affidavit of Helen Cain* of Mercer & Hole LLP [Docket No. 176], and the *Declaration of Eric Pinto, on Behalf of Proposed Ordinary Course Professional PwC US Tax LLP* [Docket No. 181].

3.        **No Committee has been Appointed in the Chapter 11 Cases**

On July 16, 2024, the U.S. Trustee Filed the *Statement that Unsecured Creditors Committee Has Not Been Appointed* [Docket No. 73], confirming that no unsecured creditors committee has been appointed in these Chapter 11 Cases.

4.        **Rejection of Executory Contracts**

On July 29, 2024, Debtors sought authority to reject an Executory Contract with Rodon Group, LLC, *nunc pro tunc* to the Petition Date (the "**Rejection Motion**"). On August 15, 2024, the Debtors withdrew the Rejection Motion.

5.        **Restructuring Support Agreement**

On August 7, 2024, Debtors Filed the *Motion of Debtors for Entry of an Order (A) Authorizing the Debtors to Enter Into, and Perform Under, the Restructuring Support Agreement and (B) Granting Related Relief* ("**Restructuring Support Agreement Motion**"), seeking approval of the Restructuring Support Agreement.

The Restructuring Support Agreement is the product of extensive, arms' length and good faith negotiations among the Debtors and Non-Debtor Parties. The Restructuring Support Agreement details the Debtors' desire to implement a restructuring of their capital structure on the terms and conditions set forth in the (i) Falcon and Founders Term Sheet, (ii) the Great Rock Term Sheet, and (iii) the RBC Term Sheet, attached to the Restructuring Support Agreement as Exhibits 1-3, respectively.

Overall, the transactions contemplated by the Restructuring Support Agreement and effectuated hereto will (a) ensure the Debtors' capital structure upon emergence is more aligned with their long-term growth strategy, (b) permit the influx of additional capital to facilitate the successful implementation of the Debtors' long-term growth strategy, and (c) provide the Debtors the most expeditious path to plan confirmation, allowing for minimal disruption to the Debtors' businesses during the Chapter 11 Cases.

Subject to the terms of the Restructuring Support Agreement, the Non-Debtor Parties agreed to support the Combined Plan and Disclosure Statement. On August 23, 2024, upon certification of counsel that all outstanding objections to the Restructuring Support Agreement Motion had been resolved, the Bankruptcy Court entered an order authorizing Debtors' entry into and performance under the Restructuring Support Agreement [Docket No. 194] (the "**Restructuring Support Agreement Order**").

C.        **Summary of Treatment of Claims and Interests Under the Combined Plan and Disclosure Statement**

The following chart summarizes the classification and treatment of the Classes:

| Class | Estimated Allowed Claims[5] | Treatment | Entitled to Vote | Estimated Recovery to Holders of Allowed Claims[6] |
|---|---|---|---|---|
| Class 1 – Other Priority Claims | $0 | Unimpaired | No (Deemed to Accept) | 100% |
| Class 2 – Other Secured Claims | $0 | Unimpaired | No (Deemed to Accept) | 100% |
| Class 3 – Prepetition Mezzanine Claims | $9,188,914.00 | Impaired | Yes | 85+%[7] |
| Class 4 – TopCo Note Claims | $49,189,511.36 | Unimpaired | No (Deemed to Accept) | 100% |
| Class 5 – General Unsecured Claims | $25,656,893.65 | Unimpaired | No (Deemed to Accept) | 100% |
| Class 6 – Intercompany Claims | N/A | Unimpaired | No (Deemed to Accept) | 100% |
| Class 7 – Interests | N/A | Unimpaired | No (Deemed to Accept) | 100% |

---

[5]  These amounts represent estimated Allowed Claims, and do not represent amounts actually asserted by creditors in Proofs of Claim or otherwise. The Debtors have not completed their analysis of Claims in the Chapter 11 Cases, and objections to such Claims have not been Filed and/or fully litigated and may continue following the Effective Date. Therefore, there can be no assurances of the exact amount of the Allowed Claims at this time. Rather, the actual amount of the Allowed Claims may be greater or lower than estimated.

[6]  The estimated percentage recovery is based upon, among other things, an estimate of the Allowed Claims in the Chapter 11 Cases. As set forth above, the actual amount of the Allowed Claims may be greater or lower than estimated. Thus, the actual recoveries may be higher or lower than projected depending upon, among other things, the amounts and priorities of Claims that are actually allowed by the Bankruptcy Court.

[7]  Holders of Prepetition Mezzanine Claims will receive New First Out Term Notes issued under the Mezzanine Exit Facility. The Mezzanine Exit Facility amends and restates the Prepetition Mezzanine Facility by, among other things, extending the maturity date to three (3) years and 90 days after the Effective Date. Accordingly, the Prepetition Mezzanine Claims are impaired.

**D.    Certain U.S. Federal Income Tax Consequences to this Combined Plan and Disclosure Statement**

Substantial uncertainty exists with respect to many of the tax issues discussed below. Therefore, each holder of a Claim is urged to consult its own tax advisor regarding the federal, state, and other tax consequences of this Combined Plan and Disclosure Statement.  No rulings have been or are expected to be requested from the Internal Revenue Service ("**IRS**") with respect to any tax aspects of this Combined Plan and Disclosure Statement.

A summary description of certain United States ("**U.S.**") federal income tax consequences of this Combined Plan and Disclosure Statement is provided below. The description of tax consequences below is for informational purposes only and, due to lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various U.S. federal income tax consequences of this Combined Plan and Disclosure Statement as discussed herein.  Only the potential material U.S. federal income tax consequences to the Debtor and to a hypothetical holder of Claims who are entitled to vote to confirm or reject this Combined Plan and Disclosure Statement are described below.  No opinion of counsel has been sought or obtained with respect to any tax consequences of this Combined Plan and Disclosure Statement, and no tax opinion is being given in this Combined Plan Disclosure Statement.  No rulings or determinations of the IRS or any other tax authorities have been obtained or sought with respect to any tax consequences of this Combined Plan and Disclosure Statement, and the discussion below is not binding upon the IRS or such other authorities.  No representations are being made regarding the particular tax consequences of the confirmation and Consummation of this Combined Plan and Disclosure Statement.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

The discussion of the U.S. federal income tax consequences below is based on the Tax Code, Treasury Regulations promulgated and proposed thereunder, judicial decisions, and administrative rulings and pronouncements of the IRS and other applicable authorities, all as in effect on the date hereof.  Legislative, judicial or administrative changes or interpretations enacted or promulgated in the future could alter or modify the analyses and conclusions set forth below.  It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences to the holders of Claims.  Any such changes or interpretations may be retroactive and could significantly affect the U.S. federal income tax consequences discussed below.

**THIS DISCUSSION DOES NOT ADDRESS FOREIGN, STATE OR LOCAL TAX CONSEQUENCES OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT, NOR DOES IT PURPORT TO ADDRESS THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT TO SPECIAL CLASSES OF TAXPAYERS (SUCH AS FOREIGN ENTITIES, NONRESIDENT ALIEN INDIVIDUALS, PASS-THROUGH ENTITIES SUCH AS PARTNERSHIPS AND HOLDERS THROUGH SUCH PASS-THROUGH ENTITIES, S CORPORATIONS, MUTUAL FUNDS, INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, SMALL BUSINESS INVESTMENT COMPANIES, REGULATED INVESTMENT COMPANIES, CERTAIN SECURITIES TRADERS, BROKER-DEALERS AND TAX-EXEMPT ORGANIZATIONS).  FURTHERMORE, ESTATE AND**

31

GIFT TAX ISSUES ARE NOT ADDRESSED HEREIN AND TAX CONSEQUENCES RELATING TO THE ALTERNATIVE MINIMUM TAX ARE NOT DISCUSSED HEREIN.

NO REPRESENTATIONS ARE MADE REGARDING THE PARTICULAR TAX CONSEQUENCES OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT TO ANY SPECIFIC HOLDER OF A CLAIM. EACH HOLDER OF A CLAIM IS STRONGLY URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THIS COMBINED PLAN AND DISCLOSURE STATEMENT.

**1.    Consequences to Debtors**

In general, absent an exception, a debtor will realize and recognize cancellation of indebtedness income ("**COD Income**") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of cash paid, (ii) the issue price of any new indebtedness of the taxpayer issued, and (iii) the fair market value of any other new consideration (including stock of the debtor) given in satisfaction of such satisfied indebtedness at the time of the exchange.

Under section 108 of the Internal Revenue Code ("**IRC**"), a debtor is not, however, required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC. In general, tax attributes will be reduced in the following order: (a) net operating losses ("**NOL**") and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (f) passive activity loss and credit carryovers; and (g) foreign tax credit carryovers. Section 163(j) Carryforwards are not subject to reduction under these rules. Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC. The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined. Any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

**2.    Consequences to Holders of Prepetition Mezzanine Claims**

Except to the extent that a Holder of an Allowed Prepetition Mezzanine Claim has agreed to a less favorable treatment of such Claim, and only to the extent that any such Allowed Prepetition Mezzanine Claim has not been paid in full prior to the Effective Date, each such Holder of an Allowed Prepetition Mezzanine Claim shall receive such Holder's Pro Rata share of the New First Out Term Notes. The Debtors expect that this exchange would constitute a "significant modification" of the original debt instruments for U.S. federal income tax purposes for any Holder receiving its Pro Rata share of New First Out Term Notes. Where there is a significant modification

to a non-publicly traded debt instrument, holders may recognize gain or loss measured by the difference between the issue price of the new debt and the tax basis of the old debt.  Under the circumstances, the Debtors expect that any tax consequences to such Holders will not be material.

### 3.    Consequences to other Holders

The tax consequences to Other Holders are described in the Fourth Amended LPA and Restructuring Support Agreement, as applicable.

### E.    Certain Risk Factors to Be Considered

BEFORE TAKING ANY ACTION WITH RESPECT TO THE COMBINED PLAN AND DISCLOSURE STATEMENT, HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE COMBINED PLAN AND DISCLOSURE STATEMENT SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE COMBINED PLAN AND DISCLOSURE STATEMENT, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES. THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE RESTRUCTURING AND CONSUMMATION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT. EACH OF THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE STATEMENT MAY APPLY EQUALLY TO THE DEBTORS OR THE REORGANIZED DEBTORS, AS APPLICABLE AND AS CONTEXT REQUIRES.

### 1.    Bankruptcy Law Considerations.

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to holders of Allowed Claims under the Combined Plan and Disclosure Statement and may affect the validity of the vote of the Impaired Classes to accept or reject the Combined Plan and Disclosure Statement and may require a re-solicitation of the votes of holders of Claims in such Impaired Classes.

### a.    There is a Risk of Termination of the Restructuring Support Agreement.

To the extent that events giving rise to termination of the Restructuring Support Agreement occur, the Restructuring Support Agreement may terminate prior to the Confirmation or Consummation of the Combined Plan and Disclosure Statement, which could result in the loss of support for the Combined Plan and Disclosure Statement by important stakeholder constituencies and could result in the loss of the Debtors' use of cash collateral and/or access to the DIP Facilities under certain circumstances. Any such loss of support could adversely affect the Debtors' ability to confirm and consummate the Combined Plan and Disclosure Statement. If the Combined Plan and Disclosure Statement is not consummated, there can be no assurance that the Chapter 11 Cases

98876382.5

would not be converted to chapter 7 liquidation cases or that any new chapter 11 plan would be as favorable to holders of Claims or Interests as the current Combined Plan and Disclosure Statement.

**b.     The Debtors May Exhaust Their Use of Cash Collateral and/or Lose Access to the DIP Facilities.**

On the Petition Date, the Debtors filed the DIP Motion, which requested authorization to enter into the DIP Facilities and use cash collateral to fund the Chapter 11 Cases in accordance with the terms of the Restructuring Support Agreement. Such access to post-petition financing and cash collateral will provide liquidity during the pendency of the Chapter 11 Cases. While the Bankruptcy Court has entered the Final DIP Order, if the Chapter 11 Cases take longer than expected to conclude, the Debtors may exhaust their available cash collateral and/or lose access to the DIP Facilities. There is no assurance that the Debtors will be able to obtain an extension of the right to obtain further post-petition financing and/or use cash collateral, in which case, the liquidity necessary for the orderly functioning of the Debtors' businesses may be impaired materially.

**c.     Parties in Interest May Object to the Combined Plan and Disclosure Statement's Classification of Claims and Interests.**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Combined Plan and Disclosure Statement complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. However, a Holder of a Claim or Interest could challenge the Debtors' classification. In such an event, the cost of the Chapter 11 Cases and the time needed to confirm the Combined Plan and Disclosure Statement may increase, and there can be no assurance that the Bankruptcy Court will agree with the Debtors' classification. If the Bankruptcy Court concludes that the classifications of Claims and Interests under the Combined Plan and Disclosure Statement do not comply with the requirements of the Bankruptcy Code, the Debtors may need to modify the Combined Plan and Disclosure Statement (subject to the terms of the Restructuring Support Agreement). The Combined Plan and Disclosure Statement may not be confirmed if the Bankruptcy Court determines that the Debtors' classification of Claims and Interests is not appropriate.

**d.     The Conditions Precedent to the Effective Date of the Combined Plan and Disclosure Statement May Not Occur.**

As more fully set forth in Article XIII of the Combined Plan and Disclosure Statement, the Confirmation Date and the Effective Date of the Combined Plan and Disclosure Statement are subject to a number of conditions precedent. If all conditions precedent are not satisfied or waived, the Confirmation Date or the Effective Date will not take place. In the event that the Effective Date does not occur, the Debtors may seek Confirmation of a new plan (if available). If the Debtors do not secure sufficient working capital to continue their operations and/or if the new plan is not confirmed, however, the Debtors may be forced to liquidate their assets.

e.      **The Debtors May Fail to Satisfy Vote Requirements.**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Combined Plan and Disclosure Statement, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Combined Plan and Disclosure Statement. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction. There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the holders of Interests and Allowed Claims as those proposed in the Combined Plan and Disclosure Statement and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Combined Plan and Disclosure Statement.

f.      **The Debtors May Not Be Able to Secure Confirmation of the Combined Plan and Disclosure Statement.**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Combined Plan and Disclosure Statement will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Combined Plan and Disclosure Statement. A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code and/or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Combined Plan and Disclosure Statement if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, holders of Interests and Allowed Claims against them would ultimately receive.

The Debtors, subject to the terms and conditions of the Combined Plan and Disclosure Statement and the Restructuring Support Agreement, reserve the right to modify the terms and conditions of the Combined Plan and Disclosure Statement as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Combined Plan and Disclosure Statement. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Combined Plan and Disclosure Statement or no distribution whatsoever under the Combined Plan and Disclosure Statement.

98876382.5

g.      **The Debtors May Not Be Able to Secure Nonconsensual Confirmation Over Certain Impaired Non-Accepting Classes.**

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one Impaired Class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Combined Plan and Disclosure Statement satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Combined Plan and Disclosure Statement may result in, among other things, increased expenses relating to professional compensation.

h.      **Even if the Restructuring Transactions are Successful, the Debtors Will Face Continued Risk Upon Confirmation.**

Even if the Combined Plan and Disclosure Statement is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in demand for the goods the Debtors provide, and increasing expenses. *See* Article IV(E)(2) of this Combined Plan and Disclosure Statement, entitled "Risks Related to Recoveries under the Combined Plan and Disclosure Statement and the Debtors' and the Reorganized Debtors' Businesses." Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Combined Plan and Disclosure Statement will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Combined Plan and Disclosure Statement and prohibits creditors and others from proposing a plan. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Combined Plan and Disclosure Statement in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Combined Plan and Disclosure Statement, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

i.      **The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code.**

If the Bankruptcy Court finds that it would be in the best interest of Creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to Creditors than those provided for in a chapter 11 case because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing the business in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) a materially longer case timeline and agreed to in the Restructuring Support Agreement; and (d) as a result of a longer case timeline, additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

j.      **The Debtors May Object to the Amount or Classification of a Claim.**

Except as otherwise provided in the Combined Plan and Disclosure Statement, the Debtors reserve the right to object to the amount or classification of any Claim under the Combined Plan and Disclosure Statement. The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim where such Claim is subject to an objection. Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

k.      **Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Combined Plan and Disclosure Statement.**

The distributions available to holders of Allowed Claims under the Combined Plan and Disclosure Statement can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to holders of Allowed Claims and Interests under the Combined Plan and Disclosure Statement, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Combined Plan and Disclosure Statement or require any sort of revote by the Impaired Classes.

The estimated Claims and Creditor recoveries set forth in this Combined Plan and Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Combined Plan and Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things,

the percentage recoveries to holders of Allowed Claims under the Combined Plan and Disclosure Statement.

### l.      Releases, Injunctions, and Exculpation Provisions May Not Be Approved.

Article XIV of the Combined Plan and Disclosure Statement provides for certain releases, injunctions, and exculpations, including a release of Liens and third-party releases that may otherwise be asserted against the Debtors or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Combined Plan and Disclosure Statement are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Combined Plan and Disclosure Statement.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts that are critical to the success of the Combined Plan and Disclosure Statement (including, but not limited to, funding the DIP Facilities), but only if they receive the full benefit of the Combined Plan and Disclosure Statement's release and exculpation provisions. The Combined Plan and Disclosure Statement's release and exculpation provisions are an inextricable component of the Restructuring Support Agreement and Combined Plan and Disclosure Statement and the significant deleveraging and financial benefits that they embody.

### m.      The Debtors Cannot Predict the Amount of Time Spent in Bankruptcy, and Time Spent in Bankruptcy Could Disrupt the Debtors' Business.

The Debtors estimate that the process of obtaining Confirmation and Consummation of the Combined Plan and Disclosure Statement by the Bankruptcy Court could last approximately 45 days from the filing of the Combined Plan and Disclosure Statement, but it could last considerably longer if, for example, Confirmation is contested or the conditions to Confirmation or Consummation, including obtaining any required regulatory approvals, are not satisfied or waived.

Although the Combined Plan and Disclosure Statement is designed to minimize the length of the bankruptcy proceedings, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy, and the Debtors cannot be certain that the Combined Plan and Disclosure Statement will be confirmed. Even if confirmed on a timely basis, a bankruptcy proceeding to confirm the Combined Plan and Disclosure Statement could itself have an adverse effect on the Debtors' businesses. There is a risk, due to uncertainty about the Debtors' future, such that, among other things:

> (i)  employees could be distracted from performance of their duties or more easily attracted to other career opportunities; and

> (ii)  suppliers, vendors, or other business partners could terminate their relationship with the Debtors or demand financial assurances or enhanced performance, any of which could impair the Debtors' prospects. A lengthy bankruptcy proceeding also would involve additional expenses and divert the attention of management from the operation of the Debtors' businesses.

98876382.5

The disruption that the bankruptcy process would have on the Debtors' businesses could increase with the length of time it takes to complete the Chapter 11 Cases. If the Debtors are unable to obtain Confirmation of the Combined Plan and Disclosure Statement in accordance with the milestones, because of a challenge to the Combined Plan and Disclosure Statement or otherwise, the Debtors may be forced to operate in bankruptcy for an extended period of time. A protracted bankruptcy case would increase both the probability and the magnitude of the adverse effects described above.

        **2.**        **Risks Related to Recoveries Under the Combined Plan and Disclosure Statement and the Debtors' and the Reorganized Debtors' Businesses.**

        **a.**        **The Reorganized Debtors May Not Be Able to Achieve Their Projected Financial Results.**

The Reorganized Debtors may not be able to achieve their projected financial results. The Financial Projections (as defined herein) to be attached to the Combined Plan and Disclosure Statement Supplement represent the Debtors' advisors and management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the industry segments in which the Debtors operate in particular. While the Debtors believe that the Financial Projections are reasonable, there can be no assurance that they will be realized. If the Debtors do not achieve their projected financial results, the value of the Interests may be negatively affected and the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date. Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

        **b.**        **Estimated Valuations of the Debtors and the Equity, and Estimated Recoveries to Holders of Allowed Claims and Interests Are Not Intended to Represent Potential Market Values.**

The Debtors' estimated recoveries to Holders of Allowed Claims and Allowed Interests are not intended to represent the market value of the Debtors' Securities. The estimated recoveries are based on numerous assumptions (the realization of many of which will be beyond the control of the Debtors), including: (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections; (d) the Debtors' ability to maintain adequate liquidity to fund operations; (e) the assumption that capital and equity markets remain consistent with current conditions; (f) the Debtors' ability to maintain critical existing customer relationships, including customer relationships with key customers.

3.      **The Support of the Non-Debtor Parties is Subject to the Terms of the Restructuring Support Agreement, which is Subject to Termination in Certain Circumstances.**

Pursuant to the Restructuring Support Agreement, the Non-Debtor Parties have agreed to support the Reorganization Transactions set forth in the Combined Plan and Disclosure Statement. Nevertheless, the Restructuring Support Agreement is subject to termination upon the occurrence of certain termination events (including the failure of the Debtors to satisfy the milestones set forth therein). Accordingly, the Restructuring Support Agreement may be terminated after the date of this Combined Plan and Disclosure Statement, and such a termination would present a material risk to Confirmation and/or Consummation of the Combined Plan and Disclosure Statement because the Combined Plan and Disclosure Statement may no longer have the support of the Non-Debtor Parties.

4.      **The Debtors May Not Be Able to Accurately Report Their Financial Results.**

The Debtors have established internal controls over financial reporting. However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud. Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements. If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required under the terms of the agreements governing the Debtors' indebtedness. Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition. Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

5.      **The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness.**

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest and/or fees on their indebtedness.

6.      **Certain Tax Implications of the Combined Plan and Disclosure Statement.**

Holders of Allowed Claims should carefully review Article IV(D) of this Combined Plan and Disclosure Statement entitled "Certain U.S. Federal Income Tax Consequences of the

Combined Plan and Disclosure Statement" to determine how the federal income tax implications of the Combined Plan and Disclosure Statement and the Chapter 11 Cases may affect the Debtors, the Reorganized Debtors, and Holders of Claims, as well as certain tax implications of owning and disposing of the consideration to be received pursuant to the Combined Plan and Disclosure Statement.

**7.     The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases.**

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) ability to develop, confirm, and consummate the Reorganization Transactions specified in the Combined Plan and Disclosure Statement; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' Creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

**8.     Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses.**

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization. A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' businesses. In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to

reorganize their businesses successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors may be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases. If the chapter 11 proceedings last longer than anticipated, the Debtors may require additional debtor-in-possession financing to fund the Debtors' operations. If the Debtors are unable obtain such financing in those circumstances, the chances of successfully reorganizing the Debtors' businesses may be seriously jeopardized, the likelihood that the Debtors will instead be required to liquidate or sell their assets may be increased, and, as a result, Creditor recoveries may be significantly impaired.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

9.      **Financial Results May Be Volatile and May Not Reflect Historical Trends.**

During the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as restructuring activities and expenses, contract terminations and rejections, and/or claims assessments significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.

In addition, if the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors also may be required to adopt "fresh start" accounting in accordance with Accounting Standards Codification 852 ("Reorganizations") in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends. The Financial Projections do not currently reflect the impact of fresh start accounting, which may have a material impact on the Financial Projections.

10.     **The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases.**

In the future, the Reorganized Debtors may become parties to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Combined Plan and Disclosure Statement. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to nor the final resolution

42

of such litigation. The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

**11.    Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations.**

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all Claims that arise prior to the Debtors' filing of their petitions or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization. Any Claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations.

**F.    Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that, in order for a plan to be confirmed, the Bankruptcy Court must find that confirmation of such plan is not likely to be followed by the liquidation or need for further reorganization of the debtor unless contemplated by the plan.

In order to establish the feasibility of the Combined Plan and Disclosure Statement for purposes of section 1129(a)(11) of the Bankruptcy Code, the Debtors and their management team and advisors, have developed financial projections (the "**Financial Projections**") to be attached to the Combined Plan and Disclosure Statement Supplement. The Financial Projections set forth the projected financial performance of the Reorganized Debtors over a defined period of time based upon a number of assumptions and factors. Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Combined Plan and Disclosure Statement will meet the feasibility requirements of the Bankruptcy Code.

**G.    Best Interests Test and Alternatives to the Combined Plan and Disclosure Statement**

Section 1129(a)(7) of the Bankruptcy Code requires that, with respect to an impaired class of claims or interests, each holder of an impaired claim or interest in such class either (i) accepts the plan or (ii) receives or retains under the plan property of a value, as of the effective date of the plan, that is not less than the amount (value) such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

The Debtors believe that liquidation under chapter 7 would result in smaller distributions, if any, being made to Creditors than those provided for in the Combined Plan and Disclosure Statement because of: (a) the likelihood that the Debtors' Assets would have to be sold or otherwise disposed of in an orderly fashion; (b) additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other professionals; and (c) additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in

connection with a cessation of the Debtors' operations. In the opinion of the Debtors, given that Holders of Claims are receiving 100% recoveries under the Combined Plan and Disclosure Statement, the recoveries projected to be available in a chapter 7 liquidation are not likely to afford the Holders of Claims as great a realization potential as afforded to them under the Combined Plan and Disclosure Statement.

Accordingly, the Debtors believe that in a chapter 7 liquidation, Holders of Claims would receive less than such Holders would receive under the Combined Plan and Disclosure Statement. There can be no assurance, however, as to values that would actually be realized in a chapter 7 liquidation, nor can there be any assurance that a Court would accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code. Therefore, the Debtors believe that the Combined Plan and Disclosure Statement provides the greatest possible value to all stakeholders under the circumstances, and has the greatest chance to be confirmed and consummated.

The Debtors, with the assistance of their Professionals, have prepared a liquidation analysis (the "**Liquidation Analysis**"), attached hereto as <u>Exhibit C</u> and incorporated herein, to further establish that the Combined Plan and Disclosure Statement is in the best interests of Creditors.

## V.    Unclassified Claims

### A.    Administrative Expense Claims

Requests for payment of Administrative Expense Claims must be Filed no later than the Administrative Expense Bar Date. Holders of Administrative Expense Claims that do not File requests for the allowance and payment thereof on or before the Administrative Expense Bar Date shall forever be barred from asserting such Administrative Expense Claims against the Debtors or the Estates; provided, however, taxing authorities and Holders of Claims under 28 U.S.C. § 1930 shall not be required to file requests for payment of Administrative Expense Claims, and the Debtors shall pay taxes that arose after the Petition Date in the ordinary course of business to the greatest extent possible.

Subject to the provisions of sections 328, 330(a), and 331 of the Bankruptcy Code, and unless the Holder of an Allowed Administrative Expense agrees to less favorable treatment or such Holder has been paid by any Debtor on account of such Allowed Administrative Expense prior to the Effective Date, each Holder of an Allowed Administrative Expense (other than holders of Professional Fee Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Expense Claims an amount of Cash equal to the amount of such Allowed Administrative Expense in accordance with the following: (1) if an Administrative Expense is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Expense is due or as soon as reasonably practicable thereafter); (2) if such Administrative Expense is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Expense becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Expense is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular

transaction giving rise to such Allowed Administrative Expense without any further action by the holders of such Allowed Administrative Expense; (4) at such time and upon such terms as may be agreed upon by such holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

### B.    Professional Fee Claims

Unless otherwise ordered by the Bankruptcy Court or provided herein, all Professionals or other Persons requesting compensation or reimbursement of Professional Fee Claims for services rendered before the Effective Date (including compensation requested by any Professional or other Entity for making a substantial contribution in the Chapter 11 Cases) in these Chapter 11 Cases shall File an application for final allowance of compensation and reimbursement of expenses no later than the Professional Fee Claims Bar Date.

The Final Fee Hearing to determine the allowance of Professional Fee Claims shall be held as soon as practicable after the Professional Fee Claims Bar Date. The Debtors' counsel shall File a notice of the Final Fee Hearing. Such notice shall be posted on the Case Website, and served upon counsel for all Professionals, the U.S. Trustee, and all parties on the Debtors' Bankruptcy Rule 2002 service list.

Allowed Professional Fee Claims of the Professionals shall be paid: (a) as soon as is reasonably practicable following the later of (i) the Effective Date and (ii) the date upon which the order relating to any such Allowed Professional Fee Claims is entered by the Bankruptcy Court; or (b) upon such other terms as agreed by the Holder of such an Allowed Professional Fee Claims.

### C.    Priority Tax Claims

Pursuant to Bankruptcy Code section 1129(a)(9)(C), unless otherwise agreed to by a Holder of an Allowed Priority Tax Claim and the Debtors, each Holder of an Allowed Priority Tax Claim shall receive, in full satisfaction of its Priority Tax Claim, payment in full in Cash of the Allowed amount of the Priority Tax Claim as of the Effective Date equal to the Allowed amount of the Priority Tax Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Priority Tax Claim becomes an Allowed Priority Tax Claim; or (iii) the date for payment provided by any agreement or arrangement between the Debtors or the Reorganized Debtors, as the case may be, and the Holder of the Allowed Priority Tax Claim.

The Debtors estimate that the aggregate amount of Allowed Priority Tax Claims does not exceed $205,414.48.

### D.    Statutory Fees

The Debtors and the Reorganized Debtors, as applicable, will pay the undisputed fees payable under 28 U.S.C § 1930(a), including fees, expenses, and applicable interest payable to the United States Trustee, for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first. Any disputed fees will be paid in the amount determined to be due by a Final Order.

E.    **Great Rock DIP Claims**

Each Holder of an Allowed Great Rock DIP Claim shall receive, in full satisfaction of its Great Rock DIP Claim, payment in full in Cash of the Allowed amount of the Great Rock DIP Claim on the Effective Date from the proceeds of the Senior Exit Facility.

The Debtors estimate that the aggregate amount of Great Rock DIP Claims does not exceed $19,686,980.00.

F.    **RBC DIP Claims**

On the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed RBC DIP Claim, each Holder of an Allowed RBC DIP Claim shall receive, New First Out Term Notes in an amount equal to the Allowed amount of such Holder's RBC DIP Claims on the Effective Date.

The Debtors estimate that the aggregate amount of RBC DIP Claims does not exceed $10,000,000.

VI.    **Classification and Treatment of Claims and Interests**

A.    **Classification of Claims and Interests**

The below categories of Claims and Interests classify such Claims and Interests for all purposes, including voting, Confirmation, and Distribution pursuant hereto and pursuant to Bankruptcy Code sections 1122 and 1123.

B.    **Treatment of Claims and Interests**

1.    **Class 1 – Other Priority Claims**

Except to the extent that a Holder of an Allowed Other Priority Claim has agreed to a less favorable treatment of such Claim, and only to the extent that any such Allowed Other Priority Claim has not been paid in full prior to the Effective Date, each such Holder of an Allowed Other Priority Claim shall receive Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between the Debtors or the Reorganized Debtors, as the case may be, and the Holder of the Allowed Other Priority Claim.

The Debtors estimate that the aggregate amount of Allowed Other Priority Claims does not exceed $0. Class 1 Claims are Unimpaired and deemed to accept the Combined Plan and Disclosure Statement.

98876382.5

### 2.   Class 2 - Other Secured Claims

Except to the extent that a Holder of an Allowed Other Secured Claim has agreed to a less favorable treatment of such Claim, and only to the extent that any such Allowed Secured Claim has not been paid in full prior to the Effective Date, on the later of the Effective Date and the date on which the Other Secured Claim is Allowed, each Holder of an Allowed Other Secured Claim shall receive, at the sole and exclusive option of the Reorganized Debtors: (a) Cash equal to the amount of such Claim; (b) the collateral securing its Allowed Other Secured Claim; (c) Reinstatement of its Allowed Other Secured Claim; or (d) such other treatment that renders its Allowed Other Secured Claim Unimpaired in accordance with Bankruptcy Code section 1124. In the event the Reorganized Debtors treat a Claim under clause (a) of this Section, the Liens securing such Allowed Other Secured Claim shall be deemed released, terminated, and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization, or approval of any Person. The Debtors and the Reorganized Debtors specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported Liens relating to the Other Secured Claims.

The Debtors estimate that the aggregate amount of Allowed Other Secured Claims will not exceed $0. Class 2 Claims are Unimpaired and deemed to accept the Combined Plan and Disclosure Statement.

### 3.   Class 3 – Prepetition Mezzanine Claims

Except to the extent that a Holder of an Allowed Prepetition Mezzanine Claim has agreed to a less favorable treatment of such Claim, and only to the extent that any such Allowed Prepetition Mezzanine Claim has not been paid in full prior to the Effective Date, each such Holder of an Allowed Prepetition Mezzanine Claim shall receive (a) solely with respect to Holders of Prepetition Mezzanine Claims arising from the Original Mezzanine Loans (other than the Prepetition Last Out Loans), New First Out Term Notes in an amount equal $2,500,000 on the Effective Date, and New Last Out Term Notes in an amount equal to no less than $3,952,501.05, which, for the avoidance of doubt, shall be purchased by Falcon and the Founders on the Effective Date in the form of participations pursuant to the terms of the Out-Of-Court Restructuring (as defined below) and subject to the terms of the Mezzanine Exit Facility,  and (b) solely as to Holders of Prepetition Mezzanine Claims arising from Prepetition Last Out Loans, the Founder Preferred Equity (as defined herein) in Basic Fun TopCo pursuant to the Last Out Conversion (as defined herein), on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Prepetition Mezzanine Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between the Debtors or the Reorganized Debtors, as the case may be, and the Holder of the Allowed Prepetition Mezzanine Claim.

The Debtors estimate that the aggregate amount of Allowed Prepetition Mezzanine Claims does not exceed $9,188,914.00. Class 3 Claims are Impaired and entitled to vote on the Combined Plan and Disclosure Statement.

### 4.    Class 4 – TopCo Note Claims

On the Effective Date, each such Holder of an Allowed TopCo Note Claim shall receive such Holder's Pro Rata share of the New TopCo Notes and such Holder's Pro Rata share of the New TopCo Note Cash Payment.

The TopCo Note Claims shall be Allowed in the aggregate amount of $49,189,511.36. Class 4 Claims are Unimpaired and deemed to accept the Combined Plan and Disclosure Statement.

### 5.    Class 5 – General Unsecured Claims

Except to the extent that a Holder of an Allowed General Unsecured Claim has agreed to a less favorable treatment of such Claim, and only to the extent that any such Allowed General Unsecured Claim has not been paid by any applicable Debtors prior to the Effective Date, on the Effective Date, or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors, as applicable, shall continue to pay or dispute each General Unsecured Claim in the ordinary course of business as if the Chapter 11 Cases had never been commenced.

The Debtors estimate that the aggregate amount of Allowed General Unsecured Claims will be approximately $25,656,893.65. Class 5 Claims are Unimpaired and deemed to accept the Combined Plan and Disclosure Statement.

### 6.    Class 6 – Intercompany Claims

Except to the extent that a Holder of an Allowed Intercompany Claim has agreed to a less favorable treatment of such Allowed Intercompany Claim, each such Holder of an Allowed Intercompany Claim shall receive Reinstatement of its Allowed Intercompany Claim.

Class 6 Claims are Unimpaired and deemed to accept the Combined Plan and Disclosure Statement.

### 7.    Class 7 – Interests

Except to the extent that a Holder of an Allowed Interest has agreed to a less favorable treatment of such Allowed Interest, each such Holder of an Allowed Interest shall receive Reinstatement of its Allowed Interests.

Class 7 Interests are Unimpaired and deemed to accept the Combined Plan and Disclosure Statement.

### C.    Impaired Claims and Interests

Under the Combined Plan and Disclosure Statement, Holders of Claims in Class 3 is an Impaired Class pursuant to Bankruptcy Code section 1124 because the Combined Plan and

Disclosure Statement alters the legal, equitable or contractual rights of the Holders of such Claims treated in such Class.

**D.    Cramdown and No Unfair Discrimination**

To the extent that any Impaired Class does not accept the Combined Plan and Disclosure Statement, the Debtors will seek Confirmation pursuant to Bankruptcy Code section 1129(b). This provision allows the Bankruptcy Court to confirm a plan accepted by at least one Impaired Class so long as it does not unfairly discriminate and is fair and equitable with respect to each class of claims and interest that is Impaired and has not accepted the plan. Colloquially, this mechanism is known as a "cramdown."

The Debtors believe the treatment of Claims and Interests described in the Combined Plan and Disclosure Statement are fair and equitable and do not discriminate unfairly. The proposed treatment of Claims and Interests provides that each Holder of such Claim or Interest will be treated identically within its respective class and that, except when agreed to by such Holder, no Holder of any Claim or Interest junior will receive or retain any property on account of such junior Claim or Interest.

## VII.    Confirmation Procedures

**A.    Confirmation Procedures**

**1.    Combined Hearing**

The Confirmation Hearing before the Bankruptcy Court has been scheduled for **October 21, 2024 at 11:30 a.m. (ET)** at the United States Bankruptcy Court, 824 North Market Street, 3rd Floor, Courtroom #7, Wilmington, DE 19801 to consider (a) approval of the Combined Plan and Disclosure Statement as providing adequate information pursuant to Bankruptcy Code section 1125, and (b) confirmation of the Combined Plan and Disclosure Statement pursuant to Bankruptcy Code section 1129. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing and Filed with the Court.

**2.    Procedure for Objections**

Any objection to approval or confirmation of the Combined Plan and Disclosure Statement must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim held by the objector. Any such objection must be Filed by **October 11, 2024 at 4:00 p.m. (ET)** with the Bankruptcy Court and served on (i) the Debtors, c/o Basic Fun, Inc., 301 Yamato Road, Suite 4200, Boca Raton, FL 33431; (ii) counsel to the Debtors, Polsinelli PC, 222 Delaware Avenue, Suite 1101, Wilmington, Delaware 19801, Attn: Shanti M. Katona (skatona@polsinelli.com) and 1401 Eye Street N.W., Suite 800, Washington, D.C. 20005, Attn: Mark B. Joachim (mjoachim@polsinelli.com), and 2049 Century Park East, Suite                                                                                                      2900 Los Angeles, CA 90067, Attn: Tanya Behnam (tbehnam@polsinelli.com); (iv) counsel to RBC, Klehr Harrison Harvey Branzburg LLP, 919 N. Market Street, Suite 1000, Wilmington, DE 19801 Attn: Domenic Pacitti (dpacitti@klehr.com); Richard Beck (rbeck@klehr.com); Sally Veghte

(SVeghte@klehr.com) and Orrick, Herrington & Sutcliffe LLP, 51 West 52nd Street, New York, NY 10019, Attn: Raniero D'Aversa (rdaversa@orrick.com) and 400 Capitol Mall, Suite 3000, Sacramento, CA 95814, Attn: Nick Sabatino (nsabatino@orrick.com); (v) counsel to Great Rock, Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, DE 19801, Attn: Edmon L. Morton (emorton@ycst.com), Matthew B. Lunn (mlunn@ycst.com), and Paul Hastings LLP, 515 S. Flower Street, 25th Floor, Los Angeles, CA 90071, Attn: Justin E. Rawlins (justinrawlins@paulhastings.com), Jennifer B. Hildebrandt (jenniferhildebrandt@paulhastings.com), and 200 Park Ave, New York, NY 10166, Attn: Matthew D. Friedrick (matthewfriedrick@paulhastings.com); (vi) counsel to Falcon, Landis Rath & Cobb LLP, 919 Market St., Suite 1800, P.O. Box 2087, Wilmington, DE 19899, Attn: Richard Cobb (cobb@lrclaw.com), Joshua Brooks (brooks@lrclaw.com) and Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY 10019, Attn: Sean A. Mitchell (smitchell@paulweiss.com), Nicholas Krislov (nkrislov@paulweiss.com), and (vii) the Office of the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Timothy J. Fox, Jr. (Timothy.fox@usdoj.gov). Unless an objection is timely Filed and served, it may not be considered by the Bankruptcy Court.

### 3.    Requirements for Confirmation

The Bankruptcy Court will confirm the Combined Plan and Disclosure Statement only if the requirements of Bankruptcy Code section 1129 are met. As set forth in the Combined Plan and Disclosure Statement, the Debtors believe that the Combined Plan and Disclosure Statement: (a) meets the cramdown requirements; (b) meets the feasibility requirements; (c) is in the best interests of Creditors; (d) has been proposed in good faith; and (e) meets all other technical requirements imposed by the Bankruptcy Code.

Additionally, pursuant to Bankruptcy Code section 1126, under the Combined Plan and Disclosure Statement, only Holders of Claims in Impaired Classes are entitled to vote.

### B.    Solicitation and Voting Procedures

### 1.    Substantive Consolidation

Except as otherwise expressly provided in the Combined Plan and Disclosure Statement, each Debtor shall continue to maintain its separate corporate existence for all purposes other than the treatment of Claims under the Combined Plan and Disclosure Statement and Distributions. On the Effective Date, (1) all liabilities of each of the Debtors shall be deemed merged or treated as though they were merged into and with the assets and liabilities of each other, (2) any obligation of a Debtor and any guarantee thereof by any other Debtor shall be deemed to be one obligation, and any such guarantee shall be eliminated, (4) each Claim filed or to be filed against more than one Debtor shall be deemed filed only against one consolidated Debtor and shall be deemed a single Claim against and a single obligation of the Debtors, and (5) any joint or several liability of the Debtors shall be deemed one obligation of the Debtors. Such substantive consolidation shall

not (other than for purposes relating to the Combined Plan and Disclosure Statement) affect the legal and corporate structures of the Reorganized Debtors.

If Bankruptcy Court does not approve the substantive consolidation of all of the Estates for the purposes set forth herein: (1) the Combined Plan and Disclosure Statement shall be treated as a separate plan of reorganization for each Debtor not substantively consolidated, and (2) the Debtors shall not be required to resolicit votes with respect to the Combined Plan and Disclosure Statement.

The Combined Plan and Disclosure Statement shall serve as, and shall be deemed to be, a motion for entry of an order substantively consolidating the Chapter 11 Cases for the limited purposes set forth herein. If no objection to substantive consolidation is timely filed and served by any Holder of an Impaired Claim on or before the deadline to object to the confirmation of the Combined Plan and Disclosure Statement, or such other date as may be fixed by the Bankruptcy Court and the Debtors meet their burden of introducing evidence to establish that substantive consolidation is merited under the standards of applicable bankruptcy law, the Confirmation Order, which shall be deemed to substantively consolidate the Debtors for the limited purposes set forth herein, may be entered by the Bankruptcy Court. If any such objections are timely filed and served, a hearing with respect to the substantive consolidation of the Chapter 11 Cases and the objections thereto shall be scheduled by the Bankruptcy Court, which hearing shall coincide with the Confirmation Hearing.

### 2. Eligibility to Vote on the Combined Plan and Disclosure Statement

Except as otherwise ordered by the Bankruptcy Court, only Holders of Claims in Class 3 may vote on the Combined Plan and Disclosure Statement pursuant to Bankruptcy Code section 1126. To vote on the Combined Plan and Disclosure Statement, a Holder must hold a Claim in Class 3 and have a Claim that is identified on the Schedules and is not listed as disputed, unliquidated, or contingent, or be the holder of a Claim that has been temporarily Allowed for voting purposes only under Bankruptcy Rule 3018(a).

**ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASS 3**.

### 3. Solicitation Package

Accompanying the Combined Plan and Disclosure Statement for the purposes of solicitation votes on the Combined Plan and Disclosure Statement are Solicitation Packages, which contain copies of: (a) the Confirmation Hearing Notice; (b) the Interim Approval and Procedures Order, excluding the exhibits annexed thereto; (c) a Ballot; (d) the Combined Plan and Disclosure Statement and all exhibits annexed thereto; and (e) such other documents the Bankruptcy Court may direct or approve or that the Debtors deem appropriate.

Holders of Claims and Interests in non-voting classes that are deemed to accept the Combined Plan and Disclosure Statement will receive packages consisting of: (a) the Confirmation Hearing Notice; and (b) a notice of such Holder's non-voting status (deemed to accept).

4.        **Voting Procedures and Voting Deadline**

The Voting Record Date for determining which Holders of Claims in Class 3 may vote on the Combined Plan and Disclosure Statement is the earlier of September 30, 2024 and the date of entry of the Interim Approval and Procedures Order.

The Voting Deadline by which Stretto must *RECEIVE* original Ballots is **October 11, 2024 at 4:00 p.m. (ET)**. In order to be counted as a vote to accept or reject the Combined Plan and Disclosure Statement, each Ballot must be properly delivered to Stretto by either (i) first class mail, overnight courier, or hand delivery to Stretto at the following address: Basic Fun, Inc., et al. Ballot Processing, c/o Stretto, 410 Exchange, Suite 100, Irvine, CA 92602, or (ii) online transmission through Stretto's customized, electronic balloting platform ("**E-Ballot Portal**"). The E-Ballot Portal will be available on the Case Website for these Chapter 11 Cases.  Holders may cast an E-Ballot and electronically sign and submit such electronic ballot via the E-Ballot Portal. Instructions for casting an electronic Ballot will be available on the Case Website.

If you are entitled to vote to accept or reject the Combined Plan and Disclosure Statement, a Ballot is enclosed. Please carefully review the Ballot instructions and complete the Ballot by: (a) indicating your acceptance or rejection of the Combined Plan and Disclosure Statement; and (b) signing and returning the Ballot to Stretto.

If you are a member of a Voting Class and did not receive a Ballot, received a damaged Ballot, or lost your Ballot, contact Stretto at: TeamBasicFun@stretto.com or (833) 394-1658.

The following Ballots will not be counted or considered:

(1)        any Ballot received after the Voting Deadline, unless the Bankruptcy Court grants an extension to the Voting Deadline with respect to such Ballot;

(2)        any Ballot that is illegible or contains insufficient information;

(3)        any Ballot cast by a Person or Entity that does not hold a Claim in a Voting Class;

(4)        any Ballot timely received that is cast in a manner that indicates neither acceptance nor rejection of the Combined Plan and Disclosure Statement or that indicates both acceptance and rejection of the Combined Plan and Disclosure Statement;

(5)        simultaneous duplicative Ballots voted inconsistently;

(6)        Ballots partially rejecting and partially accepting the Combined Plan and Disclosure Statement;

(7)        any Ballot received other than the official form sent by Stretto;

(8)        any unsigned Ballot; or

(9)        any Ballot that is submitted by facsimile or e-mail.

### 5. Deemed Acceptance or Rejection

Holders of Claims and Interests in Classes 1, 2, 4, 5, 6, and 7 are Unimpaired, and thus deemed to accept the Combined Plan and Disclosure Statement. Under Bankruptcy Code section 1126(f), Holders of such Claims and Interests are conclusively presumed to have accepted the Combined Plan and Disclosure Statement, and the votes of the Holders of such Claims and Interests shall not be solicited.

Holders of Claims in Class 3 are Impaired and entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

### 6. Acceptance by Impaired Classes

In order for the Combined Plan and Disclosure Statement to be accepted by an Impaired Class of Claims, a majority in number (i.e., more than half) and two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims) must vote to accept the Combined Plan and Disclosure Statement. At least one (1) Impaired Class of Creditors, excluding the votes of insiders, must actually vote to accept the Combined Plan and Disclosure Statement. The Debtors urge that you vote to accept the Combined Plan and Disclosure Statement.

**YOU ARE URGED TO COMPLETE, DATE, SIGN AND PROMPTLY MAIL THE BALLOT ATTACHED TO THE NOTICE. PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE CREDITOR.**

## VIII. Implementation and Execution of the Combined Plan and Disclosure Statement

### A. Effective Date

The Effective Date shall not occur until all conditions for the Effective Date are satisfied or otherwise waived in accordance with the terms of the Combined Plan and Disclosure Statement. Upon occurrence of the Effective Date, the Debtors shall File the Notice of Effective Date, which shall also be posted on the Case Website.

### B. Implementation of the Combined Plan and Disclosure Statement

The Combined Plan and Disclosure Statement shall be implemented through the Effective Date Transactions as described in detail below; *provided*, *however*, that the provisions contained in the Combined Plan and Disclosure Statement shall be subject in all respects to the provisions of the Final DIP Order and Restructuring Support Agreement; and nothing in the Combined Plan and Disclosure Statement shall be deemed to modify, negate, abrogate, overrule or supersede the terms and provisions of the aforementioned documents.

### C. Senior Exit Facility

The Confirmation Order shall include approval of the Senior Exit Facility and authorization for the Reorganized Debtors to enter into and execute the Senior Exit Facility Documents and such other documents as may be required to effectuate the treatment afforded to the lenders under the

Senior Exit Facility pursuant to the Senior Exit Facility Documents. The Reorganized Debtors may use the Senior Exit Facility for any purpose permitted thereunder. including the funding of obligations under the Combined Plan and Disclosure Statement and satisfaction of ongoing working capital needs.

The Reorganized Debtors are authorized to execute and deliver the Senior Exit Facility Documents and perform their obligations thereunder including, without limitation, the payment or reimbursement of any fees, expenses, losses, damages, or indemnities. Subject to the occurrence of the Effective Date the Senior Exit Facility Documents shall constitute the legal, valid, and binding obligations of the Reorganized Debtors and be enforceable in accordance with their respective terms.

The material terms of the Senior Exit Facility are as follows:

| Term | Description |
| --- | --- |
| Facility | A Revolving Credit Facility ("**Revolver**") in the amount of up to $50,000,000. |
| Security and Priority | A first priority lien on all assets of the Reorganized Debtors, and any parent companies or subsidiaries of the Reorganized Debtors (not including Basic Fun TopCo) including cash, accounts receivables, inventory, unencumbered machinery & equipment, intellectual property, and stock of the Reorganized Debtors and any parent companies or subsidiaries (not including Basic Fun TopCo). |
| Maturity Date | The Senior Exit Facility will have a maturity date three (3) years from the closing date of the Senior Exit Facility. |
| Interest Rate | The Senior Exit Facility will accrue interest at the annual Secured Overnight Financing Rate ("SOFR") plus 4.25% on the Revolver, with SOFR having a floor of 2.00%, payable in cash on the first day of each calendar month. |

### D.    Mezzanine Exit Facility

The Confirmation Order shall include approval of the Mezzanine Exit Facility and authorization for the Reorganized Debtors to enter into and execute the Mezzanine Exit Facility Documents and such other documents as may be required to effectuate the treatment afforded to the lenders under the Mezzanine Exit Facility pursuant to the Mezzanine Exit Facility Documents. The Reorganized Debtors may use the Mezzanine Exit Facility for any purpose permitted thereunder.

The Reorganized Debtors are authorized to execute and deliver the Mezzanine Exit Facility Documents and perform their obligations thereunder including, without limitation, the payment or reimbursement of any fees, expenses, losses, damages, or indemnities. Subject to the occurrence

54

of the Effective Date the Mezzanine Exit Facility Documents shall constitute the legal, valid, and binding obligations of the Reorganized Debtors and be enforceable in accordance with their respective terms.

The material terms of the Mezzanine Exit Facility are as follows:

| Term | Description |
|---|---|
| Facility | New First Out Term Loans in an aggregate principal amount equal to $12,500,000 plus paid-in-kind principal plus accrued and unpaid interest thereafter.<br><br>New Last Out Term Loans in an aggregate principal amount equal to $3,952,501.05. |
| Security and Priority | Liens on all assets of the Reorganized Debtors, and any parent companies or subsidiaries of the Reorganized Debtors (not including Basic Fun TopCo) including cash, accounts receivables, inventory, unencumbered machinery & equipment, intellectual property, and stock of the Reorganized Debtors. The liens granted under the Mezzanine Exit Facility will be subordinate to the liens granted under the Senior Exit Facility and any parent companies or subsidiaries of the Reorganized Debtors (not including Basic Fun TopCo). |
| Maturity Date | The Mezzanine Exit Facility will have a maturity date three (3) years and 90 days after the closing date of the Mezzanine Exit Facility. |
| Interest Rate | New First Out Term Loans<br>• Cash Pay: 12.5%<br>• PIK (if cash pay not permitted): 16%<br>• Default: 2%<br>New Last Out Term Loans<br>• Cash Pay: 8%<br>• PIK: 8%<br>• Default: 2% |

### E.    General Settlement of Claims and Interests.

In consideration for the classification, distributions, releases, and other benefits provided under this Combined Plan and Disclosure Statement, on the Effective Date, the provisions of this Combined Plan and Disclosure Statement shall constitute a set of integrated, good-faith compromises and settlements of all Claims, Interests, Causes of Action belonging to the Debtors or the Debtors' Bankruptcy Estate, and controversies resolved pursuant to this Combined Plan and Disclosure Statement. This Combined Plan and Disclosure Statement shall be deemed a motion by the Debtors to approve such compromises and settlements and section 1123 of the Bankruptcy Code, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromises and settlements under section 1123 of the Bankruptcy Code, as well as a finding

by the Bankruptcy Court that such integrated compromises or settlements are in the best interests of the Debtors, the Estates, and Holders of Claims and Interests, and are fair, equitable, and within the range of reasonableness. Subject to Article X, distributions made to Holders of Allowed Claims and Allowed Interests in any Class are intended to be and shall be final and indefeasible and shall not be subject to avoidance, turnover, or recovery by any other Person.

### F. Restructuring Transactions.

Without limiting any rights and remedies of the Debtors or Reorganized Debtors under this Combined Plan and Disclosure Statement or applicable law, but in all cases subject to the terms and conditions of the Restructuring Support Agreement, the Term Sheets, and any consents or approvals required thereunder, the entry of the Confirmation Order shall constitute authorization for the Debtors and Reorganized Debtors, as applicable, to take, or to cause to be taken, all actions necessary or appropriate to consummate and implement the provisions of this Combined Plan and Disclosure Statement (the "**Restructuring Transactions**") before, on, and after the Effective Date, including such actions as may be necessary or appropriate to effectuate a corporate restructuring of their respective businesses and to otherwise simplify the overall corporate structure of the Reorganized Debtors. Such Restructuring Transactions may include (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation, or dissolution containing terms that are consistent with the terms of this Combined Plan and Disclosure Statement, the Restructuring Support Agreement, and the Term Sheets, and that satisfy the applicable requirements of applicable state law and such other terms to which the applicable entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty, or obligation on terms consistent with the terms of this Combined Plan and Disclosure Statement, the Restructuring Support Agreement and the Term Sheets, and having such other terms to which the applicable Entities may agree; (3) the filing of appropriate certificates or articles of merger, consolidation, or dissolution pursuant to applicable state law; (4) the execution and delivery of the Senior Exit Facility Documents; (5) the execution and delivery of the Mezzanine Exit Facility Documents; (6) any actions reasonably required by the Debtors to take to implement the Out-of-Court Restructuring, and (7) all other actions that the Debtors, Reorganized Debtors and/or the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law or foreign law in connection with such transactions, but in all cases subject to the terms and conditions of this Combined Plan and Disclosure Statement, the Restructuring Support Agreement, the Term Sheets, and any consents or approvals required thereunder.

The Confirmation Order shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions (including any other transaction described in, approved by, contemplated by, or necessary to effectuate this Combined Plan and Disclosure Statement).

### G. Out-of-Court Restructuring.

In addition to the Restructuring Transactions described in the Combined Plan and Disclosure Statement, the Non-Debtor Parties will contemporaneously consummate an out-of-

98876382.5

court restructuring of Basic Fun TopCo (the "**Out-of-Court Restructuring**"). The Out-of-Court Restructuring contemplates the following:[8]

### 1.      The Fourth Amended LPA

On the Effective Date, the General Partner, the Founders, and Falcon agree to enter into the Fourth Amended LPA. The Fourth Amended LPA shall constitute Basic Fun TopCo's fourth amended and restated limited partnership agreement.

### 2.      Mezzanine Facility Paydown

On the Effective Date, Falcon shall purchase participations totaling $2,500,000 of New Last Out Term Loans under the Mezzanine Exit Facility and the Founders shall purchase participations totaling $1,452,501.93. Such last out loans shall be junior in payment priority to the other loans under the Mezzanine Exit Facility, and interest on such last out loans shall not be paid in cash if interest on the other loans under the Mezzanine Exit Facility is paid in-kind.

Pursuant to the Falcon and Founders Term Sheet, the Founders' existing commitment to purchase participations of Prepetition Last Out Loans under the Amended and Restated Mezzanine Credit Agreement totaling no less than $3,952,501.05 (the "**Prepetition Mezzanine Facility Paydown**") was deferred to the earlier to occur of (i) the Effective Date and (ii) October 30, 2024.

If the Prepetition Mezzanine Facility Paydown occurs in connection with the occurrence of the Effective Date, Falcon shall purchase participations totaling $2,500,000 of last out loans under the Mezzanine Exit Facility due to RBC and the Founders shall purchase participations totaling $1,452,501.93. Such last out loans shall be junior in payment priority to the other loans under the Mezzanine Exit Facility, and interest on such last out loans shall not be paid in cash if interest on the other loans under the Mezzanine Exit Facility is paid in-kind.

: If the Effective Date occurs after October 30, 2024, the Founders may request an extension of the Prepetition Mezzanine Facility Paydown from RBC. If no extension is granted and the Prepetition Mezzanine Facility Paydown occurs prior to the Effective Date, Founders shall purchase participations totaling $3,952,501.05 of Prepetition Last Out Loans under the Amended and Restated Mezzanine Credit Agreement. On the Effective Date, the $3,952,501.05 of Prepetition Last Out Loans purchased by the Founders will convert to New Last Out Term Loans under the Mezzanine Exit Facility. On the Effective Date, Falcon will reimburse the Founders for their $2,500,000 portion of the Prepetition Last Out Loans.

On the Effective Date, in exchange for Falcon and the Founders' purchase of last out loans and the Last Out Conversion (as defined below), the Prepetition Mezzanine Secured Obligations shall be refinanced pursuant to a cashless exchange of loans into the Mezzanine Exit Facility consistent with the terms of the RBC Term Sheet, including a maturity date that is three (3) years plus 90 days after the Effective Date (as defined below).

---

[8] For the avoidance of doubt, this description of the Out-of-Court Restructuring transaction is being provided for disclosure purposes only.

98876382.5

### 3.  Loan and Note Conversion

On the Effective Date, (i) the Prepetition Last Out Loans held by the Founders issued under the Amended and Restated Mezzanine Credit Agreement shall convert into the preferred equity of Basic Fun TopCo (the "**Last Out Conversion**") issued to the Founders in the transaction (collectively, the "**Founder Preferred Equity**"); (ii) the TopCo Notes previously held by the Founders and subsequently converted into junior preferred equity of Basic Fun TopCo, shall convert into Founder Preferred Equity, at the Founder's option (the "**Founders Notes Conversion**"); and (iii) the remaining TopCo Notes will be reinstated as New TopCo Notes (after giving effect to the New TopCo Note Cash Payment).

### 4.  Equity Restructuring

On the Effective Date, the preferred equity of Basic Fun TopCo shall be restructured to a total of $35,000,000, comprised of:

- $25,000,000 to Falcon on account of pre-transaction preferred equity,
- $10,000,000 to the Founders on account of the Last Out Conversion and/or the Founders Notes Conversion, at the Founders' option.

Other existing preferred equity held by Falcon shall be equitized into common equity, as stated below (the "**Preferred Equity Equitization**").

Further, on the Effective Date, the common equity of Basic Fun TopCo shall be restructured to be:

- 32.5% to Falcon in account of the Preferred Equity Equitization and its preexisting common equity;
- 67.5% to the Founders (the "**Founder Equity Issuance**"), subject to dilution by the MIP.

### 5.  Management Incentive Plan

On the Effective Date, Basic Fun TopCo shall establish a new MIP from an allocation of common equity from the Founder Equity Issuance.  For the avoidance of doubt, approval of the MIP shall be subject to the approval of the Jay Foreman and will contain at least 10% of the common equity. Neither of the Founders will participate in the MIP unless Falcon consents thereto.

### 6.  Governance

For all Major Decisions,[9] the Advisory Committee and the boards of directors (or equivalents) of Basic Fun and Holdco (the "**Boards**") shall be reconstituted and comprised of:

- two (2) directors appointed by the Founders,
- two (2) directors appointed by Falcon, and
- one (1) independent director acceptable to the Founders and Falcon.

---

[9] "Major Decision" has the meaning ascribed to it in the Fourth Amended LPA.

The Advisory Committee and the Boards shall be reconstituted and comprised of:

- four (4) directors appointed by the Founders,
- two (2) directors appointed by Falcon, and
- one (1) independent director acceptable to the Founders and Falcon

For non-Major Decisions, the Advisory Committee and the Board shall act by a majority of the Advisory Board present and constituting a quorum. For Major Decisions, approval shall require approval of both a majority of the Advisory Board present and constituting a quorum and the approval of at least one of the Independent Director and/or one of the directors appointed by Falcon. The Company shall pay or reimburse $100,000 per year (total) for non-Falcon employee(s) who are appointed to the Board by Falcon.

### 7.    Acquisition Preferred Basket

On the Effective Date, the Reorganized Company shall be permitted to issue up to $10,000,000 of preferred equity pari passu with preferred equity pursuant to a rights offering in order to fund an opportunistic acquisition by way of a rights offering; *provided* that the rights allocation under such rights offering shall be offered 50% to Falcon and 50% to the Founders included herein, but neither Falcon nor the Founders shall be under an obligation to exercise the rights offered (with the consequence of declining to exercise rights offered is that either Falcon or the Founders, as applicable, shall be afforded the opportunity to fund in excess of such party's offered rights, and such excess shall be funded as preferred equity senior to the preferred equity restructured and/or issued pursuant to this transaction); *provided further* that the $10,000,000 may also be funded by a third party, with a maximum of $5,000,000 that may be funded as preferred equity senior to the preferred equity restructured and/or issued pursuant to this transaction (the "Acquisition Preferred Basket").

### 8.    Falcon Preferred Consent Rights

On the Effective Date, subject to the Acquisition Preferred Basket described above, the Falcon consent rights as preferred equityholder shall include protections substantially similar those in Section 3.3(a)(ii), (vi), (vii), (viii), and (x) of the Third Amended LPA.[10] In addition, Falcon's consent shall be required in order for the Reorganized Company to incur indebtedness in excess of an amount that is equal to the sum of (i) the maximum indebtedness permitted under the Company's Prepetition Senior Facility, plus (ii) 1.0x TTM EBITDA, provided that such indebtedness is to a third party on arms'-length basis; provided, further, however, such sum does not exceed 6.0x TTM EBITDA.

### 9.    Reimbursement of Fees and Expenses

On the Effective Date, Basic Fun TopCo shall satisfy all fees and expenses, including, but not limited to, the Falcon Fees and Expenses.

---

[10] The "**Third Amended LPA**" means that Third Amended & Restated Agreement of Limited Partnership of Basic Fun, L.P., dated as of August 1, 2018 (as amended).

### H.    Corporate Existence.

Except as otherwise provided in this Combined Plan and Disclosure Statement or the Confirmation Order, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each Debtor is incorporated or formed and pursuant to the respective memorandum and articles of association, certificate of incorporation and bylaws (or other formation documents) in effect before the Effective Date, except to the extent such memorandum and articles of association, certificate of incorporation and bylaws (or other formation documents) are amended by this Combined Plan and Disclosure Statement, by the Debtors, or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to this Combined Plan and Disclosure Statement and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law). On or after the Effective Date, one or more of the Debtors may be disposed of, dissolved, wound down, or liquidated with or without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### I.    Vesting of Assets in the Reorganized Debtors Free and Clear of Liens and Claims.

Except as otherwise expressly provided in this Combined Plan and Disclosure Statement, the Confirmation Order, or any agreement, instrument, or other document incorporated herein pursuant to sections 1123(a)(5), 1123(b)(3), 1141(b) and (c), and other applicable provisions of the Bankruptcy Code, on and after the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to this Combined Plan and Disclosure Statement shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, the Reorganized Debtors may (1) operate their respective businesses, (2) use, acquire, and dispose of their respective property, and (3) compromise or settle any Claims, Interests, or Causes of Action, in each case without notice to, supervision of, or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules. For the avoidance of doubt, no Reorganized Debtor shall be treated as being liable on any Claim that is discharged pursuant to the Combined Plan and Disclosure Statement.

### J.    Preservation of Causes of Action.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, each Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Combined Plan and Disclosure Statement, including in Article VIII hereof, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date. The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. No Entity (other than the Released

98876382.5

Parties) may rely on the absence of a specific reference in the Combined Plan and Disclosure Statement or the Combined Plan and Disclosure Statement Supplement, to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. The Debtors and Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Combined Plan and Disclosure Statement, including Article VIII hereof. Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Combined Plan and Disclosure Statement or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Combined Plan and Disclosure Statement. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Combined Plan and Disclosure Statement, including Article VIII hereof. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

**K.     Director and Officer Liability Insurance.**

Notwithstanding anything in the Combined Plan and Disclosure Statement to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Policies. Notwithstanding anything to the contrary contained in the Combined Plan and Disclosure Statement, Confirmation of the Combined Plan and Disclosure Statement shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Combined Plan and Disclosure Statement as to which no Proof of Claim need be filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth

therein, regardless of whether such directors and officers remain in such positions after the Effective Date.

### L.    Indemnification Obligations.

Consistent with applicable Law, all indemnification provisions in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other Professionals of the Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Combined Plan and Disclosure Statement on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other Professionals of the Debtors than the indemnification provisions in place prior to the Effective Date.

## IX.    Executory Contracts and Unexpired Leases

### A.    Assumption and Rejection of Executory Contracts and Unexpired Leases.

On the Effective Date, except as otherwise provided in Section IX(H) and elsewhere herein, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that are: (a) previously expired or terminated pursuant to their own terms; (b) have been previously assumed or rejected by the Debtors pursuant to a Final Order; (c) are the subject of a motion to reject that is pending on the Effective Date; or (d) have an ordered or requested effective date of rejection that is after the Effective Date.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Combined Plan and Disclosure Statement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Combined Plan and Disclosure Statement are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Combined Plan and Disclosure Statement or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor or Non-Debtor Subsidiary party thereto in accordance with its terms, except as such terms may have been modified by the provisions of the Combined Plan and Disclosure Statement or any order of the Bankruptcy Court authorizing and providing for its assumption. No Affiliate of a Debtor that is party to such agreement may terminate such agreement or exercise any other default-related rights with respect thereto. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors.

To the maximum extent permitted by Law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Combined Plan and Disclosure Statement restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Combined Plan and Disclosure Statement shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. The Debtors or the Reorganized Debtors, as applicable, shall serve notice of such alteration, amendment, modification, or supplement to any affected counterparties which notice shall advise of the effective date of the rejection of subject Executory Contracts or Unexpired Leases ("**Notice of Amended Rejection Schedule**").

B.        **Claims Based on Rejection of Executory Contracts or Unexpired Leases.**

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Combined Plan and Disclosure Statement or the Confirmation Order, if any, must be Filed within thirty (30) days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, (3) the Effective Date, or (4) date of service of the Notice of Amended Rejection Schedule. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Section VI.B of this Combined Plan and Disclosure Statement.

C.        **Cure Defaults for Assumed Executory Contracts and Unexpired Leases.**

The Debtors or the Reorganized Debtors, as applicable, shall pay Cures, if any, on the Effective Date or as soon as reasonably practicable thereafter. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date. Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure; *provided* that nothing herein shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to File such request for payment of such Cure. The Reorganized Debtors also may settle any Cure without any further

63

notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Combined Plan and Disclosure Statement must be Filed with the Bankruptcy Court on or before 30 days after the Effective Date. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing, or such other setting as requested by the Debtors or Reorganized Debtors, for which such objection is timely Filed. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is any dispute regarding any Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of Bankruptcy Code section 365, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Combined Plan and Disclosure Statement or otherwise and full payment of any applicable Cure pursuant to this Section IX.C shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to this Section Section IX.C, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

D.      **Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.**

Rejection of any Executory Contract or Unexpired Lease pursuant to the Combined Plan and Disclosure Statement or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases. In particular, notwithstanding any non-bankruptcy Law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

E.      **Insurance Policies.**

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, shall be treated as Executory Contracts hereunder. Unless otherwise provided in

the Combined Plan and Disclosure Statement, on the Effective Date, in connection with all contemplated transactions under this Combined Plan and Disclosure Statement, (1) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims, including all D&O Policies, and (2) such insurance policies and any agreements, documents, or instruments relating thereto, including all D&O Policies, shall revest in the applicable Reorganized Debtors.

Nothing in this Combined Plan and Disclosure Statement, Restructuring Support Agreement, the Combined Plan and Disclosure Statement Supplement, the Disclosure Statement, the Confirmation Order, or any other Final Order (including any other provision that purports to be preemptory or supervening), (1) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of such insurance policies or (2) alters or modifies the duty, if any, that the insurers or third party administrators have to pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Debtors or draw on any collateral or security therefor. For the avoidance of doubt, insurers and third-party administrators shall not need to nor be required to file or serve a cure objection or a request, application, claim, Proof of Claim, or motion for payment and shall not be subject to any claims bar date or similar deadline governing Cure amounts or Claims.

F.     **Reservation of Rights.**

Nothing contained in the Combined Plan and Disclosure Statement, the Restructuring Support Agreement, or the Combined Plan and Disclosure Statement Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

G.     **Nonoccurrence of Effective Date.**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

H.     **Contracts and Leases Entered into After the Petition Date.**

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or Reorganized Debtor in the ordinary course of their business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

98876382.5

### X.      Provisions Governing Distributions

#### A.      Distributions on Account of Claims Allowed as of the Effective Date.

Except as otherwise provided herein, in a Final Order, or as otherwise agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of the applicable Allowed Claim on the Effective Date, the Reorganized Debtors shall make distributions under the Combined Plan and Disclosure Statement on account of Claims Allowed on or before the Effective Date, subject to the Reorganized Debtors' right to object to Claims; *provided* that (1) Allowed Administrative Expenses with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, (2) Allowed Priority Tax Claims shall be paid in accordance with Section V(C) of the Combined Plan and Disclosure Statement, and (3) Allowed General Unsecured Claims shall be paid in accordance with Section VI(B)(5) of the Combined Plan and Disclosure Statement. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy Law or in the ordinary course of business.

#### B.      Manner of Payment.

(i)      All distributions of Cash to the Holders of the applicable Allowed Claims under the Combined Plan and Disclosure Statement shall be made by the Debtors or Reorganized Debtors, as applicable.

(ii)      All distributions of Interests to the Holders of the applicable Allowed Interests under the Combined Plan and Disclosure Statement shall be made by the Debtors or the Reorganized Debtors, as applicable.

(iii)      At the option of the Debtors or Reorganized Debtors, as applicable, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

#### C.      Compliance with Tax Requirements.

In connection with the Combined Plan and Disclosure Statement, to the extent applicable, the Debtors, the Reorganized Debtors, and any applicable withholding agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Combined Plan and Disclosure Statement shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Combined Plan and Disclosure Statement to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Combined Plan and Disclosure Statement to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, collecting an executed Form W-9, applicable Form W-8 or other appropriate tax form or documentation, or

establishing any other mechanisms they believe are reasonable and appropriate. All Holders of Allowed Claims, as a condition to receiving any Distribution, shall provide the Debtors or Reorganized Debtors with a completed and executed Form W-8 or Form W-9, or similar form within sixty (60) days of a written request by the Debtors or Reorganized Debtors or be forever barred from receiving a Distribution. The Debtors and the Reorganized Debtors reserve the right to allocate all distributions made under the Combined Plan and Disclosure Statement in compliance with all applicable wage garnishments, alimony, child support, and similar spousal awards, Liens, and encumbrances.

### D.    Allocations.

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

### E.    No Postpetition Interest on Claims.

Unless otherwise specifically provided for in the Combined Plan and Disclosure Statement, the Confirmation Order, any other order of the Bankruptcy Court, or required by applicable bankruptcy and non-bankruptcy Law, post-petition interest shall not accrue or be paid on any prepetition Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on such Claim.

### F.    Foreign Currency Exchange Rate.

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal (National Edition),* on the Effective Date.

### G.    Setoffs and Recoupment.

Except as expressly provided in this Combined Plan and Disclosure Statement, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Combined Plan and Disclosure Statement Distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Reorganized Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) and the Holder of the Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable holder. In no event shall any Holder of a Claim be entitled to recoup such Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Effective Date,

notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

### H.   Claims Paid or Payable by Third Parties.

#### 1.   Claims Paid by Third Parties/Insurers.

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the holder's total recovery on account of such Claim from the third party and under the Combined Plan and Disclosure Statement exceeds the amount of such Claim as of the date of any such distribution under the Combined Plan and Disclosure Statement. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

#### 2.   Claims Payable by Third Parties.

No distributions under the Combined Plan and Disclosure Statement shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

#### 3.   Applicability of Insurance Policies.

Except as otherwise provided in the Combined Plan and Disclosure Statement, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Combined Plan and Disclosure Statement shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

XI.    **Effect of Rejection by One or More Classes**

A.    **Impaired Classes Entitled to Vote.**

Each Impaired Class shall be entitled to vote separately to accept or reject the Combined Plan and Disclosure Statement. A holder of a Disputed Claim which has not been temporarily allowed for purposes of voting on the Combined Plan and Disclosure Statement may vote only such Disputed Claim in an amount equal to the portion, if any, of such Claim shown as fixed, liquidated, and undisputed in the Debtors' Schedules.

B.    **Acceptance by Class.**

A Class of Claims shall have accepted the Combined Plan and Disclosure Statement if the Combined Plan and Disclosure Statement is accepted by at least two thirds (2/3) in amount and more than one half (1/2) in number of the Allowed Claims of such Class that have voted to accept or reject the Combined Plan and Disclosure Statement.

C.    **Reservation of Cramdown Rights.**

In the event that any Impaired Class shall fail to accept the Combined Plan and Disclosure Statement in accordance with Bankruptcy Code section 1129(a), the Debtors reserve the right to request that the Bankruptcy Court confirm the Combined Plan and Disclosure Statement in accordance with the provisions of the Bankruptcy Code section 1129(b).

XII.    **Procedures For Resolving Contingent, Unliquidated, And Disputed Claims**

A.    **Disputed Claims Process.**

There is no requirement to file a Proof of Claim (or move the Bankruptcy Court for allowance) to have a Claim Allowed for the purposes of the Combined Plan and Disclosure Statement, except as provided in Section IX(B) of the Combined Plan and Disclosure Statement. On and after the Effective Date, except as otherwise provided in this Combined Plan and Disclosure Statement, all Allowed Claims shall be satisfied in the ordinary course of business of the Reorganized Debtors in accordance with the books and records of the Debtors. The Debtors and the Reorganized Debtors, as applicable, shall have the exclusive authority to (1) determine, without the need for notice to or action, order, or approval of the Bankruptcy Court, that a claim subject to any Proof of Claim that is Filed is Allowed and (2) file, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under this Combined Plan and Disclosure Statement. If the Debtors or Reorganized Debtors dispute any Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced; provided that the Debtors or the Reorganized Debtors may elect to object to any Claim and to have the validity or amount of any Claim adjudicated by the Bankruptcy Court; provided, further, that Holders of Claims may elect to resolve the validity or amount of any Claim in the Bankruptcy Court by providing the Reorganized Debtors with written notice no later than thirty (30) days after receiving a Distribution on account of its Claim. If a Holder makes such an election, the Bankruptcy Court shall apply the Law that would have governed the dispute if the Chapter 11 Cases had not been filed. All Proofs of Claim Filed in the Chapter 11 Cases shall be

69

considered objected to and Disputed without further action by the Debtors. **Except as otherwise provided herein, all Proofs of Claim Filed after the Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

B.      **Allowance of Claims.**

After the Effective Date, except as otherwise expressly set forth herein, each of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date. The Debtors or the Reorganized Debtors, as applicable, may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy Law, without further notice or order from the Bankruptcy Court.

C.      **Claims Administration Responsibilities.**

Except as otherwise specifically provided in the Combined Plan and Disclosure Statement, after the Effective Date, the Reorganized Debtors shall have the exclusive authority: (1) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Section VIII(J) of the Combined Plan and Disclosure Statement.

Any objections to Proofs of Claims (other than Administrative Expenses) shall be served and Filed (a) on or before the date that is one hundred and eighty days following the later of (i) the Effective Date and (ii) the date that a Proof of Claim is Filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a Holder of a Claim or (b) such later date as ordered by the Bankruptcy Court.

D.      **Adjustment to Claims or Interests without Objection.**

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      **Disallowance of Claims or Interests.**

Except as otherwise expressly set forth herein, all Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is

70

avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if: (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order. No payment or distribution shall be made on account of such Claim or Interest unless the transferee has paid or turned over such property.

### F.    No Distributions Pending Allowance.

Notwithstanding any other provision of the Combined Plan and Disclosure Statement, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest; *provided* that if only the Allowed amount of an otherwise valid Claim or Interest is Disputed, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

### G.    Distributions After Allowance.

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Combined Plan and Disclosure Statement. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Interest becomes a Final Order, the Reorganized Debtors shall provide to the Holder of such Claim or Interest the distribution (if any) to which such holder is entitled under the Combined Plan and Disclosure Statement as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

## XIII.   Conditions Precedent to Confirmation and the Effective Date

### A.    Conditions Precedent to Confirmation

The following is the list of conditions precedent to Confirmation:

(1)    The Restructuring Support Agreement shall not have been terminated and shall remain in full force and effect;

(2)    the Combined Plan and Disclosure Statement Supplement is Filed;

(3)    the Confirmation Order shall have been entered by the Bankruptcy Court confirming the Combined Plan and Disclosure Statement in form and substance acceptable to the Debtors, and such order shall have become a Final Order that has not been stayed or modified or vacated on appeal; and

(4)    the Combined Plan and Disclosure Statement shall not have been materially amended, altered, or modified from the Combined Plan and Disclosure Statement

as Filed unless such material amendment, alteration or modification has been made in accordance with Article XIII herein.

**B.      Conditions Precedent to the Effective Date**

The following is the list of conditions precedent to the Effective Date:

(1)      The Restructuring Support Agreement shall not have been terminated and shall remain in full force and effect;

(2)      The Restructuring Support Agreement Order remains in full force and effect;

(3)      The Bankruptcy Court shall have entered the Confirmation Order and the Confirmation Order shall be a Final Order that has not been stayed or modified or vacated on appeal;

(4)      the Exit Facility Documents shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the consummation of the Exit Facilities shall have been waived or satisfied in accordance with the terms thereof and the closing of the Exit Facilities shall occur concurrently with the occurrence of the Effective Date;

(5)      the new corporate governance documents of the Debtors shall have been duly filed with the applicable authorities in the relevant jurisdiction;

(6)      the Definitive Documents (as defined in the Restructuring Support Agreement) contain terms, conditions, representations, warranties, or covenants that are consistent in all material respects with the terms of the Restructuring Support Agreement and the Term Sheets and reasonably acceptable to the Founders and Falcon;

(7)      the Out-of-Court Restructuring shall have occurred, including the payment of Falcon Fees and Expenses;

(8)      the professional fees of Paul Hastings LLP and Young Conaway Stargatt & Taylor, LLP on behalf of Great Rock due and owed on the Effective Date shall be paid in full in accordance with the Final DIP Order;

(9)      the fees of Orrick, Herrington & Sutcliffe LLP, Klehr Harrison Harvey Branzburg LLP, and RPA Advisors, LLC on behalf of RBC due and owing on the Effective Date shall have been paid in full in accordance with the Final DIP Order; and

(10)     the Combined Plan and Disclosure Statement shall not have been materially amended, altered, or modified from the Combined Plan and Disclosure Statement as confirmed by the Confirmation Order, unless such material amendment, alteration, or modification has been made in accordance with Article XIII herein.

72

### C.      Waiver of Conditions

The conditions precedent to Confirmation and conditions precedent to the Effective Date may be waived in whole or in part, in writing, by the Debtors with the consent of Falcon and RBC, without further order of the Bankruptcy Court.

### D.      Effect of Nonoccurrence of Conditions

If the conditions precedent to the Effective Date are not satisfied or waived, the Debtors may, upon motion and notice to parties in interest, seek to vacate the Confirmation Order; *provided, however*, that notwithstanding the filing of such motion, the Confirmation Order may not be vacated if each of the conditions precedent to the Effective Date are satisfied or waived before the Bankruptcy Court enters an order granting such motion.

If the Confirmation Order is vacated: (a) the Combined Plan and Disclosure Statement is null and void in all respects; and (b) nothing contained in the Combined Plan and Disclosure Statement shall (i) constitute a waiver or release of any Claims by or against the Debtors, or (ii) prejudice, in any manner, the rights of the Debtors or any other party in interest.

## XIV.   Settlement, Release, Exculpation, Injunction, and Related Provisions

### A.      Discharge of Claims and Termination of Interests.

Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Combined Plan and Disclosure Statement, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Combined Plan and Disclosure Statement, the distributions, rights, and treatment that are provided in the Combined Plan and Disclosure Statement shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Combined Plan and Disclosure Statement on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Combined Plan and Disclosure Statement. The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than any Claims that are Reinstated) and Interests (other than the Interests that are Reinstated) subject to the occurrence of the Effective Date.

98876382.5

B.      **Release of Liens.**

Except as otherwise provided in the Combined Plan and Disclosure Statement, the Restructuring Support Agreement, the Confirmation Order, or in any contract, instrument, release, or other agreement or document amended or created pursuant to the Combined Plan and Disclosure Statement, on the Effective Date and concurrently with the applicable distributions made pursuant to the Combined Plan and Disclosure Statement and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with this Combined Plan and Disclosure Statement, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Combined Plan and Disclosure Statement, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or the Reorganized Debtors that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

C.      **Releases by the Debtors.**

Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code and to the fullest extent permitted by applicable Law, for good and valuable consideration, each Released Party is conclusively, absolutely, unconditionally, irrevocably, and forever released by each and all of the Debtors and the Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims (other than Reinstated Claims), Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtors or their Estates, whether liquidated or unliquidated, fixed or contingent, known or unknown, foreseen or unforeseen, matured or unmatured, existing or

98876382.5

hereafter arising, in Law, equity, contract, tort, or otherwise, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that the Debtors, the Reorganized Debtors, the Estates, or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to (including the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable), or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof) or their Estates or the Non-Debtor Subsidiaries, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or Non-Debtor Subsidiaries or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Combined Plan and Disclosure Statement, the business or contractual arrangements between any Debtor or Non-Debtor Subsidiaries and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the decision to file the Chapter 11 Cases, any intercompany transactions, the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Restructuring Support Agreement, the Combined Plan and Disclosure Statement (including the Combined Plan and Disclosure Statement Supplement), the solicitation of votes on the Combined Plan and Disclosure Statement, the pursuit of Confirmation and Consummation of the Combined Plan and Disclosure Statement, the DIP Facilities, the DIP Credit Agreement, the Exit Facility Documents, the administration and implementation of the Combined Plan and Disclosure Statement, including the issuance or distribution of Securities pursuant to the Combined Plan and Disclosure Statement, the distribution of property under the Combined Plan and Disclosure Statement or any other related agreement (but not, for the avoidance of doubt, any legal opinion effective as of the Effective Date requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Combined Plan and Disclosure Statement), or upon any other act, omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date obligations of any party or Entity under the Combined Plan and Disclosure Statement, or any document, instrument, or agreement (including those set forth in the Combined Plan and Disclosure Statement Supplement) executed to implement the Combined Plan and Disclosure Statement, including the assumption of the indemnification provisions as set forth in the Combined Plan and Disclosure Statement; (b) the rights of any Holder of an Allowed Claim to receive distributions under the Combined Plan and Disclosure Statement; or (c) the liability of any Released Party that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a Final Order to have constituted fraud, gross negligence or willful misconduct.

D.      **Releases by the Releasing Parties.**

Effective as of the Effective Date, to the fullest extent permissible under applicable Law, each Releasing Party, in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any

Claim, Cause of Action, directly or derivatively, by, through, for, or because of a Releasing Party, is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Debtor and each other Released Party from any and all Claims (other than any Reinstated Claims or Interests), interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, known or unknown, foreseen or unforeseen, existing or hereafter arising, in Law, equity, contract, tort, or otherwise, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, the Estates or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert (whether individually or collectively), based on or relating to (including the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable), or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof) or their Estates or the Non-Debtor Subsidiaries, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or Non-Debtor Subsidiaries, the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Combined Plan and Disclosure Statement, the business or contractual arrangements between any Debtor or Non-Debtor Subsidiaries and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the decision to file the Chapter 11 Cases, any intercompany transactions, the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Restructuring Support Agreement, the Combined Plan and Disclosure Statement (including the Combined Plan and Disclosure Statement Supplement), the solicitation of votes on the Combined Plan and Disclosure Statement, the pursuit of Confirmation and Consummation of the Combined Plan and Disclosure Statement, the DIP Facilities, the DIP Credit Agreement, the Exit Facility Documents, the administration and implementation of the Combined Plan and Disclosure Statement, including the issuance or distribution of Securities pursuant to the Combined Plan and Disclosure Statement, or the distribution of property under the Combined Plan and Disclosure Statement or any other related agreement, or upon any other act, omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date obligations of any party or Entity under the Combined Plan and Disclosure Statement or the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Combined Plan and Disclosure Statement Supplement) executed to implement the Combined Plan and Disclosure Statement, including the assumption of the indemnification provisions as set forth in the Combined Plan and Disclosure Statement; (b) the rights of any Holder of an Allowed Claim to receive distributions under the Combined Plan and Disclosure Statement; or (c) the liability of any Released Party that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a Final Order to have constituted fraud, gross negligence or willful misconduct.

E.    **Injunction**

**Except as otherwise expressly provided in the Combined Plan and Disclosure Statement, or for obligations issued or required to be paid pursuant to the Combined Plan and Disclosure Statement or the Confirmation Order, all Entities that have held, hold, or may hold Claims (other than Reinstated Claims), Interests, or Causes of Action that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Cause of Action; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable Law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released or settled pursuant to the Combined Plan and Disclosure Statement.**

F.      **Exculpation**

**Effective as of the Effective Date, to the fullest extent permissible under applicable Law and without affecting or limiting either the Debtor Release or the Third Party Releases, and except as otherwise specifically provided in the Combined Plan and Disclosure Statement or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party shall be released and exculpated from any Cause of Action or any claim arising from the Petition Date through the Effective Date related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable the Chapter 11 Cases, the Restructuring Support Agreement, the Combined Plan and Disclosure Statement (including the Combined Plan and Disclosure Statement Supplement), the DIP Facilities, the DIP Credit Agreement, the Exit Facility Documents, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Combined Plan and Disclosure Statement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Combined Plan and Disclosure Statement, including the issuance of Securities pursuant to the Combined Plan and Disclosure Statement, or the distribution of property under the Combined Plan and Disclosure Statement or any other related agreement (excluding, for the avoidance of doubt, providing any legal opinion effective as of the Effective Date requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the**

Combined Plan and Disclosure Statement), except for claims or Causes of Action related to any act or omission constituting actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Combined Plan and Disclosure Statement. The Exculpated Parties have, and upon Consummation of the Combined Plan and Disclosure Statement shall be deemed to have, participated in good faith and in compliance with the applicable Laws with regard to the solicitation of votes and distribution of consideration pursuant to the Combined Plan and Disclosure Statement and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable Law, rule, or regulation governing the solicitation of acceptances or rejections of the Combined Plan and Disclosure Statement or such distributions made pursuant to the Combined Plan and Disclosure Statement. Notwithstanding the foregoing, the exculpation shall not release any obligation or liability of any Entity for any post-Effective Date obligation under the Combined Plan and Disclosure Statement or any document, instrument or agreement (including those set forth in the Combined Plan and Disclosure Statement Supplement) executed to implement the Combined Plan and Disclosure Statement.

The Exculpated Parties and other parties set forth above have, and upon confirmation of the Combined Plan and Disclosure Statement shall be deemed to have, participated in good faith and in compliance with the applicable Laws with regard to the solicitation of votes and distribution of consideration pursuant to the Combined Plan and Disclosure Statement and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable Law, rule, or regulation governing the solicitation of acceptances or rejections of the Combined Plan and Disclosure Statement or such distributions made pursuant to the Combined Plan and Disclosure Statement.

## XV.    Retention of Jurisdiction

Following the Confirmation Date and the Effective Date, the Bankruptcy Court shall retain jurisdiction for the following purposes:

(1)    to hear and determine any objections to Claims and to address any issues relating to Disputed Claims;

(2)    to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(3)    to issue such orders in aid of execution and Consummation of the Combined Plan and Disclosure Statement, to the extent authorized by Bankruptcy Code section 1142;

(4)    to consider any amendments to or modifications of the Combined Plan and Disclosure Statement, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(5)     to hear and determine all requests for compensation and reimbursement of expenses to the extent allowed by the Bankruptcy Court under Bankruptcy Code sections 330 or 503;

(6)     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Combined Plan and Disclosure Statement;

(7)     to hear and determine matters concerning state, local, and federal taxes in accordance with Bankruptcy Code sections 346, 505, and 1146;

(8)     to hear any other matter as to which the Bankruptcy Court has jurisdiction;

(9)     to enter the Final Decree;

(10)    to ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Combined Plan and Disclosure Statement;

(11)    to decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

(12)    to issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the occurrence of the Effective Date or enforcement of the Combined Plan and Disclosure Statement, except as otherwise provided herein;

(13)    to determine any other matters that may arise in connection with or related to the Combined Plan and Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created or implemented in connection with the Combined Plan and Disclosure Statement;

(14)    to enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, exculpations, and rulings entered in connection with the Chapter 11 Cases (whether or not the Chapter 11 Cases have been closed);

(15)    to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof; and

(16)    to resolve any disputes concerning whether a Person or Entity had sufficient notice of the Chapter 11 Cases or the Confirmation Hearing for the purpose of determining whether a Claim or Interest is discharged hereunder, or for any other purpose.

## XVI.  Miscellaneous Provisions

### A.     Amendment or Modification of the Combined Plan and Disclosure Statement

The Debtors, in consultation with Great Rock, the DIP Agent, and the Prepetition Mezzanine Agent, and with the consent of Falcon, and subject to the terms of the Restructuring Support Agreement, may modify the Combined Plan and Disclosure Statement at any time after Confirmation and before substantial consummation, provided that the Combined Plan and Disclosure Statement, as modified, meets the requirements of Bankruptcy Code sections 1122 and 1123 and the circumstances warrant such modifications and any such modifications are in compliance with section 1127(b) of the Bankruptcy Code and Bankruptcy Rule 3019 (b). A Holder of a Claim that has accepted the Combined Plan and Disclosure Statement shall be deemed to have accepted such Combined Plan and Disclosure Statement as modified if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

### B.      Exhibits/Schedules

All exhibits and schedules to the Combined Plan and Disclosure Statement are incorporated into and are part of the Combined Plan and Disclosure Statement as if set forth in full herein.

### C.      Combined Plan and Disclosure Statement Supplement

The Debtors will File the Combined Plan and Disclosure Statement Supplement by October 4, 2024 at 4:00 p.m. The Combined Plan and Disclosure Statement Supplement will contain, among other things: (a) the Financial Projections; (b) the Senior Exit Facility Agreement; (c) the Mezzanine Exit Facility Agreement; and (d) any other disclosures as required by the Bankruptcy Code.

### D.      Filing of Additional Documents

On or before substantial consummation of the Combined Plan and Disclosure Statement, the Reorganized Debtors shall File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Combined Plan and Disclosure Statement.

### E.      Binding Effect of Combined Plan and Disclosure Statement

The Combined Plan and Disclosure Statement shall be binding upon and inure to the benefit of the Debtors, the Holders of Claims, the Holders of Interests, and their respective successors and assigns.

### F.      Governing Law

Except as required by the Bankruptcy Code, the Bankruptcy Rules, or the Local Rules, the rights and obligations arising under the Combined Plan and Disclosure Statement shall be governed by, and construed and enforced in accordance with the laws of the State of Delaware.

### G.      Time

98876382.5

To the extent that any time for the occurrence or happening of an event as set forth in the Combined Plan and Disclosure Statement falls on a day that is not a Business Day, the time for the next occurrence or happening of said event shall be extended to the next Business Day.

**H.      Severability**

Should any provision of the Combined Plan and Disclosure Statement be deemed unenforceable after the Effective Date, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of the Combined Plan and Disclosure Statement.

**I.      Revocation**

The Debtors reserve the right to revoke and withdraw the Combined Plan and Disclosure Statement prior to the entry of the Confirmation Order. If the Debtors revoke or withdraw the Combined Plan and Disclosure Statement, the Combined Plan and Disclosure Statement shall be deemed null and void, and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtors, any other Person, or to prejudice in any manner the rights of such parties in any further proceedings involving the Debtors.

**J.      Claims Agent**

Stretto, in its capacity as Claims and Noticing Agent and as Administrative Agent, shall be relieved of such duties on the date of the entry of the Final Decree or upon written notice by the Debtors or Reorganized Debtors, and subject to approval by the Bankruptcy Court.

**K.      Inconsistency**

To the extent that the Combined Plan and Disclosure Statement conflicts with or is inconsistent with any agreement related to the Combined Plan and Disclosure Statement, the provisions of the Combined Plan and Disclosure Statement shall control; *provided*, *however*, that nothing in the Combined Plan and Disclosure Statement shall be deemed to supersede, amend, modify the provisions of the Final DIP Order or the Restructuring Support Agreement.

In the event of any inconsistency between any provision of any of the foregoing documents, and any provision of the Confirmation Order, the Confirmation Order shall control and take precedence; *provided*, *however*, that nothing in the Confirmation Order shall be deemed to supersede, amend, modify the provisions of the Final DIP Order or the Restructuring Support Agreement.

**L.      No Admissions**

Notwithstanding anything herein to the contrary, nothing contained in the Combined Plan and Disclosure Statement shall be deemed an admission by any Entity with respect to any matter set forth herein.

**M.      Successors and Assigns**

98876382.5

The rights, benefits, and obligations of any Person or Entity named or referred to in this Combined Plan and Disclosure Statement shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or assign of such Person or Entity.

### N.      Votes Solicited in Good Faith.

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Combined Plan and Disclosure Statement in good faith and in compliance with section 1125(g) of the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, stockholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Combined Plan and Disclosure Statement and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable Law, rule, or regulation governing the solicitation of votes on the Combined Plan and Disclosure Statement or the offer, issuance, sale, or purchase of the Securities offered and sold under the Combined Plan and Disclosure Statement and any previous plan.

### O.      Closing of Chapter 11 Cases.

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

### P.      Waiver or Estoppel.

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Combined Plan and Disclosure Statement or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

### Q.      Reservation of Rights

Except as expressly set forth herein, the Combined Plan and Disclosure Statement shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the filing of the Combined Plan and Disclosure Statement, any statement or provision contained herein, or the taking of any action by the Debtors with respect to the Combined Plan and Disclosure Statement shall be or shall be deemed to be an admission or waiver of any rights of the Debtors, Holders of Claims, or Holders of Interests before the Effective Date.

## XVII.   Recommendation

In the opinion of the Debtors, the Combined Plan and Disclosure Statement is superior and preferable to the alternatives described in the Combined Plan and Disclosure Statement. Further, the value being provided to Creditors under the Combined Plan and Disclosure Statement was

98876382.5

subject to a competitive process. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Combined Plan and Disclosure Statement vote to accept the Combined Plan and Disclosure Statement and support Confirmation.

Dated: September 27, 2024

**Basic Fun, Inc., et al.**
Debtors and Debtors in Possession

*/s/ Frank McMahon*
Frank McMahon
Chief Financial Officer