## Exhibit A

Restructuring Support Agreement

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE EXECUTION DATE (WITH RESPECT TO THE NON-DEBTOR PARTIES) OR UPON ENTRY OF THE RSA ORDER (WITH RESPECT TO THE DEBTORS) ON THE TERMS DESCRIBED IN THIS AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES TO THIS AGREEMENT.

THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE RESTRUCTURING DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN, AND THE CLOSING OF ANY RESTRUCTURING SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN.

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (this "**Restructuring Support Agreement**") is made and entered into as of August 9, 2024 (the "**Execution Date**") by and among Basic Fun, Inc. ( "**Basic Fun**"), Basic Fun Holdco, LLC ("**Holdco**"), TBDUM, LLC ("**TBDUM**"), TGS Acquisition, LLC ("**TGS**"), K'NEX UK Limited ("**K'NEX**", together with Basic Fun, HoldCo, TBDUM, and TGS, the "**Debtors**"), Basic Fun, L.P. ("**Basic Fun TopCo**" together with the Debtors, the "**Company**" or the "**Company Parties**"), Jay Foreman ("**Foreman**"), John MacDonald ("**MacDonald**", together with Foreman, the "**Founders**"), Falcon Structured Equity Partners, LP (together with certain affiliates, "**Falcon**"), Royal Bank of Canada ("**RBC**" together with Falcon, and the Founders, the "**Non-Debtor Parties**").  RBC, Falcon, the Founders, the Company are collectively referred to herein as the "**Parties**" and each as a "**Party**".

## RECITALS[1]

**WHEREAS**, on August 3, 2017, Basic Fun Canada Holdings, Inc., Basic Fun, Ltd., Holdco, the subsidiaries of Holdco from time to time party thereto, as borrowers, the lenders from time to time party thereto (the "**2017 Senior Lenders**"), and RBC, as administrative agent, entered into that certain Credit Agreement (the "**2017 RBC Senior Credit Agreement**"), pursuant to which the 2017 Senior Lenders made available to the aforementioned borrowers $40,000,000 in senior term loans and a $20,000,000 accordion line for acquisitions (the "**2017 RBC Senior Obligations**").

---

[1] Capitalized terms used but not otherwise defined in these Recitals shall have the meanings ascribed to them in the relevant documents.

**WHEREAS**, on August 3, 2017, Basic Fun, as borrower, Holdco, the subsidiaries of Holdco party thereto, and RBC, as collateral agent for the lenders (in its capacity as collateral agent, the "**2017 Mezzanine Agent**") for the several financial institutions from time to time party thereto ("**2017 Mezzanine Lenders**") and for itself as lender, entered into that certain Subordinate Credit Agreement (as amended by amending agreements dated November 30, 2017, February 6, 2018, June 11, 2018, August 1, 2018, February 5, 2019, March 29, 2019, May 3, 2019, June 28, 2019, November 8, 2019, and July 15, 2020 and by consents dated May 14, 2020, and June 9, 2020, the "**2017 Mezzanine Credit Agreement**"), pursuant to which the 2017 Mezzanine Lenders made available to the Debtors up to $15,000,000 in subordinate loans (the "**Original Mezzanine Loans**").

**WHEREAS**, on August 1, 2018, Falcon and Basic Fun TopCo entered into that certain Partnership Interest Purchase Agreement, pursuant to which Falcon invested $40,000,000 in consideration for 400,000 units of Series C Preferred Partnership Interests, which accrue a preferred return of 10% per annum, and 178,533.48 Class A-4 Limited Partnership Interests (subject to certain adjustments) which represented approximately 14% of the "common equity" of the Basic Fun TopCo (the "**Falcon Investment**").

**WHEREAS**, in 2019, Foreman and MacDonald loaned Basic Fun TopCo an aggregate of $18,000,000 in principal amount of Term Notes (collectively, the "**Owner Notes**").

**WHEREAS**, on July 15, 2020, the 2017 Mezzanine Credit Agreement was amended pursuant to that certain Amendment No. 10 to the Subordinate Credit Agreement, pursuant to which the 2017 Mezzanine Lenders agreed to make an additional loan to Basic Fun in the principal amount of $2,500,000 (the "**First Out Loan I**"), by way of a single advance in the full amount thereof.

**WHEREAS**, on July 15, 2020, Foreman and MacDonald entered into those certain Participation Agreements, pursuant to which (i) Foreman purchased a 100% participation interest in RBC's right, title and interest in the First Out Loan I in the amount of $1,750,000 outstanding, which represented a 70% share of the First Out Loan I; and (ii) MacDonald purchased an undivided 100% participation interest in RBC's right, title and interest in the First Out Loan I in the amount of $750,000 outstanding, which represented a 30% share of the First Out Loan I.

**WHEREAS**, on October 30, 2020, Basic Fun as borrower, Holdco, K'NEX, TBDUM, and TGS, as other loan parties, and RBC as collateral agent ("**Prepetition Mezzanine Agent**", together with the Prepetition Senior Agent (as defined below), the "**Prepetition Agents**") for the several lenders from time to time party thereto ("**Prepetition Mezzanine Lenders**", together with the Prepetition Senior Lenders (as defined below), the "**Prepetition Secured Lenders**"), and for itself as lender, entered into that certain Amended and Restated Subordinate Credit Agreement (the "**Amended and Restated Mezzanine Credit Agreement**"), pursuant to which the parties agreed to amend and restate the terms of the 2017 Mezzanine Credit Agreement. Pursuant to the terms of the Amended and Restated Mezzanine Credit Agreement, the Prepetition Mezzanine Lenders agreed to advance an additional $2,500,000 to Basic Fun (the "**First Out Loan II**"), which has been fully repaid. The Original Mezzanine Loans and First Out Loan I shall be collectively referred to herein as the "**Prepetition Mezzanine Secured Obligations**". The Prepetition Mezzanine Secured Obligations are secured by a second-priority security interest in favor of the

Prepetition Mezzanine Agent, for the benefit of the holders of the Prepetition Mezzanine Secured Obligations, in substantially all of the **Debtors**' assets.

WHEREAS, on October 30, 2020, the Debtors refinanced the 2017 RBC Senior Obligations (the "**2020 Refinancing Transaction**"). Basic Fun, as borrower and borrower representative, and Holdco, K'NEX, TBDUM, and TGS as guarantors, entered into that certain Credit Agreement (as amended by that certain Waiver and First Amendment to the Credit Agreement, dated as of April 26, 2021, that certain Second Amendment to the Credit Agreement, dated as of October 27, 2021, that certain Waiver and Third Amendment to the Credit Agreement, dated December 30, 2021, and as further amended, restated, amended and restated, supplemented or otherwise modified, the "**2020 SLR Credit Agreement**") with Crystal Financial LLC d/b/a SLR Credit Solutions ("**SLR**"), and each other lender from time to time party thereto (the "**Prepetition Senior Lenders**"), and SLR as administrative agent (the "**Prepetition Senior Agent**").

WHEREAS, pursuant to the 2020 SLR Credit Agreement, the Prepetition Senior Lenders made available to the Debtors (i) a revolving credit facility in the maximum aggregate principal amount of $20,000,000 (the "**Prepetition Senior Credit Facility**"), subject to a traditional ABL borrowing base; and (ii) a term loan in the maximum principal amount of $20,000,000 (the "**Prepetition Senior Term Loan**", together with the Prepetition Senior Credit Facility, the "**Prepetition Senior Secured Obligations**"). The Prepetition Senior Secured Obligations are secured by a first-priority security interest in favor of the Prepetition Senior Agent, for the benefit of the holders of the Prepetition Senior Secured Obligations, in substantially all of the Debtors' assets.

WHEREAS, the $18,000,000 in principal amount of Owner Notes were amended and restated on October 30, 2020. Pursuant to the amended and restated Owner Notes, the Owner Notes were converted to Junior Preferred Securities (as defined herein) on April 1, 2021. "**Junior Preferred Securities**" is a newly created class of Partnership Interests of Basic Fun TopCo, which (w) is entitled to aggregate liquidation preference distributions equal to the amount of any principal and interest of the converted Owner Note plus a preferred return, (x) is not convertible to any other equity security of Basic Fun TopCo, (y) has no voting rights or other rights under the limited partnership agreement of Basic Fun TopCo, other than rights to approve amendments to the terms of the Junior Preferred Securities, and (z) has rights to distributions (including upon liquidation and redemption) junior to the Class C units and only after payment in full of the Class C Liquidation Preference (but senior to the rights of the Class A units and Class B units of Basic Fun TopCo).

WHEREAS, on October 30, 2020, in connection with, and as condition to, the 2020 Refinancing Transaction, Basic Fun TopCo sold $1,000,000 of Class A-1 units in Basic Fun TopCo to the then-existing Class A unitholders. In that transaction, Foreman acquired 6,292,348.31 Class A-1 units for $562,793.75, MacDonald acquired 2,707,651.72 Class A-1 units for $242,175.00, Falcon acquired 1,712,558.31 Class A-1 units for $153,172.88 and CCNAS Investment Holdings, LLC acquired 468,000 Class A-1 units for 41,858.37.

WHEREAS, on June 28, 2024 (the "**Petition Date**"), the Debtors each filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy**

Code"), commencing cases (collectively, the "**Chapter 11 Cases**"), which Chapter 11 Cases are jointly administered in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").

**WHEREAS**, on July 1, 2024, the Debtors filed the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 34] (the "**DIP Financing Motion**"), pursuant to which the **Debtors** sought authority to, *inter alia*, (i) enter into that certain Senior Secured Super-Priority Debtor-in-Possession Loan and Security Agreement with Great Rock Capital ("**Great Rock**") as Agent (the "**DIP Credit Agreement**") to refinance their Prepetition Senior Secured Obligations, and (ii) roll-up $10,000,000 of Prepetition Mezzanine Secured Obligations of RBC.

**WHEREAS**, on July 3, 2024, the Bankruptcy Court entered that certain *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 65] (the "**Interim DIP Order**"), granting the DIP Financing Motion on an interim basis.

WHEREAS, on July 3, 2024, the Debtors entered into the DIP Credit Agreement, with the lenders party thereto and Great Rock as Agent, and with the proceeds thereof refinanced the Prepetition Senior Secured Obligations.

**WHEREAS**, the Company desires to implement a restructuring (the "**Restructuring**") of their capital structure on the terms and conditions set forth in the (i) term sheet for this Restructuring Support Agreement, attached hereto as **Exhibit 1** (the "**RSA Term Sheet**"), (ii) term sheet for the $50,000,000 First Priority Senior Secured DIP-to-Exit Revolving Credit Facility, attached hereto as **Exhibit 2** (the "**Great Rock Term Sheet**"), (iii) the term sheet for the amended and extended subordinate credit agreement (the "**Amended and Extended Subordinate Credit Agreement**"), attached hereto as **Exhibit 3** (the "**RBC Term Sheet**", together with the RSA Term Sheet and the Great Rock Term Sheet, the "**Term Sheets**"), (iv) the amended and restated limited partnership agreement of Basic Fun TopCo (the "**New TopCo LP Agreement**"), attached hereto as **Exhibit 4**, and (v) the Certificate of Amendment of Certificate of Incorporation for Basic Fun, Inc. (the "**Charter Amendment**"), attached hereto as **Exhibit 5**. The terms and conditions set forth in the Term Sheets are incorporated by reference in this Restructuring Support Agreement and are hereby made a part hereof to the same extent and with the same force as if fully set forth herein.

**WHEREAS**, each Party has reviewed, or has had the opportunity to review, this Restructuring Support Agreement, the Term Sheets, and the New TopCo LP Agreement that are attached hereto with the assistance of professional legal advisors of its own choosing.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and

sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

## STATEMENT OF AGREEMENT

**Section 1.**    <u>Preliminary Statements</u>.  The statements set forth in the recitals are incorporated herein and form an integrated part of this Restructuring Support Agreement, subject to such modifications and amendments as may be permitted pursuant to Section 14 hereof.  The <u>Exhibits</u> attached hereto are, likewise, incorporated herein and form an integral part of this Restructuring Support Agreement.

**Section 2.**    <u>Effectiveness of Restructuring Support Agreement</u>.  This Restructuring Support Agreement shall become immediately effective, legally binding, and enforceable as to (i) each of the Parties except the Debtors as of the Execution Date and (ii) the Debtors upon the Bankruptcy Court's entry of an order authorizing the Debtors to perform their obligations under this Restructuring Support Agreement (the "**RSA Order**").

**Section 3.**    <u>Definitive Documents</u>.

    **3.1**    The Parties shall work in good faith to negotiate, prepare, and execute all definitive documents required to implement the Restructuring, including, but not limited to, the following (together, the "**Definitive Documents**"):

    a)   a final order of the Bankruptcy Court approving the DIP Financing Motion (the "**Final DIP Order**"), which shall be in the form substantially similar to the Interim DIP Order;

    b)   a motion to assume this Restructuring Support Agreement and perform the terms hereunder (the "**RSA Motion**");

    c)   a proposed order approving the RSA Motion;

    d)   a plan of reorganization under Chapter 11 of the Bankruptcy Code (the "**Plan**"), which shall be consistent in all material respects with the terms of this Restructuring Support Agreement and otherwise reasonably acceptable to each of the Non-Debtor Parties, and which shall implement the terms set forth in the Term Sheets and further provide the following material terms:

    (i)   all general unsecured claims will "ride through" the Chapter 11 Cases and be paid in full in the ordinary course of business;

    (ii)   all administrative claims, priority tax claims, and other priority claims will be paid in full on the Plan Effective Date (as defined herein); and

    (iii)   all executory contracts and unexpired leases shall be assumed as of the Plan Effective Date, unless determined to be rejected by the Debtors.

    e)   a proposed order of the Bankruptcy Court approving the Plan;

    f)   a disclosure statement with respect to the Plan (the "**Disclosure Statement**");

    g)   all documents, forms, and other materials distributed in connection with the solicitation of votes on the Plan pursuant to sections 1125 and 1126 of the

Bankruptcy Code, including, without limitation, the Disclosure Statement, the forms of ballots with respect to votes on the Plan, and the opt out and opt in forms with respect to third-party releases, as applicable (the "**Solicitation Materials**");

h)  an order of the Bankruptcy Court conditionally approving the Disclosure Statement and solicitation procedures (the "**Conditional DS Order**");

i)  a final order of the Bankruptcy Court (i) approving the Disclosure Statement and solicitation procedures and (ii) confirming the Plan (the "**Combined DS/Confirmation Order**");

j)  exit financing documents, which shall implement the terms materially set forth in the Great Rock Term Sheet;

k)  the Amended and Extended Subordinate Credit Agreement;

l)  a mutual release agreement;

m)  the new organizational documents for the Company, including, charters, bylaws, operating agreements, other organization or formation documents, any shareholder agreements, as applicable (including the New TopCo LP Agreement and Charter Amendment); and

n)  all other documents, motions, pleadings, briefs, applications, orders, agreements, supplements, and other filings, including any summaries or term sheets in respect thereof, that are directly related to any of the foregoing or as may be reasonably necessary or advisable to implement the Restructuring contemplated herein.

The Definitive Documents, including all amendments and modifications thereto and including all forms thereof filed with the Bankruptcy Court, shall contain terms, conditions, representations, warranties, and covenants consistent in all material respects with the terms of this Restructuring Support Agreement and the Term Sheets, as they may be modified, amended, or supplemented in accordance with Section 14 hereof and be in form and substance reasonably acceptable to the Founders and Falcon; *provided*, however, that the Definitive Documents identified in Section 3.1(i)–(k) shall be in form and substance also reasonably acceptable to RBC.

**Section 4.**    Milestones.

4.1    The Company shall comply with the following milestones (the "**Milestones**"),[2] unless extended or waived in writing by each of Falcon and the Company in accordance with the terms herein:

a)  no later than August 26, 2024, the Debtors shall have filed a motion seeking entry of the Conditional DS Order;

---

[2] All Milestone dates are subject to the approval and availability of the Bankruptcy Court.

b) no later than August 30, 2024, the Bankruptcy Court shall have entered an order authorizing the Debtors to perform their obligations under this Restructuring Support Agreement;

c) no later than September 16, 2024, the Bankruptcy Court shall have entered the Conditional DS Order;

d) no later than October 21, 2024, the Bankruptcy Court shall have entered the Combined DS/Confirmation Order consistent with the terms of this Restructuring Support Agreement; and

e) the Plan effective date shall occur, and the Restructuring shall be implemented on or before October 30, 2024 (the "**Plan Effective Date**").

**Section 5.**    Agreements of the Company Parties. Each Company Party shall:

5.1

a) take all steps reasonably necessary and desirable to consummate the Restructuring in accordance with this Restructuring Support Agreement;

b) secure and document a secured exit facility substantially on the terms included in the Great Rock Term Sheet;

c) negotiate in good faith to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring as contemplated by this Restructuring Support Agreement;

d) perform their obligations under the Definitive Documents in accordance with the terms of this Restructuring Support Agreement and any other agreements required to effectuate and consummate the Restructuring and the transactions contemplated by the Definitive Documents;

e) take all reasonable steps to obtain any and all requisite regulatory or third-party approvals necessary to consummate the Restructuring; and

f) operate their businesses in the ordinary course in a manner consistent with past practice in all material respects (other than any changes in operations required to implement the Restructuring or imposed by the Bankruptcy Court).

5.2    Each Company Party shall not:

a) transfer any assets other than in the ordinary course of business;

b) take, or encourage any other person or entity to take, any action, directly or indirectly that is inconsistent in any material respect with, or is intended to frustrate, delay or impede in any material respect the timely approval and entry of the Conditional DS Order, the Combined DS/Confirmation Order and consummation of the transactions necessary to effectuate the Restructuring;

c) execute, agree to execute, file, or agree to file any motion, pleading, or

Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is inconsistent with this Restructuring Support Agreement or the Definitive Documents; or

d)  amend any of their Organizational Documents in a manner that materially impacts the rights of Falcon.

**Section 6.**    Agreements of Non-Debtor Parties.

6.1    Restrictions on Transfers: Each Non-Debtor Party shall not voluntarily sell, transfer, or assign any right or interest (voting or otherwise) relating to the Debtors unless the transferee thereof has already executed this Restructuring Support Agreement or a joinder thereto.

6.2    Voting on the Plan: Subject to receipt of a Disclosure Statement and the other Solicitation Materials that comply with applicable law, to the extent such Non-Debtor Party is entitled to vote to accept or reject the Plan, such Non-Debtor Party will vote all claims, rights, or interests that exist against the Debtors to accept the Plan.

6.3    Each Non-Debtor Party shall negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring as contemplated by this Restructuring Support Agreement to which it is required to be a party.

6.4    Each Non-Debtor Parties shall not:

a)  support or encourage, directly or indirectly, any financial restructuring or sale of assets concerning the Debtors or their assets, other than the Restructuring;

b)  take any action that is materially inconsistent with the Term Sheets, the transactions contemplated hereby or thereby, or the expeditious confirmation and consummation of such transactions;

c)  vote against the Plan or otherwise agree, consent, or provide any support, to any other chapter 11 plan or other restructuring or sale or liquidation of assets concerning the Debtors or their assets, other than the Restructuring;

d)  object to, fail to consent to (if such consent is expressly required herein), or otherwise commence any proceeding to oppose or alter the Plan, the Final DIP Order, or any of the terms of the Restructuring (or any other document filed in furtherance of, and that is consistent with the Restructuring);

e)  to the extent applicable, make any election under Section 1111(b) of the Bankruptcy Code, and will vote against and/or object to any action or motion to make such an election; or

f)  take any action that is contrary to the terms of this Restructuring Support Agreement.

6.5    Falcon and the Founders will use reasonable efforts to agree to either (i) appointment of a mutually agreed Independent Representative (as defined in the LPA) or (ii) a process to appoint a mutually agreed Independent Representative (as defined in the LPA), in each case, by August 12, 2024 at 10 A.M. prevailing Eastern Time (the "**Governance Milestone**")

unless extended by each of Falcon and the Founders. In addition to Falcon's consent rights in respect of the debtor-in-possession financing and the Final DIP Order in section 3.1 of this Agreement, Falcon's consent to the debtor-in-possession financing and the Final DIP Order shall also be subject to the parties' compliance with the Governance Milestone.

**Section 7.**     Limited Partnership Restructuring.  The Founders and Falcon shall cooperate and each agree with respect to the implementation of a restructuring of Basic Fun TopCo and any other non-debtor Company Party, regarding of whether such restructuring is implemented through the Plan or an out-of-court transaction.

**Section 8.**     Representations and Warranties of the Parties.  Each Party represents to each other Party that the following statements are true, correct, and complete as of the date hereof:

a)    It has all requisite corporate, partnership, limited liability company, or similar authority to enter into this Restructuring Support Agreement and perform its obligations contemplated hereunder, and the execution and delivery of this Restructuring Support Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, limited liability, partnership, or other similar action on its part;

b)    the execution, delivery, and performance by the undersigned of and under this Restructuring Support Agreement does not and shall not violate any provision of law, rule, or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries;

c)    the execution, delivery, and performance by the undersigned of and under this Restructuring Support Agreement does not and shall not require any registration or filing with, consent or approval of, notice to, or other action to, with or by, any federal, state or governmental authority or regulatory body; and

d)    this Restructuring Support Agreement is the legally valid and binding obligation of such Party, enforceable in accordance with its terms.

**Section 9.**     Alternative Transactions.  Subject to Section 12 hereof, from and after execution of this Restructuring Support Agreement until it is terminated, neither the Company, nor any of the Company' respective officers, directors, employees, agents, representatives, or affiliates (including any investment banker or financial advisor retained by the Debtors or any of the foregoing) shall, directly or indirectly, encourage, solicit, or initiate any inquiry or proposal from, or encourage, solicit, or initiate any negotiations with, or solicit or initiate any discussions with any person or entity  concerning any potential sale of the Company or restructuring of the Company or a transaction that is similar to, in conflict with or in substitution of the Restructuring pursuant to the terms hereof (each, an "**Alternative Transaction**"), or agree to endorse or take any other action to facilitate any Alternative Transaction, unless the Company have obtained the prior written consent of Falcon.

**Section 10.**    Termination Events.

10.2    Falcon's obligations herein shall automatically terminate without notice upon the occurrence of any of the following events:

96560100.7

a) The Bankruptcy Court:

(i)  enters an order denying confirmation of the Plan;

(ii)  enters an order pursuant to Section 1104 of the Bankruptcy Code appointing a trustee or appointing an examiner with powers beyond the duty to investigate and report (as set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code), including, without limitation, to operate and manage the Debtors' business;

(iii)  enters an order dismissing any of the Chapter 11 Cases or an order pursuant to Section 1112 of the Bankruptcy Code converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(iv)  enters an order suspending any of the Chapter 11 Cases under Section 305 of the Bankruptcy Code;

(v)  enters an injunction, judgment, order, decree, ruling, or charge that prevents consummation of the Restructuring and that remains in effect for longer than 30 days; or

(vi)  grants relief that is inconsistent with this Restructuring Support Agreement or the Plan or that would result in a withdrawal, modification, or amendment of the Restructuring or Plan that is contrary to the Term Sheets or Plan and that has a material adverse effect on the Non-Debtor Parties; *provided* that such relief has not resulted from any action or inaction by any of the Non-Debtor Parties.

10.3    Falcon's obligations herein shall terminate upon five (5) days written notice, unless otherwise specified herein, following the occurrence of any of the following events:

a) Any Company Party:

(i)  files or supports confirmation of, or fails to actively oppose confirmation of, a plan of reorganization that requests or would result in a withdrawal, modification, or amendment of the Plan, or that, as to any provision of the Plan, materially adversely affects Falcon;

(ii)  files a motion, pleading, objection, lawsuit, or administrative or adversary proceeding (or takes any action in support of such a motion or pleading filed by another party) in the Bankruptcy Court or other court, or otherwise assists in any of the foregoing, that requests or would result in a withdrawal, modification, or amendment (including in the case of a document which is an interim order, by replacement with a final order) of the Restructuring;

(iii)  fails to achieve any of the Milestones set forth in Section 4 (as may be extended or waived by Falcon in accordance with this Restructuring Support Agreement) by the date specified for such Milestone, unless such failure is the result of (i) any act, omission, or delay on the part of Falcon in violation of their obligations under this Restructuring Support Agreement or (ii) the availability of the Bankruptcy Court;

96560100.7

(iv) fails to comply with any obligations under this Restructuring Support Agreement, other than those set forth in this Section 10, and such failure is not cured within five (5) business days after written notice thereof has been given to the Company; or

(v) fails to comply with any obligations under this Section 10; *provided* that such termination shall be immediately effective upon notice.

b) The Definitive Documents or any of the documentation reasonably required to implement the terms of the Restructuring (i) contain terms, conditions, representations, warranties, or covenants that are not materially consistent with the terms of this Restructuring Support Agreement and the Term Sheets as reasonably determined by Falcon or (ii) shall have been materially and adversely amended or modified without the prior written consent of Falcon;

c) Failure by any Party to comply with such Party's obligations under this Restructuring Support Agreement, and such failure is not cured within five (5) business days after written notice thereof has been given by the Falcon to such Party.

10.4    RBC's obligations herein shall terminate upon five (5) days written notice if (a) the Bankruptcy Court has not approved the Debtors' entry into Restructuring Support Agreement by the date specified for such Milestone in Section 4 (as may be extended or waived by RBC in accordance with this Restructuring Support Agreement), unless such failure is the result of (i) any act, omission, or delay on the part of RBC in violation of its obligations under this Restructuring Support Agreement or (ii) the Bankruptcy Court setting the hearing on approval of the Restructuring Support Agreement on a date later than the Milestone date, and (b) any of the finalized Definitive Documents identified in Section 3.1(i)-(k) contain terms, conditions, representations, warranties, or covenants that are not materially consistent with the terms of the RBC Term Sheet as reasonably determined by RBC in its discretion or shall have been amended or modified in a way materially adverse to RBC, in each case without the prior written consent of RBC; *provided* that such termination will be solely as to RBC.

10.5    This Restructuring Support Agreement shall terminate automatically without any further required action or notice immediately after the occurrence of the Plan Effective Date.

10.6    [Reserved].

10.7    Effect of Termination: Termination of this Restructuring Support Agreement (as to a Party or in total) shall not relieve a Party from liability, if any, for its breach or non-performance of any of its obligations hereunder prior to the date of such termination.

**Section 11.**    <u>No Solicitation</u>.  This Restructuring Support Agreement is not and shall not be deemed to be a solicitation of votes for the acceptance of the Plan (or any other plan of reorganization) for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.

**Section 12.**    <u>Debtors' Fiduciary Duties</u>.  Notwithstanding anything to the contrary in this Restructuring Support Agreement, nothing in this Restructuring Support Agreement shall require the Debtors or any of their respective directors or officers (in such person's capacity as a director or officer of such Debtor), after consultation with outside counsel, to take any action, or to refrain from taking any action, to the extent that taking such action or refraining from taking such action

would be inconsistent with such party's fiduciary obligations under applicable law, including the Bankruptcy Code.

**Section 13.**    Cooperation; Further Assurances; Acknowledgment; Definitive Documents. The Parties shall cooperate with each other and shall coordinate their activities (to the extent practicable) in respect of all commercially reasonable actions necessary to consummate the Restructuring. The Parties further agree to execute and deliver such other instruments and to perform such commercially reasonable acts, in addition to the matters herein specified, as may be appropriate or necessary, from time to time, to effectuate the Restructuring.

**Section 14.**    Amendments. This Restructuring Support Agreement may not be modified, amended or supplemented except in writing by the Founders and Falcon (which may be via electronic mail); provided, however, that if (i) the proposed modification, amendment, waiver, or supplement has a material and adverse impact on RBC, or (ii) amends, modifies, supplements or waives any term of the RBC Term Sheet, then the consent of RBC shall also be required to effectuate such modification, amendment, waiver or supplement.

**Section 15**.    GOVERNING LAW; JURISDICTION. THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO ANY CONFLICT OF LAWS PROVISIONS THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. BY ITS EXECUTION AND DELIVERY OF THIS RESTRUCTURING SUPPORT AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT, OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER UNDER, OR ARISING OUT OF OR IN CONNECTION WITH, THIS RESTRUCTURING SUPPORT AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT, OR PROCEEDING, SHALL BE BROUGHT IN ANY FEDERAL OR STATE COURT IN THE STATE OF DELAWARE HAVING JURISDICTION, AND BY EXECUTION AND DELIVERY OF THIS RESTRUCTURING SUPPORT AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF EACH SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING; PROVIDED, THAT AFTER THE PETITION DATE THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ANY ISSUES RELATING TO THIS RESTRUCTURING SUPPORT AGREEMENT PROVIDED THAT THE BANKRUPTCY COURT SHALL FOLLOW APPLICABLE CHOICE OF LAW RULES.

**Section 16.**    Specific Performance. It is understood and agreed by the Parties that the exact nature and extent of damages resulting from a breach of this Restructuring Support Agreement are uncertain at the time of entering into this Restructuring Support Agreement and that breach of this Restructuring Support Agreement would result in damages that would be difficult to determine with certainty. It is understood that money damages would not be a sufficient remedy for any breach of this Restructuring Support Agreement, and that each non-breaching Party shall be entitled to specific performance, injunctive, and any other legal or equitable relief as a remedy of any such breach including attorneys' fees and costs (without the posting of bond) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy, including an order

of a court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

**Section 17.** <u>Headings</u>. The headings of the Sections, paragraphs, and subsections of this Restructuring Support Agreement are inserted for convenience only, and shall not affect the interpretation hereof.

**Section 18.** <u>Successors and Assigns; Severability; Several Obligations.</u> This Restructuring Support Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators, and representatives. The invalidity or unenforceability at any time of any provision hereof shall not affect or diminish in any way the continuing validity and enforceability of the remaining provisions hereof. The agreements, representations, and obligations of the Non-Debtor Parties under this Restructuring Support Agreement are, in all respects, several and not joint.

**Section 19.** <u>No Third-Party Beneficiaries</u>. Unless expressly stated herein, this Restructuring Support Agreement shall be solely for the benefit of the Parties, and no other person or entity shall be a third-party beneficiary hereof.

**Section 20.** <u>Consideration</u>. No consideration shall be due or paid to the Non-Debtor Parties for agreement of the Non-Debtor Parties to support the Restructuring and to vote in favor of the Plan in accordance with the terms and conditions of this Restructuring Support Agreement, other than the Company's agreement to pursue the Restructuring and to file, pursue confirmation of, and implement the Plan in accordance with the terms and conditions of this Restructuring Support Agreement, which the Parties acknowledge is fair and sufficient consideration to support the Parties' respective agreements hereunder.

**Section 21.** <u>Prior Negotiations; Entire Agreement</u>. This Restructuring Support Agreement constitutes the entire agreement of the Parties related to the Restructuring, and supersedes all other prior negotiations with respect to the subject matter hereof.

**Section 22.** <u>Counterparts</u>. This Restructuring Support Agreement and any amendments, joinders, consents, or supplements hereto, may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same agreement. Facsimile or scanned signatures on this Restructuring Support Agreement shall be treated as originals for all purposes.

**Section 23.** <u>Construction</u>. This Restructuring Support Agreement shall be deemed to have been negotiated and prepared at the joint request, direction, and construction of the Parties, and at arm's length and shall be interpreted without favor to any Party.

**Section 24.** <u>Time of the Essence</u>. Time shall be of the essence with respect to each and every of the various undertakings and obligations set forth in this Restructuring Support Agreement.

**Section 25.** <u>Notices</u>. All notices, demands, requests, consents, approvals, and other communications ("**Notice**" or "**Notices**") hereunder shall be in writing and delivered by (i) courier or messenger service, (ii) express or overnight mail, (iii) electronic mail, or (iv) by registered or certified mail, return receipt requested and postage prepaid, addressed to the respective parties as follows:

If to the Company:

Basic Fun, Inc.

13

301 Yamato Road, Suite 4200
Boca Raton, FL 33431
Attention: Frank McMahon
Email: Frank.McMahon@basicfun.com

Copy to:

Polsinelli PC
1401 Eye Street N.W., Suite 800
Washington, D.C. 20005
Attention: Mark B. Joachim
Email: mjoachim@polsinelli.com

If to RBC:

RBC Capital Partners
200 Bay St., Main Floor
Toronto, Ontario, Canada
Attention: Matthew Hall
Email: matthew.hall@rbccm.com

Copy to:

Orrick, Herrington & Sutcliffe LLP
51 West 52nd Street
New York, NY 10019
Attention: Raniero D'Aversa
Email: rdaversa@orrick.com

If to Falcon:

Falcon Structured Equity Partners, LP
21 Custom House St.
Boston, MA 02110
Attention: Matthew White
Email: mwhite@falconinvestments.com

Copy to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Attention: Paul M. Basta, Sean A. Mitchell, and Nick Krislov
Email: pbasta@paulweiss.com, smitchell@paulweiss.com, and
nkrislov@paulweiss.com

If to the Founders:

301 Yamato Road, Suite 4200

> Boca Raton, FL 33431
> Attention: John MacDonald and Jay Foreman
> Email: John.MacDonald@basicfun.com and
> Jay.Foreman@basicfun.com

Copy to:

> Wilson Sonsini Goodrich & Rosati
> 222 Delaware Avenue, Suite 800
> Wilmington, DE 19801-5225
> Attention: Erin R. Fay
> Email: efay@wsgr.com

or to such other addresses as any Party may hereafter designate. Notice by courier or messenger service or by express or overnight mail shall be effective upon receipt. Notice by electronic mail shall be effective upon delivery by the sender of a confirming telephone message. Notice by mail shall be complete at the time of deposit in the United States mail system, but any right or duty to do any act or make any response within any prescribed period or on a date certain after the service of such Notice given by mail shall be, without further action by any Party, automatically extended three (3) days.

**Section 26.**     <u>Reservation of Rights</u>.  Except as expressly provided in this Restructuring Support Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of any Party to protect and preserve its rights, remedies, and interests, including its Claims.  Nothing herein shall be deemed an admission of any kind.  If the transactions contemplated herein are not consummated, or this Restructuring Support Agreement is terminated for any reason, the Parties hereto fully reserve any and all of their rights.  Except as required by the Bankruptcy Code to assume, perform, or disclose this Restructuring Support Agreement, pursuant to Rule 408 of the Federal Rule of Evidence, any applicable state rules of evidence, and any other applicable law, foreign or domestic, this Restructuring Support Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

**Section 27.**     <u>Support Agreement Not a Plan</u>.  This Restructuring Support Agreement does not constitute a plan of reorganization or confirmation thereof under the Bankruptcy Code.  The Plan will not become effective unless and until the Bankruptcy Court enters an order confirming the Plan and the Plan becomes effective in accordance with its terms.  This Restructuring Support Agreement is not intended to constitute a solicitation or acceptance of the Plan.

*[Signature Blocks on Following Page]*

96560100.7

Dated:  August __, 2024

**DEBTORS:**

**Basic Fun, Inc.**
**Basic Fun Holdco, LLC**
**TGS Acquisition, LLC**
**TBDUM, LLC**
**K'NEX UK Limited**

*Frank McMahon*

Name:  Frank McMahon
Title:  Chief Financial Officer, Authorized Signatory

[Signature Page to Restructuring Support Agreement]

**COMPANY:**

**Basic Fun, LP**

Name: Frank McMahon
Title: Chief Financial Officer, Authorized Signatory

**FOUNDERS**

**JAY FOREMAN**

By: _____

**JOHN MACDONALD**

By: _____

**FALCON STRUCTURED EQUITY PARTNERS, LP**

Name:  Matthew White
Title:  Managing Director

**ROYAL BANK OF CANADA**

Name:  Matt Hall
Title:  Director

Name:  David Goldband
Title:  Vice President

**Exhibit 1**

Term Sheet for Restructuring Support Agreement

## TERM SHEET FOR RESTRUCTURING SUPPORT AGREEMENT

This settlement term sheet (this "Term Sheet") describes the principal terms of a potential settlement by and among Basic Fun, L.P., a Delaware limited partnership ("Basic Fun TopCo"), Basic Fun Holdco, LLC, a Delaware limited liability company ("Holdco"), and Basic Fun, Inc., a Delaware corporation (together, with any subsidiaries and affiliates, the "Company"), Jay Foreman and John MacDonald (together, the "Founders"), and Falcon Structured Equity Partners, LP (together with certain affiliates, "Falcon"). The transactions described in this Term Sheet (the "Proposed Settlement") are subject in all respects to definitive documentation and the consent of the parties.

This Term Sheet and the Proposed Settlement shall remain strictly confidential and may not be shared with any other party or person without the consent of Falcon and the Company. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Third Amended & Restated Agreement of Limited Partnership of Basic Fun, L.P., dated as of August 1, 2018 (as may be amended, supplemented, or restated).

This Term Sheet has been produced for discussion purposes only and is subject to Rule 408 of the Federal Rules of Evidence and any other applicable state or Federal rules or doctrines protecting the use or disclosure of information exchanged in the context of settlement discussions. Nothing in this Term Sheet shall be deemed an admission of fact or liability of any party hereto.

## COMPREHENSIVE RESTRUCTURING TERMS

| | |
|---|---|
| **Mezzanine Facility Paydown:** | Upon execution of this Restructuring Support Agreement, the Founder' existing commitment to purchase participations of last out loans under the Amended and Restated Mezzanine Credit Agreement totaling no less than $3,900,000 effective upon entry of the Final DIP Order (the "Mezzanine Facility Paydown") shall be deferred to the earlier to occur of (i) the Plan Effective Date and (ii) October 30, 2024. |
| | If the Mezzanine Facility Paydown occurs in connection with the occurrence of the Plan Effective Date, Falcon shall purchase participations totaling $2,500,000 of last out loans under the Mezzanine Exit Facility[3] due to RBC and the Founders shall purchase participations totaling $1,400,000.[4] Such last out loans shall be junior in payment priority to the other loans under the |

---

[3]     The "Mezzanine Exit Facility" means the facility issued under an Amended and Restated Subordinate Credit Agreement to be negotiated and executed on the Plan Effective Date (as defined below) among Basic Fun, Inc. as Borrower, Basic Fun Holdco, LLC as Holdings, certain subsidiaries of Holdings from time to time party thereto, as Loan Parties, the financial institutions party thereto, as Lenders, and Royal Bank of Canada, as Collateral Agent, among others or any permitted refinancing thereof.

[4]     For the avoidance of doubt, such last out loans will not have call protection (i.e., they will be prepayable at any time without condition or premium of any kind).

Mezzanine Exit Facility, and interest on such last out loans shall not be paid in cash if interest on the other loans under the Mezzanine Exit Facility is paid in-kind.

If the Mezzanine Facility Paydown occurs prior to the Plan Effective Date, the Founders shall purchase participations totaling $3,900,000 of last out loans under the Amended and Restated Mezzanine Credit Agreement.

In exchange for Falcon and the Founders' purchase of last out loans and the Last Out Conversion (as defined below), the Prepetition Mezzanine Secured Obligations shall be refinanced into the Mezzanine Exit Facility consistent with the terms of the RBC Term Sheet, including a maturity date that is three (3) years plus 90 days after the Effective Date (as defined below).

The Company shall secure an extension of the maturity of the Senior Facility[5] (or the replacement thereof) to no earlier than a date that is three (3) years after the Effective Date.

**Last Out Loans Conversion:** Upon the occurrence of the Plan Effective Date, Last Out Loans held by the Founders issued under the Amended and Restated Mezzanine Credit Agreement (approximately $2,700,000) shall convert into the preferred equity (the "Last Out Conversion") issued to the Founders in the transaction (collectively, the "Founder Preferred Equity").

**LP Notes Conversion:** The LP Notes[6] held by the Founders shall convert into Founder Preferred Equity, at the Founder's option[7] (the "LP Notes Conversion").

The remaining LP Notes shall be eliminated.

---

[5]    The "Senior Facility" means the facility issued under an Amended and Restated Credit Agreement to be negotiated and executed on the Plan Effective Daye (as defined below) among Basic Fun, Inc., as Borrower Representative, K'NEX UK Limited, as the UK Guarantor, Great Rock Capital Partners Management, LLC and the other Lenders Party thereto, and Great Rock Capital Partners Management, LLC, as Administrative Agent, among others.

[6]    The "LP Notes" means those certain Term Notes issued between August 1, 2018 and September 30, 2019, as further described in the Declaration of Frank McMahon, Chief Financial Officer of the Debtors, in support of Chapter 11 Petitions and First Day Pleadings, filed at docket number 15 in the Chapter 11 Cases.

[7]    For the avoidance of doubt, preferred equity issued to the Founders on the Plan Effective Date shall in all instances be equal to $10,000,000 regardless of the Founders' option with respect to conversion of the LP Notes Conversion and the First Out Conversion.

| | |
|---|---|
| **Preferred Equity Restructuring:** | The preferred equity shall be restructured to a total of $35,000,000, comprised of:
• $25,000,000 to Falcon on account of pre-transaction preferred equity (the "<u>Falcon Preferred Equity</u>"),
• $10,000,000 to the Founders on account of the Last Out Conversion and/or the LP Notes Conversion, at the Founders' option.
Other existing preferred equity held by Falcon shall be equitized into common equity, as stated below (the "<u>Preferred Equity Equitization</u>").

The restructured preferred equity shall (i) commencing on January 1, 2025, bear interest at a rate of 8.00% per annum, payable in kind, or 7.00% payable in cash to the extent payable under the Amended and Extended Subordinate Credit Agreement, at the Company's election and (ii) be subject to mandatory redemption six (6) months after the final maturity date of the Mezzanine Exit Facility. |
| **Common Equity:** | The common equity shall be restructured to be:
• 32.5% to Falcon in account of the Preferred Equity Equitization and its preexisting common equity;
• 67.5% to the Founders (the "<u>Founder Equity Issuance</u>"), subject to dilution by the MIP. |
| **Management Incentive Plan:** | The Company shall establish a new management incentive plan (the "<u>MIP</u>") from an allocation of common equity from the Founder Equity Issuance. For the avoidance of doubt, approval of the MIP shall be subject to the approval of the Jay Foreman and will contain at least 10% of the common equity. Neither of the Founders will participate in the MIP unless Falcon consents thereto. |
| **Governance:** | For all Major Decisions, [8] the Advisory Committee and the boards of directors of each of the Company entities (the "<u>Boards</u>") shall be reconstituted and comprised of:
• two (2) directors appointed by the Founders,
• two (2) directors appointed by Falcon, and |

---

[8] "Major Decisions" to be defined in the definitive documentation for the Proposed Settlement.

- one (1) independent director acceptable to the Founders and Falcon (the "Independent Director")

For all non-Major Decisions, the Advisory Committee and the Boards shall be reconstituted and comprised of:
- four (4) directors appointed by the Founders,
- two (2) directors appointed by Falcon, and
- one (1) independent director acceptable to the Founders and Falcon (the "Independent Director")

The Company shall pay or reimburse $100,000 per year (total) for non-Falcon employee(s) who are appointed to the Board by Falcon.

**Acquisition Preferred Basket:**

The Company shall be permitted to issue up to $10,000,000 of preferred equity pari passu with preferred equity pursuant to a rights offering in order to fund an opportunistic acquisition by way of a rights offering; *provided* that the rights allocation under such rights offering shall be offered 50% to Falcon and 50% to the Founders included herein, but neither Falcon nor the Founders shall be under an obligation to exercise the rights offered (with the consequence of declining to exercise rights offered is that either Falcon or the Founders, as applicable, shall be afforded the opportunity to fund  in excess of such party's offered rights, and such excess shall be funded as preferred equity senior to the preferred equity restructured and/or issued pursuant to this transaction); *provided further* that the $10,000,000 may also be funded by a third party, with a maximum of $5,000,000 that may be funded as preferred equity senior to the preferred equity restructured and/or issued pursuant to this transaction.

For the avoidance of doubt, no other issuances of preferred equity senior to or pari passu with the preferred equity restructured and/or issued pursuant to this transaction shall be allowed without the consent of each of the preferred equityholders.

**Falcon Preferred Consent Rights:**

Subject to the Acquisition Preferred Basket described above, the Falcon consent rights as preferred equityholder shall include protections substantially similar those in Section 3.3(a)(ii), (vi), (vii), (viii), and (x) of the LPA.[9]  In addition, Falcon's consent shall be required in order for the Company to incur  indebtedness in excess of

---

[9] The "LPA" means that Third Amended & Restated Agreement of Limited Partnership of Basic Fun, L.P., dated as of August 1, 2018 (as amended).

an amount that is equal to the sum of (i) the maximum indebtedness permitted under the Company's Senior Facility, plus (ii) 1.0x TTM EBITDA, provided that such indebtedness is to a third party on arms'-length basis; provided, further, however, such sum does not exceed 6.0x TTM EBITDA.

**Tax Issues:**    The parties shall cooperate in good faith to structure these transactions in a tax efficient manner (which may include effectuating the restructuring at the Holdco level, dissolving Basic Fun TopCo, and executing a new Shareholders' Agreement amount Holdco's equity owners, as the parties agree).

**Implementation:**    The Proposed Settlement shall be implemented through a plan of reorganization (the "Plan").

**Professional Fees and Expenses:**    The Company shall pay all reasonable and documented legal fees and expenses of Falcon through the transaction effective date.

**Mutual Releases:**    The parties shall execute customary mutual releases.

**Conditions to Closing:**    Customary for transactions of this type, including, among other things, execution of definitive documentation for the Proposed Settlement through the Plan and amendments to the Senior Facility (or the replacement thereof) and the Mezzanine Exit Facility acceptable to the parties hereto.  Without limiting the conditions precedent outlined in the foregoing sentence, upon execution and delivery of the definitive documentation for the Proposed Settlement acceptable to all parties as described above, the effectiveness thereof shall be subject to entry a final order confirming the Plan.

**Exhibit 2**

Great Rock Term Sheet

**$50 Million First Priority Senior Secured DIP-to-Exit Revolving Credit Facility Term Sheet**

| Material Terms | |
|---|---|
| *Borrower(s)* | Basic Fun, Inc. (the "Borrower") |
| *Guarantors:* | Each subsidiary of the Borrower, along with the parent company of the Borrowers, on a joint and several basis (together with Borrower, the "Loan Parties"). |
| *Facility* | A Revolving Credit Facility ("Revolver") in the amount of up to $50,000,000. The Revolver will have the ability to revolve two times per week; amounts and mechanics to be determined working with Borrower.<br><br>The Revolver shall be referred to as the Facility ("Facility"). |
| *Security & Priority* | The Facility will have a first priority lien on all assets of the Loan Parties including Cash, Accounts Receivables, Inventory, unencumbered Machinery & Equipment, Intellectual Property, and Stock of the Borrower.<br><br>Cash management agreement and controls satisfactory to Agents will need to be in place. The Borrower will have the flexibility to choose the bank of its choice for treasury management so long as the bank is mutually agreeable to Agent and Borrower. |
| *Facility Agent* | Great Rock Capital ("Agent"). |
| *Facility Lenders* | Great Rock Capital or its affiliates and other financial institutions acceptable to Great Rock Capital. |
| *Closing Date* | To be determined. |
| *Exit Facility Maturity Date* | 3 years from the Closing Date. |
| *Borrowing Base* | Loans advanced to the Borrower under the Facility will not be permitted to exceed the (i) lesser of the Facility or (ii) the following formula (the "Borrowing Base"):<br>• Up to 95% of eligible US and UK A/R; plus<br>• Up to the lesser of (i) 95% of Net Orderly Liquidation Value ("NOLV") or (ii) 70% of cost of eligible US inventory (inventory purchased or manufactured pursuant to a license agreement subject to further underwriting diligence); plus<br>• Up to the lesser of (i) 95% of NOLV or (ii) 70% of cost of eligible UK inventory (inventory purchased or manufactured pursuant to a license agreement subject to further underwriting diligence); plus<br>• Up to the lesser of (i) 95% of NOLV or (ii) 70% of cost of eligible in-transit inventory, subject to To Be Determined dollar sub-limit; plus<br>• Up to the lesser of (i) 50% of appraised Net Orderly Liquidation Value of eligible intellectual property value, and (ii) $3MM sub-limit, less;<br>• Customary Reserves<br><br>Eligible A/R includes all accounts receivable of the Borrower other than: (a) accounts not paid within 60 days from invoice due date or 90 days from invoice date with longer terms for certain debtors as reasonably agreed to by the Agent; (b) accounts subject to a 25% cross-age as well as any past due credits; (c) accounts of a customer with a concentration greater than |

| | |
|---|---|
| | [25]%, except for certain debtors as reasonably agreed to by the Agent (which are expected to include Walmart and Target of up to [40]% each); (d) contra accounts; (e) accounts subject to a prior security interest; (f) accounts consisting of finance charges; (g) progress and milestone billings; (h) bill and hold accounts; (i) customer deposits, cash on delivery, vendor rebates, deferred revenue, advance billings (including pre billing & billed not shipped); (j) intercompany accounts or accounts due from affiliated entities; (k) poor credit quality accounts; (l) accounts subject to enforceable anti-assignment provisions without acceptable waivers; (m) other accounts which in the reasonable discretion of the Lender do not constitute acceptable collateral, or (n) accounts located in ineligible jurisdictions. <br><br> Eligible inventory would exclude, without limitation, obsolete or slow moving; damaged, contaminated, unmerchantable, returned, discontinued, repossessed or rejected inventory; fabricated parts; consigned; supplies and packaging; inventory located outside the United States excluding Canada, U.K., and other select jurisdictions; inventory located at a third- party location where the owner thereof has not executed a waiver agreement satisfactory to Lender; and inventory otherwise deemed unacceptable for lending purposes by GRC in its sole discretion. <br><br> Borrowers would only be permitted to request loans under the Facility to the extent required to pay, when due, those expenses set forth in the DIP budget. <br><br> Customary reserves at Lender's discretion, expected to include substantially similar categories of reserves in the existing ABL credit facility and other statutory reserves required to perfect on Borrowing Base collateral.  Agent will use standard commercially reasonable practices to improve liquidity to grow the Borrower in the Agent's discretion. |
| *Exit Facility Interest Rate* | Interest will accrue at the annual rate of SOFR plus 4.25% on the Revolver, with SOFR having a floor of 2.00%, payable in cash on the first day of each calendar month. |
| *Exit Facility Closing Fee* | If Great Rock Capital finances the exit or does not commit to financing the exit, none. <br><br> If Great Rock Capital commits to financing the exit, and the Loan Parties elect to finance with a party other than Great Rock Capital, a fee equal to 2.00% of the Facility, which shall be fully earned and non-refundable and payable on the earlier of (a) the closing date of the exit facility financing provided by another lender and (b) the date of the Loan Parties' exit from the Bankruptcy Cases without the use of exit financing provided by Great Rock Capital and/or its affiliates, including if the Bankruptcy Cases are dismissed. |
| *Collateral Monitoring Fee* | A Collateral Monitoring Fee in the amount of $5,000 per month, which fee shall be fully earned on the Closing Date and payable to Agent in equal monthly installments on the Closing Date and on the first day of every month thereafter. |

| | |
|---|---|
| ***Facility Unused Commitment Fee*** | A Revolver Unused Commitment Fee equal to 0.50% per annum payable on the first of each month, computed on the difference between (A) the total Revolver commitment amount and (B) the average daily Revolver balance during the month.<br><br>A minimum Revolver Balance of 25% of the Revolver Commitment will be required at all times. |
| ***Exit Facility Early Termination/Prepayment Fee*** | A prepayment fee of 2.0% will apply to any amount of the Facility prepaid prior to one year after the Closing Date, thereafter, a prepayment fee of 0.0% will apply to any amount of the Facility prepaid. |
| ***Minimum Liquidity at Close*** | To be determined. |
| ***Minimum Liquidity Test*** | To be determined. |
| ***Exit Covenants*** | To be determined but expected to include a Minimum EBITDA and Fixed Charge Coverage Ratio (FCCR) tests on a quarterly basis. |
| ***Collateral and Financial Reporting Requirements*** | Customary for a transaction of this nature and satisfactory to Agent in all respects but to include monthly financials and weekly Revolver Borrowing Bases. |
| ***Field Exam*** | A Field Exam satisfactory to the Agent will be conducted prior to the Closing Date. All audit fees and expenses to be paid by Borrower. |
| ***Appraisals*** | Inventory appraisal satisfactory to the Agent will be conducted prior to the Closing Date. All appraisal fees and expenses to be paid by Borrower. |

**Exhibit 3**

RBC Term Sheet

**Term Sheet for Amended and Extended Subordinate Credit Agreement**

| Material Terms | |
|---|---|
| *Borrower(s)* | Basic Fun, Inc. (the "**Borrower**") |
| *Other Loan Parties* | Each subsidiary of the Borrower, along with the parent company of the Borrower |
| *Facility* | A secured subordinate term loan facility (the "**Mezzanine Exit Facility**"). |
| *Lender* | Royal Bank of Canada (the "**Mezzanine Lender**") |
| *First Out Term Loans* | First Out Term Loans in an aggregate principal amount equal to $12,552,501.00 as of the date of the Restructuring Support Agreement plus paid-in-kind principal plus accrued and unpaid interest thereafter. |
| *Last Out Term Loans* | Last Out Term Loans in an aggregate principal amount equal to $3,900,000.00.  If the Mezzanine Facility Paydown has not occurred, Falcon to purchase participations totaling $2,500,000 of Last Out Term Loans and the Founders to purchase participations totaling $1,400,000 of Last Out Term Loans upon the occurrence of the Closing Date. |
| *Maturity Date* | 3 years and 90 days after the Closing Date. |
| *Closing Date* | The effective date of a confirmed Plan. |
| *Amortization* | Quarterly amortization to be determined. |
| *Interest Rate of First Out Term Loans* | Cash Pay: 12.5% <br> PIK (if cash pay not permitted): 16% <br> Default: 2% |
| *Interest Rate of Last Out Term Loans* | Cash Pay: 8% <br> PIK: 8% <br> Default: 2% <br><br> Interest on the Last Out Term Loans shall not be paid in cash if interest on First Out Term Loans is paid in-kind. |
| *Collateral* | The Borrower's and other Loan Parties' obligations under the Mezzanine Exit Facility will be secured by valid and perfected security interests in and liens on all of the Loan Parties' assets securing the Senior Facility, junior only to the liens securing the Senior Facility. |
| *Conditions Precedent* | Customary for a transaction of this nature and satisfactory to the Mezzanine Lender in all respects, including, but not limited to, Senior Facility documents that are in form and substance satisfactory to RBC in its sole discretion. |
| *Affirmative and Negative Covenants* | Customary for a transaction of this nature and satisfactory to the Mezzanine Lender in all respects, including, but not limited to, a restriction on payment in cash of interest or dividends to the holders of preferred equity. |
| *Optional Prepayments* | Customary for a transaction of this nature and satisfactory to the Mezzanine Lender in all respects. |
| *Financial Covenants* | To be determined but expected to include Leverage Ratio and Fixed Charge Coverage Ratio (FCCR) tests on a quarterly basis. |
| *Definitive Documentation* | The definitive documentation for the Mezzanine Exit Facility will be drafted by counsel to the Mezzanine Lender, based on the form of the Amended and Restated Credit Agreement, and with affirmative and negative covenants, representations and warranties, and events of default that are substantially similar to those set forth in the Senior Facility, |

| | |
|---|---|
| | modified to reflect a term loan facility instead of an asset-based revolving facility. |
| *Governing Law* | New York |

**Exhibit 4**

Amended and Restated Limited Partnership Agreement of Basic Fun TopCo

# FOURTH AMENDED & RESTATED

## AGREEMENT OF LIMITED PARTNERSHIP

### OF

### BASIC FUN, L.P.[1]

### Dated as of [_____], 2024

THE INTERESTS IN THIS LIMITED PARTNERSHIP HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS REGISTERED UNDER THAT ACT AND THE APPLICABLE STATE SECURITIES LAWS, OR THE LIMITED PARTNERSHIP WILL HAVE RECEIVED AN OPINION OF COUNSEL (WHICH COUNSEL AND OPINION WILL BE SATISFACTORY TO THE LIMITED PARTNERSHIP'S COUNSEL) THAT REGISTRATION OF SUCH SECURITIES UNDER THAT ACT AND UNDER APPLICABLE STATE SECURITIES LAWS IS NOT REQUIRED.

THE INTERESTS IN THIS PARTNERSHIP ARE SUBJECT TO THE RESTRICTIONS AND PROVISIONS OF THIS AGREEMENT OF LIMITED PARTNERSHIP AND MAY ONLY BE DISPOSED OF OR ENCUMBERED IN COMPLIANCE HEREWITH.

---

[1] Note to Draft: BFI charter to be amended to specify that BFI cannot take any action that would otherwise be in contravention of this agreement without first complying with the provisions hereof.

96267650.18
96267650.18
96267650.18

## TABLE OF CONTENTS [TO BE UPDATED]

ARTICLE 1 DEFINITIONS ........................................................................................... 2

    1.1    Definitions ........................................................................... 2
    1.2    Terms Generally ................................................................. 15

ARTICLE 2 THE PARTNERSHIP AND ITS BUSINESS ...................................... 15

    2.1    Partnership Name ............................................................... 15
    2.2    Term ................................................................................... 15
    2.3    Filing of Certificate and Amendments .............................. 15
    2.4    Business; Scope of Partners' Authority ............................ 16
    2.5    Principal Office; Registered Agent .................................. 16
    2.6    Addresses of the Partners ................................................. 16
    2.7    Classes and Rights of Partners ......................................... 16
    2.8    Representations by the Partners ....................................... 20

ARTICLE 3 MANAGEMENT OF PARTNERSHIP BUSINESS ........................... 21

    3.1    Advisory Committee .......................................................... 21
    3.2    Falcon Consent Rights ...................................................... 24
    3.3    General Partner and Officers ............................................ 26
    3.4    Limited Partners ................................................................ 26

ARTICLE 4 INDEMNIFICATION AND EXCULPATION .................................. 27

    4.1    Limitation of Liability ....................................................... 27
    4.2    Indemnification ................................................................. 28
    4.3    Dealing with Partners ........................................................ 28
    4.4    Use of Partnership Property .............................................. 29
    4.5    [Reserved] ...........................................................**Error! Bookmark not defined.**
    4.6    Restrictive Covenants ....................................................... 29

ARTICLE 5 BOOKS AND RECORDS; ANNUAL REPORTS; CONSTRUCTION ............... 31

    5.1    Books and Records ............................................................ 31
    5.2    Availability of Books and Records ................................... 31
    5.3    Periodic Reports and Statements and Construction .......... 32
    5.4    Bank Account ..................................................................... 32
    5.5    Confidentiality .................................................................. 32

ARTICLE 6 CAPITAL CONTRIBUTIONS ......................................................... 34

    6.1    Capital Contributions ........................................................ 34
    6.2    Capital of the Partnership ................................................. 34
    6.3    Limited Liability of Limited Partners ............................... 34

i

| | | |
|---|---|---|
| 6.4 | Approved Acquisition Capital | 34 |
| 6.5 | Additional Capital | 35 |

**ARTICLE 7 CAPITAL ACCOUNTS, PROFITS AND LOSSES AND ALLOCATIONS** ........ 36

| | | |
|---|---|---|
| 7.1 | Tax and Accounting Matters | 36 |

**ARTICLE 8 APPLICATIONS AND DISTRIBUTIONS OF AVAILABLE CASH** .................. 37

| | | |
|---|---|---|
| 8.1 | Applications and Distributions | 37 |
| 8.2 | Liquidation; Sale Event | 38 |
| 8.3 | Distributions Subject to Law | 38 |

**ARTICLE 9 TRANSFER OF PARTNERSHIP INTERESTS** ........................................ 38

| | | |
|---|---|---|
| 9.1 | Limitations on Assignments of Partnership Interests | 38 |
| 9.2 | Assignment Binding on Partnership | 39 |
| 9.3 | Bankruptcy of a Partner | 39 |
| 9.4 | Assignees | 39 |
| 9.5 | Acceptance of Prior Acts | 40 |
| 9.6 | Right of First Refusal and Tag-Along Rights | 40 |
| 9.7 | Drag-Along Rights | 43 |
| 9.8 | Redemption Rights | 45 |
| 9.9 | Class C Put and Call Rights | 46 |
| 9.10 | Additional Limitations | 47 |

**ARTICLE 10 DISSOLUTION OF THE PARTNERSHIP; WINDING UP AND DISTRIBUTION OF ASSETS** ........................................................................ 48

| | | |
|---|---|---|
| 10.1 | Dissolution | 48 |
| 10.2 | Winding Up | 48 |
| 10.3 | Distribution of Assets | 49 |

**ARTICLE 11 AMENDMENTS** ........................................................................ 49

| | | |
|---|---|---|
| 11.1 | Amendments | 49 |
| 11.2 | Additional Partners | 49 |

**ARTICLE 12 MISCELLANEOUS** ........................................................................ 50

| | | |
|---|---|---|
| 12.1 | Further Assurances | 50 |
| 12.2 | Notices | 50 |
| 12.3 | Headings and Captions | 50 |
| 12.4 | Variance of Pronouns | 50 |
| 12.5 | Counterparts | 50 |
| 12.6 | Governing Law | 50 |
| 12.7 | Partition | 50 |

96267650.18
96267650.18
96267650.18

| 12.8 | Invalidity | 51 |
| 12.9 | Successors and Assigns | 51 |
| 12.10 | Entire Agreement | 51 |
| 12.11 | Waivers | 51 |
| 12.12 | Acknowledgement by Partners | 51 |
| 12.13 | No Third Party Beneficiaries | 51 |
| 12.14 | Construction of Documents | 52 |
| 12.15 | Time of Essence | 52 |
| 12.16 | Partnership for Tax Purposes | 52 |
| 12.17 | Attorney Advice | 52 |
| 12.18 | Good Faith and Fair Dealing; Fiduciary Duty | 52 |
| 12.19 | Corporate Opportunities | 52 |
| 12.20 | Jurisdiction and Waiver of Jury Trial | 53 |
| 12.21 | Fees and Costs | 53 |
| 12.22 | Partnership Deemed a Party to this Agreement | 53 |
| 12.23 | Partial Invalidity | 53 |

96267650.18
96267650.18
96267650.18

## FOURTH AMENDED AND RESTATED
## AGREEMENT OF LIMITED PARTNERSHIP
## OF
## BASIC FUN, L.P.

This **FOURTH AMENDED & RESTATED AGREEMENT OF LIMITED PARTNERSHIP** (the "**Agreement**") of **BASIC FUN, L.P.** (the "**Partnership**"), dated as of [_____], 2024 (the "**Effective Date**") is entered into by and among **BF GP, Inc.**, as the general partner of the Partnership (the "**General Partner**"), Jay Foreman ("**Foreman**"), John MacDonald ("**MacDonald**", and collectively with the Foreman, the "**Founder Limited Partners**"), Falcon Structured Equity Partners, LP, a Delaware limited partnership ("**Falcon**", and collectively with the General Partner, the Founder Limited Partners, the "**Current Partners**"), and each other Person signatory to this Agreement.

## RECITALS

**WHEREAS**, on July 24, 2012, the Partnership was organized as an Exempted Limited Partnership pursuant to the Exempted Limited Partnership Law (as amended) of the Cayman Islands, under the name The Bridge Direct, L.P.;

**WHEREAS**, on July 28, 2017, the Partnership was domesticated and transferred to a limited partnership organized pursuant to the Act with the name "Basic Fun, L.P." in accordance with Section 17-217 of the Act by the filing of a Certificate of Conversion to Limited Partnership (as it may be amended or restated from time to time, the "**Certificate**") with the Secretary of State of Delaware on that date;

**WHEREAS**, on August 3, 2017, the initial Agreement of Limited Partnership of the Partnership was amended and restated pursuant to that certain Amended and Restated Agreement of Limited Partnership of the Partnership (the "**A&R Partnership Agreement**");

**WHEREAS**, on February 6, 2018, the A&R Partnership Agreement was amended and restated pursuant to that certain Second Amended and Restated Agreement of Limited Partnership of the Partnership (the "**Second A&R Partnership Agreement**");

**WHEREAS**, on August 1, 2018, the Second A&R Partnership Agreement was amended and restated pursuant to that certain Third Amended and Restated Agreement of Limited Partnership of the Partnership (as amended prior to the date hereof, the "**Third A&R Partnership Agreement**"), which was entered into in connection with, among other things, the sale and issuance of certain limited partner interests to Falcon and the admission of Falcon as a Limited Partner in the Partnership;

**WHEREAS**, on June 28, 2024, Basic Fun, Inc. (f/k/a Bridge Direct, Inc.) ("**BFI**") and certain other Subsidiaries of the Partnership filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code ("**Chapter 11**") with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") pursuant to Case No. 24-11432 (CTG) (the "**Bankruptcy Petitions**") and on [_____], the Partnership filed for relief under

1

Chapter 11 with the Bankruptcy Court, and its case was consolidated with the cases of BFI and its debtor Subsidiaries;

[**WHEREAS,** on _____ (the "Plan Effective Time"), the Bankruptcy Court approved that certain Plan of Reorganization (the "**Bankruptcy Plan**") pursuant to which, among other things, (A) all of the Class A-1 Limited Partnership Interests (as defined in the Third A&R Partnership Agreement), Class A-2 Limited Partnership Interests (as defined in the Third A&R Partnership Agreement), Class A-3 Limited Partnership Interests (as defined in the Third A&R Partnership Agreement), Class A-4 Limited Partnership Interests (as defined in the Third A&R Partnership Agreement) and Class B Limited Partnership Interests (as defined in the Third A&R Partnership Agreement), in each case expressed as Units (as defined in the Third A&R Partnership Agreement) in the Partnership outstanding immediately prior to the Plan Effective Time were cancelled without provision of any consideration, (B) in consideration for its equity interest in the Partnership outstanding immediately prior to the Plan Effective Time, Falcon received the Class C Limited Partnership Interests and Class A-1 Limited Partnership Interests as set forth in this Agreement, (C) in consideration for their equity interest in the Partnership, their interest in the [Mezzanine Facility] (as defined in the Bankruptcy Plan), and the LP Notes (as defined in the Bankruptcy Plan) [NTD: final terms and defined terms to be conformed to the Plan] owned by each of Foreman and MacDonald, in each case immediately prior to the Plan Effective Time, they received the Class C Limited Partnership Interests and Class A-2 Limited Partnership Interests as set forth in this Agreement, (D) the General Partner remained General Partner with the General Partner Interest reflected in this Agreement and (E) the Third A&R Partnership is to be amended and restated in the form of this Agreement;]

**WHEREAS,** the Bankruptcy Plan was entered and became effective on the Effective Date;

**WHEREAS**, in accordance with the Bankruptcy Plan the parties hereto desire to amend and restate the Third A&R Partnership Agreement in its entirety as of the Effective Date, with this Agreement constituting the Partnership's "limited partnership agreement" under the Act to set forth the rules, regulations and provisions regarding the Partnership's management and business, the governance of the Partnership, the conduct of its business, and the rights and privileges of its Partners; including the restructuring of certain rights and privileges of the Partners in accordance with the terms and conditions of this Agreement.

**NOW, THEREFORE**, in consideration of the agreements and obligations set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby amend and restate the Third A&R Partnership Agreement in its entirety and agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1    **Definitions**.  As used in this Agreement, the following terms have the meanings set forth below, which meanings shall be applicable equally to the singular and plural of the terms defined:

"**A&R Partnership Agreement**" has the meaning set forth in the Recitals to this Agreement.

"**Act**" means the *Delaware Revised Uniform Limited Partnership Act*, as amended from time to time (or any corresponding provision or provisions of any succeeding Law).

"**Additional Class**" has the meaning set forth in <u>Section 2.7(d)</u>.

"**Additional Partner**" means any Person, other than a Current Partner listed in the preamble to this Agreement, who, in the manner provided for in this Agreement, is admitted a Partner.

"**Advisory Committee**" has the meaning set forth in <u>Section 3.1</u>.

"**Affiliate**" means with respect to any Person: (i) any other Person that directly or indirectly through one or more intermediaries controls or is controlled by or is under common control with such Person (together with any Person(s) who have a familial relationship by blood, marriage or otherwise with such other Person) (and, for greater certainty, a trust shall be considered to be controlled by a majority of its trustees); (ii) any other Person (together with any Person(s) who have a familial relationship by blood, marriage or otherwise with such other Person) owning or controlling greater than fifty percent (50%) of the outstanding voting securities of, or other ownership interests in, such Person (or any other Person in which such Person owns greater than fifty percent (50%) of the outstanding voting securities or ownership interests); (iii) any officer, director, general partner or managing Partner of such Person; (iv) if such Person is an officer, director, general partner or managing Partner of any Person, the Person for which such Person acts in any such capacity; or (v) any Person who has a familial relationship, by blood, marriage or otherwise with any of the foregoing; and (vi) any Person who, pursuant to clauses (i) through (iv), would be an Affiliate of a Person specified in clause (v).

"**Affiliate Transfer**" has the meaning set forth in <u>Section 9.1(b)</u>.

"**Agreement**" means this Fourth Amended and Restated Agreement of Limited Partnership of the Partnership, as it may hereafter be amended or modified from time to time.

"**Applicable Class**" means, for the purposes of <u>Section 9.6</u>, (i) with respect to Purchased Partnership Interests which are Class A Limited Partnership Interests, all other Class A Limited Partnership Interests and (ii) with respect to Purchased Interests which are Class C Limited Partnership Interests, all other Class C Limited Partnership Interests.

"**Available Cash**" means, for any fiscal period, the excess, if any, of (A) the sum of (i) the amount of all cash receipts of the Partnership during such period from whatever source and (ii) any cash reserves of the Partnership existing at the start of such period, less (B) the sum of (i) all cash amounts paid or payable (without duplication) in such period on account of expenses and capital expenditures incurred in connection with the Partnership's business and approved in accordance with the provisions hereof (including general operating expenses, fees due and payable under this Agreement, taxes and amortization and/or interest on any debt of the Partnership)and (ii) any cash reserves to satisfy future obligations as reasonably determined by the Advisory Committee.

"**Bankruptcy**" means, with respect to the affected party: (i) the entry of an order for relief under a Bankruptcy Code; (ii) the admission by such party in writing of its inability to pay its debts as they mature; (iii) the making by it of an assignment for the benefit of creditors; (iv) the filing

by it of a petition in bankruptcy or a petition for relief under a Bankruptcy Code or any other applicable federal or state bankruptcy or insolvency statute or any similar Law; (v) the expiration of sixty (60) days after the filing of an involuntary petition under a Bankruptcy Code or an involuntary petition seeking liquidation, reorganization, arrangement or readjustment of its debts under any other United States, Canadian, state, provincial or other insolvency Law, provided that the same shall not have been vacated, set aside or stayed within such sixty (60) day period; (vi) an application by such party for the appointment of a receiver for the assets of such party; (vii) the imposition of a judicial or statutory lien on all or a substantial part of its assets unless such lien is discharged or vacated or the enforcement thereof stayed within sixty (60) days after its effective date; or (viii) the liquidation, dissolution or discontinuation of business of the affected party.

"**Bankruptcy Code**" means any of (i) Title 11 of the *United States Code*, as amended, (ii) the *Companies Creditors Arrangement Act*, as amended, (iii) the *Bankruptcy and Insolvency Act*, as amended or (iv) any similar Law of any other foreign jurisdiction, including, without limitation, the Companies (Winding Up and Miscellaneous Provisions) Ordinance (Cap 32) of and the Companies (Winding Up) Rules (Cap 32H) pursuant to Hong Kong Law.

"**Bankruptcy Plan**" has the meaning set forth in the Recitals to this Agreement.

"**BFI**" has the meaning set forth in the Recitals to this Agreement.

"**Business Day**" means any day except Saturday or Sunday, or a statutory holiday in Toronto, or any day upon which banks in New York, New York or Chicago, Illinois are not authorized or required by Law to be closed.

"**Buyer**" has the meaning set forth in Section 9.6.

"**Capital Contribution**" has the meaning set forth in **Exhibit B**.

"**Cause**" means, with respect to any Employee Owner, termination of the Employee Owner's employment by the Partnership or any Subsidiary that employs the Employee Owner, by reason of one or more of the following having occurred (as reasonably determined by the Advisory Committee based on information then known to it): such Employee Owner (a) commits, or pleads guilty or nolo contendere to, a felony or any other crime involving fraud, dishonesty or moral turpitude, other than any traffic offense that is not individually a felony; (b) materially breaches Employee Owner's duties to the Partnership or any Subsidiary, including any duties under this Agreement so long as such breach is not cured to the reasonable satisfaction of the Partnership or Subsidiary (as applicable) within thirty (30) days after receipt of written notice from the Partnership or Subsidiary (as applicable) of such breach; (c) breaches in any material respect any provision of this Agreement so long as such breach is not cured to the reasonable satisfaction of the Partnership or Subsidiary (as applicable) within thirty (30) days after receipt of written notice from the Partnership or Subsidiary (as applicable) of such breach; or (d) commits an act of fraud, embezzlement, or misrepresentation against the Partnership or any Subsidiary . Any determination by the Advisory Committee with respect to whether an Employee Owner should be terminated for Cause shall be made without the participation or vote of such Employee Owner.

"**Certificate**" has the meaning set forth in the Recitals to this Agreement.

"**Cessation Date**" means, with respect to any Person, the date on which such Person's Engagement with the Partnership and/or its Subsidiaries was terminated, and solely with respect to Foreman, the date on which Foreman was terminated for Cause.

"**Claims**" has the meaning set forth in Section 4.2(a).

"**Class A Limited Partner**" means a Partner who owns Class A Limited Partnership Interests in the Partnership.

"**Class A Limited Partnership Interest**" means any Class A-1 Limited Partnership Interest or any Class A-2 Limited Partnership Interest.

"**Class A Percentage Interest**" means, with respect to each Class A Limited Partner, as of any given time, an amount, expressed as a percentage, equal to the quotient of (i) the number of Class A Units (including Class A-1 Units and/or Class A-2 Units) held by such Class A Limited Partner, divided by (ii) the total number of Class A Units held by all Class A Limited Partners.

"**Class A-1 Limited Partnership Interest**" means any Partnership Interest designated herein as a "**Class A-1 Limited Partnership Interest**".

"**Class A-2 Limited Partnership Interest**" means any Partnership Interest designated herein as a "**Class A-2 Limited Partnership Interest**".

"**Class B Limited Partner**" means a Partner who owns Class B Limited Partnership Interests in the Partnership.

"**Class B Limited Partnership Interest**" means any Partnership Interest designated herein as a "**Class B Limited Partnership Interest**".

"**Class C Current Preferred Return**" means with respect to each outstanding Class C Unit, a preferred return in the amount of seven percent (7.00%) per annum payable in cash on the Class C Unit Price of such Class C Unit, which shall accrue daily and compound quarterly beginning in any calendar quarter (or portion thereof) from and after January 1, 2025 in which such Class C Unit is issued and outstanding, solely to the extent that the Advisory Committee elects to distribute Class C Preferred Return accruing during a particular calendar quarter pursuant to Section 8.1(c)(i).  For the avoidance of doubt, in the event that the Advisory Committee elects not to distribute Class C Preferred Return accruing during a particular calendar quarter, the outstanding Class C Units shall accrue the Class C In-Kind Preferred Return during such calendar quarter.

"**Class C In-Kind Preferred Return**" means with respect to each outstanding Class C Unit, a preferred return in the amount of eight percent (8.00%) per annum payable in kind on the Class C Unit Price of such Class C Unit, which shall accrue daily and compound on a quarterly basis beginning in any calendar quarter (or portion thereof) from and after January 1, 2025 in which such Class C Unit is issued and outstanding, to the extent that the Advisory Committee elects not to make a distribution of Available Cash for the payment of Class C Preferred Return accruing during such calendar quarter pursuant to Section 8.1(c)(i).  To the extent that the Advisory Committee elects not to distribute Class C Current Preferred Return accruing during a particular

calendar quarter, any Class C In-Kind Preferred Return accruing on the outstanding Class C Units for such period shall be converted to additional Class C Units (in each case, at the Class C Purchase Price) held by the applicable Class C Limited Partner, effective as of the end of the calendar quarter in which such Class C In-Kind Preferred Return accrued and the Class C Preferred Return shall accrue thereon.

"**Class C Limited Partner**" means a Partner who owns Class C Limited Partnership Interests in the Partnership.

"**Class C Limited Partnership Interest**" means any Partnership Interest designated herein as a "**Class C Limited Partnership Interest**".

"**Class C Liquidation Preference**" means an amount equal to the sum of (i) for each Class C Unit, the Class C Unit Price, plus (ii) any accrued and unpaid Class C Preferred Return.

"**Class C Percentage Interest**" means with respect to each Class C Limited Partner, as of any given time, an amount, expressed as a percentage, equal to the quotient of (i) the number of Class C Units held by such Class C Limited Partner, divided by (ii) the total number of Class C Units held by all Class C Limited Partners.

"**Class C Preferred Return**" means, for each Class C Unit, for each calendar quarter (or portion thereof) commencing as of January 1, 2025 and ending as of the date on which such Class C Unit has been redeemed, either (i) the Class C Current Preferred Return accruing during such calendar quarter (or portion thereof), to the extent that the Advisory Committee elects to make a cash payment of any or all of the Class C Current Preferred Return for such calendar quarter pursuant to Section 8.1(c)(i), or (ii) the Class C In-Kind Preferred Return accruing during such calendar quarter (or portion thereof), in the event that the Advisory Committee elects not make a cash distribution of Class C Current Preferred Return for such calendar quarter; provided that if, in any quarter, the Partnership pays a portion of the Class C Current Preferred Return, but not the full amount thereof, then for such purposes (A) the Class C Preferred Return shall accrue at the Class C Current Preferred Return rate with respect to the percentage of the Class C Unit Price of the then outstanding Class C Unit price which is proportionate with the percentage of the full Class C Current Preferred Return which is paid and (B) the Class C Preferred Return shall accrue at the Class C In-Kind Return rate with respect to the remainder of the Class C Unit Price of the then outstanding Class C Units.  Notwithstanding the foregoing with respect to the calendar quarter in which the redemption of a Class C Unit occurs, the Class C Preferred Return with respect to such calendar quarter shall accrue as Class C Current Preferred Return and shall be included as accrued and unpaid Class C Preferred Return in the calculation of the Class C Liquidation Preference for such Class C Unit. For the avoidance of doubt any Class C Current Preferred Return that has accrued and not been paid for a particular period shall convert to a Class C In-Kind Preferred Return as set forth herein and shall no longer be deemed accrued and unpaid.

"**Class C Redemption Date**" means the date that is six (6) months after the final maturity date of the Mezzanine Facility.

"**Class C Unit Call Notice**" has the meaning set forth in Section 9.9(b).

"**Class C Unit Call Right**" has the meaning set forth in Section 9.9(b).

"**Class C Unit Price**" means $100.00, as appropriately adjusted for any unit splits, unit combinations, recapitalizations, reclassifications, reorganizations, mergers and the like of the Class C Units .

"**Class C Unit Put Notice**" has the meaning set forth in Section 9.9(a).

"**Class C Unit Put Right**" has the meaning set forth in Section 9.9(a).

"**Class D Exercise Notice**" has the meaning set forth in Section 6.4(d).

"**Class D Limited Partner**" means a Partner who owns Class D Limited Partnership Interests in the Partnership.

"**Class D Limited Partnership Interest**" means any Partnership Interest designated herein as a "Class D Limited Partnership Interest".

"**Code**" means the Internal Revenue Code of 1986, as amended, or any corresponding provision(s) of succeeding Law.

"**Company Budget**" means an annual operating budget for the Partnership and its Subsidiaries, on a consolidated basis.

"**Competitive Business**" has the meaning set forth in Section 4.5(a).

"**Confidential Information**" has the meaning set forth in Section 5.5.

"**Corporate Opportunities Group**" has the meaning set forth in Section 12.19.

"**Covered Person**" has the meaning set forth in Section 4.1(a).

"**Current Partners**" has the meaning set forth in the preamble to this Agreement.

"**Drag Sale Notice**" has the meaning set forth in Section 9.7(a).

"**Drag Sale Purchase Agreement**" has the meaning set forth in Section 9.7(a).

"**Drag Along Portion**" means, with respect to each class of Partnership Interests being sold by the Drag-Along Selling Partners, the number of Units equal to (a) the total number of Units of such class held by the Dragged Party, (b) multiplied by a fraction, (i) the numerator of which is the total number of Units of such class to be sold by the Drag Along Seller in connection with the Drag Along Transaction, and (ii) the denominator of which is the total number of Units of such class held by the Drag-Along Selling Partners.

"**Drag-Along Sale**" has the meaning set forth in Section 9.7(a).

"**Drag-Along Selling Partners**" has the meaning set forth in Section 9.7(a).

"**Dragged Partners**" has the meaning set forth in Section 9.7(a).

"**EBITDA**" means [_____].[2]

"**Effective Date**" has the meaning set forth in the preamble to this Agreement.

"**Eligible Tag Participants**" has the meaning set forth in Section 9.6(a).

"**Employee Owner**" means each of Foreman or any Class B Limited Partner, in each case, for so long as such Person is employed by or is otherwise a service provider to the Partnership or any of its Subsidiaries.

"**Engage**" has the meaning set forth in Section 4.5(a).

"**Engagement**" means an employment-type or service type arrangement between any Employee Owner and any one or more of the Partnership or any of its Subsidiaries.

"**ERISA**" has the meaning set forth in Section 2.8(k).

"**Exempt Offering**" shall mean any issuance of the Partnership which is:

(i)    an issuance of Class B Limited Partnership Interests in connection with the Management Incentive Plan;

(ii)    issued as a dividend, distribution or Units split or combination provided, that, in the case of any such dividend, distribution or Unit split with respect to the Class A Units or the Class B Units, a pro rata dividend, distribution, split or combination is made with respect to all Class A Units and Class B Units;

(iv)    issued to banks, equipment lessors or other financial institutions, or to real property lessors pursuant to a debt financing, equipment leasing or real property leasing transaction approved by the Advisory Committee;

(iv)    issued to suppliers or third party service providers in connection with the provision of goods or services pursuant to transactions on an arms' length basis that have been approved by the Advisory Committee;

(v)    issued pursuant to an arms' length basis acquisition of another business by the Partnership or any of its Subsidiaries by merger, purchase of substantially all of the assets or other reorganization or to a joint venture agreement, provided that such issuances are approved by the Advisory Committee; or

(vi)    issued in connection with collaboration, trademark or product license, development, distribution, marketing or other similar agreements or strategic partnerships approved by the Advisory Committee.

---

[2] NTD: EBITDA definition to be agreed.  To reconcile with any applicable definitions in the Senior Credit Agreement.

96267650.18

"**Falcon**" has the meaning set forth in the preamble to this Agreement.

"**Financial Rights**" means the rights of a Partner or his, her or its permitted successors in interest, under the Act and this Agreement, to receive distributions, as described in this Agreement and to share in the Profits (as defined in **Exhibit B, Section 2.2**) and Losses (as defined in **Exhibit B, Section 2.2**) of the Partnership.

"**Fiscal Year**" means the fiscal year of the Partnership, which shall be the calendar year; and upon termination of the Partnership, "Fiscal Year" shall be the period from the end of the last preceding Fiscal Year to the date of such termination.

"**FMV**" means the total consideration that would be received upon a sale of all outstanding Units as if they were being sold in a single transaction on the Triggering Date and the proceeds of such sale were distributed to the Partners in accordance with terms hereof, as may be reasonably determined by the Advisory Committee (including the approval of Independent Representative).

"**Foreman**" has the meaning set forth in the preamble to this Agreement.

"**Founder Limited Partners**" has the meaning set forth in the preamble to this Agreement.

"**Founder Limited Partner's Class C Percentage Interest**" means with respect to a Founder Limited Partner, as of any given time, an amount, expressed as a percentage, equal to the quotient of (i) the number of Class C Units held by such Founder Limited Partner, divided by (ii) the total number of Class C Units held by all Founder Limited Partners.

"**Founder Representatives**" has the meaning set forth in Section 3.1(a).

"**Funding Partner**" has the meaning set forth in Section 6.4(d).

"**GAAP**" means U.S. generally accepted accounting principles consistently applied with the Partnership's historical practices.

"**General Partner**" has the meaning set forth in the preamble to this Agreement.

"**General Partner Interest**" means the Partnership Interest designated herein as a "**General Partner Interest**".

"**Governance Rights**" means all of a Partner's rights as a Partner of the Partnership, under the Act (subject to the terms of this Agreement as applicable), the Certificate and this Agreement, except such Partner's Financial Rights; the term shall include, without limitation, the right to vote and participate in the management of the Partnership and to bind the Partnership as set forth in the provisions of this Agreement.

"**Hurdle Amount**" has the meaning set forth in Section 2.7(c)(iv).

"**Indebtedness**" has the meaning ascribed to such term in the Senior Credit Documents, as in effect on the Effective Date and without giving effect to any amendment, waiver, consent or other modification occurring after the Effective Date.[3]

"**Independent Representative**" has the meaning set forth in <u>Section 3.1(a)(iii)</u>.

"**Information Rights**" means those rights to information about the Partnership assets, operations, financial affairs, and its Subsidiaries, Partners, Partnership Interests and other matters as are afforded a Partner pursuant to the Act (subject to the terms of this Agreement as applicable) and the provisions of this Agreement.

"**IRS**" means the Internal Revenue Service and any successor agency or entity thereto.

"**IPO**" means an initial public offering of securities to the public pursuant to an effective registration statement under the Securities Act where such securities are listed and traded on an established United States or non-United States securities exchange.

"**Laws**" means collectively, all US, Canadian, Chinese, other foreign, state, provincial and local laws, statutes, codes, ordinances, orders, rules and regulations which have been duly authorized and are currently in effect and/or hereinafter enacted, including judicial opinions, subpoenas, or precedential authority in the applicable jurisdiction, and including, without limitation, all environmental laws, all rules and regulations relating to life safety and the *Americans with Disabilities Act of 1990*, 42 U.S.C. 12101, as from time to time amended.

"**Legal Dispute**" means any action, claim, suit, hearing, arbitration, investigation, charge, complaint, demand, proceeding or similar action.

"**Limited Partners**" means the Class A Limited Partners, the Class B Limited Partners and the Class C Limited Partners, and any other Person admitted as a limited partner of the Partnership in accordance with the terms of this Agreement.

"**MacDonald**" has the meaning set forth in the preamble to this Agreement.

"**Major Decision**" means each of the following actions with respect to the Partnership and each of its Subsidiaries (i) engage in any business not described in Section 2.4(a), (ii) any merger, consolidation, other similar business combination involving the Partnership or any Subsidiary or any Sale Event, except any such merger, consolidation, other similar business combination involving the Partnership or a Subsidiary in which the Partnership Interests outstanding immediately prior to such merger, consolidation, other similar business combination continue to represent, or are converted into or exchanged for shares of capital stock or equity that represent, immediately following such merger, consolidation, other similar business combination at least a majority, by voting power, of the capital stock or equity of (1) the surviving or resulting corporation or entity or (2) if the surviving or resulting corporation or entity is a wholly owned Subsidiary of another corporation or entity immediately following such merger, reorganization or consolidation, the parent corporation or entity of such surviving or resulting corporation or entity,

---

[3] NTD: Subject to update based upon the final Senior Credit Documents.

(iii) the making by the Partnership or any Subsidiary of any guaranty or indemnity for the benefit of any Person other than the Partnership or any Subsidiary, (iv) entering into any transaction between the Partnership or any Subsidiary, on one hand, and any Partner or its Affiliates, on the other hand; provided, however, that (a) any redemption or repurchase of Units by the Partnership, (b) any agreement or arrangement with any employee or consultant of the Partnership or any Subsidiary, including the awarding of any award or bonus under a Management Incentive Plan, and (c) any other transaction between the Partnership or any Subsidiary, on one hand, and any Partner or its Affiliates, on the other hand, as specifically permitted by this Agreement, shall not be considered a Major Decision, (v) any Transfer of all or any part of a Limited Partner's Partnership Interest described in Section 9.1, (vi) initiate any dissolution, liquidation, winding up, recapitalization, reorganization or bankruptcy involving the Partnership or any of its direct or indirect Subsidiaries, (vii) directly or indirectly issue any additional interests in the Partnership or admit any additional Person as a partner of the Partnership, or sell any equity interests in any Subsidiary other than (i) to the Partnership or a Subsidiary which is directly or indirectly wholly owned by the Partnership or (ii) issuance of Class B Units pursuant to the Management Incentive Plan, (viii) undertake any transaction or series of transactions that results in the acquisition or disposition of any assets or business for consideration in excess of $2,500,000, (ix) institute, defend or settle any litigation or arbitration proceeding (either by it or against it) together with any costs incurred (or likely to be incurred) by it in connection therewith in excess of $1,250,000, (x) appoint or terminate any executive officer of the Partnership or any of its Major Subsidiaries, (xi) approve, adopt, amend or otherwise alter the Company Budget (other than pursuant to a Company Budget Rollover), (xii) cause the Partnership and its Subsidiary's aggregate expenditures, on a consolidated basis, during any fiscal year to exceed by more than 5% the expenditures provided pursuant to the then applicable Company Budget, other than as a result of any Tariff Adjustments, (xii) consummate an IPO or take any action that results in the Partnership becoming a public reporting company under the Exchange Act; (xiii) amend or modify the Management Incentive Plan, or create any new employee benefit plan; and (xiv) adopt or change any material method of tax accounting, make, change or revoke any material tax election (including elections referenced in Article 7 and Exhibit B), make a material amendment to any tax return, surrender any right to claim a material refund or offset of any taxes, make a request for a material tax ruling, enter into a closing agreement with respect to or settle or compromise any material tax liability, or consent to any extension or waiver of the limitation period applicable to any material tax claim or assessment.

"**Major Investor**" means Falcon, so long as Falcon and/or its Affiliates collectively own either (i) any Class C Units or (ii) Class A Units equal to at least fifty percent (50%) of the Class A Units held by it as of the Effective Date.

"**Management Incentive Plan**" has the meaning set forth in Section 2.7(c)(i).

"**Material Subsidiary**" means Basic Fun, Inc. and Basic Fun Holdco, LLC.

"**Maximum Combined Marginal Rate**" means, with respect to a particular taxable year, the percentage determined by adding the maximum marginal federal income tax rate and the maximum marginal state income tax rate in the State of New York for individuals filing joint returns for such taxable year, and taking into account any applicable deductions from federal income taxes on account of the payment of such state income taxes.

"**Mezzanine Facility**" means [the credit facility issued under that certain Amended and Restated Credit Agreement among BFI, as borrower, Basic Fun Holdco, LLC and certain Subsidiaries thereof from time to time party thereto, as loan parties, the financial institutions party thereto, as lenders, and Royal Bank of Canada, as collateral agent, among others, or any Permitted Refinancing thereof].

"**Minority Approval**" means the Required Approval of the Advisory Committee which includes the affirmative vote or consent of either (x)the Independent Representative or (y) one or more of the Falcon Representative.

"**New Partnership Interest**" means any Partnership Interest that is not issued and outstanding as of the Effective Date.

"**Nonfunding Partner**" has the meaning set forth in Section 6.4(d).

"**Partner**" or "**Partners**" means and includes the Current Partners listed in the preamble to this Agreement and any Persons admitted as Additional Partners or Substitute Partners pursuant to the provisions of this Agreement, but such term shall not include any Persons who have ceased to be Partners.

"**Partnership**" has the meaning set forth in the preamble to this Agreement.

"**Partnership Call**" has the meaning set forth in Section 9.8(a).

"**Partnership Interest**" means a Partner's entire interest in the Partnership, including Class A Limited Partnership Interests, Class B Limited Partnership Interests, Class C Limited Partnership Interests and General Partner Interests in the Partnership, and including such Partner's Financial Rights, Governance Rights and Information Rights as applicable.

"**Percentage Interest**" of a Limited Partner means as of any given time:

(1) as to each Class A-1 Limited Partner, the quotient (expressed as a percentage) of (x) the number of Class A-1 Limited Partnership Interests owned by such Class A-1 Limited Partner divided by (y) the number of Units Class A Limited Partnership Interests then outstanding; and

(2) for as to each Class A-2 Limited Partner and each Class B Limited Partner, the product (expressed as a percentage) of

(x) the quotient of (A) the number Units of Class A-2 Limited Partnership Interests or Class B Limited Partnership Interests (as applicable) held by such Partner divided by (B) the total number of Units of Class A-2 Limited Partnership Interests and Class B Limited Partnership Interests issued and outstanding as of such time, multiplied by

(y) the quotient of (x) the number of Units of Class A-2 Limited Partnership Interests then outstanding, divided by (y) the number of Units of Class A Limited Partnership Interests then outstanding.

Notwithstanding the foregoing, and for the avoidance of doubt, for purposes of determining the Percentage Interests of the Limited Partners: (i) no outstanding Class B Limited Partnership Interest will be included in the calculation of such Percentage Interests unless and until distributions equal to the Hurdle Amount with respect to such Class B Limited Partnership Interests have been made in accordance with Section 8.1(c)(ii); and (ii) to the extent that any Class B Limited Partnership Interests are unvested in accordance with the terms and conditions of the award agreement pursuant to which such Class B Limited Partnership Interests are issued, such unvested Class B Limited Partnership Interests shall be excluded in calculating the Percentage Interests of the Limited Partners and Limited Partners.

For clarity, neither the Class C Limited Partnership Interests nor the Class D Limited Partnership Interests, to the extent issued, shall have any Percentage Interest and shall not be included for any purposes in calculating Percentage Interests.

"**Permitted Refinancing**" means a refinancing of the Indebtedness under the Senior Credit Documents or Mezzanine Facility which is approved by the Advisory Committee and, to the extent expressly required by Section 3.2(a)(iv), Falcon.

"**Permitted Transferee**" means, with respect to any Partner: (i) in the case of a Partner which is a trust, its beneficiaries, (ii) in the case of a Partner which is neither a trust nor an individual, the Affiliates of such Partner, (iii) in the case of a Partner which is an individual (A) the spouse, lineal descendants, and spouses of lineal descendants of the Partner; or (B) any trust in which all of the current beneficiaries (whether mandatory or discretionary) consist of any one or more of the Partner and Persons described in subparagraph (A) of this definition, (iv) any Person that is wholly-owned and controlled by the Partner and (v) in the case of Falcon, to any partners of Falcon.

"**Person**" means any individual, corporation, limited liability company, partnership, limited liability partnership, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated organization, or government or any agency or political subdivision thereof.

"**Profits**" has the meaning set forth in Section 2.2 of **Exhibit B**.

"**Purchase Agreement**" has the meaning set forth in Section 9.6.

"**Purchased Partnership Interests**" has the meaning set forth in Section 9.6.

"**Redemption Closing**" has the meaning set forth in Section 9.8(d).

"**Relationship Conditions**" has the meaning set forth in Section 4.5.

"**Representative**" has the meaning set forth in Section 3.1.

"**Required Approval**" has the meaning set forth in Section 3.1(b).

"**Required Distributions**" has the meaning set forth in Section 8.1(b).

"**Restrictive Covenants**" has the meaning set forth in Section 4.5.

"**Restricted Parties**" has the meaning set forth in Section 4.5(a).

"**Restricted Period**" has the meaning set forth in Section 4.5.

"**Rights Offering Notice**" has the meaning set forth in Section 6.4(b).

"**ROFR Notice**" has the meaning set forth in Section 9.6(d).

"**ROFR Parties**" has the meaning set forth in Section 9.6(d).

"**Sale Event**" means (i) a sale of all or substantially all of the assets of the Partnership, in one transaction or a series of transactions, (ii) a sale or other transfer of outstanding Partnership Interests, merger, consolidation, share exchange, business combination or recapitalization, in one transaction or a series of transactions, that results in the holders of Units immediately prior to such transaction beneficially owning less than a majority of (A) the outstanding Units immediately after such transaction, or (B) in the case of a merger, consolidation or similar transaction where the Partnership is not the surviving entity, the outstanding equity interests in the surviving entity, or (iii) any other transaction or series of transactions having a substantially similar effect to those described in clauses (i) or (ii) of this definition.

"**Sale Notice**" has the meaning set forth in Section 9.6(a).

"**Second A&R Partnership Agreement**" has the meaning set forth in the Recitals to this Agreement.

"**Securities Act**" has the meaning set forth in Section 2.8(e).

"**Securities Laws**" has the meaning set forth in Section 2.8(e).

"**Senior Credit Agreement**"  means [_____].

"**Senior Credit Documents**" means the credit agreements and related documents set forth on Schedule 2 hereto and any credit agreements and related documents entered into in connection with any Permitted Refinancing.

"**Subject Interests**" has the meaning set forth in Section 9.8(a).

"**Subsidiary**" means any entity in which a Person holds any ownership interest, whether directly or through one or more other Persons.

"**Substitute Partner**" means a Person to whom Partnership Interests have been transferred and who, with the approval of the Advisory Committee or as otherwise herein provided, is admitted as a Partner of the Partnership in the place and stead of the transferor of the subject Partnership Interests.

"**Tariff Adjustments**" means any increase in expenses of the Partnership or its Subsidiaries resulting from the imposition of new, additional or increased tariffs, customs tolls,

custom duties or similar charges imposed upon the Partnership or its Subsidiaries or the goods and services which it purchases or sells after the date of the last Company Budget (which in this case shall not include any roll-over of a Company Budget for a prior period).

"**Third A&R Partnership Agreement**" has the meaning set forth in the Recitals to this Agreement.

"**Toy Category**" means the categories of toys set forth on **Exhibit [D]**.

"**Transfer**" means, with respect to any Partner, any direct, indirect or synthetic (including by reference under a derivatives or similar contract) transfer, sale, resignation, pledge, hypothecation, encumbrance, assignment or other disposition of any portion of the Partnership Interest of such Partner or the proceeds thereof (whether voluntarily, involuntarily, by operation of law or otherwise).

"**Treasury Regulations**" means the regulations promulgated under the Code, as such regulations are in effect from time to time.

"**Triggering Date**" means with respect to any Partnership Call, (i) if notice of the exercise of the Partnership Call by the Partnership pursuant to Section 9.8(b) is delivered within one year of the Cessation Date of the applicable Employee Owner, the Cessation Date of such Employee Owner and (ii) in all other circumstances, the date of the delivery of such notice.

"**Unit**" has the meaning set forth in Section 2.7.

1.2    **Terms Generally**.  For all purposes of this Agreement except as otherwise expressly provided or unless the context otherwise requires: the terms defined in this Article (or elsewhere herein) include both the plural and the singular; the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision; and the words "including" and "include" and other words of similar import shall be deemed to be followed by the phrase "without limitation."

## ARTICLE 2
## THE PARTNERSHIP AND ITS BUSINESS

2.1    **Partnership Name**.  The business of the Partnership shall be conducted under the name of Basic Fun, LP.  Legal and beneficial title to any properties, real and personal, which may at any time during the term of the Partnership be owned or leased by the Partnership shall be held in the name of the Partnership.

2.2    **Term**.  The term of the Partnership commenced on the filing of the Certificate with the Secretary of State of Delaware and shall continue in full force and effect until terminated following dissolution as hereinafter provided.  The existence of the Partnership as a separate legal entity shall continue until the cancellation of the Certificate as provided in the Act.

2.3    **Filing of Certificate and Amendments**.  On July 28, 2017 the Certificate was filed with the Secretary of State of the State of Delaware.  The Partners hereby agree to execute and file any required amendments to the Certificate and shall do all other acts requisite for the constitution of

the Partnership as a limited partnership pursuant to the laws of the State of Delaware or any other applicable law.

2.4    **Business; Scope of Partners' Authority**.

(a)    The Partnership is organized primarily to (i) engage through its Subsidiaries in the creation, design, manufacturing, licensing, distribution, marketing and sales of toys, games, and children's, novelty and entertainment products as well as ancillary products, (ii) engage in any other lawful purpose permitted under the Act and (iii) do any and all acts and things related, necessary, appropriate, proper, advisable, incidental to, convenient or desirable for the furtherance and accomplishment of the purposes and business described herein and for the protection and benefit of the Partnership, including full power and authority to enter into, perform and carry out contracts of any kind, borrow money and issue evidences of indebtedness whether or not secured by any mortgage, deed of trust, pledge or other lien, acquire, own, manage, lease, improve or develop any real property (or any interest therein), and sell, transfer and dispose of any such real property.

(b)    Except as otherwise expressly and specifically provided in this Agreement, no Partner shall have any authority to bind, to act for, to sign for or to assume any obligation or responsibility on behalf of, any other Partner.  Neither the Partnership nor any Partner shall, by virtue of executing this Agreement, be responsible or liable for any indebtedness or obligation of any other Partner incurred or arising either before or after the Effective Date, except, as to the Partnership, those joint responsibilities, liabilities, indebtedness, or obligations expressly assumed by the Partnership as of the Effective Date or incurred after the Effective Date pursuant to and as limited by the terms of this Agreement.

(c)    The Partners shall conduct the business and affairs of the Partnership in accordance with this Agreement and the Partner's implied contractual obligation of good faith and fair dealing.

2.5    **Principal Office; Registered Agent**.  The principal office of the Partnership shall be at 301 Yamato Rd., Suite 4200, Boca Raton, FL  33431.  The Partnership may change its place of business to such location or locations as may at any time or from time to time be determined by the General Partner.  The name and address of the Partnership's registered agent in Delaware is set forth in the Certificate.

2.6    **Addresses of the Partners**.  The addresses of the Partners are as set forth in **Exhibit A** hereto.  A Partner may change his or its address for notice by sending written notice of the new address to the General Partner in the manner set forth herein.

2.7    **Classes and Rights of Partners**.  As of the Effective Date, the Partnership shall have five classes of Partnership Interests, which are designated General Partner Interest, Class A Limited Partnership Interest, Class B Limited Partnership Interest, Class C Limited Partnership Interest and Class D Limited Partnership Interest.  Partnership Interests shall be represented by Units (each a "**Unit**") with each Unit of the same class or series of Partnership Interest having pro rata and equivalent rights (except to the extent provided in Section 2.7(c)).

(a)    General Partner Interests.  Each Person who owns a General Partner Interest as indicated by such Person's execution and delivery of the signature pages hereto shall be a General

96267650.18

Partner to the extent of such General Partner Interest and, as such, has all rights, privileges and obligations as are conferred upon General Partners by this Agreement and by provisions of the Act which are not inconsistent with the terms of this Agreement to the extent of such General Partner Interest. As of the Effective Date, BF GP, Inc., shall own all of the General Partner Interests and be the sole general partner of the Partnership.

(b)    <u>Class A Limited Partnership Interests</u>. Each Person who owns a Class A Limited Partnership Interest and who has been admitted as a Class A Limited Partner in accordance with the terms of this Agreement shall be a Class A Limited Partner to the extent of such Class A Limited Partnership Interest and, as such, has all rights, privileges and obligations as are conferred upon Class A Limited Partners by this Agreement and by provisions of the Act which are not inconsistent with the terms of this Agreement to the extent of such Class A Limited Partnership Interest. One or more Class A Limited Partners may be hereafter admitted from time to time, but only in accordance with the terms and conditions of this Agreement.

(i)    Except as expressly provided herein, the Class A Limited Partners shall have no right to vote on, approve of, consent to or otherwise participate in any decision-making matters pertaining to the Partnership or any of its affairs, all such rights being reserved to and vested in the Advisory Committee and the General Partner.

(ii)    The Class A Limited Partnership Interests shall be divided into two (2) series denoted as either Class A-1 Limited Partnership Interests or Class A-2 Limited Partnership Interests, with each of them having equivalent rights and preferences except as otherwise expressly set forth in this Agreement. As of the Effective Date, each of Falcon and the Founder Limited Partners hereby continue as Limited Partners of the Partnership. The number of Class A-1 Units owned by Falcon as of the Effective Date (after giving effect to the effectiveness of the Bankruptcy Plan and the adoption of this Agreement) is set forth on **Exhibit A** hereto. The number of Class A-2 Units owned by each of MacDonald and Foreman as of the Effective Date (after giving effect to the effectiveness of the Bankruptcy Plan and the adoption of this Agreement) is set forth on **Exhibit A** hereto.

(c)    <u>Class B Limited Partnership Interests</u>. Each Person who owns a Class B Limited Partnership Interest and who has been admitted as a Class B Limited Partner in accordance with the terms of this Agreement shall be a Class B Limited Partner to the extent of such Class B Limited Partnership Interest and, as such, has all rights, privileges and obligations as are conferred upon Class B Limited Partners by this Agreement and by provisions of the Act which are not inconsistent with the terms of this Agreement to the extent of such Class B Limited Partnership Interest.

(i)    The Partnership may issue Class B Limited Partnership Interests solely to employees, consultants or other service providers to the Partnership or any of its Subsidiaries and admit them (and their Permitted Transferees) as Class B Limited Partners pursuant to a management incentive plan adopted by the Advisory Committee and approved in writing by Foreman (a "**Management Incentive Plan**") and which shall authorize the issuance of a number of Class B Units that shall not exceed ten percent (10%) of the aggregate total then-outstanding number of Class A-1 Units, Class A-2 Units and Class B Units. **[NTD: The Management Incentive Plan will be adopted upon, or as soon as practicable after, the Effective Date]**

Subject to Section 3.2(a)(vi), Class B Limited Partnership Interests shall be issued by the Partnership to such Persons and in such amount as provided by resolutions of the Advisory Committee. For the avoidance of doubt, and notwithstanding anything to the contrary in this Agreement (i) in no event will the Percentage Interest of the Class A-1 Limited Partnership Interests be diluted as a result of the Class B Units issued in respect of the Management Incentive Plan and (ii) for all purposes of this Agreement the Class A-1 Limited Partnership Interests shall receive all distributions and other economic entitlements as if no Class B Units were issued in connection with the Management Incentive Plan.

(ii)    The issuance of Class B Limited Partnership Interests shall be granted subject to such vesting and forfeiture terms, and such optional or mandatory purchase and sale provisions, as are determined in accordance with the Management Incentive Plan at or prior to the time of grant, and as reflected in an award agreement entered into between the Partnership and the applicable Class B Limited Partner.

(iii)    Each Class B Limited Partnership Interest shall constitute a "profits interest" within the meaning of Rev. Proc. 93-27, 1993-2 C.B. 343. In accordance with Rev. Proc. 2001-43, 2001-2 C.B. 191, the Partnership shall treat a Class B Limited Partner as the owner of such profits interest from the date it is granted, and shall file the Partnership's IRS Form 1065, and issue appropriate Schedule K-1s (or the equivalent, if the Partnership is not required to file IRS Form 1065) to each Class B Limited Partner, allocating to such Class B Limited Partner its distributive share of all items of income, gain, loss, deduction and credit associated with such profits interests as if it were fully vested. Each Class B Limited Partner shall be required to take into account such distributive share in computing its income tax liability for the entire period during which it holds Class B Limited Partnership Interests. The undertakings contained in this clause (B) shall be construed in accordance with Section 4 of Rev. Proc. 2001-43.

(iv)    The Management Incentive Plan will provide that each Class B Limited Partnership Interest shall be assigned an amount (the "**Hurdle Amount**") for such Unit by the Advisory Committee at the time of the issuance of such Class B Limited Partnership Interest, which amount shall at least be equal to (x) the net equity value of the Partnership immediately prior to the grant of such Class B Limited Partnership Interest, as reasonably determined in good faith by the Advisory Committee minus (y) the aggregate Class C Liquidation Preference as of such date. Unless otherwise provided by the Advisory Committee, the Hurdle Amount with respect to each Class B Limited Partnership Interest shall be increased from time to time by the amount of cash and the fair market value of other property contributed to the capital of the Partnership between the date of grant of such Class B Limited Partnership Interest and the date of any distribution thereon on account of Class A Limited Partnership Interests and any other securities which participate pro rata in distributions with the Class A Limited Partnership Interests.

(v)    Except as expressly provided herein, the Class B Limited Partners shall have no right to vote on, approve of, consent to or otherwise participate in any decision making matters pertaining to the Partnership or any of its affairs, all such rights being reserved to and vested in the Advisory Committee and the General Partner.

(d)    Class C Limited Partnership Interests. Each Person who owns a Class C Limited Partnership Interest and who has been admitted as a Class C Limited Partner in accordance with

the terms of this Agreement shall be a Class C Limited Partner to the extent of such Class C Limited Partnership Interest and, as such, has all rights, privileges and obligations as are conferred upon Class C Limited Partners by this Agreement and by provisions of the Act which are not inconsistent with the terms of this Agreement to the extent of such Class C Limited Partnership Interest.

(i)       The number of Class C Units held by each Class C Limited Partner as of the Effective Date (after giving effect to the effectiveness of the Bankruptcy Plan and the adoption of this Agreement) is set forth opposite such Class C Limited Partner's name on **Exhibit A** to this Agreement.  The Partnership shall not issue any additional Class C Limited Partnership Interests after the Effective Date except to the extent permitted in accordance with the terms and conditions of Section 6.4.

(e)       Class D Limited Partnership Interests.  To the extent permitted in Section 6.4, the Partnership may issue Class D Limited Partnership Interests, which shall have the same rights and privileges as the Class C Limited Partnership Interests (including, without limitation, the same price per Unit, the same right to preferred returns, and the same redemption rights); provided, however, that the Class D Limited Partnership Interests shall have priority to the Class C Limited Partnership Interests with respect to distribution rights and, if upon a redemption there are insufficient funds to redeem all of the outstanding Class C Limited Partnership Interests and Class D Limited Partnership Interests, the proceeds shall be applied first to redeem the Class D Limited Partnership Interests and then the Class C Limited Partnership Interests (on a pro rata basis).  In the event that any such Class D Limited Partnership Interests are issued by the Partnership, the Partners hereby agree that the General Partner shall have the right to amend this Agreement to reflect the establishment of the Class D Limited Partnership Interests and the rights and privileges thereof, notwithstanding that such rights and privileges may have an adverse effect on the rights and privileges of the Class C Limited Partnership Interests.  As of the Effective Date, no Class D Units are outstanding.

(f)       Additional Classes.  In addition, but subject to compliance with Section 6.4, Section 6.5, and Section 3.2 (as expressly applicable), the Advisory Committee shall have the authority to create and issue additional classes of Partnership Interests (each an "**Additional Class**"), on such terms and with such rights, preferences and priorities as the Advisory Committee may designate at such time, and the Advisory Committee shall be authorized to amend the terms of this Agreement, without the consent of any Partner, to create such Additional Class.

(g)       Nature of Partners' Interests.  The interests of the Partners in the Partnership shall include the Partners' respective (i) shares of the capital, profits and losses of the Partnership and (ii) rights to receive distributions and allocations of income, gain, loss, deduction, credit or similar items, as set forth herein (as applicable).  The interests of the Partners in the Partnership shall be personal property for all purposes.  Except as is otherwise provided herein, a Partner, unless the Partner is the General Partner, shall take no part, and shall not interfere in any way, in the management, conduct or control of the business of the Partnership and shall have no right or authority to act for, vote or bind the Partnership.

(h)       Names and Contact Information of the Partners.  Appropriate contact information for each Partner shall be provided to the Partnership by each Partner, and each Partner shall

promptly notify the Partnership of any change to such information. Unless and until the Partnership receives a notice to the contrary, the Partnership may rely on the information most recently made available to it by the Partner.

(i)      <u>Resignation</u>. Except as otherwise provided herein, a Partner may not resign or withdraw from the Partnership prior to the dissolution and winding up of the Partnership.

(j)      <u>Partition</u>. Each Partner irrevocably waives any right that such Partner may have to maintain an action for partition and no Partner shall have the right to partition any assets of the Partnership, nor shall a Partner make an application or proceeding for a partition of any assets of the Partnership. Upon any breach of the provisions of this section by any Partner, the other Partners (in addition to all other rights and remedies afforded by Law or equity) shall be entitled to a decree or order restraining or enjoining such application, action or proceeding. The Partners expressly agree that damages at law would be an inadequate remedy for a breach or threatened breach of the restrictions set forth in this <u>Section 2.7(h)</u>.

2.8    **Representations by the Partners**. Each Partner represents, warrants, agrees and acknowledges that:

(a)      <u>Due Formation; Valid Existence; Authority</u>. If not a natural person, it is an entity duly organized or formed and validly existing and in good standing under the Laws of the jurisdiction of its organization or formation; it has all requisite power and authority to enter into this Agreement; to acquire and hold its Partnership Interest and to perform its obligations hereunder; and the execution, delivery and performance of this Agreement has been duly authorized by all necessary actions.

(b)      <u>Enforceability</u>. This Agreement constitutes the legal, valid and binding obligation of such Partner enforceable in accordance with its terms, subject to the application of principles of equity and Laws governing insolvency and creditors' rights generally.

(c)      <u>No Conflict</u>. The execution and delivery of this Agreement, and the consummation of the transactions contemplated hereby, do not conflict with or contravene the provisions of any material agreement or instrument in effect by which it is bound or any Law to which it is subject.

(d)      <u>No Litigation</u>. There is no action, suit or proceeding pending against such Partner or, to its knowledge, threatened in any court or by or before any other governmental agency or instrumentality that would prohibit its entering into or performing its obligations under this Agreement.

(e)      <u>Investment Intent</u>. Such Partner is acquiring its Partnership Interest in the Partnership for investment purposes, solely for its own account, with the intention of holding such Partnership Interest for investment and not with a view to, or for resale in connection with, any distribution or public offering or resale of any portion of such Partnership Interest within the meaning of the *Securities Act of 1933*, as amended or the *Securities Act* (Ontario) (collectively, the "**Securities Act**") or any other applicable federal or state Law affecting securities (such Laws collectively, "**Securities Laws**").

(f)    No Disposition in Violation of Law.  Without limiting the representations set forth above, and without limiting Article ARTICLE 9 of this Agreement, it will not make a Transfer of all or any part of its Partnership Interests or any direct or indirect ownership interest in it which will result in the violation by it or the Partnership of the Securities Act, or any other Securities Laws.

(g)    Due Authorization and Delivery.  This Agreement and all agreements, instruments and documents herein provided to be executed or caused to be executed by it are duty authorized, executed and delivered by and are and will be binding upon it.

(h)    No Violation.  Neither this Agreement nor any agreement, document or instrument executed or to be executed in connection with the same, nor anything provided in or contemplated by this Agreement or any such other agreement, document or instrument, breaches, invalidates, cancels, makes inoperative, or interferes with, or results in the acceleration of maturity of, or requires any consent or authorization that has not been obtained under, any contract, agreement, lease, easement, right or interest, or Law, to which it is subject (other than as a result of its entry into this Agreement).

(i)    No Broker.  Such Partner has not retained any broker, finder or other commission or fee agent, and no such person has acted on its behalf in connection with the negotiation, execution, delivery, and performance of this Agreement.

(j)    Attorney Review.  Such Partner acknowledges that, prior to its execution of this Agreement, it received a copy of this Agreement and that it examined this document.  Such Partner does hereby further acknowledge that it is familiar with this Agreement, and with the business and affairs of the Partnership, and that except as otherwise specifically provided in this Agreement, it does not desire any further information or data relating to the Partnership or to the other Partners. Such Partner does hereby acknowledge that it understands that the acquisition of its Partnership Interest in the Partnership is a speculative investment involving a high degree of risk and hereby represents that it has a net worth sufficient to bear the economic risk of its investment in the Partnership and to justify its investing in a highly speculative venture of this type.

(k)    ERISA.  Such Partner is not (and throughout the term of this Agreement will not be) and is not acting on behalf of (and throughout the term of this Agreement will not be acting on behalf of) an "employee benefit plan" as defined in Section 3(3) of the *Employee Retirement Income Security Act of 1974*, as amended ("**ERISA**"), whether or not subject to ERISA, a "plan" as defined in Section 4975 of the Internal Revenue Code of 1986, as amended, or any entity deemed to hold the plan assets of any of the foregoing.

# ARTICLE 3
## MANAGEMENT OF PARTNERSHIP BUSINESS

3.1    **Advisory Committee**.  There shall be a committee (the "**Advisory Committee**") composed of seven (7) representatives (each a "**Representative**" and collectively the "**Representatives**").  No Partner other than the General Partner shall have any right, power or authority to act (as agent or otherwise) for, or to bind, the Partnership in any manner except through the Advisory Committee or as otherwise specified in this Agreement, and all matters with respect

to management of the Partnership shall be brought to and determined by the Advisory Committee. Anything contained in this Agreement to the contrary notwithstanding and for the avoidance of doubt, the Advisory Committee shall have the exclusive right, power and authority to govern and control the operations of the Partnership and each of its Subsidiaries and, in the case of any Major Decision, the Partnership shall not take, or cause any Subsidiary to take, any action that constitutes a Major Decision without first obtaining Minority Approval. For the avoidance of doubt, the Partnership shall not permit any of its direct or indirect Subsidiaries to take any action that would be in contravention of the terms of this Agreement without first complying with the terms hereof.

(a)    Appointment.

(i)    Foreman shall have the right to appoint and to remove three (3) Representatives, who shall initially be Foreman, [Steven Littman] and [                    ], and MacDonald shall have the right to appoint and to remove one (1) Representative, who shall initially be MacDonald (collectively, the "**Founder Representatives**").

(ii)    Falcon, so long as it, together with its Affiliates, is a Major Investor, shall have the right to appoint and remove two (2) Representatives (the "**Falcon Representatives**") who shall initially be Berj Garabedian and [                ].

(iii)    The Advisory Committee shall have the right to appoint and to remove one (1) Representative (the "**Independent Representative**"), which such person shall not be an Affiliate of any Partner, who shall initially be [                ]. In the event of a vacancy with respect to the Independent Representative (whether as a result of the removal, death or resignation of the prior Independent Representative) the General Partner shall recommend and the Representatives (by Required Approval which must include at least one (1) Falcon Representative) shall elect a successor. In furtherance of the foregoing, the General Partner shall, not later than ten (10) Business Days after the Independent Representative position has become vacant, provide all of the Representatives written notice of up to three potential nominees to be elected as the Independent Representative, which the Representatives shall consider in good faith, and the Advisory Committee shall vote upon their election ten (10) Business Days thereafter; provided, that if the Advisory Committee fails to elect any of the candidates recommended by the General Partner, the General Partner shall promptly make additional recommendations until a new Independent Representative is elected in accordance with the foregoing procedures. Notwithstanding the foregoing, at any time during the period in which there is an Independent Representative vacancy, the General Partner shall in good faith consider any recommendation made by a Falcon Representative.

(b)    Required Approval. The Advisory Committee shall act only by or with the affirmative vote of a majority of a quorum present at a meeting of the Advisory Committee ("**Required Approval**") with respect to all actions of the Advisory Committee under this Agreement other than in respect of Major Decisions, which shall require Minority Approval.

(c)    Meetings. Meetings of the Advisory Committee shall be held at least on a quarterly basis at the principal office of the Partnership (or at such other place(s) as are designated by the Advisory Committee) at such times as shall be designated from time to time by the Advisory Committee, but in any event not less than once each calendar quarter. Meetings of the Advisory

22

Committee may be called by or at the request of any Founder Representative or Falcon Representative and shall be held at the principal office of the Partnership (or at such other place(s) as may be designated by the Representative calling such meeting), upon not less than 72 hours written notice (including by way of electronic notification), with such notice to include an agenda of matters to be discussed at such meeting.  The Representative calling a special meeting of the Advisory Committee may designate any reasonable time for the holding of the special meeting. Representatives may participate in any regularly scheduled or special meeting of the Advisory Committee telephonically or through other similar communications equipment, as long as all of the Representatives participating in the meeting can hear and speak to one another.  Participation in a meeting pursuant to the preceding sentence shall constitute attendance in person at such meeting for all purposes of this Agreement.  A quorum shall be required to conduct any business at any meeting of the Advisory Committee.  A quorum of the Advisory Committee shall be deemed present at a meeting so long as at least four (4) Representatives are in attendance, including at least one (1) Falcon Representative; provided, that if a Falcon Representative is not present for a meeting duly called pursuant in accordance to this Section 3.1(c), then a majority of the Advisory Committee without the Falcon Representative shall constitute a quorum for the next meeting called for the same purpose (so long as there are at least seventy-two (72) hours between such meetings) other than in connection with a meeting called for the purpose of approving a Major Decision for which attendance by either the Independent Director or a Falcon Representative shall be required in all instances.

(d)    Actions By Written Consent.  Subject to Section 3.1(b) and Section 3.1(c), any action required or permitted to be taken by the Advisory Committee may be taken without a meeting by a written approval executed by the General Partner and the number of Representatives that would be entitled to take such action by vote at a meeting of the Advisory Committee at which all Representatives are present and that are required for any such approval.  Any such approval shall set forth the actions to be taken.  Any such approval shall have the same effect as a vote by such Representatives (including proxy votes) at a properly called and constituted meeting of the Advisory Committee.  Copies of any such approval shall be delivered promptly to all Representatives and shall be incorporated into the books and records of the Partnership by the General Partner.

(e)    Insurance.  The Partnership shall maintain in full force and effect a "directors and officers" liability insurance policy covering the Representatives and any boards of directors or managers (or any similar group performing a similar function) of any Subsidiary in an amount and on terms and conditions reasonably acceptable to Falcon.

(f)    Fees and Expenses.

(i)    The Partnership shall reimburse each Independent Representative for the reasonable out-of-pocket expenses (including direct travel expenses) incurred by such individual in connection with attending meetings of the Advisory Committee or any committee thereof, or of the board or any committee of any Subsidiary, as well as pay such retainer or other compensation as approved by the Advisory Committee; provided, that any compensation in excess of $100,000 shall require Minority Approval.

(ii)    During each Fiscal Year, the Partnership shall pay or reimburse the Falcon Representatives who are not employees of or partners or members in Falcon or any of its Affiliates, collectively, an aggregate of not more than $100,000 for their service as Representatives with such amount to be prorated for any partial fiscal year based upon the portion of such fiscal year that such Representative served as a Representative (which, for fiscal 2024 shall not include any period prior to the Effective Date).

(g)    <u>Board of Directors of the General Partner and of Subsidiaries</u>.  Unless unanimously agreed in writing by each Representative or otherwise required by any residency or similar requirements under applicable law, each board of directors of  each Material Subsidiary of the Partnership shall have the same composition as the Advisory Committee and no director or any other party shall be entitled to a casting or tie-breaking vote.   Meetings for each Material Subsidiary shall take place in the United States, including telephonically or through other similar communications equipment, as long as all of the participants in the meeting can hear and speak to one another.

(h)    <u>Company Budgets</u>.  The Company Budget for the period from the Partnership's Fiscal Year ending December 31, 2024 is attached hereto as Schedule 3.1(h)[4] and is hereby approved as the budget of the Partnership and its Subsidiaries for the period covered thereby.  As soon as practicable, and in any event not later than _____ with respect to the period ending December 31, 2025 and as soon as practicable and in any event not later than _____ days prior to the end of each subsequent Fiscal Year thereafter, the General Partner shall propose a Company Budget for the succeeding Fiscal Year, which, as amended or modified, shall be subject to approval of the Advisory Committee with Minority Approval.  In the event a new annual or Company Budget is not agreed to by the Advisory Committee in the manner described herein, the then-current Company Budget (as it may have been amended from time to time) shall remain in effect until the Board approves a new Company Budget (a "<u>Rollover Company Budget</u>"), with all expenses therein being increased by (i) the Producer Price Index published by the U.S.  Department of Labor and (ii) any Tariff Adjustments but otherwise remain materially the same for the next Fiscal Year until Company Budget is approved by the Advisory Committee for such Fiscal Year.  Any amendment or modification of a Company Budget may only be adopted with approval of the Advisory Committee with Minority Approval.

3.2    **Falcon Consent Rights**.

(a)    Anything contained in this Agreement to the contrary notwithstanding, as long as Falcon, together with its Affiliates, is a Major Investor, the Partnership (including any Subsidiary thereof), the General Partner and the Advisory Committee hereby covenant and agree not to undertake any of the following without the prior written approval or consent of Falcon:

(i)    Except to the extent permitted in accordance with the terms and conditions of <u>Section 6.4</u>, issue or authorize for issuance any New Partnership Interests or any Additional Class, or any phantom equity, equity appreciation or similar rights, that would be pari passu with

---

[4] NTD:  Agreed budget for the stub period to be agreed based upon existing budget and adjustments to reflect any required expenses related to the Bankruptcy.

96267650.18

or senior to the Class C Limited Partnership Interests with respect to any distributions or redemption by the Partnership.

(ii)     The incurrence of any Indebtedness by the Partnership or any of its Subsidiaries, whether secured or unsecured, including acquisition, construction, permanent or mezzanine financing, any modification, amendment, renewal, refinancing or extension of such Indebtedness and any non-pro rata repayment of any Indebtedness which has equal priority of payment (i.e., senior Indebtedness may be paid prior to junior Indebtedness, but if there is pari passu Indebtedness it must be paid pro rata); provided that this Section (ii) shall not apply so long as the aggregate amount of all such Indebtedness as of any given date does not exceed the greater of (A) an amount that is equal to the sum of (1) the maximum amount of Indebtedness permitted under the Senior Credit Documents (as in effect as of the Effective Date and without giving effect to any amendment, waiver, consent or other modification occurring after the Effective Date which has not been consented to in writing, in advance, by Falcon), plus (2) an amount equal to 1.0x EBITDA for the trailing twelve (12) month period measured as of the end of the most recent fiscal quarter ending on prior to such date, and (B) an amount equal to 6.0x EBITDA for the trailing twelve (12) month period measured as of the end of the most recent fiscal quarter ending on prior to such date; provided, that clause (B) shall not limit the ability of the Partnership to incur revolving credit Indebtedness under the Senior Credit Documents to the extent that the Company has the right to make such borrowing under the Senior Credit Documents, as in effect as of the Effective Date, and the maximum borrowing under such Senior Credit Documents did not exceed such amount as of the date of the entry into the applicable Senior Credit Document; provided, that in no event shall any consent be required pursuant to this Section (ii) to the extent that substantially simultaneously or immediately after the incurrence of such Indebtedness all of the Class C Membership Interests are redeemed pursuant to Section 9.9.

(iii)     Make, authorize or commit to the making of any dividend payments, redemptions, repurchase or other distributions to any Partner or any equity holders of any Subsidiaries (other than the Partnership and any wholly owned Subsidiary of the Partnership), other than (A) payment of any distribution pursuant hereto on account of the Class C Limited Partnership Interests to the extent made pro rata with respect to all Class C Limited Partnership Interests in accordance with the terms hereof, (B) in accordance with Section 8.1 and (C) redemptions pursuant to Section 9.8 and Section 9.9 or as required by the governing documents of such Subsidiary.

(iv)     Make, authorize or commit to the making of any change, modification, alteration, reclassification or amendment to the rights, preferences, powers and privileges of the Class A-1 Units or the Class C Units, or to any other Partnership Interest that would be materially adverse to the rights, preferences, powers and privileges of the Class A-1 Units or the Class C Units, it being understood that the issuance of additional Partnership Interests and the amendments to this Agreement as necessary or advisable in connection with such issuances as contemplated by this Agreement, including without limitation, pursuant to Section 6.4, shall not be considered adverse to the rights, preferences, powers and privileges of the Class A-1 Units or the Class C Units.

(v)     Increase or decrease the authorized number of Representatives.

96267650.18

(vi)     Issue Class B Limited Partnership Interests to Jay Foreman or John MacDonald.

(vii)    Make any tax election which changes the tax status of (i) the Partnership from being treated as a partnership or (ii) any Subsidiary to the extent that it would result in the Partnership recognizing UBTI, ECI or CAI (each as defined in <u>Exhibit B</u>) or conducting commercial activities within the meaning of Section 892 of the Code or a U.S. trade or business within the meaning of Section 871(b) or Section 882(a)(1) of the Code.

(viii)   Take any action (or fail to take any action) as it relates to tax audits or other tax matters if taking (or failing to take) such action would affect Falcon in a manner that is adverse and disproportionate relative to the effect on the Founder Limited Partners (other than de minimis effects).

### 3.3    General Partner and Officers.

(a)      <u>Appointment</u>.  The General Partner hereby continues as the general partner of the Partnership. The General Partner may be removed only with the unanimous consent of the Limited Partners. In the event the General Partner is removed or resigns, a substitute general partner may be admitted with the prior written consent of Partners owning more than fifty percent (50%) of the Class A Limited Percentage Interests. Notwithstanding Section 9.1, such substitute general partner shall be automatically admitted as a Substitute Partner effective as of the removal or resignation of the prior general partner and the General Partner Units outstanding shall automatically be deemed transferred to the substitute general partner for no consideration.

(b)      <u>Duty and Authority</u>.  The General Partner shall have the duty, responsibility, power and authority to manage and administer the day-to-day business and affairs of the Partnership and its Subsidiaries in accordance with this Agreement and the decisions of the Advisory Committee.

(c)      <u>Officers</u>.  The General Partner may nominate officers of the Partnership for election by the Advisory Committee, including a President, Chief Executive Officer, Chief Operating Officer, Secretary and Treasurer and such other or additional officers (including, without limitation, one or more Vice-Presidents (or such special rank and designation as the Partners may specify), Assistant Secretaries and Assistant Treasurers) as the Advisory Committee may designate from time to time.  Each officer shall hold office until his or her resignation or removal.  Any officer or agent may be removed with or without cause at any time upon the recommendation of the General Partner by the Advisory Committee subject to Minority Approval.  Vacancies in any office, whether occurring by death, resignation, removal or otherwise, may be filled by the Advisory Committee subject to Minority Approval upon the recommendation of the General Partner.  Each of the officers of the Partnership shall, unless otherwise ordered by the Advisory Committee subject to Minority Approval upon the recommendation of the General Partner, have such powers and duties as generally pertain to their respective offices as well as such powers and duties as from time to time may be conferred upon him or her by the Advisory Committee.  The officers (with titles set out opposite their names) and directors of the Partnership as of the Effective Date are as set out in **<u>Exhibit C</u>** hereto.  The officers, acting in such capacity, shall have the same duties of care and loyalty as an officer of a Delaware corporation.

3.4    **Limited Partners**.  The Limited Partners will have the powers and will be entitled to exercise the rights given to them by the terms of this Agreement, and the exercise of such rights will not be deemed to constitute participation or taking part in the control of the Partnership's business.

(a)    Each Limited Partner has the right, subject to reasonable standards and discretion of the General Partner, to obtain from the General Partner(s):

(i)    a copy of any of the Partnership's records required to be maintained;

(ii)    a current list of the name and last known business, residence, or mailing address of each Partner;

(iii)    full information regarding the state of the business and financial condition of the Partnership and its Subsidiaries; and

(iv)    a copy of the Partnership's federal, state, and local income tax returns

(b)    No Limited Partner will be personally liable for the Partnership's or the General Partner's expenses, liabilities or obligations, unless such Limited Partner is also a General Partner. The liability of each Limited Partner as such will be limited solely to the amount of such Limited Partner's capital contribution as and when it is payable under this Agreement.

(c)    Each Limited Partner will promptly report to the Partnership any changes in the address or citizenship of such Limited Partner as previously reported to the Partnership.

(d)    In the event that a General Partner is also a Limited Partner or purchases, acquires, or otherwise becomes a transferee of all or any part of the Partnership Interest of a Limited Partner, the General Partner will be treated also as a Limited Partner to the extent of such Partnership Interest.

## ARTICLE 4
## INDEMNIFICATION AND EXCULPATION

4.1    **Limitation of Liability**.

(a)    To the extent permitted by Law, none of any Representative, the General Partner or any Partner nor any of their respective shareholders, officers, directors, partners, owners, trustees, members, managers, employees and agents (each a "**Covered Person**") will be liable for damages to the Partnership or any Partner for any act, omission, or error in judgment performed, omitted, or made by them in good faith and in a manner reasonably believed by them to be within the scope of authority granted to them by this Agreement and in the Partnership's best interests, provided that such act, omission, or error in judgment does not constitute bad faith, fraud, gross negligence, or willful misconduct.

(b)    A Covered Person will be fully protected in relying in good faith upon the Partnership's records and upon such information, opinions, reports, or statements presented to the Partnership by any Person as to matters the Covered Person reasonably believes are within such

other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Partnership, including information, opinions, reports, or statements as to the value and amount of the assets, liabilities, income, losses, or available cash or any other facts pertinent to the existence and amount of assets from which distributions to Partners might properly be paid.

4.2    **Indemnification**.

(a)    In any threatened, pending or completed action, suit or proceeding, each Covered Person shall be fully protected and indemnified and held harmless by the Partnership against all liabilities, obligations, losses, damages, penalties, demands, actions, judgments, suits, proceedings, costs, expenses and disbursements of any kind or nature whatsoever (including reasonable attorneys' fees, costs of investigation, fines, judgments and amounts paid in settlement, actually incurred by such Covered Person in connection with such action, suit or proceeding) (collectively, "**Claims**") by virtue of such Person's status as a Covered Person or with respect to any action or omission taken or suffered in good faith, other than liabilities and losses resulting from the gross negligence, fraud, or willful misconduct of such Covered Person; provided, however, such Covered Person shall not be so indemnified for any acts determined by any adjudicative procedure to be in contravention of an express term of this Agreement.  The indemnification provided by this Section 4.2(a) shall be recoverable only out of the assets of the Partnership, and no Partner shall have any personal liability (or obligation to contribute capital to the Partnership) on account thereof.

(b)    To the fullest extent permitted by applicable Law, expenses (including legal fees) incurred by a Covered Person or his, her or its shareholders, officers, directors, partners, owners, trustees, members, managers, employees and agents in defending any Claim relating to the Partnership will be advanced by the Partnership before the final disposition of such Claim upon receipt by the Partnership of an undertaking by or on behalf of the Covered Person to repay such amount if it is determined that the Covered Person is not entitled to be indemnified as authorized in this Article ARTICLE 4.

(c)    Each Partner shall defend and indemnify the Partnership and the other Partners against, and shall hold it and them harmless from, any damage (excluding consequential damages), loss, liability, or expense, including reasonable attorneys' fees, as and when incurred by the Partnership or the other Partners in connection with or resulting from such indemnifying Partner's gross negligence, fraud, or willful misconduct.  The obligations of a Partner under this Section (b) shall survive the transfer of such Partner's Partnership Interest.

(d)    The Partnership shall purchase and maintain insurance on behalf of the Covered Persons against insurable liabilities asserted against them and incurred by them in such capacity, or arising out of their status as a Covered Person, whether or not the Partnership is obligated to indemnify them against such liabilities under this Article ARTICLE 4.

4.3    **Dealing with Partners**.  The fact that a Partner, an Affiliate of a Partner, or any officer, director, employee, partner, consultant or agent of a Partner, is directly or indirectly interested in or connected with any Person employed or retained by the Partnership to render or perform a service, or from or to whom the Partnership may buy or sell any property or have other business

dealings, shall not prohibit a Partner from employing such Person or from dealing with such Person on customary terms and at competitive rates of compensation, and neither the Partnership nor any of the other Partners shall have any right in or to any income or profits derived therefrom by reason of this Agreement.

4.4     **Use of Partnership Property**.  No Partner shall make use of the funds or property of the Partnership, or assign its rights to specific Partnership property, other than for the business or benefit of the Partnership, subject, in all instances, to the terms of this Agreement.

4.5     **Restrictive Covenants**.  Each Employee Owner[5] agrees to the restrictions in this <u>Section 4.5</u> so long as such Employee Owner is an employee of the Partnership or any Subsidiary (the "**Relationship Conditions**"), until the first anniversary of the first date after the termination of such Employee Owner's termination of employment or service with the Partnership or any of its Subsidiaries (the "**Restricted Period**").

(a)     During the Restricted Period such Employee Owner and its Affiliates (collectively, the "**Restricted Parties**") shall not, directly or indirectly, either alone or as a stockholder, partner, associate, consultant, owner, agent, creditor or co-venturer of any other Person, or in any other capacity, engage  anywhere in the world where the Company currently conducts business or sells products, except on the behalf of the Partnership or its Subsidiaries, in the business of the licensing, design, manufacture, marketing, distribution and sales of toys (i) while any Relationship Condition exists, in any Toy Category in which the Partnership or its Subsidiaries are currently selling, distributing or marketing products in such Toy Category or (ii) in any Toy Category in which during the twelve month period preceding the cessation of all Relationship Conditions, the Partnership and its Subsidiaries, on a consolidated basis, had net revenue on account of sales in such Toy Category of at least the lesser of (y) one percent (1%) of the total net revenues of the Partnership and its Subsidiaries, on a consolidated basis for such period or (z) $5,000,000 (a "**Competitive Business**"), in each case only to the extent that such activities could result in such Employee Owner or its Affiliate's, direct or indirect, whether intentional or unintentional, use, disclosure, or reliance upon Confidential Information or exploitation of goodwill of the Partnership or any of its Subsidiaries; provided, that the foregoing shall in no way preclude (i) any Employee Owner from being engaged by, owing, or otherwise providing services to an accounting or similar firm which provides accounting or related services to a Competitive Business (whether directly or on a decision making or supervisory basis) so long as such Employee Owner shall not be involved directly in the provision of services to such Competitive Business and (ii) a Restricted Party from being engaged as an employee by a Person which engages in multiple businesses, including a Competitive Business, as long as (i) such Person derives not more than 10% of its revenue from the Competitive Business and (ii) such Restricted Party does not provide services or have any decision making or supervisory authority with respect to such Person's conduct of its Competitive Business.  Notwithstanding the foregoing provisions of this <u>Section 4.5(a)</u>, nothing contained herein shall prohibit any Restricted Party (i) from being an owner of not more than 5% of the outstanding stock of any class of a Person that is publicly traded, so long as no such Restricted Party actively participates in the business of such corporation, or (ii) from investing an investment company under the *Investment Company Act of 1940*, as amended, or making investments through

---

[5] NTD: Revisions to be discussed prior to the Effective Date, if at that time the FTC proposed rule becomes effective, and enforcement is not then enjoined.

any profit sharing account or managed investment account so long as no Restricted Party (x) controls the investment decisions with respect to such account or (y) actively participates in the business of such corporation.

(b)    During the Restricted Period, none of the Restricted Parties shall, directly or indirectly, solicit, induce, or attempt to solicit or induce, any customer, supplier, licensee or other business relation of Partnership or any of its Subsidiaries to cease doing business with, or materially reduce the volume of business conducted with, the Partnership or any of its Subsidiaries.

(c)    During the Restricted Period, none of the Restricted Parties shall, directly or indirectly, either alone or as a stockholder, member, partner, consultant, adviser, owner, associate, agent, creditor, or co-venturer of any other Person, or in any other capacity, (i) solicit (A) any licensor of the Partnership or any Subsidiary or (B) any Person which the Partnership or any Subsidiary actively solicited at any time within one year of the date thereof to provide a license to the Partnership or any Subsidiary to grant a license to such Restricted Party for use in any Competitive Business or (ii) solicit, hire, attempt to solicit or hire, or participate in any attempt to solicit or hire any Person who is or was an employee of, or independent consultant to, the Partnership or any Subsidiary at any time during the then preceding six (6)-months; provided, however, that the general solicitation of employment or engagement not targeted at such employee or independent consultant shall be deemed a breach of this Section 4.6(c).

(d)    During the Restricted Period, no Restricted Party shall knowingly make, and no Restricted Party shall authorize its directors, managers, officers, employees, shareholders, members or agents to knowingly make, any public statement, whether oral, written, electronic or other, or induce, assist or participate in the making of any such public statement, which libels, slanders or disparages in a material manner the Partnership or any Subsidiary. Notwithstanding the foregoing, truthful statements made in the course of any legal proceeding, shall not be subject to the restrictions set forth in this Section 4.5(d).

(e)    If, at the time of enforcement of this Section 4.5, a court of competent jurisdiction shall hold that the duration, scope or area restrictions stated herein are unreasonable under circumstances then existing, the Partners agree that the maximum duration, scope or area reasonable under such circumstances shall be substituted for the stated duration, scope or area. Each of the Partners acknowledges and agrees that the restrictions in this Section 4.6 are reasonable and necessary in light of the benefits to it from the transactions contemplated by this Agreement.

(f)    The Employee Owners agree that if any of them shall commit or threaten to commit a breach of any of the covenants and agreements contained in this Section 4.6, then the Partnership or any Subsidiary shall have the right to seek appropriate injunctive or other equitable remedies therefor in addition to any other rights and remedies that may be available at law, it being acknowledged and agreed that any such breach may cause irreparable injury to Partnership and that money damages may not provide an adequate remedy therefor.

(g)    Notwithstanding the foregoing, the Partners agree that the restrictions set forth in this Section 4.5 shall not apply with respect to Falcon and its Affiliates.

96267650.18

(h)    Notwithstanding anything to the contrary set forth herein, in the event of a breach of any of the provisions of this <u>Section 4.5</u> (the "**Restrictive Covenants**"):

(i)    the Partnership and its Subsidiaries shall have the right and remedy, without regard to any other available remedy, to (i) have the Restrictive Covenants specifically enforced by any court of competent jurisdiction and (ii) have issued an injunction restraining any such breach without posting of a bond; it being understood that any breach of any of the Restrictive Covenants would cause irreparable and material loss to the Partnership and its Subsidiaries, the amount of which cannot be readily determined and as to which neither the Partnership and its Subsidiaries will have any adequate remedy at law or in equity;

(ii)    it is the desire and intent of the Employee Owners and the Partnership that the Restrictive Covenants be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought and if any Restrictive Covenant shall be adjudicated finally to be invalid or unenforceable, such Restrictive Covenant shall be amended to the maximum less restrictive limitations permitted under applicable law to the extent necessary in order that such provision be valid and enforceable, the Partnership and the Employee Owners hereby expressly acknowledge their desire that in such event such action be taken and the remainder of such Restrictive Covenant shall not thereby be affected and shall be given full effect without regard to invalid portions and such amendment shall apply only with respect to the operation of the Restrictive Covenant in the particular jurisdiction in which such adjudication is made; and

(iii)    the Partnership and each Employee Owner acknowledge and agree that the Restrictive Covenants are necessary for the protection and preservation of the value and the goodwill of the Partnership's and each of its Subsidiaries' businesses and are reasonable and valid in geographical and temporal scope and in all other respects.

(i)    Notwithstanding anything to the contrary set forth in this Agreement, the provisions of this <u>Section 4.5</u> shall be governed in accordance with New York Law.

## ARTICLE 5
## BOOKS AND RECORDS; ANNUAL REPORTS; CONSTRUCTION

5.1    **Books and Records**.  At all times during the continuance of the Partnership, the General Partner shall keep or cause to be kept true and complete books and records of the Partnership (including all records required to be maintained by the Act, as amended from time to time, or other provisions of applicable Law) in which shall be entered fully and accurately each transaction of the Partnership.  Such books and records shall be kept on the basis of the Fiscal Year in accordance with the accrual method of accounting, and shall reflect all Partnership transactions in accordance with generally accepted accounting principles.

5.2    **Availability of Books and Records**.  All of the books and records referred to in <u>Section 5.1</u>, together with an executed copy of this Agreement and the Certificate, and any amendments thereto, shall at all times be maintained at the principal office of the Partnership or such other location as the General Partner may propose (which other location, upon such approval, shall be communicated to all of the Partners), and upon reasonable notice to the General Partner, shall be

open to the inspection and examination of any Partner or their representatives during reasonable business hours for any purpose.

5.3    **Periodic Reports and Statements and Construction**.

(a)    For each Fiscal Year, the General Partner shall send to each Partner and to each Person who was a Partner at any time during such Fiscal Year, within one hundred and twenty (120) days after the end of such Fiscal Year, an annual report of the Partnership including audited financial statements for the previous Fiscal Year, which shall include an annual balance sheet, profit and loss statement and a statement of changes in financial position, and a statement showing distributions to the Partners all as prepared in accordance with generally accepted accounting principles consistently applied, and a statement showing allocations to the Partners of taxable income, gains, losses, deductions and credits, as may be prepared by the Partnership's tax accountants.

(b)    For each fiscal quarter, the General Partner shall send to each Partner, within sixty (60) days after the end of such fiscal quarter, quarterly financial statements for the Partnership including a balance sheet, profit and loss statement and a statement of changes in financial position all as prepared in accordance with generally accepted accounting principles consistently applied.

(c)    For each calendar month, the General Partner shall send to each Partner, within thirty (30) days after the end of such month, monthly financial statements for the Partnership including a balance sheet, profit and loss statement and a statement of changes in financial position all as prepared in accordance with generally accepted accounting principles consistently applied.

(d)    The General Partner shall be responsible for overseeing the Partnership's independent accountants in the preparation of all federal, state and local tax returns required to be filed (it being acknowledged that the General Partner is not obligated to guaranty timely delivery of audits, tax returns or similar third party work product, and the failure of the auditor or another third party to make such delivery shall not in and of itself constitute a default hereunder on the part of the General Partner). The General Partner shall, or shall cause the accountants to, use reasonable efforts to submit the tax returns and completed IRS Schedules K-1 to the Partnership no later than March 31 of each year (and if such date is not a Business Day, then on the previous Business Day) and each Partner shall assist the General Partner in obtaining such accountant's cooperation. Each Partner shall notify the other Partners upon receipt of any notice of tax examination of the Partnership by federal, state or local authorities or any Canadian or provincial taxing authority. If any Partner is a Canadian resident for purposes of the *Income Tax Act* (Canada) at any time in a taxation period, the General Partner shall, or shall cause the accountants to, calculate and report to such Canadian resident Partner the income the Partnership that is required to be reported in such Canadian resident Partner's Canadian income tax return for such period.

5.4    **Bank Account**. The General Partner shall, as soon as reasonably practicable, establish and maintain segregated bank accounts in the name of the Partnership and for the business of the Partnership, which accounts shall, to the extent reasonably practicable, be interest-bearing. Such officers as designated by the Advisory Committee shall be the authorized signatory on the Partnership's bank accounts and shall have the right to delegate signing authority to such Persons as it deems necessary or convenient.

5.5    **Confidentiality**.  The terms of this Agreement, the identity of any Person with whom the Partnership may be holding discussions with respect to any investment, acquisition, disposition or other transaction, and all other business, financial or other information relating directly to the conduct of the business and affairs of the Partnership (or its Affiliates) or the relative or absolute rights or interests of any of the Partners (collectively, the "**Confidential Information**") that has not been publicly disclosed pursuant to authorization by the General Partner is confidential and proprietary information of the Partnership, the disclosure of which would cause irreparable harm to the Partnership (or its Affiliates) and the Partners.  Accordingly, each Partner represents that it has not and agrees that it will not and will direct its partners, shareholders, General Partners, partners, directors, officers, agents, advisors and Affiliates not to, disclose to any Person any Confidential Information or confirm or deny any statement made by third Persons regarding Confidential Information until the Partnership has publicly disclosed the Confidential Information pursuant to authorization by the General Partner and has notified each Partner that it has done so; provided, however, that any Partner (or its Affiliates) may disclose such Confidential Information if required by Law (it being specifically understood and agreed that anything set forth in a registration statement or any other document filed pursuant to Law or pursuant to the rules or regulations of any securities exchange will be deemed required by Law, and provided that before making any disclosure of Confidential Information required by Law the disclosing Partner will notify the other Partners and provide them with a copy of the proposed disclosure and an opportunity to comment thereon before the disclosure is made) or in good faith determined by such Partner to be necessary for it to perform any of its duties or obligations hereunder or otherwise to entities owned by the Partnership.  Each Partner covenants and agrees that at any time upon the request of the General Partner or other authorized agent of the Partnership, and in any event upon his termination of employment with the Partnership and the Transfer of his Partnership Interests, he will immediately return and surrender to the Partnership all Confidential Information.  Each Partner further acknowledges and agrees that the Partnership expects to develop its Confidential Information, clients and substantial goodwill over an extended period of time and at a substantial investment of time and money.  It is agreed that remedies at law will not be adequate in the event of a breach of such provisions, and the Partnership shall be entitled to the equitable remedy of specific performance and shall have the right to preliminary and permanent injunctive relief (without the necessity of posting bond) to secure specific performance and to prevent a breach or contemplated breach of such covenants.  Notwithstanding the foregoing, the Partners agree that (a) Falcon shall be permitted to share Confidential Information with its actual or prospective limited partners, advisors, employees, affiliates, consultants, agents, actual or prospective lenders, and similar representatives and stakeholders; provided that any such Person is under an obligation to Falcon to keep such information confidential, and (b) the definition of "Confidential Information" shall not include any information that: (i) is or becomes generally available to the public other than as a result of breach of this Agreement; (ii) is obtained by a Partner on a non-confidential basis from a third party that, to such Partner's knowledge, was not contractually restricted from disclosing such information; (iii) was in the actual or constructive possession on or prior to the Effective Date other than to the extent acquired by a Partner on a confidential basis subject to any contractual or other similar restriction owed to the Partnership or its Affiliates; or (iv) was or is independently developed on or prior to the Effective Date without reference to, or use of, any Confidential Information.

## ARTICLE 6
## CAPITAL CONTRIBUTIONS

6.1     **Capital Contributions**.  Prior to, or as of the Effective Date, each of the Current Partners have made Capital Contributions to the Partnership.  Each Partner admitted after the Effective Date, other than a Class B Limited Partner on account of any Class B Limited Partnership Interests, shall make such Capital Contributions in such amounts and at such time as mutually agreed by such Partner and the General Partner.

6.2     **Capital of the Partnership**.  Except as otherwise expressly provided herein, no Partner shall be entitled to withdraw or receive any interest or other return on, or return of, all or any part of its Capital Contribution, or to receive any Partnership property (other than cash) in return for its Capital Contribution.  No Partner shall be entitled to make a Capital Contribution to the Partnership except as expressly authorized by the Agreement.

6.3     **Limited Liability of Limited Partners**.  No Limited Partner shall be bound by, nor be personally liable for, the expenses, liabilities, indebtedness or obligations of the Partnership, whether arising in contract, tort or otherwise.  The liability of each Limited Partner shall be limited solely to the amount of its Capital Contribution; provided, however, that after a Partner has received a distribution from the Partnership, such Partner may be liable to the Partnership for the amount of the distribution, but only to the extent required by the Act.

6.4     **Approved Acquisition Capital**.

     (a)     Subject to the approval of the Advisory Committee, the Partnership shall be permitted to issue, in the aggregate at any time after the Effective Date up to 100,000 additional Class C Units (at a purchase price of $100 per Unit), or such greater amount as approved in writing by Falcon and by Founder Limited Partners owning a majority of the Class C Units owned by all Founder Limited Partners, to fund an opportunistic acquisition by the Partnership or its Subsidiaries of a business approved by the Advisory Committee.

     (b)     To the extent that the Advisory Committee has approved an offering in accordance with Section (a), it shall provide written notice of the intention to offer such Units to Falcon and the Founder Limited Partners (the "**Rights Offering Notice**").  The offer shall permit each of (i) Falcon and (ii) the Founder Limited Partners (collectively, to be allocated among the Founder Limited Partners in accordance with their Founder Limited Partner's Class C Percentage Interests or in any other allocation among the Founder Limited Partners that the Founder Limited Partners agree), to acquire 50% of the number of Class C Units to be offered in such offer.  No Class C Limited Partner shall be under any obligation to purchase any Class C Limited Partnership Interests pursuant to this Section 6.4 unless it elects to purchase such Class C Limited Partnership Interests in accordance with Section 6.4(c).

     (c)     Not later than thirty (30) days after delivery of the Rights Offering Notice, each of Falcon and the Founder Limited Partners shall deliver written notice to the Partnership and each other making a binding election (subject to any conditions specified in the Rights Offering Notice) to purchase up their respective Class C Units subject to the Rights Offering Notice. Any failure to deliver a timely response to the Rights Offering Notice shall be deemed as an irrevocable

declination of the right to purchase any of the Class C Units issued as contemplated by such Rights Offering Notice.

(d)    If either (i) Falcon declines to purchase all or any portion of the Class C Limited Partnership Interests allocated to Falcon in such offering, or (ii) the Founder Limited Partners (collectively) decline to purchase all or any portion of the Class C Limited Partnership Interests allocated to the Founder Limited Partners (such Partner(s) who decline to fund all or any portion of the applicable allocation, the "**Nonfunding Partner**"), then provided that Falcon or the Founder Limited Partners (as applicable) has funded its full allocation of the offered Class C Limited Partnership Interests (such Partner(s), the "**Funding Partner**"), such Funding Partner(s) shall have the right to elect in writing (a "**Class D Exercise Notice**"), within thirty (30) Business Days after delivery of the Rights Offering Notice (or such later period as provided in the Rights Offering Notice) to fund the amount that the Nonfunding Partner declined to fund, and be issued in consideration for such amount, Class D Limited Partnership Interests rather than Class C Limited Partnership Interests, and this Agreement shall be amended and restated as necessary to reflect the issuance of such Class D Limited Partnership Interests and the rights and preferences thereof.

(e)    The closing with respect to the issuance and sale of any Class C Units issued pursuant to the Rights Offering Notice shall occur on the date, and subject to such conditions, as specified in the Rights Offering Notice (which date in no event shall be earlier than fifteen (15) Business Days after delivery of the Rights Offering Notice).  The closing with respect to the issuance and sale of any Class D Units issued pursuant to Section 6.4(d) shall occur on the later of (x) the date specified of the sale and issuance of the Class C Units in the Rights Offering Notice and (y) five (5) Business Days after the delivery of the Class D Exercise Notice, and, in each case, shall be subject to any conditions set forth in the Rights offering Notice.

(f)    To the extent that all of the Class C Units issuable pursuant to a Rights Offering Notice are not sold pursuant to the preceding provisions of Section 6.4, then for a period of one-hundred and eighty days after delivery of the Rights Offering Notice, the Partnership may issue any remaining Units issuable pursuant to such Rights Offering Notice to any third party approved by the Advisory Committee as either Class D Limited Partnership Interests or Class C Limited Partnership Interests; provided, that in no event shall an aggregate amount of more than 50,000 Units (at a purchase price of $100 per Unit) be issued as Class D Limited Partnership Interests.

6.5    **Additional Capital**.

(a)    No Partner shall have an obligation to make additional Capital Contributions beyond the Capital Contributions made prior to the Effective Date without its written consent, including upon the making of any election to purchase Class C Units or Class D Units pursuant to Section 6.4.

(b)    If the Advisory Committee, in accordance with the terms of this Agreement, determines from time to time, that additional capital is required by the Partnership, the Advisory Committee, prior to the issuance of any New Partnership Interests, (i) may authorize the Partnership to offer to sell New Partnership Interests to current Partners (including the General Partner and its Affiliates) and/or to third parties, subject to Section 3.2 and Section 6.4, to the extent in each case applicable, and (ii) other than as contemplated by Section 6.4 if at such time

Falcon is a Major Investor, shall solicit in writing Falcon's offer (any such offer so delivered, the "**Falcon Offer**") to purchase New Partnership Interest for sale, on such terms and conditions as Falcon shall determine, which such Falcon Offer shall be provided to the Advisory Committee, if at all, no later than fifteen (15) Business Days after the Advisory Committee's solicitation of Falcon described above. In the event that a Falcon Offer is timely delivered, the Partnership may not thereafter enter into the sale of New Partnership Interests on terms reasonably determined by the Advisory Committee to be materially less favorable to the Partnership than those contained in the Falcon Offer unless (i) such New Partnership Interests are to be issued more than ninety (90) days after the making of such Falcon Offer, and (ii) within fifteen (15) Business Days after notice to Falcon, Falcon fails to reconfirm in writing the Falcon Offer or make a substitute Falcon Offer.

(c)       Subject to <u>Section 6.4(b)(ii)</u> above, prior to selling any New Partnership Interests, other than in an Exempt Offering, the General Partner shall deliver written notice to the Class A Limited Partners describing in detail the terms and conditions of such New Partnership Interests (a "**Preemptive Rights Notice**"). Each Class A Limited Partner may, but is not required to, within ten (10) days after receipt of the Preemptive Rights Notice (the "**Response Date**"), deliver to the Partnership an irrevocable written election to purchase a portion of the New Partnership Interests to be offered by the Partnership in an amount equal to its proportionate share of such New Partnership Interests determined in accordance with the Class A Percentage Interest owned by such Partner as compared to all Class A Percentage Interests of all Partners (i.e., if Falcon's Class A Percentage Interest is 32.5% it has a right to purchase 32.5% of the New Partnership Interests offered, subject to the over-subscription set forth in the next sentence). In no event shall this Agreement be construed by the parties hereto or by any third party to require that a Class a Limited Partner to purchase any New Partnership Interests. The Partnership shall be permitted to sell any New Partnership Interests not purchased by a Class A Limited Partner pursuant to this paragraph to any other Person at any time within one hundred and twenty (120) days after the date of the Response Date on terms no more favorable to such Person than those provided in the Preemptive Rights Notice. If Falcon or another Class A Limited Partner elects to purchase New Partnership Interests, it shall purchase such Partnership Interests on the terms and conditions specified in the Preemptive Rights Notice at a closing to occur on the date established by the General Partner upon which the sale of all such New Partnership Interests shall be consummated. In no event shall such closing occur less than fifteen (15) days after the date of the Preemptive Rights Notice nor more than fifteen (15) days after the expiration of the one hundred and twenty (120) day period following the Response Date. The Partners acknowledge that such Partnership Interests may dilute their Percentage Interests, provided, that, in no event shall such New Partnership Interests have rights and preferences superior to the current Partnership Interests held by Falcon and Founders as of the Effective Date. Notwithstanding anything in this <u>Section 6.4(c)</u> to the contrary, any Affiliate of Falcon, as the case may be, shall be entitled to purchase all or a portion of such Falcon's proportionate share of the New Partnership Interests in lieu of Falcon purchasing such New Partnership Interests directly.

**ARTICLE 7**
**CAPITAL ACCOUNTS, PROFITS AND LOSSES AND ALLOCATIONS**

7.1     **Tax and Accounting Matters**.     Each and all of the provisions of **Exhibit B** are incorporated herein and shall constitute part of this Agreement. **Exhibit B** provides among other matters, for the establishment and maintenance of the Partners' capital accounts and the allocation

of profits and losses.  The Partnership shall be operated as a partnership for state and federal income tax purposes.  The General Partner is hereby authorized, upon the advice of the Partnership's tax counsel, to amend the Agreement to comply with the Code and the Regulations promulgated under Code Section 704(b); provided, however, that (i) no such amendment shall materially and adversely affect distributions to a Class A Limited Partner without the Class A Limited Partner's prior written consent, (ii) no such amendment shall materially and adversely affect distributions to a Class B Limited Partner without the Class B Limited Partner's prior written consent and (iii) no such amendment shall materially and adversely affect distributions to a Class C Limited Partner without the Class C Limited Partner's prior written consent (other than amendments which create, and reflect the issuance of Units of, one or more Additional Classes (in the manner and subject to the limitations set forth in this Agreement)).

## ARTICLE 8
## APPLICATIONS AND DISTRIBUTIONS OF AVAILABLE CASH

8.1    **Applications and Distributions**.

(a)    Distributions of Available Cash shall be made by the General Partner on behalf of the Partnership (i) on or prior to the 30th day following the end of any applicable calendar quarter (the final date of such calendar quarter, the "**Quarterly Distribution End Date**"), to the extent that the Advisory Committee elects to approve a cash distribution of Class C Current Preferred Returns accruing during such calendar quarter (with such distribution to be made pursuant to Section 8.1(c)(i)), or (ii) at such times as are determined by the Advisory Committee in its discretion, with respect to any other distribution of Available Cash pursuant to Section 8.1(c).

(b)    Notwithstanding anything herein to the contrary (except for the last sentence of this Section 8.1(b)), to the extent that there is Available Cash, the General Partner shall cause the Partnership to make distributions to the Partners (with each such Partner entitled to such a distribution to the extent that any Profit is allocated to it, whether on account of Units which are vested or unvested, and regardless of the class of such Units), on a consistent basis, as reasonably determined to be necessary to enable the Partners (and, with respect to any Partner that is a pass-through entity for federal income tax purposes, the direct and indirect owners of such Partner) to pay the federal and state income taxes on the Profits allocated to them pursuant to this Agreement ("**Required Distributions**").  For each taxable year, the General Partner shall make such Required Distributions to Partners in quarterly installments on or before the respective due dates for individual federal estimated taxes for that year, based on the General Partner's good faith estimates of the Partnership's Profits for such year and the Partners' allocable shares thereof, and shall make a final installment of any unpaid portion of the Required Distributions, based on the final determination of the Partnership's Profits for such taxable year and the Partners' allocable shares thereof, on or before April 15 of the succeeding year.  For purposes of determining the amount of the Required Distribution to be made, the General Partner shall use the Maximum Combined Marginal Rate for purposes of determining the amount of the income tax payment distribution to be made, the General Partner shall select the Maximum Combined Marginal Rate to be applied uniformly to all Partners regardless of the fact that some Partners may be subject to different effective or marginal tax rates than others.  Any distributions made pursuant to this Section 8.1(b) shall be treated as advances against the distributions payable to the Partners pursuant to Section 8.1(c) and shall be taken into account in determining the amount of future distributions to

the Partners pursuant to this Agreement. Notwithstanding anything to the contrary herein, no Required Distributions or other distributions shall be made pursuant to this <u>Section 8.1(b)</u> until after the Class C Units have been redeemed and have received payment in full of the Class C Liquidation Preference.

(c)     Subject to <u>Section 8.1(b)</u>, distributions of Available Cash shall be distributed in the following order of priority (and the calculations described in the following clauses shall be made through and including the Quarterly Distribution End Date for such calendar quarter, on a cumulative basis), subject to the other terms of this <u>Article ARTICLE 8</u>:

(i)     First, to the Class C Limited Partners pro rata in accordance with their respective Class C Percentage Interest, until aggregate distributions have been made pursuant to this <u>Section 8.1(c)(i)</u> in an amount equal to the Class C Liquidation Preference applicable to each such Class C Limited Partnership Interest with any amounts distributed pursuant to this <u>Section 8.1(c)(i)</u> to be deemed, first, to be payment of the Class C Current Preferred Return and thereafter the payment of the remainder of the Class C Liquidation Preference; and

(ii)     Thereafter, pari passu to the Class A Limited Partners and Class B Limited Partners in accordance with their Percentage Interests; <u>provided</u>, <u>however</u>, that for the purposes of calculating the Percentage Interests of the Class A-1 Limited Partners, Class A-2 Limited Partners and Class B Limited Partners, each Class B Limited Partnership Interest be included only to the extent that from and after the date of the issuance of such Class B Limited Partnership Interest, aggregate distributions have been made by the Partnership pursuant to this <u>Section 8.1(c)(ii)</u> in an amount equal to the Hurdle Amount for such Class B Limited Partnership Interest (i.e., each Class B Limited Partnership Interest only participates in distributions made after the date of its issuance which are in excess of the Hurdle Amount for such Class B Limited Partnership Interest). Subject to the foregoing, unless otherwise provided in any award agreement, Class B Limited Partnership Interests shall not be entitled to distributions on account of any Class B Limited Partnership Interests which are not vested, and for these purposes, the Percentage Interests of each Class A-1 Limited Partner, Class A-2 Limited Partner and Class B Limited Partner shall be calculated without reference to any such unvested Class B Limited Partnership Interests.

8.2     **Liquidation; Sale Event**.  In the event of a sale or disposition of all of the assets of the Partnership, the Partnership shall be dissolved and the proceeds of such sale or other disposition shall be distributed as provided in <u>Article ARTICLE 10</u>, except that to the extent that the Partnership receives a purchase money note or notes in exchange for all or a portion of such assets, the Partnership shall continue until such purchase money notes or notes have been paid in full.

8.3     **Distributions Subject to Law**.  Notwithstanding any provision to the contrary contained in this Agreement, neither the General Partner nor the Partnership shall  be required to make a distribution to a Partner if such distribution would violate Section 17-607 of the Act or any other applicable Law or any loan document.

## ARTICLE 9
## TRANSFER OF PARTNERSHIP INTERESTS

9.1     **Limitations on Assignments of Partnership Interests**.

(a)      A Limited Partner may not Transfer all or any part of such Limited Partner's Partnership Interest (including any distribution rights associated with such Partnership Interest), except (i) as otherwise expressly permitted in this Agreement, (ii) with Minority Approval, (iii) solely with respect to Jay Foreman, aggregate Transfers from and after the Effective Date to management members of the Partnership (x) not in excess of fifteen percent (15%) of the Percentage Interests held by him on the Effective Date, (y) not otherwise in connection with a transition of roles or change in responsibilities of Jay Foreman's employment, to any executive officer of the Partnership, (iv) those Transfers in compliance with <u>Section 9.6</u>, <u>Section 9.7</u>, <u>Section 9.9</u>, or <u>Section 9.10</u>, or (v) as required by pursuant to any loan agreement, credit agreement or similar obligation of the Partnership or any of its Subsidiaries to which the Partnership or any of its Subsidiaries are a party, or which are otherwise approved by the Advisory Committee.  Any purported Transfer of all or any part of a Partnership Interest in violation of the terms of this Agreement will be void *ab initio* and of no effect.  A permitted Transfer will be effective as of the date specified in the instruments relating thereto.  Any assignee desiring to make a further Transfer will be subject to all of the provisions of this <u>Article ARTICLE 9</u> to the same extent and in the same manner as any other Partner desiring to make any Transfer.

(b)      Notwithstanding the provisions of <u>Section 9.1(a)</u> to the contrary but subject to <u>Section 9.2</u> a Partner may, without the consent or approval of any other Partner but with notice to the other Partners, Transfer part or all of such Partner's Partnership Interests (i) to a Permitted Transferee in connection with their bona fide estate planning purposes; <u>provided</u> that no permitted Transfer to a minor or incompetent will be made other than in trust for the benefit of such person or in custodianship under the *Uniform Transfers to Minors Act* or similar legislation or (ii) to an Affiliate of the Partner or one or more Permitted Transferees (an "**Affiliate Transfer**"); <u>provided</u> that any subsequent Transfer of an equity interest in such Affiliate by the original Partner or any Permitted Transferee (other than a subsequent Affiliate Transfer) shall be prohibited.

9.2     **Assignment Binding on Partnership**.  No Transfer of all or any part of any Partnership Interest permitted to be made under this Agreement shall be binding upon the Partnership unless and until a duplicate original of such assignment or instrument of transfer, duly executed and acknowledged by the assignor or transferor, has been delivered to the Partnership, and such instrument evidences (i) the written acceptance by the assignee of all of the terms and provisions of this Agreement; (ii) the assignee's representation that such assignment was made in accordance with all applicable Laws; (iii) the consent to the Transfer of the Partnership Interest required pursuant to <u>Section 9.1(a)</u>, as applicable if such consent is required; and (iv) such assignee shall have paid all reasonable legal fees and filing costs in connection with its substitution as a Partner.  In addition, in the reasonable discretion of the General Partner or the Advisory Committee, a Person to whom a Transfer may be made pursuant to this <u>Article ARTICLE 9</u> may also be required as a condition precedent to it becoming a transferee to make certain additional representations, warranties and covenants to evidence compliance with federal and state Securities Laws, including representations as to its net worth, sophistication and investment intent.

9.3     **Bankruptcy of a Partner**.  The Partnership shall not be dissolved or terminated solely by reason of the Bankruptcy, removal, withdrawal, dissolution or admission of any Partner.

9.4     **Assignees**.  Upon any consented to assignment of a Partner's Partnership Interest and after such assumption, the assignor shall be relieved of its agreements and obligations hereunder arising

after such assignment and the assignee shall be admitted as a Substitute Partner in place of the assignor; provided, however, that the agreements and obligations of the assignor which existed at the time of such assignment (including, without limitation, indemnification and other obligations and representations and warranties contained herein or in any other related documents) shall continue in full force and effect in accordance with their respective terms and shall survive an assignment by such Partner, as the case may be.  Any and all obligations, representations, covenants and other provisions under the Agreement shall be applicable to such new Partner.

9.5      **Acceptance of Prior Acts**.  Any Person who is admitted as a Substitute Partner, by becoming a Partner, accepts, ratifies and agrees to be bound by this Agreement and by all actions duly taken pursuant to the terms and provisions of this Agreement by the Partnership prior to the date it became a Partner and, without limiting the generality of the foregoing, specifically ratifies and approves all agreements and other instruments as may have been executed and delivered on behalf of the Partnership prior to said date and which are in full force and effect on said date.

9.6      **Right of First Refusal and Tag-Along Rights**.  If (i) one or more Partners (the "**Selling Partners**") has a binding agreement subject to the terms of this Section 9.6 (the "**Purchase Agreement**") to sell all or any portion of the Class A Limited Partnership Interests or Class C Limited Partnership Interests held by such Selling Partners (the "**Purchased Partnership Interests**") to a particular Person or Persons (the "**Buyer**") who is a *bona fide,* arms' length buyer other than in a transaction permitted pursuant to Section 9.1(a) or Section 9.1(b) and (ii) the provisions of Sections 9.1 and 9.4 have been complied with or waived, then the Selling Partner may sell the Purchased Partnership Interests pursuant to the Purchase Agreement subject to the following:

(a)      For purposes hereof, the **"Sale Notice"** means a notice given by the Selling Partner to the Partnership and each other Class A Limited Partner and Class C Limited Partner (the "**Eligible Tag Participants**") setting forth (i) the aggregate of the Purchased Partnership Interests being sold by all Selling Partners, and the Purchased Partnership Interests proposed to be sold by each Selling Partner including the class of Partnership Interest being sold; (ii) the date (not less than forty-five (45) days after the giving of the notice) after which the sale will take place; (iii) the amount and type of consideration to be received in the aggregate and on a per Unit basis by the Eligible Tag Participant receiving such notice (before deduction for the expenses of sale) for such Eligible Tag Participant's Partnership Interests; (iv) the address of the Buyer to which notice of option exercise is to be sent; and (v) any other material terms and conditions of the sale, together with a complete copy of the Purchase Agreement related thereto.

(b)      The Purchase Agreement between the Selling Partners and the Buyer shall provide, in substance, that, unless the Purchased Partnership Interests are purchased pursuant to the rights of first refusal pursuant to Section 9.6(c) or Section 9.6(d), the Buyer is obligated to purchase the proportionate amount of Partnership Interests of each the Applicable Class of any Eligible Tag Participant who exercises such Partner's option to sell a proportionate share of Partnership Interests of (i) in the case of Class C Units, the number of Class C Units owned by each such Partner and (ii) in the case of Class A Units, based upon the Percentage Interests of the Class A Units owned by each Partner, in each case at the same proportional rate and on the same terms and conditions as set forth in the Purchase Agreement (e.g. if the Purchased Partnership Interests represent 50% of the Percentage Interests, of all Class A Units then the proportionate amount of

an Eligible Tag Participant's Percentage Interest of Class A Units would also be 50%); provided, that any consideration payable pursuant to the Purchase Agreement shall be allocated in (x) in a transaction involving only Class A Units, pro rata in accordance with the Percentage Interest represented by each Class A Unit, (y) in a transaction involving only Class C Units, in an identical amount per Unit and (z) in a transaction involving both Class A Units and Class C Units (1) to each Class C Unit which is part of the Purchased Partnership Interests in an amount equal to the Class C Liquidation Preference of such Class C Units, with the remainder to be allocated to the Class A Units which are part of the Purchased Partnership Interests, pro rata in accordance with their respective Percentage Interests. Notwithstanding the foregoing, in no event shall the Eligible Tag Participant be required to enter into the Purchase Agreement unless:

(i)     any representations and warranties to be made by such Eligible Tag Participant are limited to representations and warranties related to authority, ownership and the ability to convey title to such Partnership Interests, including, but not limited to, representations and warranties that (i) the Eligible Tag Participant holds all right, title and interest in and to the Partnership Interests such Eligible Tag Participant purports to hold, free and clear of all liens and encumbrances, (ii) the obligations of the Eligible Tag Participant in connection with the transaction have been duly authorized, if applicable, (iii) the documents to be entered into by the Eligible Tag Participant have been duly executed by the Eligible Tag Participant and delivered to the acquirer and are enforceable against the Eligible Tag Participant in accordance with their respective terms; and (iv) neither the execution and delivery of documents to be entered into in connection with the transaction, nor the performance of the Eligible Tag Participant's obligations thereunder, will cause a breach or violation of the terms of any agreement, law or judgment, order or decree of any court or governmental agency;

(ii)     the Eligible Tag Participant shall not be liable for the inaccuracy of any representation or warranty made by any other Person in connection with the transaction, other than the Partnership and its Subsidiaries (except to the extent that funds may be paid out of an escrow established to cover breach of representations, warranties and covenants of the Partnership and its Subsidiaries as well as breach by any Partner of any of identical representations, warranties and covenants provided by all Partners);

(iii)     the liability for indemnification, if any, of such Eligible Tag Participant in the transaction and for the inaccuracy of any representations and warranties made by the Partnership or its Subsidiaries or the Partners in connection with such transaction, is several and not joint with any other Person (except to the extent that funds may be paid out of an escrow established to cover breach of representations, warranties and covenants of the Partnership and its Subsidiaries as well as breach by any Partner of any of identical representations, warranties and covenants provided by all Partners), and the impact is allocable in a manner such that after giving effect to such indemnity payments, the proceeds are distributable in a manner consistent with the distribution provisions set forth in Section 8.1(c); and

(iv)     such Eligible Tag Participant is not required (without its written consent, which may not be a condition to participation in such transaction) to agree to any additional or extended non-compete or similar restrictive covenants; provided, that such transaction shall not be required to terminate or otherwise modify any such covenant then existing and binding upon such

Eligible Tag Participant, which covenants shall continue to be valid and binding in accordance with, and subject to, their respective terms and conditions.

(c)     Within ten (10) days after the delivery of the Sale Notice, the Partnership shall have the right, but not the obligation, to elect to purchase all, but not less than all, of the Purchased Partnership Interests on the terms and conditions set forth in the Sale Notice (with any non-cash consideration being payable in cash, valued at its fair market value, as determined in good faith by the Advisory Committee), including by via a transaction consistent with the structure described in described in Section 4.6 of Exhibit B.

(d)     If the Partnership does not intend to exercise its right of first refusal pursuant to Section 9.6(c), the Partnership must deliver a notice (the "**ROFR Notice**") to the Selling Partners and to each other Partner which owns Units of the Applicable Class  (the "**ROFR Parties**") to that effect no later than fifteen (15) days after the Selling Partner delivers the Sale Notice.

(i)     Within fifteen (15) days after the delivery of the ROFR Notice, each ROFR Party may elect to purchase any or all of the Purchased Partnership Interests (including by over-subscription) on the terms and conditions set forth in the Sale Notice (with any non-cash consideration being payable in cash, valued at its fair market value, as determined in good faith by the Advisory Committee), by delivery of written notice to the Partnership and the Selling Partners.

(ii)     Following the expiration of the fifteen (15) day period specified in Section 9.6(d)(i), the Partnership shall send a notice to all Partners indicating (i) if the ROFR Parties have elected to purchase all of the Purchased Partnership Interests and (ii) if so, how the right to purchase such Purchased Partnership Interests have been allocated among the ROFR Parties.

(iii)     In the event that that the ROFR Parties collectively elect to purchase more than the aggregate number of Purchased Partnership Interests, the right to purchase such Purchased Partnership Interests shall be allocated among the exercising ROFR Parties pro rata in accordance with the number of Partnership Interests (on an as exchanged to Units basis) owned by each of them, or in such other manner as they shall mutually agree in writing.

(iv)     In the event that the ROFR Parties collectively elect to purchase less than all of the Purchased Partnership Interests, then the elections shall be invalid, and the Eligible Tag Participants shall have the rights set forth in Section 9.6(f).

(e)     The closing of the purchase of Purchased Partnership Interests by the Partnership pursuant to Section 9.6(c) or the exercising ROFR Parties pursuant to Section 9.6(d) shall take place, and all payments from the Partnership or the exercising ROFR Parties shall have been delivered to the Selling Partner, by the later of (i) the date specified in the Sale Notice; and (ii) forty-five (45) days after delivery of the Sale Notice.

(f)     If pursuant to Section 9.6(d)(ii) the Partnership shall deliver a notice that neither it nor the ROFR Parties have exercised the right of first refusal rights pursuant to this Section 9.6 with respect to all of the Purchased Partnership Interest, such notice (the "**Tag Notice**") shall also include instruction on how each Eligible Tag Participant shall exercise its rights pursuant to this Section 9.6(f).  Within ten (10) days after delivery of the Tag Notice each such Eligible Tag Participant shall have the option to sell a proportionate amount of Partnership Interests of the

Applicable Class to the Buyer, simultaneously with and conditioned upon the closing of the proposed sale by the Selling Partners with any consideration payable pursuant to the Purchase Agreement with respect to an Applicable Class to be allocated in an equal amount per Unit of the Applicable Class sold pursuant to the Purchase Agreement.  Each Eligible Tag Participant exercising such option shall, subject to, Section 9.6(b), be deemed a party to the Purchase Agreement, and be bound by all the terms and conditions thereof on a pro rata basis, including any costs of such transaction, indemnification or escrow requirements contained therein. Each Eligible Tag Participant who does not timely elect to include Partnership Interests in the proposed sale shall be deemed to have waived all rights with respect to such sale.

(g)    If, either (x) at the end of the ninetieth (90th) day following delivery of the Sale Notice the Selling Partner has not completed the proposed sale or (y) if following the delivery of the Sale Notice the terms and conditions of the Purchase Agreement shall materially change, each other Partner shall be released from its obligations with respect to the proposed sale or related right of first refusal, the Sale Notice shall become null and void, and it shall be necessary for a separate Sale Notice to be furnished, and the terms and provisions of this Section 9.6 separately complied with, in order to consummate a Sale Event.

9.7    **Drag-Along Rights**.

(a)    If (x) holders of a greater than fifty percent (50%) of the Class A Percentage Interest (collectively, the "**Drag-Along Selling Partners**") or (y) the Advisory Committee recommend or approve a Sale Event to a party or parties other than any of the Drag-Along Selling Partners or any of their respective Affiliates, the Drag-Along Selling Partners may, by delivery of written notice thereof to the other Partners (a "**Drag Sale Notice**"), require all the other Partners (the "**Dragged Partners**") to sell their Drag Along Portion of Partnership Interests on the same terms and conditions as provided in the Drag Sale Notice and the definitive purchase agreement (the "**Drag Sale Purchase Agreement**") with respect to such Sale Event (a "**Drag-Along Sale**"), or to consent to, cooperate in, and not object to, such Drag-Along Sale (in each case except as otherwise set forth in this Section 9.7); provided, however, in no event shall a Drag-Along Sale be initiated if the proceeds from such Drag-Along sale are not sufficient for the payment in full of the Class C Liquidation Preference and the Drag Sale Purchase Agreement states that the Class C Liquidation Preference shall be paid in full.  In the event of such a Drag-Along Sale, except as otherwise set forth in this Section 9.7, each Dragged Partner shall take such action(s) as the Drag-Along Selling Partners shall reasonably deem necessary and appropriate to consummate the Drag-Along Sale, including consenting to, cooperating in and not objecting to a Drag-Along Sale, and the transfer of such Dragged Partner's Drag Along Portion (including executing the Drag Sale Purchase Agreement which may include representations and warranties (i) concerning such Partner's ownership of the Partnership Interests being sold, (ii) that the Partnership Interests are free and clear of all liens and other encumbrances, and (iii) that the Partner has the power and authority to consummate such transaction) and shall consent to such transfer; provided that any additional commercially reasonable representations, warranties or provisions shall require the consent of the Partner (which consent shall not be unreasonably withheld).  Upon the request of the Drag-Along Selling Partners, the General Partner shall cause the Partnership to engage such professionals selected by the Drag-Along Selling Partners to assist in a Drag-Along Sale.

(b)    Upon the request of any Dragged Partner, the Drag-Along Selling Partners shall promptly notify all of the Dragged Partners of the Drag-Along Selling Partners' intent to invoke the Drag-Along Sale rights of this <u>Section 9.7</u>, or whether such rights will irrevocably not be exercised, in which case of nonexercise, but not before receipt of such notice of intent, the Dragged Partners shall be entitled to exercise their tag-along rights pursuant to <u>Section 9.6</u>.  In the event of a transfer pursuant to this <u>Section 9.7</u>, unless all of the Partners otherwise agree, the proceeds of such sales transaction shall be allocated among and distributed to the Partners in accordance with their respective Partnership Interests and the distribution provisions contained in <u>Section 8.1(c)</u>.

(c)    Each Dragged Partner in any Drag-Along Sale shall, to the extent applicable to the Drag-Along Selling Partners, (i) bear its pro rata share of any costs and expenses of the Drag-Along Sale; (ii) participate in any escrow or indemnification obligations with respect to Drag-Along Sale on a pro rata several and not joint basis, and (iii) reasonably cooperate with all requests or covenants of the purchaser contained in such Drag-Along Sale. In the event that any Partner entitled to vote on or provide its written consent with respect to a matter shall fail at any time to vote or act by written consent with respect to any Partnership Interests held of record or beneficially owned by such Partner (or as to which such Partner otherwise has voting control), as agreed by such Partner in this Agreement, such Partner hereby irrevocably grants to and appoints the Drag-Along Selling Partner's such Partner's proxy and attorney-in-fact (with full power of substitution), for and in the name, place and stead of such Partner, to vote or act by written consent with respect to such Partnership Interests and to grant a consent, proxy or approval in respect of such Partnership Interests, in each case in such manner and to the extent as is necessary or desirable to vote such Partnership Interests as agreed to by such Partner in this Agreement.

(d)    Notwithstanding the foregoing, in no event shall any Dragged Partner be required to enter into any agreement in connection with a Drag-Along Sale unless:

(i)    any representations and warranties to be made by such Partner are limited to representations and warranties related to authority, ownership and the ability to convey title to such Partnership Interests, including, but not limited to, representations and warranties that (i) the Partner holds all right, title and interest in and to the Partnership Interests such Partner purports to hold, free and clear of all liens and encumbrances, (ii) the obligations of such Partner in connection with the transaction have been duly authorized, if applicable, (iii) the documents to be entered into by such Partner have been duly executed by such Partner and delivered to the acquirer and are enforceable against such Partner in accordance with their respective terms; and (iv) neither the execution and delivery of documents to be entered into in connection with the transaction, nor the performance of such Partner's obligations thereunder, will cause a breach or violation of the terms of any agreement, law or judgment, order or decree of any court or governmental agency;

(ii)    such Partner shall not be liable for the inaccuracy of any representation or warranty made by any other Person in connection with the transaction (except to the extent that funds may be paid out of an escrow established to cover breach of representations; warranties and covenants of the Partnership or its Subsidiaries as well as breach by any Partners of any of identical representations, warranties and covenants provided by all Partners);

(iii)    the liability for indemnification, if any, of such Partner in the transaction and for the inaccuracy of any representations and warranties made by the Partnership, its

44

Subsidiaries or the Partners in connection with such transaction, is several and not joint with any other Person (except to the extent that funds may be paid out of an escrow established to cover breach of representations, warranties and covenants of the Partnership or its Subsidiaries as well as breach by any stockholder of any of identical representations, warranties and covenants provided by all Partners), and the impact is allocable in a manner such that after giving effect to such indemnity payments, the proceeds are distributable in a manner consistent with the distribution provisions set forth in Section 8.1(c);

(iv)    such Partner is not required (without its written consent, which may not be a condition to participation in such transaction) to agree to any additional or extended non-compete, non-solicit or similar restrictive covenants; provided, that such transaction shall not be required to terminate or otherwise modify any such covenant then existing and binding upon such Partner, which covenants shall continue to be valid and binding in accordance with, and subject to, their respective terms and conditions.

9.8    **Redemption Rights.**

(a)    Except as otherwise provided in any award agreement, at any time from and after the Cessation Date of any Employee Owner, the Partnership shall have the right to redeem from such Employee Owner and its Affiliates (the "**Partnership Call**") all, but not less than all, of the Partnership Interests owned by such Employee Owner and its Affiliates (excluding any unvested Class B Limited Partnership Interests and any other Partnership Interests then subject to forfeiture pursuant to any award agreement, in each case which shall be forfeited for no consideration) (the "**Subject Interests**").  The purchase price pursuant to a Partnership Call will equal the FMV with respect to the Subject Interests.  The structure of the Partnership Call shall be consistent with the structure described in Section 4.6 of Exhibit B except to the extent that the Advisory Committee with Minority Approval concludes that effectuating the Partnership Call in such manner would materially and adversely affect the rights of the Class A Members.  Notwithstanding anything to the contrary set forth herein, the Partnership Call shall only apply with respect to Partnership Interests held by Foreman and his Affiliates if his employment with the Partnership or its Subsidiaries is terminated for Cause.

(b)    In order to exercise the Partnership Call, the Partnership shall deliver to the Partners who own the Subject Interest to be redeemed written notice specifying (i) the Subject Interests to be repurchased, (ii) the FMV with respect to such Subject Interests, including a detailed calculation thereof and (iii) the date on which the redemption of such Subject Interests shall be consummated, which in no event shall be more than sixty (60) days from the date of the delivery of such notice.

(c)    If an Employee Owner disagrees with the calculation of FMV determined by the Partnership as set forth in the applicable notice delivered by the Partnership pursuant to Section 9.8(b), it shall deliver written notice to the Partnership not more than fifteen (15) business days after the delivery of the applicable notice by the Partnership.  If such Employee Owner fails to timely deliver such a notice, the FMV set forth in the notice delivered by the Partnership shall be binding and definitive and not subject to further dispute or challenge.  If such Employee Owner timely delivers such a notice, then the FMV shall be determined by a nationally-recognized firm of independent chartered accountants designated by the Advisory Committee by Minority Approval (and if the Advisory Committee is unable to reach agreement, then the accounting firm

shall be selected by the Partnership's regularly engaged audit firm) and any such determination of the FMV shall be definitive and binding, and not subject to further dispute or challenge.

(d)    The closing with respect to any redemption pursuant to this Section 9.8 (the "**Redemption Closing**") shall take place at the time, date and place specified in the notice delivered by the Partnership pursuant to Section 9.8(b), as applicable; provided, that in the event that the FMV has not been definitively determined as of such date, then the Redemption Closing shall occur ten (10) days after the definitive determination of the FMV.

(e)    The purchase price of the Subject Interests shall be payable in cash of not less than 50% of the purchase price, with the remainder payable in a note with a maturity of not more than five years, with equal annual installments and bearing interest at an annually compounding per annum rate equal to the greater of (x) 7% per annum or (y) the applicable federal rate pursuant to Section 1274 of the Code as of the Redemption Closing.

(f)    Notwithstanding anything herein to the foregoing, the Partnership shall not exercise the Partnership Call if the exercise thereof would constitute a default, breach or violation (with or without the passage of time or the delivery of notice) pursuant to the Act, or any loan, credit or similar agreement to which the Partnership or any of its Subsidiaries is a party, and the Partnership may defer the exercise of the Partnership Call set forth in this Section 9.8 until such transaction may be consummated without causing such a default, breach or violation, with interest accruing upon the amount payable in respect of such Partnership Call, at the prime rate offered or determined by the Partnership's principal lending institution as in effect from time to time, to the extent such repurchase is deferred from the date it was otherwise initially due hereunder.

9.9    **Class** C **Put and Call Rights**.

(a)    At any time from and after the Class C Redemption Date the holders of a majority of the Class C Units then outstanding shall have the right to cause the Partnership to redeem 100% (but not less than 100%) of the then outstanding Class C Units (the "**Class C Unit Put Right**") pursuant to the terms of this Section 9.9. The exercise of the Class C Unit Put Right shall be made by the delivery of not less than sixty (60) days' prior written notice from the holders of a majority of the then outstanding Class C Units to the General Partner of their exercise of the Class C Unit Put Right (as applicable, the "**Class C Unit Put Notice**"). The exercise of the Class C Unit Put Right shall be effected using a structure consistent that described in Section 4.6 of Exhibit B except to the extent that the Advisory Committee with Minority Approval concludes that effectuating the Partnership Call in such manner would materially and adversely affect the rights of the Class A Members.

(b)    At any time upon the approval of the Advisory Committee, the Partnership shall have the right to redeem 100% (but not less than 100%) of the then outstanding Class C Units (the "**Class C Unit Call Right**"). The exercise of the Class C Unit Call Right shall be made by the delivery of not less than thirty (30) days' prior written notice from the General Partner to the Class C Members of the exercise of the Class C Unit Call Right (the "**Class C Unit Call Notice**"). The exercise of the Class C Unit Call Right shall be effected using a structure consistent that described in Section 4.6 of Exhibit B except to the extent that the Advisory Committee with Minority

Approval concludes that effectuating the Partnership Call in such manner would materially and adversely affect the rights of the Class A Members.

(c)     The consideration paid by the Partnership in respect of any Units redeemed pursuant to the exercise of the Class C Unit Put Right or the Class C Unit Call Right shall equal the Class C Liquidation Preference, which amount shall be paid by the Partnership entirely in cash by wire transfer in immediately available funds within thirty (30) days following the date of the Class C Unit Put Notice. Any payments hereunder that are not timely made, shall be automatically converted into and shall be payable via the Partnership's note with a maturity of not more than sixty months, with equal quarterly installments and bearing interest at an annually compounding per annum rate equal to 15% per annum with such interest rate increasing by 1% for each month the note remains outstanding until the rate equals 18% per annum, which shall be the maximum interest rate applicable to such note.

(d)     If required by the General Partner, each Partner redeeming Class C Units shall execute all documents reasonably required to effectuate the redemption of such Class C Units as described in this <u>Section 9.9</u> containing customary representations and warranties and indemnification rights in respect of such Class C Unit redemption, including representations and warranties with respect to title to such Units, due authorization, legal authority and capacity, non-contravention, required consents and no brokers (but excluding, for the avoidance of doubt, any non-solicit, non-compete or similar restrictive covenants).

(e)     Notwithstanding anything herein to the foregoing:

(i)     the Partnership shall not exercise the Class C Unit Call Right if the exercise thereof (including without limitation any distribution or dividend directly or indirectly to be made to the Partnership by any of its Subsidiaries to fund any such payment) would cause a default, breach or violation (with or without the passage of time or the delivery of notice) pursuant to any loan, credit or similar agreement to which the Partnership or any of its Subsidiaries is a party would prohibit the payment of redemption price; and

(ii)     in the event that the exercise of the Class C Unit Put Right and the Partnership's performance of its obligation with respect thereto (including without limitation any distribution or dividend directly or indirectly to be made to the Partnership by any of its Subsidiaries to fund any such payment) would cause a default, breach or violation (with or without the passage of time or the delivery of notice) pursuant to any loan, credit or similar agreement to which the Partnership or any of its Subsidiaries is a party (including in connection with any distribution or dividend that would be required to be made by any Subsidiary of the Partnership to the Partnership to fund the Partnership's obligations with respect to such Class C Unit Put Right) the Partnership may defer compliance with the terms of its obligations with respect to the Class C Unit Put Right until such transaction may be consummated without causing such a default, breach or violation.

9.10     **Additional Limitations**.  Notwithstanding anything contained in this Agreement, no Transfer shall be made, and the General Partner or the Partners shall have the right to prohibit and may refuse to accept any Transfer if: (a) registration is required under the Securities Act in respect of such Transfer; (b) such Transfer violates any applicable federal or state Securities Laws or other

47

Laws; (c) such Transfer is subject to, or such Transfer, when aggregated with prior Transfers in accordance with applicable Law will result in the imposition of, any state, city or local transfer taxes, including any transfer gains taxes, unless such assignor pays such taxes; and (d) such Transfer will cause the Partnership to be treated as a "publicly-traded partnership" within the meaning of Section 7704 of the Code.  The non-transferring Partners may elect prior to any Transfer to require an opinion of counsel with respect to any of the foregoing matters.

# ARTICLE 10
## DISSOLUTION OF THE PARTNERSHIP;
## WINDING UP AND DISTRIBUTION OF ASSETS

10.1    **Dissolution**.

(a)    The Partnership shall be dissolved and its affairs shall be wound up upon the first to occur of the following:

(i)    a sale or disposition of all or substantially all of the assets of the Partnership;

(ii)    any event which makes it unlawful for the Partnership's business to be continued;

(iii)    the issuance of a decree by any court of competent jurisdiction that the Partnership be dissolved;

(iv)    at any time there is no general partner of the Partnership; provided, however,  the death, withdrawal, Bankruptcy or dissolution of a General Partner or the occurrence of any other event that terminates the continued Partnership of a General Partner will not cause the Partnership to be dissolved or its affairs to be wound up, if (x) within 75 days following the occurrence of such event Partners owning more than fifty percent (50%) of the Class A Percentage Interests  agree in writing to continue the business of the Partnership and to appoint one or more additional General Partners, or (y) in the event that no such additional General Partner is appointed pursuant to clause (x), within 30 days following the end of the 75 day period described in clause (x), Partners owning more than fifty percent (50%) of the Class A Percentage Interests agree in writing to continue the business of the Partnership and to appoint one or more additional General Partners;

(v)    the entry of decree of judicial dissolution under Section 18-802 of the Act; or

(vi)    the determination of the Advisory Committee subject to Minority Approval.

(b)    Except as provided in this Agreement, no Partner shall have the right to (i) withdraw or resign as a Partner of the Partnership, or (ii) dissolve itself voluntarily.

10.2    **Winding Up**.

(a)    In the event of the dissolution of the Partnership pursuant to <u>Section 10.1(a)</u>, the General Partner shall wind up the Partnership's affairs.

(b)    Upon dissolution of the Partnership and until the filing of a certificate of cancellation as provided in the Act and subject to Section 17-804 of the Act, the General Partner or a liquidating trustee appointed by the General Partner, as the case may be, shall, in the name of, and for and on behalf of the Partnership, prosecute and defend suits, whether civil, criminal or administrative, gradually settle and close the Partnership's business, dispose of and convey the Partnership's property, discharge or make reasonable provision for the Partnership's liabilities, and distribute to the Partners in accordance with Section 10.3 any remaining assets of the Partnership.

(c)    Upon the completion of winding up of the Partnership, the General Partner or liquidating trustee, as the case may be, shall file a certificate of cancellation in the Office of the Secretary of State of Delaware as provided in the Act.

10.3    **Distribution of Assets**.    Upon the winding up of the Partnership, the assets shall be distributed as follows, and in each case subject to Section 17-804 of the Act: to the payment of debts and liabilities of the Partnership, including debts and liabilities owed to Partners (other than liabilities for distributions to Partners and former Partners) to the extent permitted by applicable Law, in order of priority as provided by applicable Law; to the setting up of any reserves that the Partners or the liquidating trustee, as the case may be, shall determine are reasonably necessary for the payment of any contingent or unforeseen liabilities or obligations of the Partnership; and to the Partners in accordance with the provisions of Section 8.1(c).

# ARTICLE 11
# AMENDMENTS

11.1    **Amendments**.    Except as provided pursuant to Section 6.4, this Agreement may not be amended, modified, supplemented or any provision hereof waived without the consent of the General Partner, the Advisory Committee and Class A Limited Partners owning greater than fifty percent (50%) of the Class A Percentage Interests, subject at all times to any approvals that may be also required pursuant to Section 3.2.  No amendment, modification, supplement, discharge or waiver hereof or hereunder shall require the consent of any Person not a party to this Agreement. Any amendment which materially changes the rights of any of the Class A-1 Limited Partners or Class A-2 Limited Partners in a manner which is adverse and disproportionate to the rights of the other series Class A Limited Partners shall require the approval of the Limited Partners owning a majority of the series of Class A Limited Partnership Interests (by Units) that is so adversely and disproportionately impacted.

11.2    **Additional Partners**.    If this Agreement shall be amended as a result of adding or substituting a Partner in accordance with the terms hereof, the amendment to this Agreement shall be signed by the General Partner and by the Person to be added or substituted.  In making any amendments, the General Partner shall prepare and file for recordation such documents and certificates as shall be required to be prepared and filed.  To avoid confusion, the addition of a new Partner requires the consent of the General Partner, in its sole and absolute discretion.

96267650.18

# ARTICLE 12
# MISCELLANEOUS[6]

12.1    **Further Assurances**.  Each party to this Agreement agrees to execute, acknowledge, deliver, file and record such further certificates, amendments, instruments and documents, and to do all such other acts and things, as may be required by Law or as, in the reasonable judgment of any Partner, may be necessary or advisable to carry out the intent and purpose of this Agreement.

12.2    **Notices**.  Unless otherwise specified in this Agreement, all notices, demands, elections, requests or other communications that any party to this Agreement may desire or be required to give hereunder shall be in writing and shall be given by hand, by depositing the same in the United States mail, first class postage prepaid, certified mail, return receipt requested, or by a recognized overnight courier service providing confirmation of delivery, or by e-mail (with confirmation of receipt) to the addresses set forth in **Exhibit A**, as applicable, or at such other address as may be designated by the addressee thereof upon written notice to all of the Partners.  All notices given pursuant to this Section 12.2 shall be deemed to have been given (i) if delivered by hand on the date of delivery or on the date delivery was refused by the addressee, (ii) if delivered by United States mail or by overnight courier, on the date of delivery as established by the return receipt or courier service confirmation (or the date on which the return receipt or courier service confirms that acceptance of delivery was refused by the addressee), or (iii)  if transmitted by e-mail, upon confirmation of receipt if sent during normal business hours on a Business Day, otherwise on the next Business Day.

12.3    **Headings and Captions**.  All headings and captions contained in this Agreement and the table of contents hereto are inserted for convenience only and shall not be deemed a part of this Agreement.

12.4    **Variance of Pronouns**.  All pronouns and all variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the person or entity may require.

12.5    **Counterparts**.  This Agreement may be executed in two or more counterparts, each of which shall constitute an original and all of which, when taken together, shall constitute one Agreement.  This Agreement may be executed by pdf, docusign or other facsimile or electronic signature and any such signature shall be deemed an original for all purposes.

12.6    **Governing Law**.   THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO CONFLICT OF LAW PROVISIONS THEREOF.

12.7    **Partition**.  The Partners hereby agree that no Partner nor any successor-in-interest to any Partner shall have the right to have the property of the Partnership partitioned, or to file a complaint or institute any proceeding at law or in equity to have the property of the Partnership partitioned,

---

[6] NTD:  Parties to agree on insertion of Corporate Transparency Act compliance provisions.

96267650.18

and each Partner, on behalf of himself, his successors, representatives, heirs and assigns, hereby waives any such right.

12.8    **Invalidity**.  Every provision of this Agreement is intended to be severable.  The invalidity and unenforceability of any particular provision of this Agreement in any jurisdiction shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

12.9    **Successors and Assigns**.  This Agreement shall be binding upon the parties hereto and their respective successors, executors, administrators, legal representatives, heirs and legal assigns, and shall inure to the benefit of the parties hereto and, except as otherwise provided herein, their respective successors, executors, administrators, legal representatives, heirs and legal assigns.  No Person other than the parties hereto and their respective successors, executors, administrators, legal representatives, heirs and permitted assigns shall have any rights or claims under this Agreement.

12.10    **Entire Agreement**.  This Agreement supersedes all prior agreements among the parties with respect to the subject matter hereof and contains the entire agreement among the parties with respect to such subject matter.

12.11    **Waivers**.  No waiver of any provision hereof by any party hereto shall be deemed a waiver by any other party nor shall any such waiver by any party be deemed a continuing waiver of any matter by such party.

12.12    **Acknowledgement by Partners**.  Each Partner acknowledges the following: (A) it is familiar with the business proposed to be conducted by the Partnership; (B) it has been advised that its Partnership Interest may not be sold, transferred, or otherwise disposed of except as provided herein; (C) it understands that the securities being purchased hereby have not been registered under the Securities Act, or any state Securities Laws, in reliance on an exemption for private offerings and, therefore, the securities cannot be resold unless they are registered under the Securities Act and applicable state Securities Laws or unless an exemption from such registration is available; (D) it is a "sophisticated investor" with substantial prior experience in high-risk business investments and is aware of and familiar with the risks associated with a private limited partnership and would qualify as an "accredited investor" as such is defined in Rule 501 of Regulation D, as enacted pursuant to Sections 3(b) and 4(2) of the Securities Act; (E) it is acquiring its Partnership Interest for its own account, for investment only and with no present intention of distributing, reselling, pledging, or otherwise disposing of its interest; and (F) that it is familiar with the type of investment which its Partnership Interest in the Partnership constitutes and has reviewed the purchase of the Partnership Interest with its tax and independent legal counsel and investment representatives to the extent it deems necessary.

12.13    **No Third Party Beneficiaries**.  Except as set forth in Section 4.1, Section 4.2 and Section 12.17, this Agreement is not intended and shall not be construed as granting any rights, benefits or privileges to any Person not a party to this Agreement.  Without limiting the generality of the foregoing, no creditor of the Partnership, or of any Partner shall have any right whatsoever to require any Partner to contribute capital to the Partnership.

12.14    **Construction of Documents**.  The parties hereto acknowledge that they were represented by their own counsel, who participated in the review, negotiation and drafting of this Agreement and that this Agreement shall not be subject to the principle of construing its meaning against the party that drafted same.

12.15    **Time of Essence**.  Time is of the essence in the performance of each and every term of this Agreement.

12.16    **Partnership for Tax Purposes**.  The Partners hereby agree that the Partnership shall be treated as a partnership for tax purposes under federal, state and local income tax Laws.  In furtherance of the foregoing agreement, neither the Partnership nor any of its Partners will take any action or position or make any election for federal, state or local income tax purposes, in a tax return or otherwise, inconsistent with the classification of the Partnership as a partnership for federal, state and local income tax purposes, including, for the avoidance of doubt, any election under Section 301.7701-3 to treat the Partnership as a corporation for federal income tax purposes.

12.17    **Attorney Advice**.  Except as otherwise agreed to in writing by all relevant parties, each Partner acknowledges and agrees (a) that it understands that the law firm that drafted this Agreement, Polsinelli PC represents certain of the Subsidiaries of the Partnership in the transactions contemplated by this Agreement and in other matters; (b) that it has had an opportunity to obtain the advice of its own counsel prior to entering into this Agreement, and (c) that no attorney client relationship exists between Polsinelli PC and any Partner except as otherwise agreed to in writing by all relevant parties.  No law firm, accountant or other professional who provides services to the Partnership, the General Partner, any Partner or their respective Affiliates shall be disqualified from acting in such capacity because such Person also provides other services to the Partnership or any of its Subsidiaries, one or more of the Partners in any other transaction at any time and all conflicts of interest in connection with such law firm representations are hereby waived by each Partner.  Polsinelli PC is acknowledged and agreed to be an express third party beneficiary of this <u>Section 12.17</u>.

12.18    **Good Faith and Fair Dealing; Fiduciary Duty**.  The Advisory Committee and the Partners shall conduct the business and affairs of the Partnership in accordance with this Agreement and the implied contractual obligation of good faith and fair dealing.  Notwithstanding the foregoing, to the fullest extent permitted by law, including Section 17-1101(d) of the Act, and notwithstanding any other provision of this Agreement or in any agreement contemplated herein or applicable provisions of law or equity or otherwise, the parties hereto hereby agree that neither the Partners nor the Representatives shall owe any fiduciary duty to any Partner or the Partnership.

12.19    **Corporate Opportunities**.  Other than the Employee Owners, each Partner acknowledges that (i) the other Partners and its Affiliates own and/or manage other businesses, including businesses that may compete with the Partnership and the other Partners and (ii)  each Partner and its Affiliates, and their respective officers, directors, shareholders, partners, members, agents and employees (collectively, a "**Corporate Opportunities Group**") shall not in any way be prohibited or restricted from engaging or investing in, independently or with others, any business opportunity of any type or description, including those business opportunities that might be the same or similar to those in which the Partnership engages and no Partner or its Corporate Opportunities Group shall be obligated to present any business opportunity to the Partnership or any other Partner or

such other Partners' Corporate Opportunities Group, even if the opportunity is of the character that, if presented to the Partnership, could be taken by the Partnership, or if presented to any other Partners or other Partners' Corporate Opportunities Group, could be taken by such Persons.

12.20 **Jurisdiction and Waiver of Jury Trial**. Each party hereto hereby irrevocably agrees that any Legal Dispute shall be brought only to the exclusive jurisdiction and venue of the appropriate federal or state courts in the State of Delaware, and each party hereto hereby consents to the exclusive jurisdiction and venue of such courts (and of the appropriate appellate courts therefrom) in any such Legal Dispute and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such Legal Dispute in any such courts or that any such Legal Dispute that is brought in any such court has been brought in an inconvenient forum. During the period in which a Legal Dispute filed in accordance with this Section 12.20 is pending before any court in the State of Delaware, all Legal Disputes, including any counterclaim, cross-claim or interpleader, shall be subject to the exclusive jurisdiction of such court. Each party hereto hereby waives, and shall not assert as a defense in any Legal Dispute, that (a) such party is not subject thereto, (b) Legal Disputes may not be brought or is not maintainable in such courts in the State of Delaware, (c) such party's property is exempt or immune from execution, (d) any Legal Dispute is brought in an inconvenient forum, or (e) the venue of Legal Dispute is improper. A final judgment in any Legal Dispute described in this Section 12.19 following the expiration of any period permitted for appeal and subject to any stay during appeal shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Applicable Laws.

12.21 **Fees and Costs**. Each party shall bear its own fees and costs of its attorneys, accountants and experts with respect to any Legal Dispute under Section 12.20. This provision is separate and several and shall survive the termination of this Agreement or the merger of this Agreement or any such other document into any judgment on this Agreement or such document.

12.22 **Partnership Deemed a Party to this Agreement**. All Partners hereby intend and agree that the Partnership shall be deemed to be a party to this Agreement and bound by the terms hereof.

12.23 **Partial Invalidity**. The Partners intend and believe that each provision in this Agreement comports with all applicable local, state and federal Laws and judicial decisions. However, if any provision or provisions in this Agreement is found by a court of law to be in violation of any applicable Law, administrative or judicial decision, or public policy, and if such court should declare such portion, provision or provisions of this Agreement to be illegal, invalid, unlawful, void or unenforceable as written, then it is the intent of the Partners that such portion or provisions shall be given force to the fullest possible extent that they are legal, valid and enforceable, that the remainder of this Agreement shall be construed as if such illegal, invalid, unlawful, void or unenforceable portion or provisions were not contained therein, and that the rights, obligations and interest of the Partners under the remainder of this Agreement shall continue in full force and effect.

[SIGNATURES PAGE FOLLOWS]

96267650.18

IN WITNESS WHEREOF, this Agreement is executed as of the date set out above.

**BF GP, INC.**, as General Partner


By:      _____
Name: _____
Title:   _____

IN WITNESS WHEREOF, this Agreement is executed as of the date set out above.

_____
Jay Foreman

*Signature Page to Fourth Amended and Restated Agreement of Limited Partnership of Basic Fun, L.P.*

96267650.18
96267650.18
96267650.18

Docusign Envelope ID: 6D7103CD-9A05-4265-BF48-D843251E32F3

IN WITNESS WHEREOF, this Agreement is executed as of the date set out above.

_____

John MacDonald

IN WITNESS WHEREOF, this Agreement is executed as of the date set out above.

**FALCON STRUCTURED EQUITY PARTNERS, LP**

By: Falcon Structured Equity Investments, LP, its General Partner

By: Falcon Structured Equity Investments GP, LLC, its General Partner

By: _____
Name: _____
Title:   Director

*Signature Page to Fourth Amended and Restated Agreement of Limited Partnership of Basic Fun, L.P.*

96267650.18
96267650.18
96267650.18

**Schedule 3**

**<u>Senior Credit Documents</u>**

1.   [_____]

## EXHIBIT A

### List of Partners

| Name and Address | Class | Number of Units |
|---|---|---|
| **LIMITED PARTNERS:** | | |
| Falcon Structured Equity Partners, LP c/o Falcon Investment Advisors, LLC 21 Custom House Street Boston, Massachusetts 02110 Attention: Matthew White Email: mwhite@falconinvestments.com | A-1 Limited Partnership | 325,000 |
| | C Limited Partnership | 250,000 |
| Jay Foreman 301 Yamato Rd. Suite 4200 Boca Raton, FL 33431 | A-2 Limited Partnership | 472,500 |
| | C Limited Partnership | 70,000 |
| John MacDonald 1337 Little Blue Heron Court Naples, FL 34108 | A-2 Limited Partnership | 202,500 |
| | C Limited Partnership | 30,000 |
| **GENERAL PARTNER:** | | |
| BF GP, Inc. 301 Yamato Rd. Suite 4200 Boca Raton, FL  33431 | General Partnership | 1 |

Exhibit A-1

# EXHIBIT B[7]

## Certain Tax and Accounting Matters

## ARTICLE I
## DEFINITIONS

Capitalized terms used in this **Exhibit B** have the meanings set forth below or in the Section of this Tax Exhibit referred to below, except as otherwise expressly indicated or limited by the context in which they appear in this Tax Exhibit.  All terms defined in this Article I in the singular have the same meanings when used in the plural and vice versa.  Accounting terms used but not otherwise defined shall have the meanings given to them under generally accepted accounting principles.  References to Sections and Articles refer to sections and articles of this Tax Exhibit, unless the context requires otherwise.  Capitalized terms that are not defined in this Tax Exhibit shall have the meaning ascribed to them in the Agreement to which this Tax Exhibit is attached (the "**Agreement**").

Section 1.1    "**Adjusted Capital Account Deficit**" means with respect to any Partner, the negative balance, if any, in such Partner's Capital Account as of the end of the relevant Fiscal Year, determined after giving effect to the following adjustments: (a) credit to such Capital Account any portion of such negative balance which such Partner (i) is treated as obligated to restore to the Partnership pursuant to the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(c), or (ii) is deemed to be obligated to restore to the Partnership pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and (b) debit to such Capital Account the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6).  This definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treasury Regulations Sections 1.704-1(b)(2)(ii)(d) and 1.704-2 and shall be interpreted consistently therewith.

Section 1.2    "**Book Gain**" or "**Book Loss**" means the gain or loss recognized by the Partnership for Code 704(b) book purposes in any Fiscal Year by reason of the sale or other disposition of any of the assets of the Partnership.  Such Book Gain or Book Loss shall be computed by reference to the Carrying Value of such property or assets as of the date of such sale or disposition (determined in accordance with Section 1.5), and each and every reference herein to "gain" or "loss" shall be deemed to refer to Book Gain or Book Loss, rather than to tax gain or tax loss, unless the context manifestly otherwise requires.

Section 1.3    "**CAI**" has the meaning ascribed thereto in Section 9.1.

Section 1.4    "**Capital Account**" has the meaning ascribed thereto in Section 2.1.  To the extent a Partner's Capital Account is greater than zero, such excess is hereinafter referred to as a "positive balance." To the extent that a Partner's Capital Account is less than zero, said amount is hereinafter referred to as a "**deficit balance**."

---

[7] Tax provisions in this Exhibit B and in the body of the Agreement are under review by tax specialists.

Exhibit B-1

Section 1.5    "**Capital Contribution**" means, with respect to any Partner, (i) the amount of money and (ii) the fair market value (as reasonably and jointly determined by the General Partner and the contributing Partner) of any property (net of related liabilities) other than money, contributed to the Partnership with respect to the interest in the Partnership held by such Partner.

Section 1.6    "**Carrying Value**" means (a) with respect to any property contributed to the Partnership by a Partner, the fair market value of such property (determined in accordance with Section 7701(g) of the Code), reduced (but not below zero) by all Depreciation with respect to such property charged to the Partners' Capital Accounts and (b) with respect to any other property of the Partnership, the adjusted basis of such property for federal income tax purposes, all as of the time of determination. The Carrying Value of any property shall be adjusted in accordance with Section 2.3 from time to time (including, without limitation, at such times provided in Section 2.3B) to reflect changes, additions or other adjustments to the Carrying Value for dispositions and acquisitions of Partnership property.

Section 1.7    "**Code**" means the Internal Revenue Code of 1986, as amended from time to time, and any subsequent federal Law of similar import, and, to the extent applicable, any Treasury Regulations promulgated thereunder.

Section 1.8    "**Depreciation**" means, for each Fiscal Year, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such year or other period for federal income tax purposes; provided, that if the Carrying Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of any such year or other period, Depreciation shall be an amount that bears the same relationship to the Carrying Value of such asset as the depreciation, amortization, or other cost recovery deduction computed for federal income tax purposes with respect to such asset for the applicable period bears to the adjusted tax basis of such asset at the beginning of such period, or if such asset has a zero adjusted tax basis, Depreciation shall be an amount determined under any reasonable method selected by the General Partner.

Section 1.9    "**ECI**" has the meaning ascribed thereto in Section 9.1.

Section 1.10    "**Economic Risk of Loss**" has the meaning given to such term in Treasury Regulations Section 1.752-2(a).

Section 1.11    "**Excess Deficit Capital Account Balance**" of any Partner means a deficit Capital Account balance at the end of any Fiscal Year that is in excess of the sum of (i) the amount such Partner is treated as obligated to restore to the Partnership pursuant to the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(c) and (ii) the amount of such Partner's share of Partnership Minimum Gain and any Partner Nonrecourse Debt Minimum Gain. The existence and amount of any Excess Deficit Capital Account Balance at the end of any year shall be determined before any other allocations provided for in Article III of this Tax Exhibit, for such year have been made.

Section 1.12    "**Losses**" has the meaning ascribed thereto in Section 2.2.

Exhibit B-2

Section 1.13    "**Nonrecourse Deductions**" has the meaning given to such term in Treasury Regulations Sections 1.704-2(b)(1) and 1.704-2(c).

Section 1.14    "**Partner Minimum Gain**" has the meaning given to such term in Treasury Regulations Section 1.704-2(d), and shall generally mean the amount by which the nonrecourse liabilities secured by any assets of the Partnership exceed the adjusted tax basis of such assets as of the date of determination.  A Partner's share of Partnership Minimum Gain (and any net decrease thereof) at any time shall be determined in accordance with Treasury Regulations Section 1.704-2(g).

Section 1.15    "**Partner Nonrecourse Debt**" has the meaning given to such term in Treasury Regulations Section 1.704-2(b)(4).

Section 1.16    "**Partner Nonrecourse Debt Minimum Gain**" has the meaning set given to such term in Treasury Regulations Section 1.704-2(i)(3).

Section 1.17    "**Partner Nonrecourse Deductions**" has the meaning given to such term in Treasury Regulations Section 1.704-2(i)(2) and the amount of Partner Nonrecourse Deductions with respect to a Partner Nonrecourse Debt for a Partnership taxable year shall be determined in accordance with the rules of Treasury Regulations Section 1.704-2(i)(2).

Section 1.18    "**Partnership Minimum Gain**" has the meaning given to such term in Treasury Regulations Section 1.704-2(b)(2) and the amount of Partnership Minimum Gain, as well as any net increase or decrease in the Partnership Minimum Gain for a Partnership taxable year, shall be determined in accordance with the rules of such Treasury Regulations.

Section 1.19    "**Partnership Nonrecourse Liability**" has the meaning given to such term in Treasury Regulations Section 1.704-2(b)(3).

Section 1.20    "**Profits**" has the meaning ascribed thereto in Section 2.2.

Section 1.21    "**UBTI**" has the meaning ascribed thereto in Section 9.1.

Section 1.22    "**Tax Exhibit**" shall refer to this Exhibit B to the Agreement.

Section 1.23    "**Treasury Regulations**" means the federal income tax regulations, including any temporary or proposed regulations, promulgated under the Code, as such Treasury Regulations.  may be amended from time to time (it being understood that all references herein to specific sections of the Treasury Regulations shall be deemed also to refer to any corresponding provisions of succeeding Treasury Regulations).

## ARTICLE II
## CAPITAL ACCOUNTS

Section 2.1    Capital Account.  A separate capital account (each a "**Capital Account**") shall be maintained for each Partner in accordance with the rules of Treasury Regulations Section 1.704-1(b)(2)(iv), and this Section 2.1 shall be interpreted and applied in a manner

consistent therewith. Whenever the Partnership would be permitted to adjust the Capital Accounts of the Partners pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(f) to reflect revaluations of Partnership property, the Partnership may so adjust the Capital Accounts of the Partners; <u>provided</u> that, in connection with the effectiveness of the Bankruptcy Plan as of the Effective Date and subject to <u>Section 3.2(a)(viii)</u> of the Agreement, the General Partner shall consult with the Falcon Partner with respect to whether the Capital Accounts of the Partners should be adjusted and shall consider any recommendations from the Falcon Partner in good faith. In the event that the Capital Accounts of the Partners are adjusted pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(f) to reflect revaluations of Partnership property, (i) the Capital Accounts of the Partners shall be adjusted in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g) for allocations of depreciation, depletion, amortization and gain or loss, as computed for book purposes, with respect to such property, (ii) the Partners' distributive shares of depreciation, depletion, amortization and gain or loss, as computed for tax purposes, with respect to such property shall be determined so as to take account of the variation between the adjusted tax basis and book value of such property in the same manner as under Code Section 704(c), and (iii) the amount of upward and/or downward adjustments to the book value of the Partnership property shall be treated as income, gain, deduction and/or loss for purposes of applying the allocation provisions of this Article II. In the event that Code Section 704(c) applies to Partnership property, the Capital Accounts of the Partners shall be adjusted in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g) for allocations of depreciation, depletion, amortization and gain and loss, as computed for book purposes, with respect to such property.

Section 2.2    <u>Profits and Losses</u>. "**Profits**" and "**Losses**" means, for purposes of computing the amount of Profits or Losses to be reflected in the Partners' Capital Accounts, for each Fiscal Year or other period for which allocations to Partners are made, an amount equal to the Partnership's taxable income or loss, respectively, as determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in computing such income or loss), but excluding in such calculation items specially allocated under Sections 3.3 and 3.6, of this Tax Exhibit computed with the following adjustments (to the extent not otherwise taken into account):

(1)    any income of the Partnership that is exempt from federal income tax shall be added to such taxable income or loss;

(2)    any expenditure of the Partnership described in Section 705(a)(2)(B) of the Code or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Profits or Losses shall be subtracted from such taxable income or loss;

(3)    in the event the Carrying Value of any Partnership asset is adjusted pursuant to this Tax Exhibit, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses, and shall be allocated in accordance with the provisions of <u>Section 3.1</u> of this Tax Exhibit;

Exhibit B-4

(4)    Book Gain or Book Loss from the sale or other disposition of any Partnership asset shall be taken into account in lieu of any tax gain or tax loss recognized by the Partnership by reason of such sale or other disposition;

(5)    in lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period, computed as provided in this Tax Exhibit; and

(6)    to the extent an adjustment to the adjusted tax basis of any Partnership asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Partner's interest in the Partnership, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the Partnership asset) or loss (if the adjustment decreases the basis of the Partnership asset) from the disposition of the Partnership asset and shall be taken into account for purposes of computing Profits or Losses.

If the Partnership's taxable income or loss for such Fiscal Year or other period, as adjusted in the manner provided above, is a positive amount, such amount shall be the Partnership's Profits for such Fiscal Year or other period; and if a negative amount, such amount shall be the Partnership's Losses for such Fiscal Year or other period.

Section 2.3    <u>Adjustments to Carrying Values</u>.

A.    Consistent with the provisions of Treasury Regulations Section 1.704-1(b)(2)(iv)(f), and as provided in Section 2.3B, the Carrying Value of each Partnership asset shall be adjusted upward or downward to reflect any Book Gain or Book Loss attributable to such Partnership asset, as of the times of the adjustments provided in Section 2.3B hereof, as if such Book Gain or Book Loss had been recognized on an actual sale of each such Partnership asset and allocated pursuant to Section 3.1 of this Tax Exhibit.

B.    Except as otherwise determined by the Advisory Committee, such adjustments shall be made as of any of the following times: (i) immediately prior to the acquisition of an additional interest in the Partnership by any new or existing Partner in exchange for more than a *de minimis* Capital Contribution; (ii) immediately prior to the distribution by the Partnership to a Partner of more than a *de minimis* amount of money or other property as consideration for an interest in the Partnership; (iii) in connection with the liquidation of the Partnership within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); (iv) the grant of an interest in the Partnership as consideration for the provision of services to or for the benefit of the Partnership by an existing Partner acting in a Partner capacity or in anticipation of being a Partner; and (v) under generally accepted industry accounting practices within the meaning of Treasury Regulations Section 1.704-1(b)(2)(iv)(f)(5).

C.    In accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(e), the Carrying Value of each Partnership asset distributed in kind shall be adjusted upward or downward to reflect

Exhibit B-5

any Book Gain or Book Loss attributable to such Partnership asset, as of the time such asset is distributed.

D.      The adjustment under this Section 2.3 (i) shall be based on a reasonable estimate of the fair market value of Partnership assets (taking Section 7701(g) of the Code into account) on the date of adjustment, as conclusively determined by the good faith action of the Advisory Committee, (ii) shall not require an appraisal and (iii) shall reflect the manner in which the unrealized income, gain, loss or deduction inherent in the assets (that have not previously been reflected in Capital Accounts) would be allocated among the Partners if there were a taxable disposition of the property for fair market value on that date.

Section 2.4      No Liability for Capital.  No Partner shall have any liability for the return of the Capital Contribution of any other Partner.  Further, except as provided in this Agreement, no Partner shall be entitled to demand or receive the return of his capital contributions, nor may any Partner require that a distribution be made to him in any form other than cash.  No Partner shall be personally liable for the return or repayment of all or any portion of the capital of any Partner or (except as otherwise provided herein) for the repayment of all or any portion of any loan made by any Partner to the Partnership; it being expressly understood that any such return of capital and/or repayment of any such loan (except as otherwise provided herein) shall be made solely from the assets of the Partnership.

Section 2.5      No Interest on Capital.  Except as specifically provided herein, no interest or additional share of Profits shall be paid or credited to the Partners on their respective Capital Accounts or on any undistributed Profits or funds left on deposit with the Partnership; provided, however, that nothing herein contained shall be construed to prevent or prohibit the payment of interest on account of loans made by any Partner to the Partnership or to any other Partner.  Any loans made to the Partnership by a Partner shall not increase his capital contribution or Percentage Interest in the Profits, Losses or distributions of the Partnership, and shall be repaid in accordance with the terms of this Agreement.

## ARTICLE III
## ALLOCATION OF PROFITS, LOSSES AND DEDUCTIONS
## FOR BOOK AND TAX PURPOSES

Section 3.1      Allocations of Profits and Losses.  Except as otherwise provided in this Article III, Profits and Losses and, to the extent necessary, individual items of income, gain or loss or deduction of the Partnership shall be allocated among the Capital Accounts of the Partners with respect to each Fiscal Year, as of the end of such Fiscal Year, in a manner that as closely as possible gives economic effect to the provisions of Sections 8.1 and 10.3 of the Agreement.

Section 3.2      Tax Allocations.

A.      Except as otherwise provided in this Section 3.2, items of Partnership income, gain, loss and deduction shall be determined in accordance with Code Section 703, and the Partners' distributive shares of such items for purposes of Code Section 702 shall be determined according to their respective shares of Profits or Losses to which such items relate; provided, however, that

Exhibit B-6

96267650.18
96267650.18
96267650.18

if any such allocation for tax purposes is not permitted by the Code or other applicable Law, the Partnership's subsequent income, gains, losses, deductions and credits shall be allocated among the Partners for tax purposes so as to reflect as nearly as possible the allocation set forth in Section 3.1 of this Tax Exhibit in computing their Capital Accounts.

B.      Items of Partnership taxable income, gain, loss and deduction with respect to any Partnership property contributed by a Partner shall be allocated among the Partners in accordance with Code Section 704(c), so as to take account of any variation between the adjusted basis of such property to the Partnership for federal income tax purposes and its Carrying Value. Notwithstanding the allocations of Profits and Losses, if any property contributed to the Partnership has a fair market value (as reasonably and jointly determined by the Advisory Committee and the contributing Partner) that differs from its adjusted basis for federal income tax purposes at the time of such contribution, or if there is a revaluation of or an adjustment to the Carrying Value of any Partnership property such that the book value of such property differs from its adjusted basis for federal income tax purposes, items of income, gain, loss, and deduction with respect to any such property shall be allocated among the Partners so as to take account of such difference, in the manner intended by Section 704(c) of the Code and the Treasury Regulations from time to time promulgated thereunder, using the "traditional" method in accordance with Treasury Regulations Section 1.704-3(b).

C.      Allocations pursuant to this Section 3.2, unless otherwise expressly stated, are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Partner's Capital Account or share of Profits, Losses, distributions or other Partnership items pursuant to any provision of the Agreement of this Tax Exhibit.

D.      If any Partner is treated for income tax purposes as realizing ordinary income because of receipt of its Partnership interest (whether under Section 83 of the Code or any similar provisions of any other applicable Law) and the Partnership is entitled to any offsetting deduction, the Partnership's deduction shall be allocated among the Partners in such manner as to, as nearly as possible, offset such ordinary income realized by such Partner.

Section 3.3      Special Allocations.  The following special allocations shall be made in the following order:

A.      General Limitation.  Notwithstanding anything to the contrary contained in this Article III, no allocation shall be made to a Partner which would cause such Partner to have an Adjusted Capital Account Deficit at the end of any Fiscal Year.  If the limitation contained in the preceding sentence would apply to cause an item of loss or deduction to be unavailable for allocation to all Partners, then such item of loss or deduction shall be allocated between or among those Partners who would not have an Adjusted Capital Account Deficit.  This Section 3.3A is intended to comply with the "alternate test for economic effect" provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

B.      Partnership Minimum Gain.  Except to the extent provided in Treasury Regulations Sections 1.704-2(f)(2), (3), (4) and (5), if there is, for any Fiscal Year of the Partnership, a net decrease in Partnership Minimum Gain, there shall be allocated to each Partner, before any other

Exhibit B-7

allocation pursuant to Article III is made under 704(b) of the Code of Partnership items for such Fiscal Year, items of income and gain for such year (and, if necessary, for subsequent years) equal to such Partner's share of the net decrease in Partnership Minimum Gain. A Partner's share of the net decrease in Partnership Minimum Gain shall be determined in accordance with Treasury Regulations Section 1.704-2(g)(2). Items of income and gain to be allocated pursuant to the foregoing provisions of this Section 3.3B shall consist first of gains recognized from the disposition of items of Partnership property subject to one or more Partnership Nonrecourse Liabilities of the Partnership, and then of a pro rata portion of the other items of Partnership income and gain for that year. This Section 3.3B is intended to comply with the "minimum gain chargeback" requirement of Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

C.     Partner Minimum Gain. Except to the extent provided in Treasury Regulations Section 1.7042(i)(4), if there is, for any Fiscal Year of the Partnership, a net decrease in Partner Nonrecourse Debt Minimum Gain attributable to a Partner Nonrecourse Debt, there shall be allocated to each Partner that has a share of Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt before any other allocation pursuant to Article III hereof (other than an allocation required pursuant to Section 3.3B) is made under 704(b) of the Code of Partnership items for such Fiscal Year, items of income and gain for such year (and, if necessary, for subsequent years) equal to such Partner's share of the net decrease in the Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt. The determination of a Partner's share of the net decrease in Partner Nonrecourse Debt Minimum Gain shall be made in a manner consistent with the principles contained in Treasury Regulations Section 1.704-2(g)(1). The determination of which items of income and gain to be allocated pursuant to the foregoing provisions of this Section 3.3C shall be made in a manner that is consistent with the principles contained in Treasury Regulations Section 1.704-2(f)(6). This Section 3.3C is intended to comply with the "minimum gain chargeback" requirement of Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

D.     Qualified Income Offset. Notwithstanding anything to the contrary in this Tax Exhibit, in the event any Partner unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5), or (6), there shall be specially allocated to such Partner such items of Partnership income and gain, at such times and in such amounts as will eliminate as quickly as possible the Adjusted Capital Account Deficit of such Partner, provided that an allocation pursuant to this Section 3.3D shall be made if and only to the extent that such Partner would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article III had been tentatively made as if this Section 3.3D were not in this Tax Exhibit. This Section 3.3D is intended to comply with the "qualified income offset" requirement of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

E.     Gross Income Allocation. If at the end of any Partnership taxable year, a Partner has an Excess Deficit Capital Account Balance, such Partner shall be specially allocated items of Partnership income or gain in an amount and manner sufficient to eliminate such Excess Deficit Capital Account Balance as quickly as possible; provided that an allocation pursuant to this Section 3.3E shall be made only if and to the extent that such Partner would have an Excess Deficit

Exhibit B-8

Capital Account Balance after all other allocations provided for in this Article III had been tentatively made as if Section 3.3D and this Section 3.3E were not in this Tax Exhibit.

F.    Nonrecourse Deductions.  Nonrecourse Deductions for any Fiscal Year shall be allocated to the Partners pro rata based on their Percentage Interests.

G.    Partner Nonrecourse Deductions.  Notwithstanding anything to the contrary contained in this Article III, any Partner Nonrecourse Deductions that are (in accordance with the principles set forth in Treasury Regulations Section 1.704-2(i)(2)) attributable to Partner Nonrecourse Debt shall be allocated to the Partner that bears the Economic Risk of Loss for such Partner Nonrecourse Debt.  If more than one Partner bears such Economic Risk of Loss, such Partner Nonrecourse Deductions shall be allocated between or among such Partners in accordance with the ratios in which they share such Economic Risk of Loss.  If more than one Partner bears such Economic Risk of Loss for different portions of a Partner Nonrecourse Debt, each such portion shall be treated as a separate Partner Nonrecourse Debt.

H.    Section 754 Adjustment.  To the extent an adjustment to the adjusted tax basis of any Partnership asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such section of the Regulations.

Section 3.4    Partners' Interests in Partnership Profits for Purposes of Section 752.  As permitted by Treasury Regulations Section 1.752-3(a)(3), the Partners hereby specify that solely for purposes of determining their respective shares of excess Partnership Nonrecourse Liabilities of the Partnership, the Partners' respective shares of Partnership profits shall be pro rata based on their Percentage Interests.

Section 3.5    Interpretation.  The foregoing provisions of this Article III are intended to comply with Treasury Regulations Sections 1.704-1(b) and 1.704-2 and shall be interpreted consistently with this intention.  Any terms used in such provisions that are not specifically defined in this Agreement has the meaning, if any, given such terms in the Treasury Regulations cited above.

Section 3.6    Curative Allocations.  If any allocation of gain, income, loss, expense or any other item is made pursuant to Section 3.3 of this Tax Exhibit (the "**Regulatory Allocations**") with respect to one or more Partners, then the Regulatory Allocations shall be taken into account in allocating Profits, Losses and other items of income, gain, loss and deduction among the Partners such that, to the extent possible (taking into account the provisions of the applicable Treasury Regulations ), the net amount of such allocations of Profits, Losses and other items and the Regulatory Allocations to each Partner shall be equal to the net amount that would have been allocated to each such Partner if the Regulatory Allocations had not been made.

Exhibit B-9

Section 3.7    Distributions.    To the extent permitted by Treasury Regulations Section 1.704-2(h)(3), the General Partner shall endeavor to treat distributions as having been made from the proceeds of a Partnership Nonrecourse Liability or a Partner Nonrecourse Debt only to the extent that such distributions would cause or increase an Adjusted Capital Account Deficit for any Partner.

## ARTICLE IV
## CERTAIN TAX AND ACCOUNTING MATTERS

Section 4.1    Accounting Method.    Except as otherwise determined by the Advisory Committee or required by Law, the Partnership shall use the accrual method of accounting for both tax and financial reporting purposes.

Section 4.2    Taxable Year.    Except as otherwise determined by the Advisory Committee or required by Law, the taxable year of the Partnership shall end on the 31st day of December of each year.

Section 4.3    Withholding Taxes, Etc.

A.    The Partnership is hereby authorized and directed by each Partner to withhold from distributions or other amounts payable to such Partner such amount or amounts as shall be required by the Code, the Treasury Regulations and/or applicable provisions of foreign, or U.S. federal, State or local tax Law, and to remit such amount or amounts to the Internal Revenue Service and/or such other applicable foreign or U.S. federal, State or local taxing authority at such time or times as may from time to time be required by the relevant taxing authority; provided that prior to any such withholding the Partnership will use reasonable best efforts to notify any such Partner and will cooperate in good faith with such Partner to reduce or avoid any such withholding.  Any amount so withheld shall be treated for purposes of the Agreement and this Tax Exhibit as a distribution (or other payment, if applicable) by the Partnership to such Partner.  If at any time the amount required to be withheld with respect to any Partner exceeds the amount distributable (or other amount payable) to such Partner at such time, such Partner shall immediately make a cash contribution (or payment) to the Partnership (which contribution or payment shall not constitute a Capital Contribution for purposes of the Agreement) equal to the amount of such excess, which amount, together with any amount actually withheld, shall be remitted by the Partnership to the relevant taxing authority or authorities.

B.    The General Partner is authorized to make, on behalf of the Partnership, any and all tax elections, filings, decisions or determinations with respect to the Partnership.

C.    Any withholdings referred to in this Section 4.3 shall be made at the maximum applicable statutory rate under the applicable tax Law unless the Partnership shall have received an opinion of counsel, or other evidence, satisfactory to the General Partner to the effect that a lower rate is applicable or that no withholding is applicable.

Section 4.4    Code Section 754 Election.    In the event of a distribution of property made in the manner provided in Code Section 734, or in the event of a Transfer of any interest in the

Exhibit B-10

Partnership permitted herein made in the manner provided in Code Section 743, the General Partner, on behalf of the Partnership, shall, upon the written request of the assigning Partner or his transferee, file an election under Code Section 754 in accordance with the procedures set forth in the applicable regulations promulgated thereunder.  At the request of the General Partner, the expense of making such election and the incidental expense, if any, of preparing and filing information and other tax returns in accordance therewith shall be borne by the assigning Partner or his transferee.

Section 4.5    <u>Intended Tax Treatment</u>[8].  The **[Last Out Conversion (as defined in the Bankruptcy Plan)]** is intended to be treated as a contribution pursuant to Section 721(a) of the Code. The **[LP Notes (as defined in the Bankruptcy Plan)]** were intended to be treated as equity for U.S. federal income tax purposes prior to the effective date of the Bankruptcy Plan, and the **[LP Notes Conversion (as defined in the Bankruptcy Plan)]** is intended to be treated as an amendment to the Agreement that is non-taxable for U.S. federal income tax purposes. The **[Preferred Equity Equitization (as defined in the Bankruptcy Plan)]** is intended to be treated as an amendment to the Agreement that is non-taxable for U.S. federal income tax purposes. The accrual of any Class C In-Kind Preferred Return is not intended to give rise to a "guaranteed payment" for U.S. federal income tax purposes. The Partnership will use best efforts (which in no event shall require any change in accounting firm unless approved by the Advisory Committee) file tax returns consistent with intended tax treatment set forth in this <u>Section 4.5</u> unless otherwise required by a change in applicable law. If any such tax return is challenged by an applicable taxing authority, the Partnership Representative will contest such challenge in good faith and shall not settle any such contest without approval by the Advisory Committee with Minority Approval and after consultation with Falcon.

Section 4.6    <u>Redemptions</u>. Except to the extent that the Advisory Committee concludes by Minority Approval that such treatment will adversely affect the Class A Members, the Partnership shall use reasonable best efforts to effect any cash non-pro  rata distributions and redemptions from the Partnership to a Partner via a two-step transaction in which (i) the Partnership distributes equity of BFI with a fair market value equal to such Partner's cash entitlement and (ii) immediately thereafter, the Partnership causes BFI to repurchase the equity of BFI that was distributed in Step (i) from any such Partner for cash. The Partnership shall consult with any such Partner to achieve sale or exchange treatment under Section 302 of the Code with respect to any such repurchase of BFI equity.

---

[8] Defined terms to be conformed with the Plan.

Exhibit B-11

# ARTICLE V
# LIQUIDATING DISTRIBUTIONS; NO DEFICIT FUNDING OBLIGATION

Section 5.1    Liquidating Distributions.  It is intended that the foregoing tax allocation provisions of this Tax Exhibit will produce final Capital Account balances of the Partners that would permit liquidating distributions, if such distributions were made in accordance with such final Capital Account balances (instead of being made in the order of priorities set forth Section 8.1 of the Agreement) to be made (after unpaid loans and interest thereon, including those owed to Partners have been paid) in a manner identical to the order of priorities set forth in Section 8.1 of the Agreement.  To the extent that the foregoing tax allocation provisions of this Tax Exhibit would fail to produce such final Capital Account balances, Profits and Losses (including items of gross income if required to fulfill the intent of this Section 5.1) will be reallocated among the Partners for the Fiscal Year of the liquidation (and, if necessary, prior Fiscal Years) so that the final Capital Account balances of the Partners will be in the correct amounts.  Notwithstanding anything herein to the contrary, in the event the Partnership is liquidated within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g), liquidating distributions shall be made by the end of the taxable year in which the Partnership liquidates or, if later, within ninety (90) days of the date of such liquidation.  Distributions may be made to a trust for the purposes of an orderly liquidation of the Partnership by the trust in accordance with the Act.

Section 5.2    Deficit Capital Accounts.  Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, upon dissolution of the Partnership, the deficit, if any, in the Partner's Capital Accounts, shall not be an asset of the Partnership and the Partners shall not be obligated to contribute such amount to the Partnership to bring the balance of their Capital Accounts to zero.

# ARTICLE VI
# CLOSING OF PARTNERSHIP BOOKS IN CONNECTION WITH ADMISSION
# OF NEW PARTNER OR TRANSFER OF PARTNER'S INTEREST

Upon the effective date (the "**Admission Date**") (i) of the admission of a new Partner into the Partnership (except in connection with the admission of a Partner pursuant to Article 10 of the Agreement), or (ii) of a valid Transfer of all or part of a Partner's interest in the Partnership pursuant to the Agreement, the books of the Partnership shall be closed in accordance with 706(d) of the Code, and consistent therewith: (X) items of income, deduction, gain, loss and/or credit of the Partnership that are recognized prior to the Admission Date shall be allocated among those Persons who were Partners in the Partnership prior to the Admission Date; and (Y) items of income, deduction, gain, loss and/or credit of the Partnership that are recognized after the Admission Date shall be allocated among the Persons who were Partners after the Admission Date.

96267650.18
96267650.18
96267650.18

## ARTICLE VII
## TAX AUDITS

Section 7.1     Tax Audits.

A.     The General Partner (or such other member designated by the Advisory Committee as such from time to time), acting at the direction of the Advisory Committee,  shall be the "tax matters partner" for the Partnership pursuant to Code Sections 6221 through 6231, and the "partnership representative" of the Partnership (collectively, with the tax matters partner, the "**Partnership Representative**"), within the meaning of Code Section 6223(a) (as amended by Title XI of the Bipartisan Budget Act of 2015 (such Title XI, including the corresponding provisions of the Code impacted thereby, and any similar provisions under any other state or local or non-U.S. laws as the same may be amended from time to time, the ("**2015 Act**"))).  The Partnership Representative shall have the right to make on behalf of the Partnership any and all elections and take any and all actions that are available to be made or taken by the Partnership Representative or the Partnership under the 2015 Act (including an election under Code Section 6226, as amended by the 2015 Act and as the same may subsequently be amended), underlined provided, underlined however, the Partnership Representative shall not settle or compromise any tax audit, dispute, controversy, or proceeding in a manner that would have a materially disproportionate adverse effect on a Partner without obtaining the prior written consent of such Partner, which consent shall not be unreasonably withheld, conditioned or delayed.  The Partnership Representative shall keep the Partners informed of any tax proceedings, audits, litigation and similar matters.

B.     In the event the Partnership incurs any liability for taxes, interest or penalties pursuant to the 2015 Act:

(i)     the Partnership may cause the Partners (including any former Partner) to whom such liability relates, as determined by the Advisory Committee, to pay, and each such Partner hereby agrees to pay, such amount to the Partnership, and such amount shall not be treated as a capital contribution;

(ii)     any amount not paid by a Partner (or former Partner) at the time requested by the Advisory Committee shall accrue interest at twelve percent (12%) per annum, compounded quarterly, until paid, and such Partner (or former Partner) shall also be liable to the Partnership for any damages resulting from a delay in making such payment beyond the date such payment is requested by the Advisory Committee, and for this purpose the fact that the Partnership could have paid this amount with other funds shall not be taken into account in determining such damages;

(iii)     without reduction in a Partner's (or former Partner's) obligation under clauses (i) and (ii), any amount paid by the Partnership that is attributable to a Partner (or former Partner), as determined by the Advisory Committee, and that is not paid by such Partner pursuant to clauses (i) and (ii) shall be treated for purposes of this Agreement as a distribution to such Partner (or former Partner).

Exhibit B-13

The obligations of each Partner (or former Partner) under this Section shall survive the transfer by such Partner of its interest in the Partnership and the dissolution of the Partnership.  In the event a Partner transfers an interest in the Partnership, the transferee and transferor shall be jointly and severally liable for any liability with respect to obligations of the transferor Partner under this Section.

## ARTICLE VIII
## INTEREST FOR SERVICES

Section 8.1    Safe Harbor Election.

A.    The Partnership is authorized and directed to elect the safe harbor described in Internal Revenue Service Notice 2005-43, I.R.B. 2005-24 (June 13, 2005), or as otherwise described in a subsequent Revenue Procedure or proposed regulations implementing the concepts articulated in Notice 2005-43 (together referred to as "Notice 2005-43") (the safe harbor election referred to herein as the "Safe Harbor Election"), and the Partnership and each of its undersigned current and future Partners (including any Person to whom a Partnership Interest is transferred in connection with the performance of services) agrees to comply with all requirements of the Safe Harbor Election described in Notice 2005-43 with respect to all Partnership Interests transferred in connection with the performance of services while the election remains effective.  If a Partner that is bound by these provisions transfers a Partnership Interest to another Person, the Person to whom the Partnership Interest is transferred must assume the transferring Partner's obligations under this Agreement.

B.    In order to make the Safe Harbor Election authorized hereby, the Partnership must prepare a document, executed by the Tax Matters Partner, stating that the Tax Matters Partner is electing, on behalf of the Partnership and each of its Partners, to have the Safe Harbor Election described in Notice 2005-43 apply irrevocably with respect to all Partnership interests transferred in connection with the performance of services while the Safe Harbor Election remains in effect. The Safe Harbor Election must specify the effective date of the Safe Harbor Election, and the effective date for the Safe Harbor Election may not be prior to the date that the Safe Harbor Election is executed.  The Safe Harbor Election must be attached to the tax return for the Partnership for the taxable year that includes the effective date of the Safe Harbor Election.

C.    All Partners shall comply with the requirements of the Safe Harbor Election and report consistently on their tax returns in accordance therewith.  In the event that a Safe Harbor Election is terminated automatically as a result of Partner or service provider reporting income tax effects of a Safe Harbor Partnership Interest (as defined in Notice 2005-43) in a manner inconsistent with the requirements of Notice 2005-43, including a failure to provide appropriate information returns, such Partner or service provider shall indemnify and hold harmless the Partnership and every other Partner from any and all income or tax consequences occasioned thereby, including any additional costs associated therewith, and shall directly bear any and all expenses associated with seeking relief from such termination.

D.    Upon satisfying the requirements under Notice 2005-43 for termination of a Safe Harbor Election, the Tax Matters Partner may affirmatively terminate a Safe Harbor Election by preparing a document, duly executed by the Tax Matters Partner, indicating that the Tax Matters Partner, on behalf of the Partnership and each of its Partners, is revoking its Safe Harbor Election under Notice 2005-43 and the effective date of the revocation, provided that the effective date may not be prior to the date the election to terminate is executed.  Such termination election must be attached to the tax return for the Partnership for the taxable year that includes the effective date of the election.

# ARTICLE IX
# TAX COVENANTS

Section 9.1    Tax Covenants.

A.    The Partnership shall use its reasonable best efforts not to generate unrelated business taxable income within the meaning of Section 512 of the Code (including income treated as unrelated business taxable income by reason of Section 514 of the Code) ("**UBTI**").

B.    The Partnership shall use its reasonable best efforts (i) not to generate income that is effectively connected with the conduct of a trade or business in the United States, within the meaning of Section 871(b) or Section 882(a)(1) of the Code ("**ECI**") and (ii) not to be engaged in the conduct of a trade or business in the United States for such purpose.

C.    The Partnership shall use its reasonable best efforts (i) not to generate income from the conduct of commercial activities, within the meaning of Section 892 of the Code ("**CAI**") and (ii) not to be engaged in the conduct commercial activities, within the meaning of Section 892 of the Code for such purpose.

Exhibit B-15

96267650.18
96267650.18
96267650.18

# EXHIBIT C

## List of Officers and Directors

| Name | Title |
|------|-------|
| John MacDonald | Chairman/Founder Representative |
| Jay Foreman | Chief Executive Officer/Founder Representative |
| Craig Leaf | President |
| Steve Littman | Chief Operating Officer/Founder Representative |
| Frank McMahon | Chief Financial Officer, Secretary and Treasurer |
| Berj Garabedian | Falcon Representative |
| | Falcon Representative |
| | Independent Representative |
| | Founder Representative |

Exhibit C-1

**EXHIBIT D**

**<u>Toy Categories</u>**

Exhibit D-1

96267650.18
96267650.18
96267650.18

**Exhibit 5**

Certificate of Amendment of Certificate of Incorporation for Basic Fun, Inc.

**STATE OF DELAWARE**
**CERTIFICATE OF AMENDMENT**
**OF CERTIFICATE OF INCORPORATION**
**FOR BASIC FUN, INC.**

The corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware does hereby certify:

**FIRST:** Pursuant to Section 141(f) of the General Corporation Law of the State of Delaware, in lieu of a meeting and by unanimous written consent, the Board of Directors of Basic Fun, Inc. adopted resolutions setting forth a proposed amendment of the Certificate of Incorporation of said corporation, declaring said amendment to be advisable and calling a meeting of the stockholders of said corporation for consideration thereof. The resolution setting forth the proposed amendment is as follows:

**RESOLVED,** that the Certificate of Incorporation of this corporation be amended by changing the Article thereof numbered "ARTICLE THIRD" so that, as amended, said Article shall be and read as follows:

"The nature of the business or purposes to be conducted or promoted is to engage in any lawful act or activity for which corporations may be organized under the General Corporate Law of the State of Delaware.  Notwithstanding the foregoing, the Corporation shall have no authority or power to, and shall not, directly or indirectly, undertake any action or enter into any agreement that would require Minority Approval (as defined in the Limited Partnership Agreement of Basic Fun, L.P. dated [___] (the "Limited Partnership Agreement")) under the Limited Partnership Agreement or the prior written approval of Falcon (as defined in the Limited Partnership Agreement) under Section 3.2 of the Limited Partnership Agreement, in each case, to be undertaken by the Partnership or any Subsidiary (each as defined in the Limited Partnership Agreement) without first obtaining such Minority Approval or approval of Falcon, respectively."

**SECOND:** That thereafter, pursuant to resolution of its Board of Directors and Section 228 of the General Corporation Law of the State of Delaware, in lieu of a special meeting and by unanimous written consent, the majority of the stockholders voted in favor of the amendment.

**THIRD:** That said amendment was duly adopted in accordance with the provisions of Sections 142, 228 and 242 of the General Corporation Law of the State of Delaware.

**IN WITNESS WHEREOF,** said corporation has caused this certificate to be signed this ___ day of _____, 2024.

By: */s/* Jay Foreman

Title: President

Name: Jay Foreman